**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| MILLER UK LTD., a United Kingdom private limited company, and MILLER INTERNATIONAL LTD., a Gibraltar private limited company, )<br>)<br>)<br>)<br>) |  |
| Plaintiffs, ) | Civil Action No. 10-cv-3770 |
| )<br>) |  |
| v. ) |  |
| )<br>CATERPILLAR, Inc., a Delaware corporation, )<br>) |  |
| )<br>Defendant. ) | **JURY TRIAL DEMANDED** |

_____ )

## COMPLAINT

Plaintiffs Miller UK Ltd. and Miller International Ltd. ("Miller" or "Plaintiffs"), by and through their attorneys, for their Complaint against Defendant Caterpillar, Inc. ("CAT" or "Defendant") allege and state as follows:

## NATURE OF ACTION

1.      This action arises under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* and under the common law of the State of Illinois.

## THE PARTIES

2.      Plaintiff Miller UK Ltd. is a privately-held corporation organized and existing under the laws of the United Kingdom, having its principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England.  Plaintiff Miller International Ltd. is a privately-held corporation organized and existing under the laws of

Gibraltar, having its principal place of business at 57/63 Line Wall Road, PO Box 199, Gibraltar. Plaintiff Miller is a leading engineering company in the design and manufacture of a range of buckets, quick couplers and other attachments used with earthmoving equipment.

3.        On information and belief, Defendant CAT is a publicly-traded corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 100 North East Adams Street, Peoria, Illinois 61629, United States of America.

## JURISDICTION AND VENUE

4.        This is an action for the threatened or actual misappropriation of trade secrets, breach of contract, unjust enrichment, and fraudulent inducement. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There exists diversity of citizenship between the parties, as Plaintiff Miller UK Ltd. is a citizen of the United Kingdom, Plaintiff Miller International Ltd. is a citizen of Gibraltar, and Defendant is a citizen of Illinois and of Delaware, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

5.        This Court has personal jurisdiction over Defendant. Defendant is qualified to do business in the State of Illinois. Defendant also has a regular and established place of business in Illinois, and is and has been doing business in Illinois and this District at all times relevant hereto.

6.        Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), and 1400(b).

## GENERAL ALLEGATIONS

7.        Miller is a leading international engineering company involved in all aspects of the design and manufacture of quick couplers, buckets and other attachments used worldwide with earthmoving equipment.

8.     CAT is an Original Equipment Manufacturer ("OEM") of equipment used in the earthmoving industry.

9.     As detailed below, this case presents the quintessential theft of trade secrets and breach of a contractual and confidential relationship between a supplier and its customer spanning almost two decades.  Using its leverage as Miller's largest customer, CAT engaged in a scheme to systematically, and through the auspices of the parties' contractual relationship, gain access to Miller's proprietary information and trade secrets, with the intent of misappropriating that information and those trade secrets to produce its own products without having to engineer them from scratch and no longer have to purchase them from Miller.  Put differently, CAT sought to deprive Miller of the return on Miller's substantial investment in the development of its products and to avoid the expense and effort that would have been required had CAT fairly and honestly developed its own products.  Unfortunately, CAT largely succeeded in this scheme, which has made the present litigation necessary.

## Miller's Pioneering Inventions

10.     Since the 1980s, Miller has been involved in the research and development of a range of proprietary quick couplers, buckets and other attachments for the earthmoving industries worldwide.  Today, Miller is recognized as the world leader in all aspects of design and manufacture of quick couplers, buckets and attachment designs.

11.     Miller's proprietary and confidential technologies include, but are not limited to: proprietary and confidential market research data; proprietary and confidential testing results and data; proprietary and confidential technical specifications and blueprints, including but not limited to proprietary and confidential piece-part drawings; proprietary and confidential manufacturing techniques, including but not limited to equipment selection, equipment organization, technician

3

instruction and training (including instructional and training materials); confidential and proprietary strategic design and manufacturing protocols, including but not limited to multi-jurisdictional safety compliance protocols; confidential and proprietary intellectual property valuations, including but not limited to projected profits and margins; and proprietary, unique, and confidential combinations and compilations of the above information (hereinafter referred to in the aggregate as "Miller's proprietary trade secrets and confidential information").

