**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,** | |
| **Plaintiffs,** | **Civil Action No. 10-cv-3770** |
| **v.** | **Judge Milton I. Shadur** |
| **CATERPILLAR INC.,** | |
| **Defendant.** | |
| **CATERPILLAR INC.,** | **JURY TRIAL DEMANDED** |
| **Counterclaim-Plaintiff,** | |
| **v.** | |
| **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,** | |
| **Counterclaim-Defendants.** | |

**AMENDED ANSWER TO THE COMPLAINT, AFFIRMATIVE
DEFENSES, AND COUNTERCLAIMS**

Defendant Caterpillar Inc. ("Caterpillar") answers the Complaint as follows:

**NATURE OF THE ACTION**

1. This action arises under the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq. and under the common law of the State of Illinois.

**Response to Paragraph 1:**

**Caterpillar admits that Plaintiffs purport to state claims under the Illinois Trade Secrets Act and the common law of the State of Illinois.**

## THE PARTIES

2.     Plaintiff Miller UK Ltd. is a privately-held corporation organized and existing under the laws of the United Kingdom, having its principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England. Plaintiff Miller International Ltd. is a privately-held corporation organized and existing under the laws of Gibraltar, having its principal place of business at 57/63 Line Wall Road, PO Box 199, Gibraltar. Plaintiff Miller is a leading engineering company in the design and manufacture of a range of buckets, quick couplers and other attachments used with earthmoving equipment.

**Response to Paragraph 2:**

**Caterpillar admits the allegations of the first two sentences of Paragraph 2 of the Complaint.  With respect to Miller UK Ltd., Caterpillar admits the allegations of the third sentence of Paragraph 2 of the Complaint.  With respect to Miller International Ltd., Caterpillar denies the allegations of the third sentence of Paragraph 2 of the Complaint.**

3.     On information and belief, Defendant CAT is a publicly-traded corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 100 North East Adams Street, Peoria, Illinois 61629, United States of America.

**Response to Paragraph 3:**

**Defendant, whose name is Caterpillar Inc., admits the allegations of Paragraph 3 of the Complaint.**

## JURISDICTION AND VENUE

4.     This is an action for the threatened or actual misappropriation of trade secrets, breach of contract, unjust enrichment, and fraudulent inducement. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There exists diversity of citizenship between the parties, as Plaintiff Miller UK Ltd. is a citizen of the United Kingdom, Plaintiff Miller

International Ltd. is a citizen of Gibraltar, and Defendant is a citizen of Illinois and of Delaware, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

**Response to Paragraph 4:**

**Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the alleged amount in controversy, but admits the other allegations of Paragraph 4 of the Complaint.**

5.      This Court has personal jurisdiction over Defendant.  Defendant is qualified to do business in the State of Illinois.  Defendant also has a regular and established place of business in Illinois, and is and has been doing business in Illinois and this District at all times relevant hereto.

**Response to Paragraph 5:**

**Caterpillar admits the allegations of Paragraph 5 of the Complaint.**

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), and 1400(b).

**Response to Paragraph 6:**

**Caterpillar admits that venue is proper in this judicial district, but denies that the specified statutory provisions establish that venue is proper here.**

**GENERAL ALLEGATIONS**

7.      Miller is a leading international engineering company involved in all aspects of the design and manufacture of quick couplers, buckets and other attachments used worldwide with earthmoving equipment.

**Response to Paragraph 7:**

**Caterpillar denies the allegations of Paragraph 7 of the Complaint.**

8.     CAT is an Original Equipment Manufacturer ("OEM") of equipment used in the earthmoving industry.

**Response to Paragraph 8:**

**Caterpillar admits the allegations of Paragraph 8 of the Complaint.**

9.     As detailed below, this case presents the quintessential theft of trade secrets and breach of a contractual and confidential relationship between a supplier and its customer spanning almost two decades. Using its leverage as Miller's largest customer, CAT engaged in a scheme to systematically, and through the auspices of the parties' contractual relationship, gain access to Miller's proprietary information and trade secrets, with the intent of misappropriating that information and those trade secrets to produce its own products without having to engineer them from scratch and no longer have to purchase them from Miller. Put differently, CAT sought to deprive Miller of the return on Miller's substantial investment in the development of its products and to avoid the expense and effort that would have been required had CAT fairly and honestly developed its own products. Unfortunately, CAT largely succeeded in this scheme, which has made the present litigation necessary.

**Response to Paragraph 9:**

**Caterpillar denies the allegations of Paragraph 9 of the Complaint.**

**MILLER'S PIONEERING INVENTIONS**

10.     Since the 1980s, Miller has been involved in the research and development of a range of proprietary quick couplers, buckets and other attachments for the earthmoving industries worldwide. Today, Miller is recognized as the world leader in all aspects of design and manufacture of quick couplers, buckets and attachment designs.

**Response to Paragraph 10:**

**Caterpillar admits that since the 1980s, Miller UK Ltd., either directly or through its predecessor, Miller Welding Engineers Ltd., has been involved in the research and**

**development of couplers, buckets, and other attachments for earthmoving applications. In all other respects, Caterpillar denies the allegations of Paragraph 10 of the Complaint.**

11.     Miller's proprietary and confidential technologies include, but are not limited to: proprietary and confidential market research data; proprietary and confidential testing results and data; proprietary and confidential technical specifications and blueprints, including but not limited to proprietary and confidential piece-part drawings; proprietary and confidential manufacturing techniques, including but not limited to equipment selection, equipment organization, technician instruction and training (including instructional and training materials); confidential and proprietary strategic design and manufacturing protocols, including but not limited to multi-jurisdictional safety compliance protocols; confidential and proprietary intellectual property valuations, including but not limited to projected profits and margins; and proprietary, unique, and confidential combinations and compilations of the above information (hereinafter referred to in the aggregate as "Miller's proprietary trade secrets and confidential information").

<u>Response to Paragraph 11:</u>

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary and confidential technologies," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 11 of the Complaint.**

12.     Miller's proprietary trade secrets and confidential information are not generally known in the trade, and Miller derives economic value and competitive advantage in the marketplace from the secrecy of such information. Indeed, Miller's proprietary trade secrets and confidential information are Miller's lifeblood as a technology leader whose market position depends upon its innovations.

**Response to Paragraph 12:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 12 of the Complaint.**

13.     Miller has invested millions of dollars, many times over, researching and developing its proprietary trade secrets and confidential information.

**Response to Paragraph 13:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," and because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 13 of the Complaint.**

14.     At all times relevant hereto, Miller has used reasonable measures to protect the secrecy of its proprietary trade secrets and confidential information, including but not limited to: restricted access on a need-to-know basis; global confidentiality policies; contractual confidentiality restrictions; security key cards; password protected computer and network platforms; and a wide array of additional physical security and monitoring measures.

**Response to Paragraph 14:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," or the extent to which the alleged "measures" were taken, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 14 of the Complaint.**

15.     Miller owns various United States Patents covering aspects of its innovations, including U.S. Patent Nos. 6,422,805, 6,481,124, 6,625,909 and 6,922,926, and U.S. Design Patent Nos. D440,983, D469,786, D565,062 and D610,592.

**Response to Paragraph 15:**

**Caterpillar admits that Miller UK Ltd. is listed as the owner of U.S. Patent Nos. 6,422,805, 6,481,124, 6,625,909 and 6,922,926, and U.S. Design Patent Nos. D440,983, D469,786, D565,062, and that Miller International Ltd. is listed as the owner of U.S. Design Patent No. 610,592. Because Caterpillar does not have access to Plaintiffs books and records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that either Plaintiff actually "owns" these patents or that these patents reflect "innovations" actually made by either Plaintiff.**

## THE MILLER "BUG" COUPLER

16.     In or about 1998, Miller designed the "Bug" coupler, the world's first-ever, fully automatic, universal quick coupler. The Bug coupler's design uniquely permitted hydraulic operation from the cab with an automatic mechanical safety device, which negated the need for a manual safety pin. The Bug's design advantageously provided universal compatibility with the world's best known machine manufacturers and the original Bug Coupler design is pictured below in Figure 1.