12.     Miller's proprietary trade secrets and confidential information are not generally known in the trade, and Miller derives economic value and competitive advantage in the marketplace from the secrecy of such information.  Indeed, Miller's proprietary trade secrets and confidential information are Miller's lifeblood as a technology leader whose market position depends upon its innovations.

13.     Miller has invested millions of dollars, many times over, researching and developing its proprietary trade secrets and confidential information.

14.     At all times relevant hereto, Miller has used reasonable measures to protect the secrecy of its proprietary trade secrets and confidential information, including but not limited to: restricted access on a need-to-know basis; global confidentiality policies; contractual confidentiality restrictions; security key cards; password protected computer and network platforms; and a wide array of additional physical security and monitoring measures.

15.     Miller owns various United States Patents covering aspects of its innovations, including U.S. Patent Nos. 6,422,805, 6,481,124, 6,625,909 and 6,922,926, and U.S. Design Patent Nos. D440,983, D469,786, D565,062 and D610,592.

### The Miller "Bug" Coupler

16.     In or about 1998, Miller designed the "Bug" coupler, the world's first-ever, fully

4

automatic, universal quick coupler.  The Bug coupler's design uniquely permitted hydraulic operation from the cab with an automatic mechanical safety device, which negated the need for a manual safety pin.  The Bug's design advantageously provided universal compatibility with the world's best known machine manufacturers and the original Bug Coupler design is pictured below in Figure 1.



**Figure 1.**

17.    Miller's history, however, begins far before its introduction of the Bug coupler. Miller was founded in 1978 as Miller Welding Engineers Ltd., focusing on the repair of earthmoving buckets for the quarry, mining, construction, and associated industries.

18.    Over the course of time, gaining expertise in the repair of these buckets, Miller recognized the bucket changeover procedure lacked efficiency, taking one to two hours, and was rife with risk for the machine operators who had to manually execute the changeover, including the risk of serious injury.

19.     By 1989, Miller's innovative engineering and manufacturing expertise resulted in the design and manufacture of the pin grabber quick coupler.  Miller marketed this pin grabber coupler as the "Mag 7."  The Mag 7 reduced the long and often dangerous attachment changeover procedure to a speedy, simple, and safe process.  In fact, the one to two hour changeover process was reduced to a mere <u>seven</u> seconds, hence its name.

20.     But commercial success of the Mag 7 was not as quick, though it did come eventually.  Miller invested hundreds of hours and hundreds of thousands of dollars in the promotion of its technology, literally creating the market for the quick coupler from the ground up.

21.     Once the quick coupler caught on, it quickly became the market standard—no operator could justify the hours lost in productivity and the risk of harm with the quick coupler available.  Major OEMs worldwide, including CAT, turned to Miller for specifically-designed quick couplers to fit their machines.

22.     Because the interface between machine and attachment is not standardized amongst the various machines and attachments produced by the OEMs, Miller designed and manufactured a custom quick coupler for each OEM.  As a result of its unique market position with the world's major OEMs, Miller was able to compile testing and other technical information regarding the various interface configurations employed by the OEMs.  Investing thousands of hours and millions of dollars, Miller synthesized and utilized its compiled information to research and develop significant innovations and optimizations to the quick coupler to become the universal coupler it is today.

23.     In 1998, Miller launched the fully automatic Bug coupler, yet another market-first.  While the Mag 7 was custom-designed for both a specific machine and its attachments (e.g.

a Mag 7 designed for a CAT machine will only work with attachments that are also manufactured for that specific Cat machine), the Bug coupler is the first quick coupler to be universally compatible with most attachments, regardless of the OEM for which they were built. In other words, the Bug coupler is designed to fit a specific OEM machine while still capable of working with a range of attachments from different OEMs. Additionally, the Bug coupler is the first quick coupler to allow an operator to perform a changeover procedure <u>solely</u> from the machine's cab and to be able to use their work tools on job sites in a variety of applications, making this product very popular and versatile.