Figure 1.

**Response to Paragraph 16:**

Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing Miller's "Bug" Coupler, which Miller Welding Engineers Ltd. described as the world's first-ever, fully automatic, universal quick coupler. Caterpillar admits that, in some circumstances, the Bug coupler's design permitted hydraulic operation from the cab with an automatic mechanical safety device. With respect to Miller Welding Engineers Ltd. (predecessor to Miller UK Ltd.), Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 16. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 16 of the Complaint.

17.     Miller's history, however, begins far before its introduction of the Bug coupler. Miller was founded in 1978 as Miller Welding Engineers Ltd., focusing on the repair of earthmoving buckets for the quarry, mining, construction, and associated industries.

**Response to Paragraph 17:**

Caterpillar admits Miller UK Ltd. informed Caterpillar, and also stated in its public literature, that Miller UK Ltd. was founded in 1978 as Miller Welding Engineers Ltd., focusing on the repair of earthmoving buckets for the quarry, mining, construction, and associated industries. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 17 of the Complaint.

18.     Over the course of time, gaining expertise in the repair of these buckets, Miller recognized the bucket changeover procedure lacked efficiency, taking one to two hours, and was rife with risk for the machine operators who had to manually execute the changeover, including the risk of serious injury.

**Response to Paragraph 18:**

Primarily because Caterpillar is not privy to what Plaintiffs recognized in this regard, or when, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 18 of the Complaint.

19.     By 1989, Miller's innovative engineering and manufacturing expertise resulted in the design and manufacture of the pin grabber quick coupler. Miller marketed this pin grabber coupler as the "Mag 7." The Mag 7 reduced the long and often dangerous attachment changeover procedure to a speedy, simple, and safe process. In fact, the one to two hour changeover process was reduced to a mere seven seconds, hence its name.

**Response to Paragraph 19:**

Caterpillar admits that Miller Welding Engineers Ltd. marketed a pin grabber coupler known as the "Mag 7," which Miller Welding Engineers Ltd. described as offering significant time savings. Caterpillar further admits that, as a general matter, the "Mag 7" reduced the time spent during the attachment changeover process in comparison with more traditional couplers that were available at the time. With respect to Miller UK Ltd.,

**Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 19 of the Complaint. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 19 of the Complaint.**

20. But commercial success of the Mag 7 was not as quick, though it did come eventually. Miller invested hundreds of hours and hundreds of thousands of dollars in the promotion of its technology, literally creating the market for the quick coupler from the ground up.

**Response to Paragraph 20:**

**Primarily because Caterpillar is not privy to Plaintiffs' records regarding the promotion of Mag 7 "technology" or its "commercial success," and because Plaintiffs have not provided sufficient specifics as to the Mag 7 "technology," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 20 of the Complaint.**

21. Once the quick coupler caught on, it quickly became the market standard—no operator could justify the hours lost in productivity and the risk of harm with the quick coupler available. Major OEMs worldwide, including CAT, turned to Miller for specifically-designed quick couplers to fit their machines.

**Response to Paragraph 21:**

**Caterpillar admits that it purchased quick couplers that fit certain Caterpillar machines from Miller UK Ltd. and its predecessor, Miller Welding Engineers Ltd. Primarily because Caterpillar does not know what "market" is referenced when the quick coupler is described as "the market standard," and because Caterpillar does not know what individual machine operators could "justify," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 21 of the Complaint.**

22. Because the interface between machine and attachment is not standardized amongst the various machines and attachments produced by the OEMs, Miller designed and manufactured a custom quick coupler for each OEM. As a result of its unique market position with the world's major OEMs, Miller was able to compile testing and other technical information regarding the various interface configurations employed by the OEMs. Investing thousands of hours and millions of dollars, Miller synthesized and utilized its compiled information to research and develop significant innovations and optimizations to the quick coupler to become the universal coupler it is today,

**Response to Paragraph 22:**

**Caterpillar admits that, as a general matter, the interface between machine and attachment is not standardized across the various machines and attachments produced by various OEMs. Primarily because Caterpillar is not privy to Plaintiffs' investment records and what Plaintiffs may have done with respect to each other OEM with respect to design, manufacture, and compilation, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 22 of the Complaint.**

23. In 1998, Miller launched the fully automatic Bug coupler, yet another market-first. While the Mag 7 was custom-designed for both a specific machine and its attachments (e.g. a Mag 7 designed for a CAT machine will only work with attachments that are also manufactured for that specific Cat machine), the Bug coupler is the first quick coupler to be universally compatible with most attachments, regardless of the OEM for which they were built. In other words, the Bug coupler is designed to fit a specific OEM machine while still capable of working with a range of attachments from different OEMs. Additionally, the Bug coupler is the first quick coupler to allow an operator to perform a changeover procedure solely from the machine's cab and to be able to use their work tools on job sites in a variety of applications, making this product very popular and versatile.

**Response to Paragraph 23:**

Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing the "Bug" Coupler, which was described by Miller Welding Engineers Ltd. as the world's first-ever, fully automatic, universal quick coupler. Caterpillar further admits that the coupler sold to Caterpillar fit Caterpillar machines, but was still capable of working with some attachments from some different OEMs. Caterpillar further admits that, as a general matter, the Bug coupler design permitted an operator to perform a changeover procedure solely from the cab. Primarily because Caterpillar does not know whether the Bug coupler was universally compatible with most attachments, or whether it was the first coupler to exhibit the various characteristics alleged, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 23. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 23 of the Complaint.

### CAT'S Access to and Knowledge of Miller's Coupler Technology and Trade Secrets

24.     In or about 1998, Miller and CAT, expanding their relationship, began discussing the manufacture and sale of both Miller's proprietary couplers to CAT. As part of the negotiations, CAT requested access to Miller's proprietary and confidential information, including Miller's proprietary trade secrets and confidential information, regarding the design and manufacture of Miller's couplers.

**Response to Paragraph 24:**

Although Caterpillar previously had purchased couplers for Caterpillar products from Miller Welding Engineers Ltd., Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. and Caterpillar began discussing the manufacture and sale to Caterpillar of additional couplers. Caterpillar denies that, as part of the negotiations with Miller Welding Engineers Ltd., it requested access to Plaintiffs' "proprietary and

**confidential information." Caterpillar further denies that it had any discussions in or about 1998 with Miller International Ltd.**

25.     On September 25, 1998, Miller entered into its first Proprietary Agreement with CAT in order to preserve the confidential and secret status of Miller's coupler technology. The Proprietary Agreement obligated CAT to treat as proprietary any information provided by Miller to CAT pursuant to the agreement.

**Response to Paragraph 25:**

**Caterpillar admits that on September 25, 1998, Miller Welding Engineers Ltd. entered into an agreement with Caterpillar (entitled "Proprietary Agreement"), that obligated Caterpillar to treat as proprietary, for a limited period of time (which has long since expired), certain information that Miller Welding Engineers Ltd. might provide to Caterpillar pursuant to the agreement.**

26.     Then, the Supply Agreement obligated Miller to provide its proprietary trade secret and confidential information to CAT as a condition of CAT's purchase of couplers designed and manufactured by Miller. The Supply Agreement reads in part:

> All products and Parts shall be manufactured by Miller in accordance with drawings, prints, specifications and other technical data provided to and approved by Caterpillar. Miller shall provide to Caterpillar copies of such drawings, prints, specifications and other technical data in either IGES or Pro-E format and shall ensure that Caterpillar receive the most current of all such documents at all times. Such documents shall include all dimensions, tolerances and technical assembly information necessary for the production of Caterpillar support material. Any design changes to the Products and Parts by Miller shall only be made ninety days (90) after receiving written approval from Caterpillar. Miller agrees to use the electronic file transfer method as preferred by Caterpillar to communicate any such proposed changes.