### CAT's Access To And Knowledge Of Miller's Coupler Technology And Trade Secrets

24.     In or about 1998, Miller and CAT, expanding their relationship, began discussing the manufacture and sale of both Miller's proprietary couplers to CAT. As part of the negotiations, CAT requested access to Miller's proprietary and confidential information, including Miller's proprietary trade secrets and confidential information, regarding the design and manufacture of Miller's couplers.

25.     On September 25, 1998, Miller entered into its first Proprietary Agreement with CAT in order to preserve the confidential and secret status of Miller's coupler technology. The Proprietary Agreement obligated CAT to treat as proprietary any information provided by Miller to CAT pursuant to the agreement.

26.     Then, on March 31, 1999, Miller and CAT entered into the subsequent Supply Agreement, drafted by CAT, in connection with CAT's purchase of couplers designed and manufactured by Miller. The Supply Agreement obligated Miller to provide its proprietary trade secret and confidential information to CAT as a condition of CAT's purchase of couplers designed and manufactured by Miller. The Supply Agreement reads in part:

All products and Parts shall be manufactured by Miller in accordance with drawings, prints, specifications and other technical data provided to and approved by Caterpillar. Miller shall provide to Caterpillar copies of such drawings, prints, specifications and other technical data in either IGES or Pro-E format and shall ensure that Caterpillar receive the most current of all such documents at all times. Such documents shall include all dimensions, tolerances and technical assembly information necessary for the production of Caterpillar support material. Any design changes to the Products and Parts by Miller shall only be made ninety days (90) after receiving written approval from Caterpillar. Miller agrees to use the electronic file transfer method as preferred by Caterpillar to communicate any such proposed changes.

27. The Supply Agreement obligated CAT to maintain as confidential any proprietary trade secret and confidential information provided by Miller. The Supply Agreement reads in part:

17. Confidential Information

(a) In order to accomplish the purposes of this Agreement, it is expected that each party will disclose Proprietary Information including technical and business information, to the other; but the transfer of Proprietary Information shall not be considered publication of such information. A party may use the Proprietary Information of the other party only for the purposes of this Agreement, and shall not disclose such Proprietary Information to any third party except pursuant to this Agreement or with the consent in writing of the other party. For the purposes of this Agreement, "Proprietary Information" shall include all confidential information and know-how, business, technical, or otherwise disclosed by a party to the other, but shall not include the information or know-how which is (i) available to the public or later becomes available to the public through no act or omission of the recipient party, or (ii) rightfully disclosed to the recipient by person or entity not party to this Agreement.

(b) Notwithstanding the above provision, each party may use and disclose to persons who are not parties to this Agreement such portions of Proprietary Information of the other party as may be reasonably necessary and appropriate to carry out the provisions of this Agreement when the person to whom such information is

disclosed has entered into an agreement with the disclosing party in form satisfactory to the other party, requiring it to assume the same obligations toward such other party, as well as toward the disclosing party, as are set forth in section to safeguard such other party's knowledge and information

(c) All drawings, prints, specifications, records, manuals, notebooks, computer programs and other similar or dissimilar materials supplied by one party to the other in connection with this Agreement and all copies thereof, shall remain the property of the supplying party and to the extent it will not interfere with the performance of this Agreement, upon request by supplying party shall be returned to the supplying party, or destroyed, by the receiving party.

28.     Over the next several years, Miller provided CAT with its proprietary trade secrets and confidential information related to the design, manufacture, and testing of Miller's proprietary coupler technology pursuant to the Supply Agreement.  Indeed, Miller provided CAT, at its request, with various Miller proprietary trade secrets and confidential information in the form of physical and electronic documents, drawings (e.g., piece-part and CAD drawings), photographs, schematics, reports, prototypes, access to Miller's manufacturing facilities, and access to Miller's engineers.