**Response to Paragraph 26:**

Caterpillar admits that Paragraph 3(a) of the Supply Agreement of March 1999, contains language similar to the language set forth above; however, the Plaintiffs' purported quotation is not entirely accurate. Caterpillar denies that the Supply Agreement obligates Plaintiffs to provide "proprietary trade secret and confidential information" to Caterpillar "as a condition" of Caterpillar's purchase of couplers designed and manufactured by Plaintiffs.

27. The Supply Agreement obligated CAT to maintain as confidential any proprietary trade secret and confidential information provided by Miller. The Supply Agreement reads in part:

17. Confidential Information

(a) In order to accomplish the purposes of this Agreement, it is expected that each party will disclose Proprietary Information including technical and business information, to the other; but the transfer of Proprietary Information shall not be considered publication of such information. A party may use the Proprietary Information of the other party only for the purposes of this Agreement, and shall not disclose such Proprietary Information to any third party except pursuant to this Agreement or with the consent in writing of the other party. For the purposes of this Agreement, "Proprietary Information" shall include all confidential information and know-how, business, technical, or otherwise disclosed by a party to the other, but shall not include the information or know-how which is (i) available to the public or later becomes available to the public through no act or omission of the recipient party, or (ii) rightfully disclosed to the recipient by person or entity not party to this Agreement.

(b) Notwithstanding the above provision, each party may use and disclose to persons who are not parties to this Agreement such portions of Proprietary Information of the other party as may be reasonably necessary and appropriate to carry out the provisions of this Agreement when the person to whom such information is disclosed has entered into an agreement with the disclosing party in form satisfactory to the other party, requiring it to assume the same obligations toward such other party, as well as toward the

disclosing party, as are set forth in section to safeguard such other party's knowledge or information

(c) All drawings, prints, specifications, records, manuals, notebooks, computer programs and other similar or dissimilar materials supplied by one party to the other in connection with this Agreement and all copies thereof, shall remain the property of the supplying party and to the extent it will not interfere with the performance of this Agreement, upon request by supplying party shall be returned to the supplying party, or destroyed, by the receiving party.

**Response to Paragraph 27:**

**Caterpillar admits that Paragraph 17 of the Supply Agreement of March 1999, contains language similar to the language set forth above; however, the Plaintiffs' purported quotation is not entirely accurate. Caterpillar denies that the Supply Agreement necessarily obligated Caterpillar "to maintain as confidential any proprietary trade secret and confidential information provided by Miller."**

28.    Over the next several years, Miller provided CAT with its proprietary trade secrets and confidential information related to the design, manufacture, and testing of Miller's proprietary coupler technology pursuant to the Supply Agreement. Indeed, Miller provided CAT, at its request, with various Miller proprietary trade secrets and confidential information in the form of physical and electronic documents, drawings (e.g., piece-part and CAD drawings), photographs, schematics, reports, prototypes, access to Miller's manufacturing facilities, and access to Miller's engineers.

**Response to Paragraph 28:**

**Caterpillar admits that, from time to time, and for several years after the signing of the Supply Agreement, Miller Welding Engineers Ltd. and Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with some technical information concerning their couplers. Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," Caterpillar lacks knowledge or**

**information sufficient to form a belief about the truth of the other allegations of Paragraph 28 of the Complaint.**

29.     For example, Miller provided CAT with proprietary information relating to its coupler technology in response to a request for such information by Warren Tarr, a CAT employee, during a telephone conference on January 14, 1998.

**Response to Paragraph 29:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary information relating to [their] coupler technology," and because the telephone conversation allegedly was with Warren Tarr, who is retired and no longer available to Caterpillar as an employee, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 29.**

30.     Then, in late 2001, Paolo Fellin of CAT raised concerns regarding continuity of supply. To address these concerns, Miller and CAT began discussions regarding CAT's licensing of Miller's technology for CAT's own production with Miller providing detailed technical information.

**Response to Paragraph 30:**

**Caterpillar admits that, at some point in time, Paolo Fellin of Caterpillar raised concerns regarding continuity of supply.  Caterpillar further admits that Miller UK Ltd. and Caterpillar discussed various ways of dealing with Caterpillar's continuity of supply concerns, including the possibility of Caterpillar licensing technology from Miller UK Ltd. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 30 of the Complaint.**

31.     In the summer of 2002, several CAT employees, including Paolo Fellin and Max Martin, visited Miller's design and manufacturing facilities in Newcastle and viewed

demonstrations of Miller's couplers. By the end of that summer, business between the two companies was increasing and as a result, CAT became the largest customer of Miller.

**Response to Paragraph 31:**

**Caterpillar admits that in the summer of 2002, several Caterpillar employees, including Paolo Fellin and Max Martin, visited the design and manufacturing facilities of Miller UK Ltd. (not Miller International Ltd.) in Newcastle and viewed demonstrations of its couplers. Caterpillar further admits that by the end of the summer of 2002, business between Caterpillar and Miller UK Ltd. (not Miller International Ltd.) was increasing. Primarily because Caterpillar is not privy to Plaintiffs' sales data, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Caterpillar became the largest customer of Miller UK Ltd. by the end of the summer of 2002. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 31 of the Complaint.**

32.    In the summer of 2003, with CAT now the largest customer of Miller, Max Martin of CAT again raised concerns about continuity of supply. Miller and CAT began negotiating an option for CAT to purchase Miller's intellectual property rights and a right of first refusal should Miller ever decide to sell the company. Under strict conditions of confidentiality, Miller provided CAT detailed calculations regarding forecasted profits, margins, and valuation of Miller's intellectual property rights, including the valuations of the Miller trade secrets and confidential information. In connection with these negotiations and the exchange of this detailed confidential and proprietary information, Miller provided a draft Addendum to the March 31, 1999 Supply Agreement was to CAT that addressed these concerns as well as other issues. Though the parties corresponded over many months and exchanged multiple drafts, the Addendum Agreement never was executed, and Miller continued providing couplers to CAT under the Supply Agreement.

**Response to Paragraph 32:**

Caterpillar admits that in the summer of 2003, Max Martin of Caterpillar discussed Caterpillar's concerns about continuity of supply with Miller UK Ltd. (not Miller International Ltd.). Caterpillar admits that at or about that time, Caterpillar and Miller UK Ltd. (not Miller International Ltd.) discussed various possible ways of dealing with Caterpillar's continuity of supply concerns, including negotiating an option for Caterpillar to purchase certain intellectual property rights that might be possessed by Miller UK Ltd. (not Miller International Ltd.) or renegotiating Caterpillar's existing right of first refusal regarding any future sale of Miller UK Ltd. Caterpillar further admits that at or about that time, Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with certain financial information. Caterpillar also admits that at or about that time, Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with a draft Addendum to the March 1999 Supply Agreement, which addressed certain issues under discussion. In addition, Caterpillar admits that Caterpillar and Miller UK Ltd. (not Miller International Ltd.) discussed one or more versions of a draft Addendum over many months, that no version of the draft Addendum was ever executed, and that Miller UK Ltd. continued providing couplers to Caterpillar under the Supply Agreement. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 32 of the Complaint. Primarily because Caterpillar is not privy to Plaintiffs' sales data, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Caterpillar was the largest customer of Miller UK Ltd. in the summer of 2003.

33. In February of 2005, Miller and CAT again met to discuss their relationship and the upcoming CONEXPO Conference, at which Miller and CAT would jointly present the Miller couplers. Once more, Miller, under strict confidentiality, provided a variety of detailed technical information including the Miller trade secrets and confidential information, specifically part listings, installation procedures, and piece-part drawings.

**Response to Paragraph 33:**

**Caterpillar admits that, from time to time, Miller UK Ltd. and Caterpillar met to discuss their commercial relationship, sometimes in connection with an industry conference, such as CONEXPO, and that, from time to time, Miller UK Ltd. provided technical information to Caterpillar. Caterpillar denies that Caterpillar and Plaintiffs "jointly" presented the Miller coupler at CONEXPO in February of 2005. Primarily because Plaintiffs have not provided sufficient specifics as to the "detailed technical information" or any "trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 33 of the Complaint with respect to Miller UK Ltd. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 33 of the Complaint.**

34.     After CONEXPO in March of 2005, Miller began to hear rumors that CAT was designing a coupler of its own, but CAT denied the truth of these rumors.