29.     For example, Miller provided CAT with proprietary information relating to its coupler technology in response to a request for such information by Warren Tarr, a CAT employee, during a telephone conference on January 14, 1998.

30.     Then, in late 2001, Paolo Fellin of CAT raised concerns regarding continuity of supply.  To address these concerns, Miller and CAT began discussions regarding CAT's licensing of Miller's technology for CAT's own production with Miller providing detailed technical information.

31.     In the summer of 2002, several CAT employees, including Paolo Fellin and Max Martin, visited Miller's design and manufacturing facilities in Newcastle and viewed demonstrations of Miller's couplers.  By the end of that summer, business between the two companies was increasing and as a result, CAT became the largest customer of Miller.

32.     In the summer of 2003, with CAT now the largest customer of Miller, Max Martin of CAT again raised concerns about continuity of supply.  Miller and CAT began negotiating an option for CAT to purchase Miller's intellectual property rights and a right of first refusal should Miller ever decide to sell the company.  Under strict conditions of confidentiality, Miller provided CAT detailed calculations regarding forecasted profits, margins, and valuation of Miller's intellectual property rights, including the valuations of the Miller trade secrets and confidential information.  In connection with these negotiations and the exchange of this detailed confidential and proprietary information, Miller provided a draft Addendum to the March 31, 1999 Supply Agreement was to CAT that addressed these concerns as well as other issues. Though the parties corresponded over many months and exchanged multiple drafts, the Addendum Agreement never was executed, and Miller continued providing couplers to CAT under the Supply Agreement.

33.     In February of 2005, Miller and CAT again met to discuss their relationship and the upcoming CONEXPO Conference, at which Miller and CAT would jointly present the Miller couplers.  Once more, Miller, under strict confidentiality, provided a variety of detailed technical information including the Miller trade secrets and confidential information, specifically part listings, installation procedures, and piece-part drawings.

34.     After CONEXPO in March of 2005, Miller began to hear rumors that CAT was designing a coupler of its own, but CAT denied the truth of these rumors.

35.     Yet CAT's requests for more detailed technical information regarding the Miller couplers, which Miller was obligated to provide under the Supply Agreement, began coming faster and faster, first in March, then in June of 2005, always under the guise of "testing" and "market research."

36.     Previously, with CAT's promises and representations that its business was not only stable, but that its requirements would increase substantially, Miller began making investments in expansion, all the while inquiring as to CAT's future plans and requirements.  In June of 2006, with expansion under way but before making substantial new investments, Miller again confirmed its continuing relationship with its largest customer, CAT.  Bob Meng of CAT confirmed that Miller would continue to be CAT's exclusive supplier of couplers and encouraged Miller's expansion.  Based on this confirmation, Miller began preparations to expand further its manufacturing facilities to China, where Miller could manufacture couplers by casting.

37.     Of course, not long thereafter in December of 2006, CAT also demanded that Miller provide its detailed technical information regarding the set-up of its new casting facility in China, which Miller has invested millions of dollars in developing.

38.     In 2007, Bob Meng and other CAT employees visited Miller's China facility in person.

39.     Recently, CAT has sought to initiate an independent relationship with Miller's partners in its China facility, which, on information and belief, is based upon the Miller trade secrets and confidential information CAT received regarding this facility.

40.     In or around the same time of Bob Meng's visit to Miller's China facility in 2007, CAT, without Miller's knowledge, filed applications with the U.S. Patent and Trademark Office for patents relating to coupler technology.

41.     Then, in June of 2008, much to Miller's surprise, Bob Meng of CAT informed Miller that CAT had developed its own coupler technology and would be phasing out its purchases of the Miller Bug Coupler.