**Response to Paragraph 34:**

**Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that, after CONEXPO in March of 2005, Plaintiffs began to hear rumors that Caterpillar was designing a coupler of its own. Caterpillar denies that it "denied the truth" of any such rumors.**

35.     Yet CAT's requests for more detailed technical information regarding the Miller couplers, which Miller was obligated to provide under the Supply Agreement, began coming faster and faster, first in March, then in June of 2005, always under the guise of "testing" and "market research."

**Response to Paragraph 35:**

**Caterpillar admits that Miller UK Ltd. was obligated to provide certain technical information pursuant to the March 1999 Supply Agreement, and that, from time to time,**

**Caterpillar asked Miller UK Ltd. (not Miller International Ltd.) for such information. Caterpillar denies that the pace of such requests quickened first in March, then in June of 2005, and that such requests were "always under the guise of 'testing' and 'market research.'"**

36.     Previously, with CAT's promises and representations that its business was not only stable, but that its requirements would increase substantially, Miller began making investments in expansion, all the while inquiring as to CAT's future plans and requirements. In June of 2006, with expansion under way but before making substantial new investments, Miller again confirmed its continuing relationship with its largest customer, CAT. Bob Meng of CAT confirmed that Miller would continue to be CAT's exclusive supplier of couplers and encouraged Miller's expansion. Based on this confirmation, Miller began preparations to expand further its manufacturing facilities to China, where Miller could manufacture couplers by casting.

**Response to Paragraph 36:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about the timing and size of or reasons for Plaintiffs' investments. In all other respects, Caterpillar denies the allegations of Paragraph 36 of the Complaint.**

37.     Of course, not long thereafter in December of 2006, CAT also demanded that Miller provide its detailed technical information regarding the set-up of its new casting facility in China, which Miller has invested millions of dollars in developing.

**Response to Paragraph 37:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the**

allegation about the size of Plaintiffs' investments. In all other respects, Caterpillar denies the allegations of Paragraph 37 of the Complaint.

38.     In 2007, Bob Meng and other CAT employees visited Miller's China facility in person.

**Response to Paragraph 38:**

**Caterpillar admits that in 2007 Bob Meng and one other Caterpillar employee visited a facility in China that Caterpillar understood had a connection to Miller UK Ltd.**

39.     Recently, CAT has sought to initiate an independent relationship with Miller's partners in its China facility, which, on information and belief, is based upon the Miller trade secrets and confidential information CAT received regarding this facility.

**Response to Paragraph 39:**

**Caterpillar admits that it has had business discussions with a manufacturer in China, which Caterpillar understands has or once had a relationship with Miller UK Ltd. In all other respects, Caterpillar denies the allegations of Paragraph 39 of the Complaint.**

40.     In or around the same time of Bob Meng's visit to Miller's China facility in 2007, CAT, without Miller's knowledge, filed applications with the U.S. Patent and Trademark Office for patents relating to coupler technology.

**Response to Paragraph 40:**

**Caterpillar admits that in or around 2007, Caterpillar filed applications with the U.S. Patent and Trademark Office for patents relating to coupler technology. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about Plaintiffs' knowledge.**

41.     Then, in June of 2008, much to Miller's surprise, Bob Meng of CAT informed Miller that CAT had developed its own coupler technology and would be phasing out its purchases of the Miller Bug Coupler.

**Response to Paragraph 41:**

**Caterpillar admits that in or around June of 2008, Bob Meng of Caterpillar informed Keith Miller that Caterpillar Work Tools, a business unit within Caterpillar, had developed its own coupler technology and would be phasing out its purchases of the Miller coupler. Caterpillar further admits that Miller UK Ltd. continued to supply couplers to Caterpillar thereafter. Caterpillar denies that Keith Miller should have been surprised.**

42.     In 2009, Keith Miller met with James L. Tevebaugh, who replaced Bob Meng as the Manager of Caterpillar Work Tools, to try to persuade Mr. Tevebaugh to reconsider CAT's decision to phase out purchases of Miller's couplers in favor of a new coupler that CAT derived from Miller's proprietary trade secrets and confidential information. Those pleas went unheeded as CAT launched its new Center Lock Pin Grabber Coupler that same year.

**Response to Paragraph 42:**

**Caterpillar admits that Keith Miller met with James L. Tevebaugh in October 2009 and discussed, among other things, Bob Meng's decision to phase out purchases by Caterpillar Work Tools of Miller's couplers. Caterpillar further admits that Mr. Tevebaugh replaced Mr. Meng as General Manager of Caterpillar Work Tools. Caterpillar denies that Caterpillar decided to phase out purchases of Miller's couplers in favor of a new coupler that Caterpillar "derived from Miller's proprietary trade secrets and confidential information." Caterpillar admits that it launched its Center-Lock Pin Grabber Coupler in early 2009, long before the meeting between Keith Miller and James Tevebaugh in October 2009.**

43.     Over the course of their relationship, dozens of CAT employees, including but not limited to the following, were exposed to Miller's proprietary trade secrets and confidential information, at CAT's request and subject to the Supply Agreement and other guarantees of confidentiality: Jim Owens, Paulo Fellin, Bob Meng, Frank Dennis, John Walker, Max Martin, Charlie Delph, Anker Henningsen, Fred Grafton, Dave Koch, Keith Heideman, Rick Oswald, Alan Switzer, Doug Bye, Ron Kropollopski, Gary Zoromski, Dave Mohr, Greg Salistead, Greg Lobica, Gary Woeman, Phil Richards, Pierre Wasserman, Donald Houge, Glen Johnson, Dan Kennedy, Warren Tarr, Roy Hatfield, Mark Moser, Delaine Bonner, Ramon Mosqueda, Joe Milke, Jon Lecocq, Eric Schultz, Craig Willoughby, Dick Smalley, Doyle Long, Greg Ferkol, Jim Nickels, Farzin Khorasanizaden, Eric Tu, Robin Mu, Michael Lebrun, Kriste Armstrong, Teresa Patterson, Jeremy Davis, Blair Maust, Caroline Pickens, Arm Reddy, Jon Council, Dave Edmunds, and many others.

**Response to Paragraph 43:**

**Caterpillar admits that a great many of the Caterpillar employees mentioned in Paragraph 43 met with or communicated with personnel from Miller UK Ltd. about various things at various points in time. Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 43 of the Complaint.**

44.     On information and belief, CAT used the Miller trade secrets and confidential information, which it repeatedly sought and which Miller was required to produce under the Supply Agreement, to produce what is now marketed as the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

**Response to Paragraph 44:**

**Caterpillar denies the allegations of Paragraph 44 of the Complaint.**

45.     Furthermore, under the terms of the Supply Agreement, Miller also provided CAT with proprietary instructions and other types of manuals related to the operation of the Miller Bug Coupler, as demonstrated in Exhibit A, for use in marketing and selling the re-branded Miller Bug Coupler in June of 1999. Even after discontinuing purchase of the Miller Bug Coupler, CAT continued to use those proprietary instructions and manuals without Miller's permission or authorization in the marketing and sale of the Caterpillar Center-Lock Pin-Grabber Quick Coupler in breach of the Supply Agreement, as demonstrated in Exhibit B, dated March 2009 and including the identical drawings to those provided to CAT by Miller. On information and belief, CAT continues to use and distribute Miller's proprietary instructions and manuals.