42.     In 2009, Keith Miller met with James L. Tevebaugh, who replaced Bob Meng as the Manager of Caterpillar Work Tools, to try to persuade Mr. Tevebaugh to reconsider CAT's decision to phase out purchases of Miller's couplers in favor of a new coupler that CAT derived from Miller's proprietary trade secrets and confidential information.  Those pleas went unheeded as CAT launched its new Center Lock Pin Grabber Coupler that same year.

43.     Over the course of their relationship, dozens of CAT employees, including but not limited to the following, were exposed to Miller's proprietary Miller trade secrets and confidential information, at CAT's request and subject to the Supply Agreement and other guarantees of confidentiality:  Jim Owens, Paulo Fellin, Bob Meng, Frank Dennis, John Walker, Max Martin, Charlie Delph, Anker Henningsen, Fred Grafton, Dave Koch, Keith Heideman, Rick Oswald, Alan Switzer, Doug Bye, Ron Kropollopski, Gary Zoromski, Dave Mohr, Greg Salistead, Greg Lobica, Gary Woeman, Phil Richards, Pierre Wasserman, Donald Houge, Glen Johnson, Dan Kennedy, Warren Tarr, Roy Hatfield, Mark Moser, Delaine Bonner, Ramon Mosqueda, Joe Milke, Jon Lecocq, Eric Schultz, Craig Willoughby, Dick Smalley, Doyle Long, Greg Ferkol, Jim Nickels, Farzin Khorasanizaden, Eric Tu, Robin Mu, Michael Lebrun, Kriste Armstrong, Teresa Patterson, Jeremy Davis, Blair Maust, Caroline Pickens, Anu Reddy, Jon Council, Dave Edmunds, and many others.

44.     On information and belief, CAT used the Miller trade secrets and confidential information, which it repeatedly sought and which Miller was required to produce under the

Supply Agreement, to produce what is now marketed as the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

45.     Furthermore, under the terms of the Supply Agreement, Miller also provided CAT with proprietary instructions and other types of manuals related to the operation of the Miller Bug Coupler, as demonstrated in Exhibit A, for use in marketing and selling the re-branded Miller Bug Coupler in June of 1999.  Even after discontinuing purchase of the Miller Bug Coupler, CAT continued to use those proprietary instructions and manuals without Miller's permission or authorization in the marketing and sale of the Caterpillar Center-Lock Pin-Grabber Quick Coupler in breach of the Supply Agreement, as demonstrated in Exhibit B, dated March 2009 and including the identical drawings to those provided to CAT by Miller.  On information and belief, CAT continues to use and distribute Miller's proprietary instructions and manuals.

**The Miller Scoop Bucket**

46.     While a machine equipped with a quick coupler provided significant advantages such as, for example, reduced changeover time, improved attachment versatility, and enhanced safety, Miller recognized that these advantages came at the expense of machine performance. Specifically, Miller recognized that machines utilizing a quick coupler experienced less breakout force due to the increased distance, introduced by the quick coupler, from the dipper arm of the machine to the tip of a conventional bucket.

47.     After significant research and development, Miller engineered a new bucket, the Miller Scoop, designed specifically for operation with quick couplers, which addressed and overcame the disadvantages of conventional buckets and is pictured below in Figure 2 and Figure 3.  The revolutionary Miller Scoop bucket was the first bucket design to include

13

integrated bucket pins, reducing the distance from the dipper arm of the machine to the tip of the bucket and minimizing the loss in breakout force that occurs when a quick coupler is installed.



**Figure 2.**                    **Figure 3.**

48.     The Miller Scoop bucket also includes an additional innovation of a triple radius profile, which enables the bucket to cut through the ground more effectively with minimal resistance and drag, and provides a self-fill action that increases load volume.  Miller patented this second innovative aspect of the Miller Scoop bucket.

49.     Both the integrated bucket pins innovation and the triple radius profile innovation increased performance, productivity, efficiency and profitability of the machine.