**Response to Paragraph 45:**

**Caterpillar admits that Exhibits A and B to the Complaint are excerpts from Caterpillar Operation and Maintenance Manuals dated June 1999 and March 2009, respectively. Caterpillar admits that Exhibit A concerns the couplers Miller UK Ltd. and Miller Welding Engineers Ltd. provided to Caterpillar, whereas Exhibit B concerns Caterpillar's own Center-Lock Pin Grabber Coupler. Caterpillar denies that it stopped purchasing Miller couplers before Plaintiff filed the Complaint. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Miller UK Ltd. provided to Caterpillar "proprietary instructions and manuals" related to the operation of the coupler, that any of the information reflected in Exhibits A and B comes from said sources, or that Plaintiffs provided any such sources or information under the terms of the Supply Agreement. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 45 of the Complaint.**

### The Miller Scoop Bucket

46.     While a machine equipped with a quick coupler provided significant advantages such as, for example, reduced changeover time, improved attachment versatility, and enhanced safety, Miller recognized that these advantages came at the expense of machine performance.

Specifically, Miller recognized that machines utilizing a quick coupler experienced less breakout force due to the increased distance, introduced by the quick coupler, from the dipper arm of the machine to the tip of a conventional bucket.

**Response to Paragraph 46:**

**Caterpillar admits that, under certain circumstances, a quick coupler could provide significant advantages over more traditional types of couplers such as, for example, reduced changeover time, improved attachment versatility, and enhanced safety. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about what Plaintiffs recognized.**

47.     After significant research and development, Miller engineered a new bucket, the Miller Scoop, designed specifically for operation with quick couplers, which addressed and overcame the disadvantages of conventional buckets and is pictured below in Figure 2 and Figure 3. The revolutionary Miller Scoop bucket was the first bucket design to include integrated bucket pins, reducing the distance from the dipper arm of the machine to the tip of the bucket and minimizing the loss in breakout force that occurs when a quick coupler is installed.



Figure 2.                         Figure 3.

**Response to Paragraph 47:**

**Caterpillar admits that Miller Welding Engineers Ltd. introduced a bucket known as the Miller Scoop bucket, which appears to be depicted in Figures 2-3. Caterpillar denies that the Miller Scoop bucket was "revolutionary," "overcame the disadvantages of**

**conventional buckets," or was "the first bucket design to include integrated bucket pins." Because it is not privy to Plaintiffs' books and records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs introduced the Scoop bucket after significant research and development. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 47 of the Complaint.**

48. The Miller Scoop bucket also includes an additional innovation of a triple radius profile, which enables the bucket to cut through the ground more effectively with minimal resistance and drag, and provides a self-fill action that increases load volume. Miller patented this second innovative aspect of the Miller Scoop bucket.

**Response to Paragraph 48:**

**Primarily because Plaintiffs have not been specific as to what they mean by "triple radius profile" (and have not responded to Caterpillar's requests for clarification about same), Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 48 of the Complaint.**

49. Both the integrated bucket pins innovation and the triple radius profile innovation increased performance, productivity, efficiency and profitability of the machine.

**Response to Paragraph 49:**

**Caterpillar admits that, under some circumstances, integrated bucket pins could increase performance, productivity, efficiency, and profitability of a machine. Based on Caterpillar's surmise as to what the undefined term "triple radius profile" means, Caterpillar denies that such a feature necessarily would increase performance, productivity, efficiency, and profitability of a machine.**

50.     In or about 1998, Miller sought to further expand its business relationship with CAT by advising CAT of its innovations in bucket technology as CAT did not then have a bucket that included the integrated pin innovation or the triple radius innovation. Miller agreed to provide CAT with access to Miller's proprietary and confidential Scoop bucket technologies and innovations based on verbal agreements and understandings that CAT would purchase buckets incorporating the Miller Scoop technologies or CAT would compensate Miller if CAT manufactured products based on the technologies of the Miller Scoop bucket.

**Response to Paragraph 50:**

**Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing buckets to be supplied by Miller Welding Engineers Ltd. In all other respects, Caterpillar denies the allegations of Paragraph 50 of the Complaint.**

51.     Over the next several years, CAT repeatedly requested and Miller provided substantial proprietary and confidential information in connection with Miller's Scoop bucket technologies purportedly for purposes of evaluating the commercial viability of the Miller Scoop bucket technologies.

**Response to Paragraph 51:**

**Caterpillar denies the allegations of Paragraph 51 of the Complaint.**

52.     During this time, CAT and Miller continued to negotiate CAT's compensation of Miller for any commercialization of the proprietary and confidential Miller Scoop bucket technologies. At a meeting between Paolo Fellin of CAT and Miller on August 8, 2002, CAT orally agreed to an exclusive license of Miller's Scoop technology, as confirmed by CAT's lack of objection to the meeting minutes and outline of terms sent to CAT by Miller.

**Response to Paragraph 52:**

**Caterpillar denies the allegations of Paragraph 52 of the Complaint.**

53. Based on the prior negotiations and on the oral agreement of August 8, 2002, Miller continued to provide CAT with substantial access, demanded by CAT, to Miller's proprietary and confidential information related to the Scoop bucket technologies, including technical drawings, specifications, market analyses, prototypes, and testing data in connection with the innovations of the Miller Scoop bucket.

**Response to Paragraph 53:**

**Caterpillar denies the allegations of Paragraph 53 of the Complaint.**

54. On or about September 4, 2002, Miller conducted comparative testing of a highly confidential, proprietary prototype Miller Scoop bucket and various buckets provided by CAT. Significantly, one of the test buckets provided by CAT was a modified version of CAT's conventional Power Bucket. Essentially, CAT modified its conventional Power Bucket to incorporate Miller's integrated pin innovation of the Scoop bucket, reducing the distance from the drive arm of the machine to the bucket tip.

**Response to Paragraph 54:**

**Caterpillar admits that in the second half of 2002, performance tests were conducted on buckets provided by Caterpillar and Miller UK Ltd. Caterpillar further admits that one of the Caterpillar supplied buckets was a modified version of Caterpillar's conventional Power Bucket. Caterpillar also admits that the modified version of the Caterpillar bucket utilized an integrated pin design, which, in comparison to the conventional Caterpillar Power Bucket (when used under comparable circumstances), reduced the distance from the drive arm of the machine to the bucket tip. In all other respects, Caterpillar denies the allegations of Paragraph 54 of the Complaint.**

55. CAT delayed signing a formal written license agreement with Miller despite having agreed to terms at the August 8, 2002 meeting. And, in or about early 2004, CAT

informed Miller that CAT would not pursue the Miller Scoop bucket because CAT did not want to displace sales of its own profitable and proprietary bucket products.

**Response to Paragraph 55:**

    **Caterpillar denies the allegations of Paragraph 55 of the Complaint.**

56.    Yet later in 2004, upon learning that Miller had further improved the design of its Scoop bucket, CAT again requested that Miller provide substantial proprietary and confidential technical information and testing data in connection with the improvements to Miller's design.

**Response to Paragraph 56:**

    **Caterpillar denies the allegations of Paragraph 56 of the Complaint.**

57.    Based upon CAT's promises that CAT would genuinely consider commercialization of the improved Scoop bucket with due compensation to Miller as previously negotiated, Miller acquiesced to CAT's repeated demands for its proprietary and confidential information.

**Response to Paragraph 57:**

    **Caterpillar denies the allegations of Paragraph 57 of the Complaint.**

58.    Investing thousands of hours and hundreds of thousands of dollars, Miller continued to research, design and test the Scoop bucket technologies at the request of CAT. For example, Miller obtained additional comparative testing of Scoop buckets by independent third parties, market surveys and market analysis to demonstrate the commercial viability of the Miller Scoop bucket to CAT.