50.     In or about 1998, Miller sought to further expand its business relationship with CAT by advising CAT of its innovations in bucket technology as CAT did not then have a bucket that included the integrated pin innovation or the triple radius innovation.  Miller agreed to provide CAT with access to Miller's proprietary and confidential Scoop bucket technologies and innovations based on verbal agreements and understandings that CAT would purchase buckets incorporating the Miller Scoop technologies or CAT would compensate Miller if CAT manufactured products based on the technologies of the Miller Scoop bucket.

51.     Over the next several years, CAT repeatedly requested and Miller provided substantial proprietary and confidential information in connection with Miller's Scoop bucket

technologies purportedly for purposes of evaluating the commercial viability of the Miller Scoop bucket technologies.

52.     During this time, CAT and Miller continued to negotiate CAT's compensation of Miller for any commercialization of the proprietary and confidential Miller Scoop bucket technologies.  At a meeting between Paolo Fellin of CAT and Miller on August 8, 2002, CAT orally agreed to an exclusive license of Miller's Scoop technology, as confirmed by CAT's lack of objection to the meeting minutes and outline of terms sent to CAT by Miller.

53.     Based on the prior negotiations and on the oral agreement of August 8, 2002, Miller continued to provide CAT with substantial access, demanded by CAT, to Miller's proprietary and confidential information related to the Scoop bucket technologies, including technical drawings, specifications, market analyses, prototypes, and testing data in connection with the innovations of the Miller Scoop bucket.

54.     On or about September 4, 2002, Miller conducted comparative testing of a highly confidential, proprietary prototype Miller Scoop bucket and various buckets provided by CAT. Significantly, one of the test buckets provided by CAT was a modified version of CAT's conventional Power Bucket.  Essentially, CAT modified its conventional Power Bucket to incorporate Miller's integrated pin innovation of the Scoop bucket, reducing the distance from the drive arm of the machine to the bucket tip.

55.     CAT delayed signing a formal written license agreement with Miller despite having agreed to terms at the August 8, 2002 meeting.  And, in or about early 2004, CAT informed Miller that CAT would not pursue the Miller Scoop bucket because CAT did not want to displace sales of its own profitable and proprietary bucket products.

56.     Yet later in 2004, upon learning that Miller had further improved the design of its Scoop bucket, CAT again requested that Miller provide substantial proprietary and confidential technical information and testing data in connection with the improvements to Miller's design.

57.     Based upon CAT's promises that CAT would genuinely consider commercialization of the improved Scoop bucket with due compensation to Miller as previously negotiated, Miller acquiesced to CAT's repeated demands for its proprietary and confidential information.

58.     Investing thousands of hours and hundreds of thousands of dollars, Miller continued to research, design and test the Scoop bucket technologies at the request of CAT.  For example, Miller obtained additional comparative testing of Scoop buckets by independent third parties, market surveys and market analysis to demonstrate the commercial viability of the Miller Scoop bucket to CAT.

59.     However, unbeknownst to Miller, CAT had for some time been planning to commercialize the confidential and proprietary integrated pin innovation of the Scoop bucket without compensating Miller.  Indeed, on or about July 6, 2005, CAT filed a patent application, without Miller's knowledge, in the United States Patent and Trademark Office on a bucket design, which includes as part of the claimed invention the integrated pin innovation of the Miller Scoop bucket.  Significantly, two of the named inventors on the CAT patent application were CAT employees, Douglas Bye and Jeff Kurtz, that had extensive access to technical information provided by Miller and were heavily involved in the field testing of Miller's Scoop buckets.  Despite the fact that the integrated pin design was Miller's innovation, the claim of CAT's design patent incorporates this feature as part of a design that CAT claims to have

16

invented. The patent application was not published or otherwise publicly available until January of 2009.

60.     Meanwhile, CAT continued to encourage Miller to provide additional proprietary and confidential information relating to Miller's continued research, development, testing and improvements to its Scoop bucket designs.