**Response to Paragraph 58:**

    **Primarily because Caterpillar is not privy to Plaintiffs investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs invested "thousands of hours and hundreds of thousands of**

**dollars" on continued research, design, and testing of the Scoop bucket technologies."**
**Caterpillar denies that it requested Plaintiffs to make any such investments. Caterpillar**
**admits that Miller UK Ltd. (not Miller International Ltd.) engaged in comparative**
**performance testing of its Scoop bucket and that Miller UK Ltd. (not Miller International**
**Ltd.) tried to demonstrate to Caterpillar the commercial viability of the Miller Scoop**
**bucket. Primarily because Caterpillar is not privy to materials that Plaintiffs may have**
**"obtained," or the purpose behind obtaining any such materials, Caterpillar lacks**
**knowledge or information sufficient to form a belief about the truth of the allegation that**
**Plaintiffs "obtained additional comparative testing of Scoop buckets by independent third**
**parties, market surveys and market analysis to demonstrate the commercial viability of the**
**Miller Scoop bucket" to Caterpillar.**

59.     However, unbeknownst to Miller, CAT had for some time been planning to commercialize the confidential and proprietary integrated pin innovation of the Scoop bucket without compensating Miller. Indeed, on or about July 6, 2005, CAT filed a patent application, without Miller's knowledge, in the United States Patent and Trademark Office on a bucket design, which includes as part of the claimed invention the integrated pin innovation of the Miller Scoop bucket. Significantly, two of the named inventors on the CAT patent application were CAT employees, Douglas Bye and Jeff Kurtz, that had extensive access to technical information provided by Miller and were heavily involved in the field testing of Miller's Scoop buckets. Despite the fact that the integrated pin design was Miller's innovation, the claim of CAT's design patent incorporates this feature as part of a design that CAT claims to have invented. The patent application was not published or otherwise publicly available until January of 2009.

**Response to Paragraph 59:**

**Caterpillar admits that on or about July 6, 2005, Caterpillar filed a patent**
**application in the United States Patent and Trademark office for a bucket design.**

**Caterpillar further admits that there are three named inventors on the design patent: Pandu Boyapally; Douglas Bye; and Jeff Kurtz. Caterpillar further admits that Douglas Bye and Jeff Kurtz attended one or more field tests of buckets, including Miller's Scoop bucket, and had access to certain results generated from those field tests. In all other respects, Caterpillar denies the allegations of Paragraph 59 of the Complaint.**

60.     Meanwhile, CAT continued to encourage Miller to provide additional proprietary and confidential information relating to Miller's continued research, development, testing and improvements to its Scoop bucket designs.

<u>Response to Paragraph 60</u>:

**Caterpillar denies the allegations of Paragraph 60 of the Complaint.**

61.     For example, on or about October 12, 2005, CAT conducted additional tests on yet another improvement to Miller's Scoop bucket technology. Again, Douglas Bye was involved in testing Miller's Scoop bucket technology.

<u>Response to Paragraph 61</u>:

**Caterpillar admits that in the second half of 2005, Caterpillar conducted performance tests on various buckets, including a Miller Scoop bucket. Caterpillar further admits that Douglas Bye was involved in those tests.**

62.     In the summer of 2006, Miller first learned from CAT that it had decided to manufacture its own bucket product, which would incorporate the integrated pin innovation of the Miller Scoop bucket, but that CAT would not compensate Miller. Bob Meng of CAT explained that CAT would not compensate Miller because there was no contract despite the extensive proprietary and confidential information that Miller provided to CAT over the previous eight years.

**Response to Paragraph 62:**

**Caterpillar admits that Bob Meng of Caterpillar stated that Caterpillar would not compensate Miller UK Ltd. with respect to buckets because Caterpillar did not owe Miller any compensation. Caterpillar lacks knowledge or information sufficient to form a belief as to when Plaintiffs first learned from Caterpillar that Caterpillar had decided to manufacture its own bucket with an integrated pin. In all other respects, Caterpillar denies the allegations of Paragraph 62 of the Complaint.**

63.     The CAT bucket, which incorporated the integrated pin innovation, was officially launched at Conexpo 2008.

**Response to Paragraph 63:**

**Caterpillar denies the allegations of Paragraph 63 of the Complaint.**

<u>**COUNT ONE**</u>
<u>**BREACH OF CONTRACT**</u>

64.     Miller repeats and realleges the averments of Paragraphs 1-63 as if fully set forth, herein.

**Response to Paragraph 64:**

**Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-63 of the Complaint.**

65.     The Supply Agreement is a valid and enforceable contract.

**Response to Paragraph 65:**

**Caterpillar admits the allegations in Paragraph 65 of the Complaint.**

66.     By using the Miller proprietary trade secrets and confidential information in the manufacture and sale of CAT's quick couplers, specifically the CAT Center-Lock Pin Grabber

Quick Coupler, Defendant CAT has breached the Supply Agreement, specifically Article 17, which restricts CAT's use of the Miller Proprietary Information "solely for the purposes of this Agreement."

**Response to Paragraph 66:**

      **Caterpillar denies the allegations of Paragraph 66 of the Complaint.**

67.     Additionally, by using the materials specified in Paragraph 11 above, CAT has breached Article 17 of the Supply Agreement which vests ownership of all the materials specified in Paragraph 11 in Miller.

**Response to Paragraph 67:**

      **Caterpillar denies the allegations of Paragraph 67 of the Complaint.**

68.     Miller has performed all of its obligations pursuant to the Supply Agreement.

**Response to Paragraph 68:**

      **Caterpillar denies the allegations of Paragraph 68 of the Complaint.**

69.     As a direct result of Defendant CAT's violation of its obligations under the Supply Agreement, Miller has sustained and will continue to sustain damages in an amount to be determined at trial.

**Response to Paragraph 69:**

      **Caterpillar denies the allegations of Paragraph 69 of the Complaint.**

**COUNT TWO**
**THREATENED OR ACTUAL**
**MISAPPROPRIATION OF TRADE SECRETS**

70.     Miller repeats and realleges the averments of Paragraphs 1-45 as if fully set forth herein.

**Response to Paragraph 70:**

Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-45 of the Complaint.

71.     Miller's proprietary Miller trade secrets and confidential information, set forth individually and collectively in Paragraph 11, supra, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

**Response to Paragraph 71:**

Primarily because Plaintiffs have not provided sufficient specifics as to any "trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 71 of the Complaint.

72.     At all times, Miller has taken reasonable measures to protect its proprietary trade secrets and confidential information and Miller derives economic value and competitive advantage from such information not being generally known to the public or trade.

**Response to Paragraph 72:**

Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," the extent and scope of measures Plaintiffs took, or the economic value and competitive advantage of such information, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 72 of the Complaint.

73.     On information and belief, there exists the threatened or actual misappropriation of trade secrets by CAT to acquire, disclose and/or use, by improper means, Miller's proprietary trade secrets and confidential information for its own benefit and/or the benefit of others without Miller's authorization and consent.

**Response to Paragraph 73:**

    **Caterpillar denies the allegations of Paragraph 73 of the Complaint.**

74.    CAT knows or had reason to know that it acquired Miller's proprietary trade secrets and confidential information under circumstances giving rise to a duty to maintain the secrecy, or limit the use of, such information, and/or that such information was obtained or derived from others who owe a duty to Miller to maintain the confidentiality of such information.

**Response to Paragraph 74:**

    **Caterpillar denies the allegations of Paragraph 74 of the Complaint.**

75.    On information and belief, Miller has suffered or will suffer damages, and CAT has or will be unjustly enriched in an amount to be proven at trial, as a direct result of CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information.

**Response to Paragraph 75:**

    **Caterpillar denies the allegations of Paragraph 75 of the Complaint.**

76.    CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information has been willful and malicious and entitles Miller to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

**Response to Paragraph 76:**

    **Caterpillar denies the allegations of Paragraph 76 of the Complaint.**

77.    Miller also is entitled to injunctive relief to prevent the threatened or actual misappropriation of its proprietary Miller trade secrets and confidential information by CAT pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

**Response to Paragraph 77:**

      **Caterpillar denies the allegations of Paragraph 77 of the Complaint.**

**COUNT THREE
FRAUDULENT INDUCEMENT**

      78.     Miller repeats and realleges the averments of Paragraphs 1-10, 15-63 as if fully set forth herein.

**Response to Paragraph 78:**

      **Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-10 and 15-63 of the Complaint.**

      79.     On or before June 9, 2008, unbeknownst to Miller, CAT began to develop the Caterpillar Center-Lock Pin-Grabber Quick Coupler with, on information and belief, the goal of ending its purchases of the Miller Bug Coupler.