61.     For example, on or about October 12, 2005, CAT conducted additional tests on yet another improvement to Miller's Scoop bucket technology. Again, Douglas Bye was involved in testing Miller's Scoop bucket technology.

62.     In the summer of 2006, Miller first learned from CAT that it had decided to manufacture its own bucket product, which would incorporate the integrated pin innovation of the Miller Scoop bucket, but that CAT would not compensate Miller. Bob Meng of CAT explained that CAT would not compensate Miller because there was no contract despite the extensive proprietary and confidential information that Miller provided to CAT over the previous eight years.

63.     The CAT bucket, which incorporated the integrated pin innovation was officially launched at Conexpo 2008.

## COUNT ONE
## BREACH OF CONTRACT

64.     Miller repeats and realleges the averments of paragraphs 1-63 as if fully set forth herein.

65.     The Supply Agreement is a valid and enforceable contract.

66.     By using the Miller proprietary trade secrets and confidential information in the manufacture and sale of CAT's quick couplers, specifically the CAT Center-Lock Pin Grabber Quick Coupler, Defendant CAT has breached the Supply Agreement, specifically Article 17,

which restricts CAT's use of the Miller Proprietary Information "solely for the purposes of this Agreement."

67.     Additionally, by using the materials specified in paragraph 11 above, CAT has breached Article 17 of the Supply Agreement which vests ownership of all the materials specified in paragraph 11 in Miller.

68.     Miller has performed all of its obligations pursuant to the Supply Agreement.

69.     As a direct result of Defendant CAT's violation of its obligations under the Supply Agreement, Miller has sustained and will continue to sustain damages in an amount to be determined at trial.

**COUNT TWO**

**THREATENED OR ACTUAL**

**MISAPPROPRIATION OF TRADE SECRETS**

70.     Miller repeats and realleges the averments of paragraphs 1-45 as if fully set forth herein.

71.     Miller's proprietary Miller trade secrets and confidential information, set forth individually and collectively in paragraph 11, *supra*, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

72.     At all times, Miller has taken reasonable measures to protect its proprietary trade secrets and confidential information and Miller derives economic value and competitive advantage from such information not being generally known to the public or trade.

73.     On information and belief, there exists the threatened or actual misappropriation of trade secrets by CAT to acquire, disclose and/or use, by improper means, Miller's proprietary trade secrets and confidential information for its own benefit and/or the benefit of others without Miller's authorization and consent.

18

74.     CAT knows or had reason to know that it acquired Miller's proprietary trade secrets and confidential information under circumstances giving rise to a duty to maintain the secrecy, or limit the use of, such information, and/or that such information was obtained or derived from others who owe a duty to Miller to maintain the confidentiality of such information.

75.     On information and belief, Miller has suffered or will suffer damages, and CAT has or will be unjustly enriched in an amount to be proven at trial, as a direct result of CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information.

76.     CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information has been willful and malicious and entitles Miller to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

77.     Miller also is entitled to injunctive relief to prevent the threatened or actual misappropriation of its proprietary Miller trade secrets and confidential information by CAT pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

## COUNT THREE
## FRAUDULENT INDUCEMENT

78.     Miller repeats and realleges the averments of paragraphs 1-10, 15-63 as if fully set forth herein.

79.     On or before June 9, 2008, unbeknownst to Miller, CAT began to develop the Caterpillar Center-Lock Pin-Grabber Quick Coupler with, on information and belief, the goal of ending its purchases of the Miller Bug Coupler.

80.     CAT, through its employee Bob Meng, affirmatively represented to Miller that CAT (a) was not developing any coupler itself and (b) that CAT required Miller's services in the future.

81.     CAT made such affirmative statements to Miller with the intent to induce Miller to continue to provide the Miller Bug Coupler to CAT until CAT could complete the development and establish manufacturing of its own coupler, from which CAT has derived and continues to derive substantial revenue and other benefits.