**Response to Paragraph 79:**

      **Caterpillar admits that on or before June 9, 2008, it began to develop what became known as the Caterpillar Center-Lock Pin Grabber Coupler. Caterpillar further admits that it envisioned that, under certain circumstances, this coupler might be used to replace the coupler supplied by Miller UK Ltd.**

      80.     CAT, through its employee Bob Meng, affirmatively represented to Miller that CAT (a) was not developing any coupler itself and (b) that CAT required Miller's services in the future.

**Response to Paragraph 80:**

      **Caterpillar denies the allegations of Paragraph 80 of the Complaint.**

81.     CAT made such affirmative statements to Miller with the intent to induce Miller to continue to provide the Miller Bug Coupler to CAT until CAT could complete the development and establish manufacturing of its own coupler, from which CAT has derived and continues to derive substantial revenue and other benefits.

**Response to Paragraph 81:**

**Caterpillar denies the allegations of Paragraph 81 of the Complaint.**

82.     On information and belief, CAT also, through various of its employees, affirmatively began soliciting Miller's trade secrets and confidential information regarding the Scoop Bucket with the intent to induce Miller to provide CAT with its trade secrets and confidential information not so that CAT could purchase the Scoop Bucket, but so that CAT could complete the development of its own bucket, from which CAT has derived and continues to derive substantial revenue and other benefits.

**Response to Paragraph 82:**

**Caterpillar denies the allegations of Paragraph 82 of the Complaint.**

83.     In reliance on either CAT's materially false affirmative statements, Miller made substantial investments in expanding its facilities to meet CAT's future requirements and also provided it valuable trade secrets and confidential information relating to the Scoop Bucket.

**Response to Paragraph 83:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief as to the size of Miller's investments.  In all other respects, Caterpillar denies the allegations of Paragraph 83 of the Complaint.**

84.     Miller has been damaged by these false, deceptive, and misleading statements. Miller has been damaged in millions of dollars, plus interest, fees and costs, through the investment in the development of the UK and China manufacturing facilities that it otherwise would not have made. Miller also has been damaged in millions of dollars, plus interest, fees and costs, through the provision of its trade secrets and confidential information relating to the Scoop Bucket that it otherwise would not have made.

**Response to Paragraph 84:**

**Caterpillar denies the allegations of Paragraph 84 of the Complaint.**


**COUNT FOUR
UNJUST ENRICHMENT**

85.     Miller repeats and realleges the averments of Paragraphs 1-10, 15-63 as if fully set forth herein.

**Response to Paragraph 85:**

**Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-10 and 15-63 of the Complaint.**


86.     The agreements entered into by the parties do not exclude the right to seek to recover based upon a claim of unjust enrichment.

**Response to Paragraph 86:**

**Caterpillar denies the allegations of Paragraph 86 of the Complaint.**


87.     CAT has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information supplied to it by Miller related to Miller's Scoop Bucket.

**Response to Paragraph 87:**

**Caterpillar denies the allegations of Paragraph 87 of the Complaint.**

88.     CAT also has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information, supplied to it by Miller, outside the terms of the Supply Agreement in developing, manufacturing, and selling the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

**Response to Paragraph 88:**

**Caterpillar denies the allegations of Paragraph 88 of the Complaint.**

89.     Accordingly, Miller is entitled to damages in the amount by which CAT has been unjustly enriched at the expense of Miller.

**Response to Paragraph 89:**

**Caterpillar denies the allegations of Paragraph 89 of the Complaint.**

## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

The following allegations are relevant to Caterpillar's affirmative defenses and counterclaims:

1.     On February 23, 1998, Miller Welding Engineers Ltd., the predecessor to Miller UK Ltd., signed an agreement with Caterpillar (the "Agreement") governing its use and handling of Caterpillar's confidential and proprietary information, establishing Caterpillar's unrestricted rights to use certain Miller improvements, modifications, and derivatives of Caterpillar confidential information, and prohibiting Miller from disclosing to Caterpillar any Miller confidential or proprietary information (unless otherwise first agreed in writing).

2.     Therein, Miller agreed as follows:

1. We will not disclose CATERPILLAR CONFIDENTIAL INFORMATION to any third party and will use CATERPILLAR

CONFIDENTIAL INFORMATION only to conduct business with CATERPILLAR.

2. If we improve, modify, of make derivatives of CATERPILLAR CONFDIENTIAL INFORMATION, CATERPILLAR may use such improvements, modifications, and derivatives without restriction by us.

3. We will not disclose to CATERPILLAR any confidential or proprietary information unless our two companies otherwise first agree in writing.

3.      On September 18, 1998, Miller Welding Engineers Ltd. signed an agreement ("the Proprietary Agreement") governing disclosure to Caterpillar of certain information relating to Miller's coupler.

4.      Therein Miller agreed that Caterpillar would treat that information "as proprietary until the earliest of the following occurrences, (i) the first sale of a latching device made in accordance with the Invention, (ii) the issuance of a patent or the publication of a pending patent application or the Invention, or (iii) September 20, 2000 . . . . There shall be no restrictions on the handling of business or technical information which is not Proprietary Information."

5.      On March 30, 1999, Miller Welding Engineers Ltd. agreed to a valid and enforceable supply contract (the "Supply Agreement") for the sale of Miller's coupler to Caterpillar.  In the Supply Agreement, Caterpillar made no representation or guarantee as to the quantity of couplers it would purchase from Miller.  By its terms, the Supply Agreement could be terminated with or without cause.

6.      Miller periodically delivered substandard couplers to Caterpillar, exposing Caterpillar to several product liability lawsuits and to warranty claims.  The issues with Miller's products included, but were not limited to, bulging cylinders, problems with the blocking bar

length, and breakage due to improper casting. Caterpillar's customers complained about these and other issues with the couplers supplied by Miller.

7.      Caterpillar representatives discussed this unsatisfactory state of affairs with Miller representatives many times, but found Miller difficult to deal with and insufficiently responsive to Caterpillar's stated concerns.

8.      As problems with Miller continued, Caterpillar considered alternatives and ultimately developed and marketed its own coupler. Caterpillar specifically told Miller that it was considering alternatives. For example, at a meeting in July 2007, Bob Meng of Caterpillar informed Keith Miller, John Lines, and Vincent Whelan of Miller that Caterpillar was reviewing its options with respect to alternate sourcing for couplers.

9.      Over time and with major investments, Caterpillar developed its own coupler. In late 2008, Caterpillar showed its coupler to Miller General Manager John Lines at his request. After viewing the coupler, Lines stated that it was quite different from the Miller coupler, and said that he had informed Keith Miller that the Caterpillar coupler did not reflect any of Miller's intellectual property.

10.      On June 17, 2010, Miller filed suit in this Court alleging that Caterpillar (1) breached the Supply Agreement, (2) misappropriated Miller's trade secrets, (3) fraudulently induced Miller to make investments, and (4) was unjustly enriched.

## **AFFIRMATIVE DEFENSES**

Caterpillar asserts the following affirmative defenses based on the allegations in the Complaint and the information currently available to it, and reserves the right to assert additional affirmative defenses as discovery proceeds.

**<u>First Affirmative Defense – Unclean Hands</u>**

11.     Caterpillar incorporates by reference the allegations in Paragraphs 1-5 and 10 above.

12.     Throughout the course of the relationship, Miller has failed to abide by its agreements with Caterpillar, including but not limited to, allegedly disclosing trade secrets to Caterpillar contrary to the Agreement in which Miller stated that it would not to do so.

13.     Miller created and/or contributed to the wrongs alleged in the Complaint by, among other things, ignoring Caterpillar's statements that it did not commit to continuing the coupler supply relationship with Miller and by failing to secure a written agreement regarding purchase of Miller's bucket products.