82.     On information and belief, CAT also, through various of its employees, affirmatively began soliciting Miller's trade secrets and confidential information regarding the Scoop Bucket with the intent to induce Miller to provide CAT with its trade secrets and confidential information not so that CAT could purchase the Scoop Bucket, but so that CAT could complete the development of its own bucket, from which CAT has derived and continues to derive substantial revenue and other benefits.

83.     In reliance on either CAT's materially false affirmative statements, Miller made substantial investments in expanding its facilities to meet CAT's future requirements and also provided it valuable trade secrets and confidential information relating to the Scoop Bucket.

84.     Miller has been damaged by these false, deceptive, and misleading statements. Miller has been damaged in millions of dollars, plus interest, fees and costs, through the investment in the development of the UK and China manufacturing facilities that it otherwise would not have made. Miller also has been damaged in millions of dollars, plus interest, fees and costs, through the provision of its trade secrets and confidential information relating to the Scoop Bucket that it otherwise would not have made.

## COUNT FOUR
## UNJUST ENRICHMENT

85.     Miller repeats and realleges the averments of paragraphs 1-10, 15-63 as if fully set forth herein.

86.     The agreements entered into by the parties do not exclude the right to seek to recover based upon a claim of unjust enrichment.

87.     CAT has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information supplied to it by Miller related to Miller's Scoop Bucket.

88.     CAT also has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information, supplied to it by Miller, outside the terms of the Supply Agreement in developing, manufacturing, and selling the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

89.     Accordingly, Miller is entitled to damages in the amount by which CAT has been unjustly enriched at the expense of Miller.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Miller respectfully requests that this Court enter judgment against CAT, including:

a.     a finding that CAT's acts and conduct constitutes misappropriation of trade secrets in violation of 765 ILCS 1065/1, *et seq.*, and that such acts and conduct have been willful and malicious;

b.     both a preliminary and permanent injunction pursuant to 765 ILCS 1065/1, *et seq.* restraining and enjoining CAT, its officers, directors, employees, agents, and all those in privity,

concert or participation with it from the threatened or actual misappropriation of Miller's proprietary Miller trade secrets and confidential information;

      c.      an order directing CAT to file with this Court and to serve upon Plaintiffs within thirty (30) days after service of the injunction issued in this action, a report in writing and under oath setting forth in detail the manner and form in which CAT have complied with the injunction;

      d.      an order requiring CAT to collect and deliver to Plaintiffs any and all documents, drawings, schematics, notebooks, binders and the like concerning or relating to Plaintiffs' Bug Coupler and/or Scoop Bucket;

      e.      compensatory damages sustained as a result of CAT's wrongful actions under 765 ILCS 1065/1, *et seq.*, and other applicable law, together with an accounting of CAT's profits arising from such actions, and that this Court exercise its discretion and enter a judgment for increased damages sustained as a result of CAT's willful, malicious, and wrongful actions under 765 ILCS 1065/1, *et seq.* and other applicable law, as well as punitive damages and such additional sums as this Court shall find to be just, according to the egregious nature of CAT's wrongful actions;

      f.      an award of the attorneys' fees and costs and other expenses, including pre-judgment and post-judgment interest, that Plaintiffs have been forced to incur pursuant to 765 ILCS 1065/1, *et seq.*, and other applicable law;

      g.      such further relief as this Court may deem just and proper, in law or equity.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38(b), Miller respectfully demands a trial by jury of all issues triable by a jury in its Complaint.

*      *      *

Date:   June 17, 2010                      Respectfully submitted,


  /s/ R. Mark Halligan
_____

R. Mark Halligan (IL 6200723)
rmhalligan@nixonpeabody.com
Deanna R. Swits (IL 6287513)
dswits@nixonpeabody.com
Jason S. Kray (IL 6293170)
jkray@nixonpeabody.com

**NIXON PEABODY LLP**
300 South Riverside Plaza, 16th Floor
Chicago, IL 60606
Tel: 312-425-3900
Fax: 312-425 3909

*Attorneys for Plaintiffs Miller UK Ltd. and Miller International Ltd.*