14.     By seeking relief, Miller is trying to take advantage of its own wrongs.

15.     Thus, Miller's claims are barred by the doctrine of unclean hands.

**<u>Second Affirmative Defense – License/No Restriction On Use</u>**

16.     Caterpillar incorporates by reference the allegations in Paragraphs 1-4 above.

17.     The Agreement, Proprietary Agreement, and Caterpillar's purchase order terms and conditions, are valid and enforceable contracts.

18.     In the Agreement, Miller promised that Caterpillar could use, without restriction, any Miller improvements, modifications, and derivatives of Caterpillar confidential information.

19.     In the Proprietary Agreement, Miller promised that Caterpillar could use certain Miller-supplied coupler information without restriction after the date specified (no later than September 20, 2000).

20.     Pursuant to Caterpillar's purchase order terms and conditions, Miller promised that Caterpillar could use Miller's technical information without restriction.

21.     Miller's claims, which, on information and belief, are based, in whole or in part, on actions expressly authorized under the Agreement, Proprietary Agreement, and Caterpillar's purchase order terms and conditions, are, therefore, barred by those agreements.

### Third Affirmative Defense – Failure to Mitigate Damages

22.     Miller failed to use reasonable efforts to mitigate alleged damages, including, but not limited to, failing to use reasonable care in its business investment decisions and product development and marketing strategies.

23.     If Miller had made reasonable efforts and acted with reasonable care, any purported damages would have been mitigated.

24.     Thus, Miller's claims are precluded and/or limited by Miller's failure to mitigate damages.

### Fourth Affirmative Defense – Statute of Limitations

25.     Miller alleges events that date back over twelve years.

26.     The statute of limitations for a breach of contract under Illinois law is, at most, ten years.

27.     The statute of limitations for misappropriation of a trade secret under the Illinois Trade Secrets Act is, at most, five years.

28.     The statute of limitations for fraudulent inducement is, at most, five years.

29.     The statute of limitations for unjust enrichment is, at most, five years.

30.     Miller's claims are barred, in whole or in part, by the applicable statutes of limitations.

### Fifth Affirmative Defense – Laches

31.     Miller alleges facts that date back over twelve years.

32.     Miller failed to assert its claims in a timely manner, resulting in prejudice to Caterpillar.

33.     Caterpillar has been prejudiced by going ahead with its coupler and bucket product development efforts, and investing money and other resources in manufacturing and marketing such products.

34.     Thus, Miller's claims are barred, in whole or in part, by laches.

### Sixth Affirmative Defense – Statute of Frauds

35.     Miller alleges the existence of one or more oral agreements.

36.     Miller does not and cannot assert that these alleged agreements were verified in writing and capable of being performed within one year.

37.     Miller's claims based thereon are barred by the statute of frauds.

### Seventh Affirmative Defense – Estoppel

38.     Caterpillar incorporates by reference the allegations in Paragraphs 1 and 2 above.

39.     In the Agreement, Miller promised that it would not disclose any confidential or proprietary information to Caterpillar.

40.     Caterpillar justifiably relied on Miller's contractual promise.

41.     Miller is, therefore, estopped, in whole or in part, from asserting that information it disclosed to Caterpillar was confidential or a trade secret.

### Eighth Affirmative Defense – Waiver

42.     Caterpillar incorporates by reference the allegations in Paragraphs 1 and 2 above.

43.     To the extent Miller disclosed to Caterpillar any confidential or proprietary Miller information relating to its Scoop bucket, or asserts rights to improvements, modifications, or derivatives of Caterpillar confidential information, it has waived any claims that such information was confidential or a trade secret.

44.     Miller's claims, therefore, are barred, in whole or in part, by the doctrine of waiver.

### Ninth Affirmative Defense – Preemption

45.     Miller's claims for fraudulent inducement and unjust enrichment are preempted, in whole or in part, by the Illinois Trade Secrets Act, and thus are barred.

WHEREFORE, Defendant Caterpillar respectfully requests that this Court dismiss the Complaint with prejudice, enter judgment in Caterpillar's favor and against Plaintiffs, award attorneys' fees to Caterpillar pursuant to 765 ILCS 1065/5, award Caterpillar its costs and expenses in connection with its defense of the Complaint, and grant such other relief as this Court deems just and proper.

### COUNTERCLAIM

Caterpillar asserts the following counterclaim based on information currently available and reserves the right to assert additional counterclaims as discovery proceeds.

### Parties

46.     Counterclaim-Plaintiff Caterpillar Inc. ("Caterpillar") is a Delaware corporation having its principal place of business at 100 N.E. Adams Street, Peoria, Illinois 61629.

47.     Counterclaim-Defendant Miller UK Ltd. is a British corporation with a principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England, and is the successor to Miller Welding Engineers Ltd.

48.     Counterclaim-Defendant Miller International Ltd. is a privately-held corporation organized and existing under the laws of Gibraltar, having its principal place of business at 57/63 Line Wall Road, PO Box 199, Gibraltar.

49.     Counterclaim-Defendants Miller UK Ltd. and Miller International Ltd. are collectively referred to hereinafter as "Miller."

## Jurisdiction and Venue

50.     Caterpillar's counterclaim arises under common law.

51.     This is an action seeking monetary damages in excess of $75,000.00, exclusive of interest and costs, and this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

52.     Personal jurisdiction exists because Counterclaim-Defendants do business in this State and have submitted to the jurisdiction of this Court by the filing of their Complaint.

53.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a) and (c).

## Counterclaim I – Breach of the Agreement

54.     Caterpillar incorporates by reference the allegations it made in Paragraphs 1, 2, 10 above.

55.     The Agreement is a valid and enforceable contract.

56.     Caterpillar fully performed the Agreement.

57.     By its Complaint, among other things, Miller asserts that it disclosed confidential and proprietary information to Caterpillar, but lacked written permission to do so.

58.     By its Complaint, among other things, Miller asserts that Caterpillar has thereby caused Miller damage in unspecified amounts.

59.     If Miller's allegations are proven to be true, then Miller has breached the Agreement and its breach has injured Caterpillar in an amount to be determined at trial.

## Prayer for Relief

WHEREFORE, Counterclaim-Plaintiff Caterpillar respectfully requests that this Court enter a judgment for:

a) damages caused by Miller's breaches of the Agreement in an amount to be determined
   at trial;

b) attorneys' fees and costs pursuant to 765 ILCS 1065/5;

c) pre- and post-judgment interest; and

d) such other and further relief as the court deems just and proper.


JURY TRIAL DEMANDED.


Date:  November 11, 2010                    Respectfully submitted,

                                            /s/ Gregory L. Baker
                                            Robert G. Abrams (admitted *pro hac vice*)
                                            Gregory L. Baker (NDIL 288357)
                                            HOWREY LLP
                                            1299 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004-2402
                                            (202) 783-0800 phone
                                            (202) 383-6610 facsimile
                                            AbramsR@howrey.com
                                            BakerG@howrey.com

                                            Michael Padden
                                            HOWREY LLP
                                            3212 North Clark Street
                                            Suite 3400
                                            Chicago, Il 60654-4717
                                            (312) 595-1239 phone
                                            (312) 595-2250 facsimile
                                            PaddenM@howrey.com

                                            *Attorneys for Defendant and Counterclaim-
                                            Plaintiff Caterpillar Inc.*

## **CERTIFICATE OF SERVICE**

I, John Stapleton, hereby certify that on November 11, 2010, I electronically filed the foregoing AMENDED ANSWER TO THE COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS to be served upon the following, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

        R. Mark Halligan
        Jodie Rosen Wine
        Deanna R. Swits
        Jason S. Kray
        NIXON PEABODY LLP
        300 South Riverside Plaza, 16th Floor
        Chicago, IL 60606

        Robert A. Weikert
        NIXON PEADBODY LLP
        One Embarcadero Center, 18th Floor
        San Francisco, CA 94111

                /s/ John Stapleton
                _____

                John Stapleton