**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,** | |
| **Plaintiff** | **Civil Action No. 10-cv-3770** |
| **v.** | **Honorable Milton I. Shadur** |
| **CAPTERPILLAR INC.,** | |
| **Defendant.** | |
| **CATERPILLAR INC.,** | |
| **Counterclaim – Plaintiff,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,** | |
| **Counterclaim – Defendants.** | |

**ANSWER TO AMENDED AND SUPPLEMENTAL COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND SUPPLEMENTAL COUNTERCLAIMS**

Defendant Caterpillar Inc. ("Caterpillar") answers the Amended and Supplemental Complaint as follows:

**I**.

**AMENDED COMPLAINT**

1.      This action arises under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* and under the common law of the State of Illinois.

**Response to Paragraph 1:**

**Caterpillar admits that Plaintiffs purport to state claims under the Illinois Trade Secrets Act and the common law of the State of Illinois.**

## THE PARTIES

2.    Plaintiff Miller UK Ltd. ("Miller UK") is a privately-held corporation organized and existing under the laws of the United Kingdom, having its principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England. Plaintiff Miller International Ltd. ("Miller Int'l") is a privately-held corporation organized and existing under the laws of Gibraltar, having its principal place of business at 57/63 Line Wall Road, PO Box 199, Gibraltar. Plaintiff Miller is a leading engineering company in the design and manufacture of a range of buckets, quick couplers and other attachments used with earthmoving equipment.

**Response to Paragraph 2:**

**Caterpillar admits the allegations of the first two sentences of Paragraph 2 of the Complaint.  With respect to Miller UK Ltd., Caterpillar admits the allegations of the third sentence of Paragraph 2 of the Complaint.  With respect to Miller International Ltd., Caterpillar denies the allegations of the third sentence of Paragraph 2 of the Complaint.**

3.    On information and belief, Defendant CAT is a publicly-traded corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 100 North East Adams Street, Peoria, Illinois 61629, United States of America.

**Response to Paragraph 3:**

**Defendant, whose name is Caterpillar Inc., admits the allegations of Paragraph 3 of the Complaint.**

**JURISDICTION AND VENUE**

4.      This is an action for the threatened or actual misappropriation of trade secrets, breach of contract, unjust enrichment, fraudulent inducement, and false advertising in violation of the Lanham Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises out of the violation of a federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all claims arising under state statutory or common law. There exists diversity of citizenship between the parties, as Miller UK is a citizen of the United Kingdom, Miller Int'l is a citizen of Gibraltar, Defendant is a citizen of Illinois and of Delaware, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

**Response to Paragraph 4:**

**Caterpillar admits that this purports to be an action for the threatened or actual misappropriation of trade secrets, breach of contract, unjust enrichment, and fraudulent inducement.  Because Plaintiffs' false advertising claim has been dismissed, Caterpillar denies that this is an action for false advertising under the Lanham Act.  For the same reason, Caterpillar also denies that the Court has jurisdiction pursuant to 28 U.S.C. § 1331 or 28 U.S.C. § 1367.  Caterpillar admits diversity of citizenship between the parties. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the alleged amount in controversy.**

5.      This Court has personal jurisdiction over Defendant. Defendant is qualified to do business in the State of Illinois. Defendant also has a regular and established place of business in Illinois, and is and has been doing business in Illinois and this District at all times relevant hereto.

**Response to Paragraph 5:**

   **Caterpillar admits the allegations of Paragraph 5 of the Complaint.**

   6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), and (c).

**Response to Paragraph 6:**

   **Caterpillar admits that venue is proper in this judicial district, but denies that the specified statutory provisions establish that venue is proper here.**

### GENERAL ALLEGATIONS

   7.      Miller is a leading international engineering company involved in all aspects of the design and manufacture of quick couplers, buckets and other attachments used worldwide with earthmoving equipment.

**Response to Paragraph 7:**

   **Caterpillar denies the allegations of Paragraph 7 of the Complaint.**

   8.      CAT is an Original Equipment Manufacturer ("OEM") of equipment used in the earthmoving industry.

**Response to Paragraph 8:**

   **Caterpillar admits the allegations of Paragraph 8 of the Complaint.**

   9.      As detailed below, this case presents the quintessential theft of trade secrets and breach of a contractual and confidential relationship between a supplier and its customer spanning almost two decades. Using its leverage as Miller largest customer, CAT engaged in a scheme to systematically, and through the auspices of the parties' contractual relationship, gain

access to Miller jointly-held proprietary information and trade secrets, with the intent of misappropriating that information and those trade secrets to produce CAT's own products without having to engineer them from scratch, such that CAT would no longer have to purchase them from the Plaintiffs. Put differently, CAT sought to deprive the Plaintiffs of the return on their substantial mutual investment in the development of Miller products and to avoid the expense and effort that would have been required had CAT fairly and honestly developed its own products. Unfortunately, CAT largely succeeded in this scheme, which has made the present litigation necessary. CAT's scheme continues to the present day through CAT's dissemination to its dealers of a competitive bulletin that blatantly and, on information and belief, willfully misrepresents CAT's own knock-off of Miller's coupler and a coupler falsely represented as being sold by MillerBaird. The bulletin falsely misrepresents Miller's coupler in nearly every material respect, including depicting a coupler that was never sold by MillerBaird and could not have been properly fitted onto the CAT machine mentioned in the bulletin, misrepresenting the size, shape, weight, material composition, and versatility of the coupler made by Miller to make it appear heavier, weaker, bulkier, less safe, and less versatile than the CAT coupler, using an old photograph of a CAT-branded coupler made by Miller to misrepresent the MillerBaird coupler, concealing features on the Miller coupler made by Miller that would have shown it to be superior to the CAT coupler, omitting features from the CAT coupler to make it appear lighter and smaller than Miller's coupler, depicting the hooks of the CAT coupler in a configuration that is impossible so as to make the CAT coupler appear to be more versatile than the coupler made by Miller, and misrepresenting the operation and safety features of the coupler made by Miller. But most significantly, CAT misrepresents its own coupler as being safe, when independent testing and Miller's extensive testing have concluded that the CAT coupler is unsafe and potentially

deadly because a bucket or other attachment can become accidentally disengaged from the coupler, causing it to fall right off the coupler, severely harming someone in its path.

**Response to Paragraph 9:**

**Caterpillar denies the allegations of Paragraph 9 of the Complaint. Caterpillar further states that because Count V of the Amended and Supplemental Complaint has been dismissed, none of the allegations concerning the competitive bulletin require a response.**

### Miller's Pioneering Inventions

10.     Since the 1980s, Miller has been involved in the research and development of a range of proprietary quick couplers, buckets and other attachments for the earthmoving industries worldwide. Today, Miller is recognized as the world leader in all aspects of design and manufacture of quick couplers, buckets and attachment designs.

**Response to Paragraph 10:**

**Caterpillar admits that since the 1980s, Miller UK Ltd., either directly or through its predecessor, Miller Welding Engineers Ltd., has been involved in the research and development of couplers, buckets, and other attachments for earthmoving applications. In all other respects, Caterpillar denies the allegations of Paragraph 10 of the Complaint.**

11.     Plaintiffs' proprietary and confidential technologies include, but are not limited to: proprietary and confidential market research data; proprietary and confidential testing results, protocols, and data and test rigs; proprietary and confidential technical proposals, specifications, and blueprints, including but not limited to proprietary and confidential piece-part drawings, 3D models, prototypes, and FE analyses; proprietary and confidential research, trial and error,

industry information, and proofs of concepts; proprietary and confidential tours of factories and facilities; proprietary and confidential manufacturing techniques and processes, including but not limited to equipment selection, equipment organization, technician instruction and training (including instructional and training materials); confidential and proprietary strategic design and manufacturing protocols, including but not limited to multi-jurisdictional safety compliance protocols; confidential and proprietary intellectual property valuations, including but not limited to projected profits and margins; and proprietary, unique, and confidential combinations and compilations of the above information (hereinafter referred to in the aggregate as "Plaintiffs' proprietary trade secrets and confidential information").

**Response to Paragraph 11:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary and confidential technologies," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 11 of the Complaint.**

12.    Miller's proprietary trade secrets and confidential information are not generally known in the trade, and Miller derives economic value and competitive advantage in the marketplace from the secrecy of such information. Indeed, Miller's proprietary trade secrets and confidential information are Miller's lifeblood as a technology leader whose market position depends upon its innovations.

**Response to Paragraph 12:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," Caterpillar lacks knowledge or**

**information sufficient to form a belief about the truth of the allegations of Paragraph 12 of the Complaint.**

13.    Miller has invested millions of dollars, many times over, researching and developing its proprietary trade secrets and confidential information.

**Response to Paragraph 13:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," and because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 13 of the Complaint.**

14.    At all times relevant hereto, Plaintiffs have used reasonable measures to protect the secrecy of their proprietary trade secrets and confidential information, including but not limited to: restricted access on a need-to-know basis; global confidentiality policies; contractual confidentiality restrictions; security key cards; surveillance systems; locking gates; security personnel; guest registration procedures; locked and restricted offices and cabinets; paper shredders; password protected computer and network platforms; and a wide array of additional physical security and monitoring measures.

**Response to Paragraph 14:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," or the extent to which the alleged**

**"measures" were taken, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 14 of the Complaint.**

15.     Miller owns various United States Patents covering aspects of its innovations, including U.S. Patent Nos. 6,422,805, 6,481,124, 6,625,909 and 6,922,926, and U.S. Design Patent Nos. D440,983, D469,786, D565,062 and D610,592.

**Response to Paragraph 15:**

**Caterpillar admits that Miller UK Ltd. is listed as the owner of U.S. Patent Nos. 6,422,805, 6,481,124, 6,625,909 and 6,922,926, and U.S. Design Patent Nos. D440,983, D469,786, D565,062, and that Miller International Ltd. is listed as the owner of U.S. Design Patent No. 610,592. Because Caterpillar does not have access to Plaintiffs books and records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that either Plaintiff actually "owns" these patents or that these patents reflect "innovations" actually made by either Plaintiff.**

**The Miller "Bug" Coupler**

16.     In or about 1998, Miller designed the "Bug" coupler, the world's first-ever, fully automatic, universal quick coupler. The Bug coupler's design uniquely permitted hydraulic operation from the cab with an automatic mechanical safety device, which negated the need for a manual safety pin. The Bug's design advantageously provided universal compatibility with the world's best known machine manufacturers and the original Bug Coupler design is pictured below in Figure 1.



**Figure 1.**

**Response to Paragraph 16:**

Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing Miller's "Bug" Coupler, which Miller Welding Engineers Ltd. described as the world's first-ever, fully automatic, universal quick coupler. Caterpillar admits that the Bug coupler's design permitted hydraulic operation from the cab with an automatic mechanical safety device. With respect to Miller Welding Engineers Ltd. (predecessor to Miller UK Ltd.), Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 16. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 16 of the Complaint.

17.     Miller's history, however, begins far before its introduction of the Bug coupler. Miller was founded in 1978 as Miller Welding Engineers Ltd., focusing on the repair of earthmoving buckets for the quarry, mining, construction, and associated industries.

**Response to Paragraph 17:**

**Caterpillar admits Miller UK Ltd. informed Caterpillar, and also stated in its public literature, that Miller UK Ltd. was founded in 1978 as Miller Welding Engineers Ltd., focusing on the repair of earthmoving buckets for the quarry, mining, construction, and associated industries. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 17 of the Complaint.**

18.     Over the course of time, gaining expertise in the repair of these buckets, Miller recognized the bucket changeover procedure lacked efficiency, taking one to two hours, and was rife with risk for the machine operators who had to manually execute the changeover, including the risk of serious injury.

**Response to Paragraph 18:**

**Primarily because Caterpillar is not privy to what Plaintiffs recognized in this regard, or when, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 18 of the Complaint.**

19.     By 1989, Miller's innovative engineering and manufacturing expertise resulted in the design and manufacture of the pin grabber quick coupler. Miller marketed this pin grabber coupler as the "Mag 7." The Mag 7 reduced the long and often dangerous attachment changeover

procedure to a speedy, simple, and safe process. In fact, the one to two hour changeover process was reduced to a mere seven seconds, hence its name.

**Response to Paragraph 19:**

**Caterpillar admits that Miller Welding Engineers Ltd. marketed a pin grabber coupler known as the "Mag 7," which Miller Welding Engineers Ltd. described as offering significant time savings. Caterpillar further admits that, as a general matter, the "Mag 7" reduced the time spent during the attachment changeover process in comparison with more traditional couplers that were available at the time. With respect to Miller UK Ltd., Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 19 of the Complaint. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 19 of the Complaint.**

20.     But commercial success of the Mag 7 was not as quick, though it did come eventually. Miller invested hundreds of hours and hundreds of thousands of dollars in the promotion of its technology, literally creating the market for the quick coupler from the ground up.

**Response to Paragraph 20:**

**Primarily because Caterpillar is not privy to Plaintiffs' records regarding the promotion of Mag 7 "technology" or its "commercial success," and because Plaintiffs have not provided sufficient specifics as to the Mag 7 "technology," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 20 of the Complaint.**

21.     Once the quick coupler caught on, it quickly became the market standard—no operator could justify the hours lost in productivity and the risk of harm with the quick coupler available. Major OEMs worldwide, including CAT, turned to Miller for specifically-designed quick couplers to fit their machines.

**Response to Paragraph 21:**

**Caterpillar admits that it purchased quick couplers that fit certain Caterpillar machines from Miller UK Ltd. and its predecessor, Miller Welding Engineers Ltd. Primarily because Caterpillar does not know what "market" is referenced when the quick coupler is described as "the market standard," and because Caterpillar does not know what individual machine operators could "justify," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 21 of the Complaint.**

22.     Because the interface between machine and attachment is not standardized amongst the various machines and attachments produced by the OEMs, Miller designed and manufactured a custom quick coupler for each OEM. As a result of its unique market position with the world's major OEMs, Miller was able to compile testing and other technical information regarding the various interface configurations employed by the OEMs. Investing thousands of hours and millions of dollars, Miller synthesized and utilized its compiled information to research and develop significant innovations and optimizations to the quick coupler to become the universal coupler it is today.

**Response to Paragraph 22:**

**Caterpillar admits that, as a general matter, the interface between machine and attachment is not standardized across the various machines and attachments produced by various OEMs. Primarily because Caterpillar is not privy to Plaintiffs' investment records and what Plaintiffs may have done with respect to each other OEM with respect to design, manufacture, and compilation, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 22 of the Complaint.**

23.     In 1998, Miller launched the fully automatic Bug coupler, yet another market-first. While the Mag 7 was custom-designed for both a specific machine and its attachments (e.g. a Mag 7 designed for a CAT machine will only work with attachments that are also manufactured for that specific CAT machine), the Bug coupler is the first quick coupler to be universally compatible with most attachments, regardless of the OEM for which they were built. In other words, the Bug coupler is designed to fit a specific OEM machine while still capable of working with a range of attachments from different OEMs. Additionally, the Bug coupler is the first quick coupler to allow an operator to perform a changeover procedure solely from the machine's cab and to be able to use their work tools on job sites in a variety of applications, making this product very popular and versatile.

**Response to Paragraph 23:**

**Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing the "Bug" Coupler, which was described by Miller Welding Engineers Ltd. as the world's first-ever, fully automatic, universal quick coupler. Caterpillar further admits that the coupler sold to Caterpillar fit Caterpillar machines, but**

was still capable of working with some attachments from some different OEMs. Caterpillar further admits that, as a general matter, the Bug coupler design permitted an operator to perform a changeover procedure solely from the cab. Primarily because Caterpillar does not know whether the Bug coupler was universally compatible with most attachments, or whether it was the first coupler to exhibit the various characteristics alleged, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 23. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 23 of the Complaint.

### CAT's Access To And Knowledge Of Miller's Coupler Technology And Trade Secrets

24. In or about 1998, Miller and CAT, expanding their relationship, began discussing the manufacture and sale of both Miller's proprietary couplers to CAT. As part of the negotiations, CAT requested access to Miller's proprietary and confidential information, including Miller's proprietary trade secrets and confidential information, regarding the design and manufacture of Miller's couplers.

**Response to Paragraph 24:**

Although Caterpillar previously had purchased couplers for Caterpillar products from Miller Welding Engineers Ltd., Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. and Caterpillar began discussing the manufacture and sale to Caterpillar of additional couplers. Caterpillar denies that, as part of the negotiations with Miller Welding Engineers Ltd., it requested access to Plaintiffs' "proprietary and confidential information." Caterpillar further denies that it had any discussions in or about 1998 with Miller International Ltd.

25. On September 25, 1998, Miller entered into its first Proprietary Agreement with CAT in order to preserve the confidential and secret status of Miller's coupler technology. The Proprietary Agreement obligated CAT to treat as proprietary any information provided by Miller to CAT pursuant to the agreement.

**Response to Paragraph 25:**

**Caterpillar admits that on September 25, 1998, Miller Welding Engineers Ltd. entered into an agreement with Caterpillar (entitled "Proprietary Agreement"), that obligated Caterpillar to treat as proprietary, for a limited period of time (which has long since expired), certain information that Miller Welding Engineers Ltd. might provide to Caterpillar pursuant to the agreement.**

26. Then, on March 31, 1999, Miller and CAT entered into the subsequent Supply Agreement, drafted by CAT, in connection with CAT's purchase of couplers designed and manufactured by Miller. The Supply Agreement obligated Miller to provide its proprietary trade secret and confidential information to CAT as a condition of CAT's purchase of couplers designed and manufactured by Miller. The Supply Agreement reads in part:

> All Products and Parts shall be manufactured by Miller in accordance with drawings, prints, specifications and other technical data provided to and approved by Caterpillar. Miller shall provide to Caterpillar copies of such drawings, prints, specifications and other technical data in either IGES or Pro-E format and shall ensure that Caterpillar receive the most current of all such documents at all times. Such documents shall include all dimensions, tolerances and technical assembly information necessary for the production of Caterpillar support material. Any design changes to the Products and Parts by Miller shall only be made ninety days (90) after receiving written approval from Caterpillar. Miller agrees to use the electronic file transfer method as preferred by Caterpillar to communicate to Caterpillar any such proposed changes.

**Response to Paragraph 26:**

Caterpillar admits that Paragraph 3(a) of the Supply Agreement of March 1999, contains the language in the block quotation set forth above. Caterpillar further admits that the Supply Agreement between Caterpillar and Miller Welding Engineers Ltd. is for the purchase of couplers. Otherwise, Caterpillar denies the allegations of Paragraph 26 of the Complaint.

27.     The Supply Agreement obligated CAT to maintain as confidential any proprietary trade secret and confidential information provided by Miller. The Supply Agreement reads in part:

> 17. Confidential Information
>
> (a) In order to accomplish the purposes of this Agreement, it is expected that each party will disclose Proprietary Information including technical and business information, to the other; but the transfer of Proprietary Information shall not be considered publication of such information. A party may use the Proprietary Information of the other party only for the purposes of this Agreement, and shall not disclose such Proprietary Information to any third party except pursuant to this Agreement or with the consent in writing of the other party. For the purposes of this Agreement, "Proprietary Information" shall include all confidential information and know-how, business, technical or otherwise, disclosed by a party to the other, but shall not include the information or know-how which is (i) available to the public or later becomes available to the public through no act or omission of the recipient party, or (ii) rightfully disclosed to the recipient by a person or entity not a party to this Agreement.
>
> (b) Notwithstanding the above provision, each party may use and disclose to persons who are not parties to this Agreement such portions of Proprietary Information of the other party as may be reasonably necessary and appropriate to carry out the provisions of this Agreement when the person to whom such information is disclosed has entered into an agreement with the disclosing party in a form satisfactory to the other party, requiring it to assume the same obligations toward such other party, as well as toward the

disclosing party, as are set forth in section to safeguard such other party's knowledge and information.

(c) All drawings, prints, specifications, records, manuals, notebooks, computer programs and other similar or dissimilar materials supplied by one party to the other in connection with this Agreement and all copies thereof, shall remain the property of the supplying party and, to the extent it will not interfere with the performance of this Agreement, upon request by supplying party shall be returned to the supplying party, or destroyed, by the receiving party.

It is important to note that this confidentiality provision is broad, and it is not limited to a particular product line, for example the Miller couplers.

**Response to Paragraph 27:**

**Caterpillar admits that Paragraph 17 of the Supply Agreement of March 1999, contains language similar to the language set forth above; however, the Plaintiffs' purported quotation is not entirely accurate. Caterpillar denies that the Supply Agreement necessarily obligated Caterpillar "to maintain as confidential any proprietary trade secret and confidential information provided by Miller." Caterpillar also denies that Paragraph 17 of the Supply Agreement was broader than the subject matter of the contract (the purchase of couplers from Miller).**

28.   Over the next several years, Miller provided CAT with its proprietary trade secrets and confidential information related to the design, manufacture, and testing of Miller's proprietary coupler technology pursuant to the Supply Agreement. Indeed, Miller provided CAT, at its request, with various Miller proprietary trade secrets and confidential information in the form of physical and electronic documents, drawings (e.g., piece-part and CAD drawings and 3D models), photographs, schematics, reports, prototypes, access to Miller's manufacturing facilities, and access to Miller's engineers.

**Response to Paragraph 28:**

**Caterpillar admits that, from time to time, and for several years after the signing of the Supply Agreement, Miller Welding Engineers Ltd. and Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with some technical information concerning their couplers. Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 28 of the Complaint.**

29. For example, Miller provided CAT with proprietary information relating to its coupler technology in response to a request for such information by Warren Tarr, a CAT employee, during a telephone conference on January 14, 1998.

**Response to Paragraph 29:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary information relating to [their] coupler technology," and because the telephone conversation allegedly was with Warren Tarr, who is now retired from Caterpillar, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 29.**

30. Then, in late 2001, Paolo Fellin of CAT raised concerns regarding continuity of supply. To address these concerns, Miller and CAT began discussions regarding CAT's licensing of Miller's technology for CAT's own production with Miller providing detailed technical information.

**Response to Paragraph 30:**

**Caterpillar admits that, at some point in time, Paolo Fellin of Caterpillar raised concerns regarding continuity of supply. Caterpillar further admits that Miller UK Ltd. and Caterpillar discussed various ways of dealing with Caterpillar's continuity of supply concerns, including the possibility of Caterpillar licensing technology from Miller UK Ltd. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 30 of the Complaint.**

31.     In the summer of 2002, several CAT employees, including Paolo Fellin and Max Martin, visited Miller's design and manufacturing facilities in Newcastle and viewed demonstrations of Miller's couplers. By the end of that summer, business between the two companies was increasing and as a result, CAT became the largest customer of Miller.

**Response to Paragraph 31:**

**Caterpillar admits that in the summer of 2002, several Caterpillar employees, including Paolo Fellin and Max Martin, visited the design and manufacturing facilities of Miller UK Ltd. (not Miller International Ltd.) in Newcastle and viewed demonstrations of its couplers. Caterpillar further admits that by the end of the summer of 2002, business between Caterpillar and Miller UK Ltd. (not Miller International Ltd.) was increasing. Primarily because Caterpillar is not privy to Plaintiffs' sales data, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Caterpillar became the largest customer of Miller UK Ltd. by the end of the summer of 2002. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 31 of the Complaint.**

32.     In the summer of 2003, with CAT now the largest customer of Miller, Max Martin of CAT again raised concerns about continuity of supply. Miller and CAT began negotiating an option for CAT to purchase Miller's intellectual property rights and a right of first refusal should Miller ever decide to sell the company. Under strict conditions of confidentiality, Miller provided CAT detailed calculations regarding forecasted profits, margins, and valuation of Miller's intellectual property rights, including the valuations of the Miller trade secrets and confidential information. In connection with these negotiations and the exchange of this detailed confidential and proprietary information, Miller provided a draft Addendum to the March 31, 1999 Supply Agreement was to CAT that addressed these concerns as well as other issues. Though the parties corresponded over many months and exchanged multiple drafts, the Addendum Agreement never was executed, and Miller continued providing couplers to CAT under the Supply Agreement.

**<u>Response to Paragraph 32</u>:**

**Caterpillar admits that in the summer of 2003, Max Martin of Caterpillar discussed Caterpillar's concerns about continuity of supply with Miller UK Ltd. (not Miller International Ltd.).   Caterpillar admits that at or about that time, Caterpillar and Miller UK Ltd. (not Miller International Ltd.) discussed various possible ways of dealing with Caterpillar's continuity of supply concerns, including negotiating an option for Caterpillar to purchase certain intellectual property rights that might be possessed by Miller UK Ltd. (not Miller International Ltd.) or renegotiating Caterpillar's existing right of first refusal regarding any future sale of Miller UK Ltd.  Caterpillar further admits that at or about that time, Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with certain**

**financial information. Caterpillar also admits that at or about that time, Miller UK Ltd. (not Miller International Ltd.) provided Caterpillar with a draft Addendum to the March 1999 Supply Agreement, which addressed certain issues under discussion. In addition, Caterpillar admits that Caterpillar and Miller UK Ltd. (not Miller International Ltd.) discussed one or more versions of a draft Addendum over many months, that no version of the draft Addendum was ever executed, and that Miller UK Ltd. continued providing couplers to Caterpillar under the Supply Agreement. Primarily because Caterpillar is not privy to Plaintiffs' sales data, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Caterpillar was the largest customer of Miller UK Ltd. in the summer of 2003. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 32 of the Complaint.**

33.     In February of 2005, Miller and CAT again met to discuss their relationship and the upcoming CONEXPO Conference, at which Miller and CAT would jointly present the Miller couplers. Once more, Miller, under strict confidentiality, provided a variety of detailed technical information including the Miller trade secrets and confidential information, specifically part listings, installation procedures, and piece-part drawings.

**Response to Paragraph 33:**

**Caterpillar admits that, from time to time, Miller UK Ltd. and Caterpillar met to discuss their commercial relationship, sometimes in connection with an industry conference, such as CONEXPO, and that, from time to time, Miller UK Ltd. provided technical information to Caterpillar. Caterpillar denies that Caterpillar and Plaintiffs "jointly" presented the Miller coupler at CONEXPO in February of 2005. Primarily**

because Plaintiffs have not provided sufficient specifics as to the "detailed technical information" or any "trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the other allegations of Paragraph 33 of the Complaint with respect to Miller UK Ltd. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 33 of the Complaint.

34.     After CONEXPO in March of 2005, Miller began to hear rumors that CAT was designing a coupler of its own, but CAT denied the truth of these rumors.

**Response to Paragraph 34:**

**Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that, after CONEXPO in March of 2005, Plaintiffs began to hear rumors that Caterpillar was designing a coupler of its own. Caterpillar denies that it "denied the truth" of any such rumors.**

35.     Yet CAT's requests for more detailed technical information regarding the Miller couplers, which Miller was obligated to provide under the Supply Agreement, began coming faster and faster, first in March, then in June of 2005, always under the guise of "testing" and "market research."

**Response to Paragraph 35:**

**Caterpillar admits that Miller UK Ltd. was obligated to provide certain technical information pursuant to the March 1999 Supply Agreement, and that, from time to time, Caterpillar asked Miller UK Ltd. (not Miller International Ltd.) for such information. Caterpillar denies that the pace of such requests quickened first in March, then in June of**

**2005, and that such requests were "always under the guise of 'testing' and 'market research.'"**

36.     Previously, with CAT's promises and representations that its business was not only stable, but that its requirements would increase substantially, Miller began making investments in expansion, all the while inquiring as to CAT's future plans and requirements. In June of 2006, with expansion under way but before making substantial new investments, Miller again confirmed its continuing relationship with its largest customer, CAT. Bob Meng of CAT confirmed that Miller would continue to be CAT's exclusive supplier of couplers and encouraged Miller's expansion. Based on this confirmation, Miller began preparations to expand further its manufacturing facilities to China, where Miller could manufacture couplers by casting.

**Response to Paragraph 36:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about the timing and size of or reasons for Plaintiffs' investments.  In all other respects, Caterpillar denies the allegations of Paragraph 36 of the Complaint.**

37.     Of course, not long thereafter in December of 2006, CAT also demanded that Miller provide its detailed technical information regarding the set-up of its new casting facility in China, which Miller has invested millions of dollars in developing.

**Response to Paragraph 37:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the**

allegation about the size of Plaintiffs' investments. In all other respects, Caterpillar denies the allegations of Paragraph 37 of the Complaint.

38.     In 2007, Bob Meng and other CAT employees visited Miller's China facility in person.

**Response to Paragraph 38:**

Caterpillar admits that in 2007 Bob Meng and one other Caterpillar employee visited a facility in China that Caterpillar understood had a connection to Miller UK Ltd.

39.     Plaintiff Miller Int'l was incorporated in Gibraltar on August 9, 2006. On June 22, 2007, Miller Int'l became the holding company for the Miller Group with Miller UK becoming one of its wholly owned subsidiaries. At this time, Miller UK transferred and/or assigned certain of its rights and obligations under the Supply Agreement to its affiliate, Miller Int'l. This transfer and/or assignment, which was shared with and agreed to by CAT, did not have any material effect upon Miller UK's performance of the Supply Agreement.

**Response to Paragraph 39:**

Primarily because Caterpillar is not privy to Plaintiffs' books and records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations about incorporation, holding company status or structure, and supposed transfer and/or assignment of unspecified rights and obligations. In all other respects, Caterpillar denies the allegations of Paragraph 39 of the Complaint.

- 25 -

40. Recently, CAT has sought to initiate an independent relationship with Miller's partners in its China facility, which, on information and belief, is based upon the Miller trade secrets and confidential information CAT received regarding this facility.

**Response to Paragraph 40:**

**Caterpillar admits that it has established a business relationship with a manufacturer in China, which Caterpillar understands has or once had a relationship with Miller UK Ltd. In all other respects, Caterpillar denies the allegations of Paragraph 40 of the Complaint.**

41. In or around the same time of Bob Meng's visit to Miller's China facility in 2007, CAT, without Miller's knowledge, filed applications with the U.S. Patent and Trademark Office for patents relating to coupler technology.

**Response to Paragraph 41:**

**Caterpillar admits that in or around 2007, Caterpillar filed applications with the U.S. Patent and Trademark Office for patents relating to coupler technology. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about Plaintiffs' knowledge.**

42. Then, in June of 2008, much to Miller's surprise, Bob Meng of CAT informed Miller that CAT had developed its own coupler technology and would be phasing out its purchases of the Miller Bug Coupler.

**Response to Paragraph 42:**

**Caterpillar admits that in or around June of 2008, Bob Meng of Caterpillar informed Keith Miller that Caterpillar Work Tools, a business unit within Caterpillar, had developed its own coupler technology and would be phasing out its purchases of the Miller coupler. Caterpillar further admits that Miller UK Ltd. continued to supply couplers to Caterpillar thereafter. Caterpillar denies that Keith Miller should have been surprised.**

43.    In 2009, Keith Miller met with James L. Tevebaugh, who replaced Bob Meng as the Manager of Caterpillar Work Tools, to try to persuade Mr. Tevebaugh to reconsider CAT's decision to phase out purchases of Miller's couplers in favor of a new coupler that CAT derived from Miller's proprietary trade secrets and confidential information. Those pleas went unheeded as CAT launched its new Center Lock Pin Grabber Coupler that same year.

**Response to Paragraph 43:**

**Caterpillar admits that Keith Miller met with James L. Tevebaugh in October 2009 and discussed, among other things, Bob Meng's decision to phase out purchases by Caterpillar Work Tools of Miller's couplers. Caterpillar further admits that Mr. Tevebaugh replaced Mr. Meng as General Manager of Caterpillar Work Tools. Caterpillar denies that Caterpillar decided to phase out purchases of Miller's couplers in favor of a new coupler that Caterpillar "derived from Miller's proprietary trade secrets and confidential information." Caterpillar admits that it launched its Center-Lock Pin Grabber Coupler in early 2009, long before the meeting between Keith Miller and James Tevebaugh in October 2009.**

44.     Over the course of their relationship, dozens of CAT employees, including but not limited to the following, were exposed to Miller's proprietary Miller trade secrets and confidential information, at CAT's request and subject to the Supply Agreement and other guarantees of confidentiality: Jim Owens, Paulo Fellin, Bob Meng, Frank Dennis, John Walker, Max Martin, Charlie Delph, Anker Henningsen, Fred Grafton, Dave Koch, Keith Heideman, Rick Oswald, Alan Switzer, Doug Bye, Ron Kropollopski, Gary Zoromski, Dave Mohr, Greg Salistead, Greg Lobica, Gary Woeman, Phil Richards, Pierre Wasserman, Donald Houge, Glen Johnson, Dan Kennedy, Warren Tarr, Roy Hatfield, Mark Moser, Delaine Bonner, Ramon Mosqueda, Joe Milke, Jon Lecocq, Eric Schultz, Craig Willoughby, Dick Smalley, Doyle Long, Greg Ferkol, Jim Nickels, Farzin Khorasanizaden, Eric Tu, Robin Mu, Michael Lebrun, Kriste Armstrong, Teresa Patterson, Jeremy Davis, Blair Maust, Caroline Pickens, Anu Reddy, Jon Council, Dave Edmunds, and many others.

**Response to Paragraph 44:**

**Caterpillar admits that a great many of the Caterpillar employees mentioned in Paragraph 43 met with or communicated with personnel from Miller UK Ltd. about various things at various points in time. Primarily because Plaintiffs have not provided sufficient specifics as to "Miller's proprietary Miller trade secrets and confidential information," Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 44 of the Complaint.**

45.     On information and belief, CAT used the Miller trade secrets and confidential information, which it repeatedly sought and which Miller was required to produce under the

Supply Agreement, to produce what is now marketed as the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

**Response to Paragraph 45:**

 **Caterpillar denies the allegations of Paragraph 45 of the Complaint.**


 46. Furthermore, under the terms of the Supply Agreement, Miller also provided CAT with proprietary instructions and other types of manuals related to the operation of the Miller Bug Coupler, as demonstrated in Exhibit A, for use in marketing and selling the re-branded Miller Bug Coupler in June of 1999. Even after discontinuing purchase of the Miller Bug Coupler, CAT continued to use those proprietary instructions and manuals without Miller's permission or authorization in the marketing and sale of the Caterpillar Center-Lock Pin-Grabber Quick Coupler in breach of the Supply Agreement, as demonstrated in Exhibit B, dated March 2009 and including the identical drawings to those provided to CAT by Miller. On information and belief, CAT continues to use and distribute Miller's proprietary instructions and manuals.

**Response to Paragraph 46:**

 **Caterpillar admits that Exhibits A and B to the Complaint are excerpts from Caterpillar Operation and Maintenance Manuals dated June 1999 and March 2009, respectively. Caterpillar admits that Exhibit A concerns the couplers Miller UK Ltd. and Miller Welding Engineers Ltd. provided to Caterpillar, whereas Exhibit B concerns the Cat® Center-Lock™ Pin Grabber Coupler. Caterpillar denies that it stopped purchasing Miller couplers before Plaintiffs filed the Complaint. Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Miller UK Ltd. provided to Caterpillar "proprietary instructions and other types of manuals" related to**

the operation of the coupler, that any of the information reflected in Exhibits A and B comes from said sources, or that Plaintiffs provided any such sources or information under the terms of the Supply Agreement.  With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 46 of the Complaint.

## The Miller Scoop Bucket

47.     While a machine equipped with a quick coupler provided significant advantages such as, for example, reduced changeover time, improved attachment versatility, and enhanced safety, Miller recognized that these advantages came at the expense of machine performance. Specifically, Miller recognized that machines utilizing a quick coupler experienced less breakout force due to the increased distance, introduced by the quick coupler, from the dipper arm of the machine to the tip of a conventional bucket.

**Response to Paragraph 47:**

**Caterpillar admits that, under certain circumstances, a quick coupler could provide advantages over more traditional types of couplers such as, for example, reduced changeover time and improved attachment versatility.  Caterpillar denies that a quick coupler would necessarily provide the advantage of enhanced safety.  Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation about what Plaintiffs recognized.**

48.     After significant research and development, Miller engineered a new bucket, the Miller Scoop, designed specifically for operation with quick couplers, which addressed and overcame the disadvantages of conventional buckets and is pictured below in Figure 2 and

Figure 3. The revolutionary Miller Scoop bucket was the first bucket design to include integrated bucket pins, reducing the distance from the dipper arm of the machine to the tip of the bucket and minimizing the loss in breakout force that occurs when a quick coupler is installed.



| Figure 2 | Figure 3 |

**Response to Paragraph 48:**

**Caterpillar admits that Miller Welding Engineers Ltd. introduced a bucket known as the Miller Scoop bucket, which appears to be depicted in Figures 2-3. Caterpillar denies that the Miller Scoop bucket was "revolutionary," "overcame the disadvantages of conventional buckets," or was "the first bucket design to include integrated bucket pins." Because it is not privy to Plaintiffs' books and records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs introduced the Scoop bucket after significant research and development. With respect to Miller International Ltd., Caterpillar denies the allegations of Paragraph 48 of the Complaint.**

49. The Miller Scoop bucket also includes an additional innovation of a triple radius profile, which enables the bucket to cut through the ground more effectively with minimal resistance and drag, and provides a self-fill action that increases load volume. Miller patented this second innovative aspect of the Miller Scoop bucket.

**Response to Paragraph 49:**

Primarily because Plaintiffs have not been specific as to what they mean by "triple radius profile" (and have not responded to Caterpillar's requests for clarification about same), Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 49 of the Complaint.

50. Both the integrated bucket pins innovation and the triple radius profile innovation increased performance, productivity, efficiency and profitability of the machine.

**Response to Paragraph 50:**

Caterpillar admits that, under some circumstances, integrated bucket pins could increase performance, productivity, efficiency, and profitability of a machine. Based on Caterpillar's surmise as to what the undefined term "triple radius profile" means, Caterpillar denies that such a feature necessarily would increase performance, productivity, efficiency, and profitability of a machine.

51. In or about 1998, Miller sought to further expand its business relationship with CAT by advising CAT of its innovations in bucket technology as CAT did not then have a bucket that included the integrated pin innovation or the triple radius innovation. Miller agreed to provide CAT with access to Miller's proprietary and confidential Scoop bucket technologies and innovations based on oral agreements and understandings that CAT would purchase buckets incorporating the Miller Scoop technologies or CAT would compensate Miller if CAT manufactured products based on the technologies of the Miller Scoop bucket.

**Response to Paragraph 51:**

Caterpillar admits that in or about 1998, Miller Welding Engineers Ltd. sought to interest Caterpillar in purchasing buckets to be supplied by Miller Welding Engineers Ltd. In all other respects, Caterpillar denies the allegations of Paragraph 51 of the Complaint.

52.     Over the next several years, CAT repeatedly requested and Miller provided substantial proprietary and confidential information in connection with Miller's Scoop bucket technologies pursuant to the parties' agreements governing the exchange of confidential and proprietary information, purportedly for purposes of evaluating the commercial viability of the Miller Scoop bucket technologies.

**Response to Paragraph 52:**

Caterpillar denies the allegations of Paragraph 52 of the Complaint.

53.     During this time, CAT and Miller continued to negotiate CAT's compensation of Miller for any commercialization of the proprietary and confidential Miller Scoop bucket technologies. At a meeting between Paolo Fellin of CAT and Miller on August 8, 2002, CAT orally agreed to an exclusive license of Miller's Scoop technology, as confirmed by CAT's lack of objection to the meeting minutes and outline of terms sent to CAT by Miller.

**Response to Paragraph 53:**

Caterpillar denies the allegations of Paragraph 53 of the Complaint.

54.     Based on the prior negotiations and on the oral agreement of August 8, 2002, and the parties' prior agreements governing exchange of confidential and proprietary information,

Miller continued to provide CAT with substantial access, demanded by CAT, to Plaintiffs' proprietary and confidential information related to the Scoop Bucket technologies, including technical drawings, specifications, market analyses, prototypes, and testing data in connection with the innovations of the Miller Scoop Bucket.

**Response to Paragraph 54:**

**Caterpillar denies the allegations of Paragraph 54 of the Complaint.**


55.     On or about September 4, 2002, Miller conducted comparative testing of a highly confidential, proprietary prototype Miller Scoop bucket and various buckets provided by CAT. Significantly, one of the test buckets provided by CAT was a modified version of CAT's conventional Power Bucket. Essentially, CAT modified its conventional Power Bucket to incorporate Miller's integrated pin innovation of the Scoop bucket, reducing the distance from the drive arm of the machine to the bucket tip.

**Response to Paragraph 55:**

**Caterpillar admits that in the second half of 2002, performance tests were conducted on buckets provided by Caterpillar and Miller UK Ltd. Caterpillar further admits that one of the Caterpillar supplied buckets was a modified version of Caterpillar's conventional Power Bucket. Caterpillar also admits that the modified version of the Caterpillar bucket utilized an integrated pin design, which, in comparison to the conventional Caterpillar Power Bucket (when used under comparable circumstances), reduced the distance from the drive arm of the machine to the bucket tip. In all other respects, Caterpillar denies the allegations of Paragraph 55 of the Complaint.**

56.     CAT delayed signing a formal written license agreement with Miller despite having agreed to terms at the August 8, 2002 meeting. And, in or about early 2004, CAT informed Miller that CAT would not pursue the Miller Scoop bucket because CAT did not want to displace sales of its own profitable and proprietary bucket products.

**Response to Paragraph 56:**

**Caterpillar denies the allegations of Paragraph 56 of the Complaint.**

57.     Yet later in 2004, upon learning that Miller had further improved the design of its Scoop bucket, CAT again requested that Miller provide substantial proprietary and confidential technical information and testing data in connection with the improvements to Miller's design.

**Response to Paragraph 57:**

**Caterpillar denies the allegations of Paragraph 57 of the Complaint.**

58.     In February of 2005, Bob Meng, Max Martin, Dave Koch, Frank Dennis, and Ron Kroplidowski of CAT met with Keith and Jacqui Miller of Miller in confidence at a hotel in Chicago, Illinois. Miller shared extensive confidential and proprietary information with CAT during this meeting relating to research and development, negative know-how, technical solutions, and test results for the Miller Scoop Bucket.

**Response to Paragraph 58:**

**Caterpillar admits that Bob Meng, Max Martin, and Dave Koch (and perhaps others) met with Keith and Jacqui Miller at a hotel in the Chicago area, although Caterpillar is not certain that meeting took place in February 2005.  In all other respects, Caterpillar denies the allegations of Paragraph 58 of the Complaint.**

59.    Based upon CAT's promises that CAT would genuinely consider commercialization of the improved Scoop bucket with due compensation to Miller as previously negotiated, Miller acquiesced to CAT's repeated demands for its proprietary and confidential information.

**Response to Paragraph 59:**

**Caterpillar denies the allegations of Paragraph 59 of the Complaint.**

60.    Investing thousands of hours and hundreds of thousands of dollars, Miller continued to research, design and test the Scoop bucket technologies at the request of CAT. For example, Miller obtained additional comparative testing of Scoop buckets by independent third parties, market surveys and market analysis to demonstrate the commercial viability of the Miller Scoop bucket to CAT.

**Response to Paragraph 60:**

**Primarily because Caterpillar is not privy to Plaintiffs investment records, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs invested "thousands of hours and hundreds of thousands of dollars" on continued research, design, and testing of "the Scoop bucket technologies." Caterpillar denies that it requested Plaintiffs to make any such investments. Caterpillar admits that Miller UK Ltd. (not Miller International Ltd.) engaged in comparative performance testing of its Scoop bucket and that Miller UK Ltd. (not Miller International Ltd.) tried to demonstrate to Caterpillar the commercial viability of the Miller Scoop bucket. Primarily because Caterpillar is not privy to materials that Plaintiffs may have "obtained," or the purpose behind obtaining any such materials, Caterpillar lacks**

**knowledge or information sufficient to form a belief about the truth of the allegation that Plaintiffs "obtained additional comparative testing of Scoop buckets by independent third parties, market surveys and market analysis to demonstrate the commercial viability of the Miller Scoop bucket" to Caterpillar.**

61.     However, unbeknownst to Miller, CAT had for some time been planning to commercialize the confidential and proprietary integrated pin innovation of the Scoop bucket without compensating Miller. Indeed, on or about July 6, 2005, CAT filed a patent application, without Miller's knowledge, in the United States Patent and Trademark Office on a bucket design, which includes as part of the claimed invention the integrated pin innovation of the Miller Scoop bucket. Significantly, two of the named inventors on the CAT patent application were CAT employees, Douglas Bye and Jeff Kurtz, that had extensive access to technical information provided by Miller and were heavily involved in the field testing of Miller's Scoop buckets. Despite the fact that the integrated pin design was Miller's innovation, the claim of CAT's design patent incorporates this feature as part of a design that CAT claims to have invented. The patent application was not published or otherwise publicly available until January of 2009.

**<u>Response to Paragraph 61</u>:**

**Caterpillar admits that on or about July 6, 2005, Caterpillar filed a patent application in the United States Patent and Trademark office for a bucket design. Caterpillar further admits that there are three named inventors on the design patent: Pandu Boyapally; Douglas Bye; and Jeff Kurtz.  Caterpillar further admits that Douglas**

Bye and Jeff Kurtz attended one or more field tests of buckets, including Miller's Scoop bucket, and had access to certain results generated from those field tests. In all other respects, Caterpillar denies the allegations of Paragraph 61 of the Complaint.

62. Meanwhile, CAT continued to encourage Miller to provide additional proprietary and confidential information relating to Miller's continued research, development, testing and improvements to its Scoop bucket designs.

**Response to Paragraph 62:**

Caterpillar denies the allegations of Paragraph 62 of the Complaint.

63. For example, on or about October 12, 2005, CAT conducted additional tests on yet another improvement to Miller's Scoop bucket technology. Again, Douglas Bye was involved in testing Miller's Scoop bucket technology.

**Response to Paragraph 63:**

Caterpillar admits that in the second half of 2005, Caterpillar conducted performance tests on various buckets, including a Miller Scoop bucket. Caterpillar further admits that Douglas Bye was involved in those tests.

64. In the summer of 2006, Miller first learned from CAT that it had decided to manufacture its own bucket product, which would incorporate the integrated pin innovation of the Miller Scoop Bucket, but that CAT would not compensate Miller. Bob Meng of CAT explained that CAT would not compensate Miller, claiming there was no contract despite the

parties' prior confidentiality agreement and extensive proprietary and confidential information that Miller provided to CAT over the previous eight years

**Response to Paragraph 64:**

**Caterpillar admits that Bob Meng of Caterpillar stated in substance that Caterpillar would not compensate Miller UK Ltd. with respect to buckets because Caterpillar did not owe any compensation. Caterpillar lacks knowledge or information sufficient to form a belief as to when Plaintiffs first learned from Caterpillar that Caterpillar had decided to manufacture its own bucket with an integrated pin. In all other respects, Caterpillar denies the allegations of Paragraph 64 of the Complaint.**

65. The CAT bucket, which incorporated the integrated pin innovation was officially launched at Conexpo 2008.

**Response to Paragraph 65:**

**Caterpillar denies the allegations of Paragraph 65 of the Complaint.**

## COUNT ONE
## BREACH OF CONTRACT

66. Miller repeats and realleges the averments of paragraphs 1- 65 as if fully set forth herein.

**Response to Paragraph 66:**

**Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-65 of the Complaint.**

67. The Supply Agreement is a valid and enforceable contract.

**Response to Paragraph 67:**

**The Supply Agreement was terminated by Caterpillar pursuant to the terms of the contract. The enforceability of the contract, if any, is limited in accordance with the terms of the contract. Moreover, as described in Caterpillar's defenses, *infra*, prior breaches of the contract by Miller Welding Engineers Ltd. and Miller UK Ltd. made the Supply Agreement unenforceable by Miller Welding Engineers Ltd. and Miller UK Ltd. (or any entity that claims rights through them).**

68.     By using Plaintiffs' proprietary trade secrets and confidential information in the manufacture and sale of CAT's quick couplers, specifically the CAT Center-Lock Pin Grabber Quick Coupler, and in the manufacture and sale of CAT's Scoop-style bucket, Defendant CAT has breached the Supply Agreement, specifically Article 17, which restricts CAT's use of Plaintiffs' Proprietary Information "solely for the purposes of this Agreement."

**Response to Paragraph 68:**

**Caterpillar denies the allegations of Paragraph 68 of the Complaint.**

69.     Additionally, by using the materials specified in paragraph 11 above, CAT has breached Article 17 of the Supply Agreement which vests ownership of all the materials specified in paragraph 11 in Miller.

**Response to Paragraph 69:**

**Caterpillar denies the allegations of Paragraph 69 of the Complaint.**

70.     Miller has performed all of its obligations pursuant to the Supply Agreement.

**Response to Paragraph 70:**

    **Caterpillar denies the allegations of Paragraph 70 of the Complaint.**

71.    As a direct result of Defendant CAT's violation of its obligations under the Supply Agreement, Miller has sustained and will continue to sustain damages in an amount to be determined at trial.

**Response to Paragraph 71:**

    **Caterpillar denies the allegations of Paragraph 71 of the Complaint.**

**COUNT TWO**
**THREATENED OR ACTUAL**
**MISAPPROPRIATION OF TRADE SECRETS**

72.    Miller repeats and realleges the averments of paragraphs 1-65 as if fully set forth herein.

**Response to Paragraph 72:**

    **Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-65 of the Complaint.**

73.    Miller's proprietary Miller trade secrets and confidential information, set forth individually and collectively in paragraph 11, supra, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

**Response to Paragraph 73:**

    **Primarily because Plaintiffs have not provided sufficient specifics as to any "trade secrets and confidential information," Caterpillar lacks knowledge or information**

**sufficient to form a belief about the truth of the allegations of Paragraph 73 of the Complaint.**

74.     At all times, Miller has taken reasonable measures to protect its proprietary trade secrets and confidential information and Miller derives economic value and competitive advantage from such information not being generally known to the public or trade.

**Response to Paragraph 74:**

**Primarily because Plaintiffs have not provided sufficient specifics as to any "proprietary trade secrets and confidential information," the extent and scope of measures Plaintiffs took, or the economic value and competitive advantage of such information, Caterpillar lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 74 of the Complaint.**

75.     On information and belief, there exists the threatened or actual misappropriation of trade secrets by CAT to acquire, disclose and/or use, by improper means, Miller's proprietary trade secrets and confidential information for its own benefit and/or the benefit of others without Miller's authorization and consent.

**Response to Paragraph 75:**

**Caterpillar denies the allegations of Paragraph 75 of the Complaint.**

76.     CAT knows or had reason to know that it acquired Miller's proprietary trade secrets and confidential information under circumstances giving rise to a duty to maintain the

secrecy, or limit the use of, such information, and/or that such information was obtained or derived from others who owe a duty to Miller to maintain the confidentiality of such information.

**Response to Paragraph 76:**

**Caterpillar denies the allegations of Paragraph 76 of the Complaint.**

77.     On information and belief, Miller has suffered or will suffer damages, and CAT has or will be unjustly enriched in an amount to be proven at trial, as a direct result of CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information.

**Response to Paragraph 77:**

**Caterpillar denies the allegations of Paragraph 77 of the Complaint.**

78.     CAT's threatened or actual misappropriation of Miller's proprietary trade secrets and confidential information has been willful and malicious and entitles Miller to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

**Response to Paragraph 78:**

**Caterpillar denies the allegations of Paragraph 78 of the Complaint.**

79.     Miller also is entitled to injunctive relief to prevent the threatened or actual misappropriation of its proprietary Miller trade secrets and confidential information by CAT pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

**Response to Paragraph 79:**

Caterpillar denies the allegations of Paragraph 79 of the Complaint.


**COUNT THREE**
**FRAUDULENT INDUCEMENT**

80.     Miller repeats and realleges the averments of paragraphs 1-10, 15-65 as if fully set forth herein.

**Response to Paragraph 78:**

Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-10 and 15-65 of the Complaint.


81.     On or before June 9, 2008, unbeknownst to Miller, CAT began to develop the Caterpillar Center-Lock Pin-Grabber Quick Coupler with, on information and belief, the goal of ending its purchases of the Miller Bug Coupler.

**Response to Paragraph 81:**

Caterpillar admits that on or before June 9, 2008, it began to develop what became known as the Cat® Center-Lock™ Pin Grabber Coupler. Caterpillar further admits that it envisioned that, under certain circumstances, this coupler might be used to replace the coupler supplied by Miller UK Ltd. Caterpillar denies that Miller lacked sufficient knowledge to expect that Caterpillar might develop its own quick coupler to replace the coupler supplied by Miller UK Ltd.

82. CAT, through its employee Bob Meng, affirmatively represented to Miller that CAT (a) was not developing any coupler itself and (b) that CAT required Miller's services in the future.

**Response to Paragraph 82:**

**Caterpillar denies the allegations of Paragraph 82 of the Complaint.**

83. CAT made such affirmative statements to Miller with the intent to induce Miller to continue to provide the Miller Bug Coupler to CAT until CAT could complete the development and establish manufacturing of its own coupler, from which CAT has derived and continues to derive substantial revenue and other benefits.

**Response to Paragraph 83:**

**Caterpillar denies the allegations of Paragraph 83 of the Complaint.**

84. On information and belief, CAT also, through various of its employees, affirmatively began soliciting Miller's trade secrets and confidential information regarding the Scoop Bucket with the intent to induce Miller to provide CAT with its trade secrets and confidential information not so that CAT could purchase the Scoop Bucket, but so that CAT could complete the development of its own bucket, from which CAT has derived and continues to derive substantial revenue and other benefits.

**Response to Paragraph 84:**

**Caterpillar denies the allegations of Paragraph 84 of the Complaint.**

85.     In reliance on either CAT's materially false affirmative statements, Miller made substantial investments in expanding its facilities to meet CAT's future requirements and also provided it valuable trade secrets and confidential information relating to the Scoop Bucket.

**Response to Paragraph 85:**

**Primarily because Caterpillar is not privy to Plaintiffs' investment records, Caterpillar lacks knowledge or information sufficient to form a belief as to the size of Miller's investments.  In all other respects, Caterpillar denies the allegations of Paragraph 85 of the Complaint**

86.     Miller has been damaged by these false, deceptive, and misleading statements. Miller has been damaged in millions of dollars, plus interest, fees and costs, through the investment in the development of the UK and China manufacturing facilities that it otherwise would not have made. Miller also has been damaged in millions of dollars, plus interest, fees and costs, through the provision of its trade secrets and confidential information relating to the Scoop Bucket that it otherwise would not have made.

**Response to Paragraph 86:**

**Caterpillar denies the allegations of Paragraph 86 of the Complaint.**

## COUNT FOUR
## UNJUST ENRICHMENT

87.     Miller repeats and realleges the averments of paragraphs 1-10, 15-65 as if fully set forth herein.

**Response to Paragraph 87:**

**Caterpillar incorporates its previous responses to the allegations in Paragraphs 1-10 and 15-65 of the Complaint.**

88.     The agreements entered into by the parties do not exclude the right to seek to recover based upon a claim of unjust enrichment.

**Response to Paragraph 88:**

**Caterpillar denies the allegations of Paragraph 88 of the Complaint.**

89.     CAT has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information supplied to it by Miller related to Miller's Scoop Bucket.

**Response to Paragraph 89:**

**Caterpillar denies the allegations of Paragraph 89 of the Complaint.**

90.     CAT also has been unjustly enriched at the expense of Miller by its use of the proprietary and confidential information, supplied to it by Miller, outside the terms of the Supply Agreement in developing, manufacturing, and selling the Caterpillar Center-Lock Pin-Grabber Quick Coupler.

**Response to Paragraph 90:**

**Caterpillar denies the allegations of Paragraph 90 of the Complaint.**

91.     Accordingly, Miller is entitled to damages in the amount by which CAT has been unjustly enriched at the expense of Miller.

**Response to Paragraph 91:**

**Caterpillar denies the allegations of Paragraph 91 of the Complaint.**


**Plaintiffs' Prayer for Relief**

**Caterpillar denies that Plaintiffs are entitled to any relief.**


**AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

The following allegations are relevant to Caterpillar's affirmative defenses and counterclaim:


1.     On February 23, 1998, Miller Welding Engineers Ltd., the predecessor to Miller UK Ltd., signed an agreement with Caterpillar (the "Agreement") governing its use and handling of Caterpillar's confidential and proprietary information, establishing Caterpillar's unrestricted rights to use certain improvements, modifications, and derivatives of Caterpillar confidential information, and prohibiting disclosure to Caterpillar of confidential or proprietary information (unless otherwise first agreed in writing).  The Agreement is a valid and binding contract.


2.     Therein, Miller Welding Engineers Ltd. agreed as follows:

1. We will not disclose CATERPILLAR CONFIDENTIAL INFORMATION to any third party and will use CATERPILLAR CONFIDENTIAL INFORMATION only to conduct business with CATERPILLAR.

2. If we improve, modify, or make derivatives of CATERPILLAR CONFIDENTIAL INFORMATION, CATERPILLAR may use such improvements, modifications, and derivatives without restriction by us.

3. We will not disclose to CATERPILLAR any confidential or proprietary information unless our two companies otherwise first agree in writing.

3. On September 18, 1998, Miller Welding Engineers Ltd. signed an agreement ("the Proprietary Agreement") with Caterpillar governing disclosure to Caterpillar of certain information relating to the coupler. The Proprietary Agreement is a valid and binding contract.

4. Therein, Miller Welding Engineers Ltd. agreed that Caterpillar would treat that information "as proprietary until the earliest of the following occurrences, (i) the first sale of a latching device made in accordance with the Invention, (ii) the issuance of a patent or the publication of a pending patent application for the Invention, or (iii) September 20, 2000 . . . . There shall be no restrictions on the handling of business or technical information which is not Proprietary Information."

5. In March 1999, Miller Welding Engineers Ltd. signed a supply contract (the "Supply Agreement") for the sale of couplers to Caterpillar. In the Supply Agreement, Caterpillar made no representation or guarantee as to the quantity of couplers that it would purchase. By its terms, the Supply Agreement could be terminated with or without cause. Pursuant to the Supply Agreement, the terms of Caterpillar's purchase orders for Products and Parts applied to such purchases.

6. Miller Welding Engineers Ltd., Miller UK Ltd., and Miller International Ltd. periodically delivered substandard couplers to Caterpillar, exposing Caterpillar to several product liability lawsuits and to warranty claims. The issues with the products included, but were not limited to, bulging cylinders, problems with the blocking bar length, and breakage due to improper casting. Caterpillar's customers complained about these and other issues.

7.     Caterpillar representatives discussed this unsatisfactory state of affairs with representatives of the Miller entities many times, but found them difficult to deal with and insufficiently responsive to Caterpillar's stated concerns.

8.     As problems continued, Caterpillar considered alternatives and ultimately developed and marketed its own coupler. Caterpillar specifically told representatives of the Miller entities that it was considering alternatives. For example, at a meeting in July 2007, Bob Meng of Caterpillar informed Keith Miller, John Lines, and Vincent Whelan that Caterpillar was reviewing its options with respect to alternate sourcing for couplers.

9.     Over time and with major investments, Caterpillar developed its own coupler. In late 2008, Caterpillar showed its coupler to General Manager John Lines of Miller UK Ltd. at his request. After viewing the coupler, Lines stated that it was quite different from the Miller coupler, and said that he had informed Keith Miller that the Caterpillar coupler did not reflect any of Miller's intellectual property.

10.     On June 17, 2010, Miller UK Ltd. and Miller International Ltd. filed suit in this Court alleging that Caterpillar (1) breached the Supply Agreement, (2) misappropriated trade secrets, (3) fraudulently induced one or both plaintiffs to make investments, and (4) was unjustly enriched.

## **AFFIRMATIVE DEFENSES**

Caterpillar asserts the following affirmative defenses based on the allegations in the Complaint and the information currently available to it, and reserves the right to assert additional affirmative defenses as discovery proceeds.

**First Affirmative Defense – Unclean Hands**

11.     Caterpillar incorporates by reference the allegations in Paragraphs 1-8 and 10 above.

12.     Throughout the course of the relationship, Miller Welding Engineers Ltd., and its successor, Miller UK Ltd., have failed to abide by agreements with Caterpillar by, including but not limited to, allegedly disclosing trade secrets to Caterpillar contrary to the Agreement in which Miller Welding Engineers Ltd. stated that it would not do so.

13.     Miller Welding Engineers Ltd. and Miller UK Ltd. created and/or contributed to any wrongs alleged in the Complaint by, among other things, ignoring Caterpillar's statements that it did not commit to continuing the coupler supply relationship and by failing to secure a written agreement regarding the purchase of bucket products.

14.     By seeking relief, Miller UK Ltd. is trying to take advantage of its own wrongs. Miller International Ltd. is also trying to take advantage of these wrongs.

15.     Thus, the claims are barred by the doctrine of unclean hands.

**Second Affirmative Defense – License/No Restriction On Use**

16.     Caterpillar incorporates by reference the allegations in Paragraphs 1-5 above.

17.     The Agreement, Proprietary Agreement, and Caterpillar's purchase order terms and conditions, are valid and enforceable contracts.

18.     In the Agreement, Miller Welding Engineers Ltd. promised that Caterpillar could use, without restriction, any improvements, modifications, and derivatives of Caterpillar confidential information.

19.     In the Proprietary Agreement, Miller Welding Engineers Ltd. promised that Caterpillar could use information supplied by Miller Welding Engineers Ltd. without restriction after the date specified (no later than September 20, 2000).

20.     Pursuant to Caterpillar's purchase order terms and conditions, Miller Welding Engineers Ltd. promised that its technical information could be used by Caterpillar without restriction.

21.     Plaintiffs' claims, which, on information and belief, are based, in whole or in part, on actions expressly authorized under the Agreement, Proprietary Agreement, and Caterpillar's purchase order terms and conditions, are, therefore, barred by those agreements.

## Third Affirmative Defense – Failure to Mitigate Damages

22.     Caterpillar incorporates by reference the allegations in Paragraphs 1-9 above.

23.     Plaintiffs failed to use reasonable efforts to mitigate alleged damages, including, but not limited to, failing to use reasonable care in its business investment decisions and product development and marketing strategies.

24.     If Plaintiffs had made reasonable efforts and acted with reasonable care, any purported damages would have been mitigated.

25.     Thus, Plaintiffs' claims are precluded and/or limited by their failure to mitigate damages.

## Fourth Affirmative Defense – Statute of Limitations

26.     Caterpillar incorporates by reference the allegations in Paragraphs 1-10 above.

27.     Plaintiffs allege events that date back over twelve years.

28.     The statute of limitations for a breach of contract under Illinois law is, at most, ten years.

29.     The statute of limitations for misappropriation of a trade secret under the Illinois Trade Secrets Act is, at most, five years.

30.     The statute of limitations for fraudulent inducement is, at most, five years.

31.     The statute of limitations for unjust enrichment is, at most, five years.

32.     Plaintiffs claims are barred, in whole or in part, by the applicable statutes of limitations.

### Fifth Affirmative Defense – Laches

33.     Caterpillar incorporates by reference the allegations in Paragraphs 1-10 above.

34.     Plaintiffs allege events that date back over twelve years.

35.     Plaintiffs failed to assert their claims in a timely manner, resulting in prejudice to Caterpillar.

36.     Caterpillar has been prejudiced by going ahead with its coupler and bucket product development efforts, and investing money and other resources in manufacturing and marketing such products.

37.     Thus, Plaintiffs' claims are barred, in whole or in part, by laches.

### Sixth Affirmative Defense – Statute of Frauds

38.     Plaintiffs allege the existence of one or more oral agreements.

39.     Plaintiffs do not and cannot assert that these alleged agreements were verified in writing and capable of being performed within one year.

40.     Plaintiffs' claims based thereon are barred by the statute of frauds.

### Seventh Affirmative Defense – Estoppel

41.     Caterpillar incorporates by reference the allegations in Paragraphs 1-4 above.

42.     In the Agreement, Miller Welding Engineers Ltd., the predecessor of Miller UK Ltd., promised that it would not disclose any confidential or proprietary information to Caterpillar.

43.     In the Proprietary Agreement, Miller Welding Engineers Ltd. promised that only certain information disclosed would need to be treated as proprietary, and would only need to be treated as proprietary for a limited period of time (long since passed).

44.     Caterpillar justifiably relied on these contractual promises.

45.     Plaintiffs are, therefore, estopped, in whole or in part, from asserting that information disclosed to Caterpillar was confidential or a trade secret.

### Eighth Affirmative Defense – Waiver

46.     Caterpillar incorporates by reference the allegations in Paragraphs 1 and 2 above.

47.     To the extent Miller Welding Engineers Ltd. or Miller UK Ltd. disclosed to Caterpillar any confidential or proprietary information relating to the Scoop bucket, or asserts rights to improvements, modifications, or derivatives of Caterpillar confidential information, they (and any purporting to claim rights from them) have waived any claims that such information was confidential or a trade secret.

48.     Plaintiffs' claims, therefore, are barred, in whole or in part, by the doctrine of waiver.

### Ninth Affirmative Defense – Preemption

49.     Plaintiffs' claims for fraudulent inducement and unjust enrichment are preempted, in whole or in part, by the Illinois Trade Secrets Act, and thus are barred.

### Tenth Affirmative Defense – Standing

50.     Miller International Ltd. has no standing to bring any of the claims in this suit.

WHEREFORE, Defendant Caterpillar respectfully requests that this Court dismiss the Complaint with prejudice, enter judgment in Caterpillar's favor and against Plaintiffs, award attorneys' fees to Caterpillar pursuant to 765 ILCS 1065/5, award Caterpillar its costs and expenses in connection with its defense of the Complaint, and grant such other relief as this Court deems just and proper.

- 54 -

## COUNTERCLAIM

Counterclaim-Plaintiff Caterpillar Inc. ("Caterpillar") asserts the following counterclaim based on information currently available and reserves the right to assert additional counterclaims as discovery proceeds.

### Parties

51. Caterpillar is a Delaware corporation having its principal place of business at 100 N.E. Adams Street, Peoria, Illinois 61629.

52. Counterclaim-Defendant Miller UK Ltd. is a British corporation with its principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England, and is the successor to Miller Welding Engineers Ltd.

53. Counterclaim-Defendant Miller International Ltd. is a privately-held corporation organized and existing under the laws of Gibraltar, having its principal place of business at 57/63 Line Wall Road, PO Box 199, Gibraltar.

### Jurisdiction and Venue

54. Caterpillar's counterclaim arises under common law.

55. This is an action seeking monetary damages in excess of $75,000.00, exclusive of interest and costs, and this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

56. Personal jurisdiction exists because Counterclaim-Defendants do business in this State and have submitted to the jurisdiction of this Court by the filing of their original Complaint and Amended and Supplemental Complaint.

57. Venue is proper pursuant to 28 U.S.C. §§ 1391(a)-(d).

### Counterclaim I – Breach of the Agreement

58. Caterpillar incorporates by reference the allegations it made in Paragraphs 1, 2, 10 above.

59. The Agreement is a valid and enforceable contract.

60.     Caterpillar fully performed the Agreement.

61.     In the Complaint, among other things, Plaintiffs assert that Miller Welding Engineers Ltd. and Miller UK Ltd. disclosed confidential and proprietary information to Caterpillar, but lacked written permission to do so.

62.     In the Complaint, among other things, Plaintiffs assert that Caterpillar has thereby caused damage in unspecified amounts to Miller UK Ltd. and Miller International Ltd.

63.     If these allegations are proven to be true, then Miller Welding Engineers Ltd. and Miller UK Ltd. breached the Agreement and their breach has injured Caterpillar in an amount to be determined at trial.

### **Prayer for Relief**

WHEREFORE, Counterclaim-Plaintiff Caterpillar respectfully requests that this Court enter a judgment for:

a) damages caused by the alleged breaches of the Agreement in an amount to be determined at trial;

b) attorneys' fees and costs pursuant to 765 ILCS 1065/5;

c) pre- and post-judgment interest; and

d) such other and further relief as the court deems just and proper.

## II.

## SUPPLEMENTAL COMPLAINT

1-36.   [Various allegations made by Plaintiffs.]

**Response to Paragraphs 1-36:**

**No response is needed because Count Five, to which these allegations relate, was dismissed on April 26, 2011.**

## COUNT FIVE
## FALSE AND DECEPTIVE ADVERTISING IN VIOLATION OF THE LANHAM ACT

37-46.  [Various allegations made by Plaintiffs.]

**Response to Paragraphs 37-46:**

**No response is needed because Count Five was dismissed on April 26, 2011.**

## Plaintiffs' Prayer for Relief

**Caterpillar denies that Plaintiffs are entitled to any relief.**

## III.

## SUPPLEMENTAL COUNTERCLAIMS

Supplemental Counterclaim-Plaintiff Caterpillar Inc. ("Caterpillar") asserts the following supplemental counterclaims based on currently available information and reserves the right to assert additional supplemental counterclaims as discovery proceeds. The circumstances giving rise to these supplemental counterclaims arose after the filing of (1) the original Complaint by Plaintiffs and (2) the original Counterclaim by Caterpillar. The following allegations are relevant to Caterpillar's supplemental counterclaims:

### Parties

1.      Caterpillar is a Delaware corporation having its principal place of business at 100 N.E. Adams Street, Peoria, Illinois 61629. Caterpillar manufactures heavy machinery and other products, including work tools such as couplers and buckets. It primarily sells its products to Caterpillar dealers who, in turn, primarily sell Caterpillar products to end-users.

2.      Counterclaim-Defendant Miller UK Ltd. is a British corporation with its principal place of business at Bassington Lane, Bassington Industrial Estate, Cramlington, Northumberland, NE23 8AD, England. Miller UK Ltd. manufactures couplers and buckets. On information and belief, Miller UK Ltd. seeks to sell its products directly to end-users, and to distributors and dealers, such as Caterpillar dealers.

### Jurisdiction and Venue

3.      Caterpillar's counterclaims arise under the Lanham Act, 15 U.S.C. § 1125, under the Copyright Act, 17 U.S.C. §§ 101 et seq., and under common law.

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for Caterpillar's Lanham Act and Copyright Act claims and under 28 U.S.C. § 1367 for Caterpillar's common law claims. In addition, the Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2)

because Caterpillar seeks monetary damages in excess of $75,000, exclusive of interest and costs, Caterpillar is a citizen of a State, and Miller UK Ltd. is a citizen of a foreign state.

5.     This Court has personal jurisdiction over Counterclaim-Defendant because Miller UK Ltd. does business in this state and has submitted to the jurisdiction of this Court by filing its original Complaint and its Amended and Supplemental Complaint here.

6.     Venue is proper under 28 U.S.C. §§ 1391(b)-(d).

### Counter-Defendant's False, Misleading, Defamatory, and Disparaging Statements

7.     In or about January 2011, Keith Miller, acting on behalf of Miller UK Ltd., sent an unsolicited package of materials ("Package") to many Caterpillar dealers (and possibly others) located in Illinois and elsewhere in the United States.  The letter transmitting the materials was sent on stationary bearing the name "MILLER® Ground breaking™" in the upper right-hand corner and is signed by "Keith Miller, Chairman."  The footer on the stationary bears the name "Miller UK Limited" and the address of the Miller UK Ltd. facility in England.

8.     In the Package, Miller UK Ltd. made false, misleading, defamatory, and disparaging statements about Caterpillar and the safety, features, and performance of the Cat® Center-Lock™ Pin Grabber Coupler for hydraulic excavators, while also making false and misleading statements about the safety, features, and performance of the Miller Pin Grabber Plus coupler.  The Package was distributed as part of a Miller UK Ltd. advertising and marketing initiative.

9.     The Package contained four items:

    a.     A letter from Keith Miller ("Miller Letter");

    b.     A DVD labeled "Independent Coupler Test: Contains important safety information" ("Video");

    c.    A document entitled "Report on the Comparison Testing for European Compliance of a CATERPILLAR COUPLER / MILLER BUG COUPLER / MILLER TWINLOCK COUPLER" dated November 20, 2009, and bearing on the top of each page "LAIDLER Certification / MILLER UK. Ltd / Reference number: 0597" ("Test Document"); and

    d.    A version of Caterpillar's August 2010 Competitive Bulletin, which is entitled "Cat® Center-Lock™ Pin Grabber Coupler for Hydraulic Excavators vs. MillerBaird Pin Grabber Advanced and Geith Claw" ("Competitive Bulletin") which has been copied and annotated by Miller UK Ltd. ("Annotated Bulletin").

10.    Each one of these items in the Package contains false, misleading, defamatory, and disparaging statements and/or images about Caterpillar and the Cat® Center-Lock™ Pin Grabber Coupler, and some make false and misleading statements about the Miller Pin Grabber Plus coupler. The statements described in the paragraphs below are material misrepresentations, as far as potential customers are concerned, and many are calculated to create fear and anxiety about the safety of the Cat® Center-Lock™ Pin Grabber Coupler.

11.    On page 1, the Miller Letter states that there is an "urgent safety issue" associated with the Cat® Center-Lock™ Pin Grabber Coupler. It further states:

> However, the major issue with the CAT designed coupler is its potential lack of safety. Following extensive tests both internally and independently, we are of the opinion that in the case of a hydraulic malfunction or "loss of engagement forces" the CAT designed coupler has the very real potential of dropping a bucket or attachment. The CAT Center-Lock coupler does not have any independent mechanical back-up system – indeed the CAT Center-Lock coupler is designed around a hydraulic overlock cam which is operated by the machine's main hydraulics via a switch in the operator's cab.

These statements are false, misleading, defamatory, and disparaging in numerous respects. There is no "urgent safety issue" with the Cat® Center-Lock™ Pin Grabber Coupler.  Safety was a major focus during the development of the Cat® Center-Lock™ Pin Grabber Coupler.  The Cat® Center-Lock™ Pin Grabber Coupler utilizes a secure primary locking mechanism with over-center locking technology as well as a highly visible secondary locking mechanism.  There is no "overlock cam" in the Cat® Center-Lock™ Pin Grabber Coupler.  There is a four bar linkage that travels into an over-center position to maintain a positive mechanical lock on the front pin.  The linkage action is based on proven mechanical principles.  The over-center design approach has been used in other applications and has been proven to be effective and safe.  The Cat® Center-Lock™ Pin Grabber Coupler is designed to retain the work tool in case of hydraulic malfunction or "loss of engagement forces."  The secondary lock is visible from the operator's position and can withstand the full operating forces of the excavator.  Simply using the switch will not make the coupler unlock.

12.    On page 2, the Miller Letter discusses two tests.  "Test One" consists of 5 steps. The sequence concludes with step 5: "If the bucket drops the coupler will not meet the regulation and is dangerous."  This is misleading and intended to scare the reader into thinking that the Cat® Center-Lock™ Pin Grabber Coupler will drop the bucket.  In point of fact, the Cat® Center-Lock™ Pin Grabber Coupler, when attached to a hydraulic excavator with a properly configured hydraulic system, will not drop the bucket in the indicated circumstances.  On information and belief, Miller UK Ltd. purposely and misleadingly used a hydraulic excavator with an improperly configured hydraulic system to create the outcome warned about in "Test One."  Similarly, "Test Two," which specifically refers to an enclosed DVD (discussed in more detail below), tells the reader to follow the instructions for "Test One" while placing the

"bucket/attachment in any position during step 3." This too is misleading and intended to scare the reader into thinking that the Cat® Center-Lock™ Pin Grabber Coupler will drop the bucket/attachment "in any position." Again, on information and belief, Miller UK Ltd. purposely and misleadingly used a hydraulic excavator with an improperly configured hydraulic system to create the same outcome warned about in "Test One." As a result, both "Test One" and "Test Two" are false, misleading, defamatory, and disparaging and are intended to scare the reader into thinking that the Cat® Center-Lock™ Pin Grabber Coupler will drop buckets or other attachments, thereby endangering the lives of workers located near the hydraulic excavator.

13. On page 3, the Miller Letter, referring to the Cat® Center-Lock™ Pin Grabber Coupler, identifies four "[p]ossible situations leading to failure or errors:

(i) an inexperienced operator checking out which switches do what.

(ii) if the operator turned the hydraulic switch off the CAT coupler would drop the bucket [see test DVD and independent report] The Miller coupler would hold the bucket in a safe position as the automatic independent blocking (redundant fail safe) system would be active.

(iii) other circumstances that no-one could foresee e.g. something hits and activates the switch. The operator moves from one machine to another and forgets. Machine in for service and apprentice presses the wrong switch. There are many possible such situations.

(iv) the buzzer has burnt out and the operator is unsure whether the hydraulics are on or off and accidentally disengages the attachment when it is overheated."

These statements are false, misleading, defamatory, and disparaging. Scenarios (i)-(iv) will not

cause a failure because simply placing the switch in an unlock position will not un-lock the Cat®
Center-Lock™ Pin Grabber Coupler.

14.     On page 3, the Miller Letter states that "The DVD enclosed shows exactly what
can happen but please don't just take our word for it, carry out the test for yourself which is
described in the DVD or in the following attachment" [i.e., the Video and the Test Document].
Through this language, and the DVD and Test Document enclosed with the Miller Letter, both of
which are discussed further below, Miller UK Ltd. falsely and misleadingly indicated that the
Cat® Center-Lock™ Pin Grabber Coupler is a dangerous product.  In doing so, Miller UK Ltd.
disparaged and defamed Caterpillar and the Cat® Center-Lock™ Pin Grabber Coupler.

15.     To falsely and misleadingly compare the coupler offered for sale by Miller UK
Ltd. with the Cat® Center-Lock™ Pin Grabber Coupler, and to disparage and defame Caterpillar
and the Cat® Center-Lock™ Pin Grabber Coupler, the Miller Letter further states:

> The Miller coupler has an independent mechanical blocking system
> designed in that [sic] ensures the bucket or attachment is held in place
> despite malfunction, failure or loss of engagement forces, including
> accidentally operating the switch.  Our design has evolved from years of
> experience in coupler technology.  We have a strong desire not to see
> couplers perceived as dangerous products simply because some have a
> poor design.

These statements are false and misleading.  The blocking system on the Miller coupler is not
designed to ensure that the bucket or attachment is held in place despite any malfunction.  It only
is designed to address a hydraulic malfunction (or, perhaps, a structural failure).  Moreover,
when the Miller coupler is past center in the curl position, then the operation of the switch will
unlock the coupler.  In other words, the mechanical blocking system is not effective in all
operating positions.  In addition, Miller UK Ltd. falsely and misleadingly indicates that the Cat®
Center-Lock™ Pin Grabber Coupler is a "dangerous" product.  The Cat® Center-Lock™ Pin

Grabber Coupler was developed using best engineering practices and computer aided simulations and underwent extensive and vigorous testing in the laboratory and in the field.

16.     The Miller Letter states that its message is "blunt," but is necessary to make the reader aware of this "real danger" and to facilitate an "informed choice."  Once again, Miller UK Ltd. falsely and misleadingly indicates that the Cat® Center-Lock™ Pin Grabber Coupler is a dangerous product.  In doing so, Miller UK Ltd. disparaged and defamed Caterpillar and the Cat® Center-Lock™ Pin Grabber Coupler.

17.     In the final paragraph of the Miller Letter, Keith Miller admits that his real purpose is to advertise and promote sales of couplers offered by Miller UK Ltd.:

> Clearly we would welcome the opportunity to talk to you directly on this and any other questions that you may have.  Now that we are not contractually constrained by CAT we are able to supply our products direct to you.  One of my colleagues will contact you shortly to see if we can arrange an appointment, or feel free to call me anytime.

Keith Miller's colleagues did subsequently contact Caterpillar dealers in order to promote sales of couplers offered by Miller UK Ltd.

18.     The Miller Letter also states that the "CAT designed coupler is approximately 13% heavier than the Miller coupler and this additional weight does not translate into strength or sturdiness…."  This statement is false, misleading, and disparaging.  The additional weight associated with the steel selected and used by Caterpillar does, in fact, translate into greater strength or sturdiness for the Cat® Center-Lock™ Pin Grabber Coupler.

19.     The Video, which was created, endorsed, and distributed by Miller UK Ltd. to Caterpillar dealers (along with the Miller Letter), purports to depict independent and/or objective comparison tests of couplers when utilized on Caterpillar hydraulic excavators.  The hydraulic couplers compared in the tests are the "Cat Center-Lock" (Cat® Center-Lock™ Pin Grabber

Coupler) and the "Cat Pin Grabber Plus / MillerBaird PGA." The "Cat Pin Grabber Plus" is said to be "identical" to the "MillerBaird PGA." Two of the three tests purportedly took place on December 23, 2010, and one of the three tests purportedly took place on November 10, 2009. The close connection between the creation of the Video and Miller UK Ltd. is demonstrated by the fact that on the label of the Video the following notice appears: "If you have problems with viewing the information on this disc, please email a.t.harrop@miller.gb.com."

20.     The Video purports to portray, among other things, the failure of a Cat® Center-Lock™ Pin Grabber Coupler that results in the decapitation of a hard-hat wearing life-sized dummy. The Video is false, misleading, defamatory, and disparaging in at least the ways described below. On information and belief, Counter-defendant purposely, misleadingly, and maliciously used two Caterpillar hydraulic excavators with improperly configured hydraulic systems to create the events depicted in the Video, and to defame and disparage Caterpillar and the Cat® Center-Lock™ Pin Grabber Coupler.

21.     At the beginning of the Video, a notice purporting to reflect a statement from the Occupational Safety and Health Administration, appears on the screen. The Video then proceeds to show "TEST 1" which represents that "The bucket was attached to the coupler following the operating procedure described in the relevant coupler's manual." "TEST 1" goes on to show adjacent comparisons of two hydraulic excavators in a field with snow on the ground. The video clip on the left of the side-by-side comparison purports to show the "Cat Center-Lock" while the video clip on the right purports to show the "Cat Pin Grabber Plus / MillerBaird PGA." Both clips of hydraulic excavators are shown with a graphic indicating "HYDRAULICS ON." In the next segment of the Video, the graphic indicates "HYDRAULICS OFF, LOSS OF ENGAGEMENT FORCES" and the Video purports to depict the couplers of both hydraulic

excavators curling away from the cab.  The bucket on the left in the "Cat Center-Lock" clip falls to the ground, while the bucket on the right in the "Cat Pin Grabber Plus / MillerBaird PGA" clip stays attached.

22.     The Video proceeds to show "TEST 2," which features adjacent video clips showing hydraulic excavators in a snowy field and the same "HYDRAULICS ON" graphic. "TEST 2" appears to show the same scenario as "TEST 1," except that in "TEST 2" the position of the excavator stick was supposedly changed: "The excavator stick was placed at a lower position within normal operation, with the bucket fully curled in."  Once again, the graphic changes and states: "HYDRAULICS OFF, LOSS OF ENGAGEMENT FORCES." Then, the video purports to depict the couplers of both hydraulic excavators curling away from the cab. The bucket on the left in the "Cat Center-Lock" clip drops to the ground.  As in "TEST 1," the bucket in the "Cat Pin Grabber Plus / MillerBaird PGA" clip stays attached.

23.     Next, the Video shows "TEST 3," which the Video represents was conducted on "10th November 2009" and was "Independently performed by LAIDLER CERTIFICATION, appointed by the UK government and recognised in Europe as a Notified Body [Number 0870] for the Machinery and EMC Directives."  The introductory segment of "TEST 3" displays this statement:

TEST 3          Independently performed by LAIDLER CERTIFICATION.

In November 2009 a similar test was conducted adjacent to a drainage trench of approximately 5 feet depth with a life size dummy in the trench to simulate actual site conditions.  The tests were performed in a controlled manner.  No one was put at risk during the tests.

The bucket was attached to the coupler following the operating procedure described in the relevant coupler's manual.

The excavator stick was then parked above the trench in a position within normal operation.

- 66 -

>At this point the attachment switch was operated simulating a "malfunction or loss of engagement forces".

"TEST 3" shows side-by-side video clips with hydraulic excavators in a dirt-covered field with a life-sized dummy wearing a hard hat standing in a trench directly below the bucket. The video clip on the left is identified as "Cat Center-Lock" while the clip on the right is identified as "Cat Pin Grabber Plus / MillerBaird PGA." Both clips show a graphic indicating "HYDRAULICS ON." Next, the graphic changes to "HYDRAULICS OFF, LOSS OF ENGAGEMENT FORCES" and the bucket in the "Cat Center-Lock" clip falls from the excavator stick directly onto the "life size dummy" in the trench. At the time when the bucket falls in the "Cat Center-Lock" clip, the excavator stick in the "Cat Center-Lock" clip is positioned at a different elevation than the stick in the "Cat Pin Grabber Plus / MillerBaird PGA" clip. The "Cat Center-Lock" stick is positioned so that the bucket is much higher in the air – approximately 10 feet above the dummy's head – compared to the approximate three feet distance in the "Cat Pin Grabber Plus / MillerBaird PGA" clip. This difference in position between the hydraulic excavators makes the purported results of "TEST 3" appear more dramatic when the bucket in the "Cat Center-Lock" clip plummets onto the dummy in the trench, decapitating the dummy, and causing the dummy's hard hat to separate from the dummy, pop up out of the ditch, and roll along the ground.

24. Shortly thereafter, in referring to the "Cat Center-Lock" coupler, the Video shows graphics with a red "X" next to the word "FAIL." In contrast, the Video shows a green check mark next to the word "PASS" for the "Cat Pin Grabber Plus / MillerBaird PGA."

25. The Video goes on to state: "The Caterpillar unit (Cat Center-Lock) is deemed to be unsafe and should not be placed on the market."

- 67 -

26.     In the Test Document, which was endorsed and distributed by Miller UK Ltd. to Caterpillar dealers (along with the Miller Letter), Laidler Certification ("Laidler"), a testing enterprise, states that it was hired as "a totally independent third party to perform certain tests on a number of couplers that are used on earth moving machinery."  This is false and misleading. Laidler was commissioned and directed by Miller UK Ltd. in designing and performing the "tests."  Laidler functioned as the agent of Miller UK Ltd., which ratified and adopted the actions of its agent.

27.      The Test Document states that "[t]he remit was to investigate the coupler performance to determine their safety in use…."  This is false and misleading.  On information and belief, the purpose of the investigation was to develop false, misleading, defamatory, and disparaging advertising materials for Miller UK Ltd.

28.     On page 10, the Test Document states that the Cat® Center-Lock™ Pin Grabber Coupler, "Serial number WAD 00109, Model 312 linkage; was attached to the excavator in accordance with the Manufacturer's instructions."  This is false and misleading.  On information and belief, the Cat® Center-Lock™ Pin Grabber Coupler was not attached to the excavator in accordance with Caterpillar's instructions.  On information and belief, Miller UK Ltd. knowingly and intentionally induced or caused Laidler or others not to attach the Cat® Center-Lock™ Pin Grabber Coupler in accordance with the Caterpillar's instructions.  On information and belief, the couplers and other products used in the supposedly independent tests were selected by Miller UK Ltd. and/or supplied to Laidler by Miller UK Ltd.

29.     The three "tests" described on page 11 of the Test Document, all of which result in a bucket detaching from the Cat® Center-Lock™ Pin Grabber Coupler, are false, misleading, defamatory, and disparaging.   On information and belief, Counter-defendant purposely and

misleadingly caused a Caterpillar hydraulic excavator with an improperly configured hydraulic system to be used, and the Cat® Center-Lock™ Pin Grabber Coupler was not attached to the excavator in accordance with Caterpillar's instructions. Moreover, some of the "tests" were based on misuse of the Cat® Center-Lock™ Pin Grabber Coupler, thereby rendering the "results" misleading.

30.     In referring to the Cat® Center-Lock™ Pin Grabber Coupler, the Note at the bottom of page 11 of the Test Document, states that "[t]he operation of the coupler appears to be by cascaded hydraulic operation in that the rear pin jaw must first be locked in and pressurized before the front pin locking mechanism is triggered." This is false and misleading. Once the Cat® Center-Lock™ Pin Grabber Coupler's secondary lock goes over center, it is not dependent on the hydraulics. It is a mechanical over-center mechanism in which the hydraulic cylinder could be removed and the secondary lock would still function. The hydraulic cylinder is used to move the secondary lock over center, but is not used to hold it in position.

31.     In the conclusion on page 14 of the Test Document, Laidler states that the Cat® Center-Lock™ Pin Grabber Coupler "is deemed to be unsafe and should not be placed on the market." This is false, misleading, defamatory, and disparaging for the reasons referenced above.

32.     The Annotated Bulletin, which was endorsed and distributed by Miller UK Ltd. to Caterpillar dealers (along with the Miller Letter), refers to the Cat® Center-Lock™ Pin Grabber Coupler on page 2 column 1 and, in the words of Miller UK Ltd., states as follows:

> The secondary backup system is part of the control system. If the on/off switch is accidentally activated attachments can drop off from height and/or cause attachments to swing vigorously as the secondary backup system holds the front attachment pin only.

This statement of Miller UK Ltd. is false, misleading, defamatory, and disparaging. The "accidental activation" scenario described above is not possible.

33. The Annotated Bulletin refers to the Cat® Center-Lock™ Pin Grabber Coupler on page 3 column 1 and, in the words of Miller UK Ltd., states the "[s]econdary lock revolves around small metal straps which could bend if debris collects inside the coupler frame. (Unproven)." This statement of Miller UK Ltd. is false, misleading, defamatory, and disparaging. The secondary lock does not use "small metal straps" to lock the mechanism; the connector links are used to open or close the secondary lock but not to maintain the secondary lock in a closed position. Moreover, it is misleading to assert that "small metal straps" could be damaged if debris collects inside the coupler frame without any factual support whatsoever.

34. In referring to the Cat® Center-Lock™ Pin Grabber Coupler, the Annotated Bulletin, in the words of Miller UK Ltd., states on page 4 column 1 that the use of one switch in the control sequence is a "[n]egative feature – the operator could accidentally hit switch and release attachment from both pins…." This statement of Miller UK Ltd. is false, misleading, defamatory, and disparaging. The coupler switch on the Cat® Center-Lock™ Pin Grabber Coupler is a safety switch that cannot be bumped into the unlock position. Also, to release a bucket there is a requirement to curl the bucket to create high pressure in the bucket head end hydraulic circuit for 5 seconds.

35. The Annotated Bulletin refers to the Cat® Center-Lock™ Pin Grabber Coupler on page 5 and, in the words of Miller UK Ltd., asserts this "statement is not correct": "BOTTOM LINE: Cat cylinder is not only built heavier, it is better protected." This assertion by Miller UK Ltd. is false, misleading, defamatory, and disparaging. The Cat® Center-Lock™ Pin Grabber Coupler has thicker walls (58% thicker), is heavier, and has a bolted flange instead of a threaded

flange. The counterbalance valve offers better hydraulic protection than a straight check valve. The Cat® Center-Lock™ Pin Grabber Coupler cylinders do not experience bulging, weld failures, or seal extrusion.

36.     Each item included in the Package that Miller UK Ltd. distributed contains false, misleading, defamatory, and disparaging statements. By sending the Package, Miller UK Ltd. intended to harm and did harm the reputation of Caterpillar and the reputation and sales of the Cat® Center-Lock™ Pin Grabber Coupler. Moreover, by sending the Package, Miller UK Ltd. intended to retaliate in a willful and malicious manner against Caterpillar for Caterpillar's termination of the Supply Agreement with Miller UK Ltd.

37.     On March 10, 2011, Caterpillar, by and through its counsel, sent a letter to Mark Halligan of Nixon Peabody, counsel for Keith Miller and Miller UK. Ltd., pointing to the Package and demanding that his clients "cease and desist distribution of this false, misleading, defamatory, and disparaging material, including at the upcoming CONEXPO, and take affirmative steps to mitigate the damages inflicted upon Caterpillar." To date, Caterpillar has received no commitment that Keith Miller and Miller UK Ltd. will cease and desist distribution of the Package or will act to mitigate the damages inflicted upon Caterpillar.

### Counterclaim I – Commercial Disparagement Under Common Law

38.     Caterpillar incorporates by reference the allegations in Paragraphs 1-37 above.

39.     Miller UK Ltd. is responsible for creating and distributing in Illinois and elsewhere the Miller Letter, Video, Test Document, and Annotated Bulletin, all of which contain false and misleading factual statements, and all of which disparage the Cat® Center-Lock™ Pin Grabber Coupler.

40.     By its actions, Miller UK Ltd. willfully and maliciously disparaged the quality of the Cat® Center-Lock™ Pin Grabber Coupler, and Caterpillar's business in general, in violation of Illinois common law and/or comparable common law of other states.

41.     Miller UK Ltd. distributed these disparaging materials to Caterpillar dealers (and perhaps others) in the course of its own coupler business and with the purpose and effect of disparaging the Cat® Center-Lock™ Pin Grabber Coupler, and increasing the sales of couplers offered by Miller UK Ltd.

42.     The false, misleading, and disparaging statements and images in the Package specifically attack the quality, safety, and performance of the Cat® Center-Lock™ Pin Grabber Coupler by representing that its design is flawed and unsafe and that its quality and performance is dangerously substandard.

43.     This disparagement has damaged Caterpillar in an amount to be determined at trial.  Caterpillar seeks compensatory and punitive damages.


**Counterclaim II – Commercial Disparagement Under Statute**

44.     Caterpillar incorporates by reference the allegations in Paragraphs 1-43 above.

45.     Miller UK Ltd. is responsible for creating and distributing in Illinois and elsewhere the Miller Letter, Video, Test Document, and Annotated Bulletin, all of which are false and misleading, and all of which disparage the Cat® Center-Lock™ Pin Grabber Coupler.

46.     By its actions, Miller UK Ltd. willfully and maliciously disparaged the quality of the Cat® Center-Lock™ Pin Grabber Coupler, and Caterpillar's business in general, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. § 510/2(a)(8) and (a)(12), and/or comparable statutes of other states.

47.     Miller UK Ltd. distributed these disparaging materials to Caterpillar dealers (and perhaps others) in the course of its own coupler business and with the purpose and effect of disparaging the Cat® Center-Lock™ Pin Grabber Coupler, and increasing the sales of couplers offered by Miller UK Ltd.

48.     The false, misleading, and disparaging statements and images in the Package specifically attack the quality, safety, and performance of the Cat® Center-Lock™ Pin Grabber Coupler by representing that its design is flawed and unsafe and that its quality and performance is dangerously substandard.

49.     Pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. § 510/3 and/or comparable statutes of other states, Caterpillar is entitled to injunctive relief to prevent Miller UK Ltd. from continuing its disparagement of the Cat® Center-Lock™ Pin Grabber Coupler and to prevent any further damage that Caterpillar will likely incur as a result of Miller UK Ltd.'s deceptive trade practices.

50.     Pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. § 510/3 and/or comparable statutes of other states, Caterpillar also is entitled to an award of costs and attorney's fees because of the willful nature of Miller UK Ltd.'s conduct.


**Counterclaim III – Consumer Fraud Under Statute**

51.     Caterpillar incorporates by reference the allegations in Paragraphs 1-50 above.

52.     Caterpillar dealers are both (a) Caterpillar customers and potential customers, and (b) consumers of couplers who purchase couplers not just for resale, but also for use in their own rental fleets of hydraulic excavators.

53.     The deliberate and widespread distribution by Miller UK Ltd. of the false, misleading, and disparaging Package to Caterpillar dealers (and potentially other participants and consumers in the market for the purchase and sale of couplers) in Illinois and elsewhere constitutes an act that is both unfair and deceptive under the Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. § 505/2, and/or the comparable statutes of other states, because it was directed towards the coupler market and implicates consumer protection concerns.

54.     In the course of its own trade and business, Miller UK Ltd. distributed its false, misleading, and disparaging Package to consumers of couplers (and the coupler market in general) with the intent that consumers of couplers would rely on the unfair and deceptive statements, believe that the Cat® Center-Lock™ Pin Grabber Coupler is dangerous and unfit for use in the market, and ultimately purchase Miller UK Ltd. couplers instead of the Cat® Center-Lock™ Pin Grabber Coupler.

55.     The distribution of the Package to coupler consumers by Miller UK Ltd. implicates consumer protection concerns because the Package contains false and misleading statements and specifically attacks the quality, safety, and performance of the Cat® Center-Lock™ Pin Grabber Coupler.  The Package will confuse and deceive coupler consumers into believing that the Cat® Center-Lock™ Pin Grabber Coupler is dangerous, when it point of fact, it is safe.

56.     The deceptive statements contained in the Package are so substantial that distribution of the Package is likely to affect the general coupler market by sparking unfounded doubt in the minds of consumers about the safety of coupler products they already own.

57.     As a direct and proximate result of unfair and deceptive distribution of the Package into the coupler market by Miller UK Ltd., Caterpillar has suffered damages in the form of lost sales and disparagement of its coupler product, goodwill, and business reputation.

58.     Miller UK Ltd. acted with malice and deliberate indifference in distributing the Package to coupler consumers and, therefore, Caterpillar is entitled to punitive damages.

59.     Pursuant to the Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. §§ 505/2, 505/10a, and/or the comparable statutes of other states, Caterpillar is entitled to compensatory and punitive damages in an amount to be determined at trial.

## Counterclaim IV – Defamation Under Common Law

60.     Caterpillar incorporates by reference the allegations in paragraphs 1-59 above.

61.     Keith Miller wrote a letter to Caterpillar dealers in Illinois and elsewhere (and perhaps other potential customers) that purports to identify an "urgent safety issue" and a "real danger" regarding purported design flaws in the Cat® Center-Lock™ Pin Grabber Coupler.  The Miller Letter purports to state facts that are false, misleading, defamatory, and disparaging.  The Miller Letter was calculated to injure and did injure Caterpillar's reputation and goodwill.

62.     Miller UK Ltd. is responsible for creating a false, misleading, defamatory, and disparaging Video that is calculated to injure and does injure Caterpillar's reputation and goodwill.  Miller UK Ltd. distributed the Video to Caterpillar dealers in Illinois and elsewhere along with the Miller Letter.  Among other things, the Video purports to state facts showing design flaws in the Cat® Center-Lock™ Pin Grabber Coupler that render that product dangerous.  To this end, the Video falsely depicts a Cat® Center-Lock™ Pin Grabber Coupler

dropping an attached bucket. The bucket plummets to earth, decapitating a life-sized dummy placed directly underneath the bucket.

63.     Miller UK Ltd. is responsible for creating a false, misleading, defamatory, and disparaging Test Document that is calculated to injure and does injure Caterpillar's reputation and goodwill. Miller UK Ltd. distributed the Test Document to Caterpillar dealers in Illinois and elsewhere along with the Miller Letter. Among other things, the Test Document purports to state facts showing design flaws in the Cat® Center-Lock™ Pin Grabber Coupler that render that product dangerous. It falsely states that the Cat® Center-Lock™ Pin Grabber Coupler is "unsafe and should not be placed on the market." The Test Document pretends to be an "independent" report, when, in fact, it was commissioned, directed, and controlled by Miller UK Ltd.

64.     Miller UK Ltd. is responsible for creating a false, misleading, defamatory, and disparaging Annotated Bulletin that is calculated to injure and does injure Caterpillar's reputation and goodwill. Miller UK Ltd. distributed the Annotated Bulletin to Caterpillar dealers in Illinois and elsewhere along with the Miller Letter. Among other things, the Annotated Bulletin purports to state facts showing design flaws that render the Cat® Center-Lock™ Pin Grabber Coupler dangerous, and falsely claims to identify a series of quality or performance problems with that coupler.

65.     The Package is intended to demonstrate that Caterpillar lacks ability in its trade and business.

66.     By distributing the false, misleading, defamatory, and disparaging Miller Letter, Video, Test Document, and Annotated Bulletin, Miller UK Ltd. maliciously and wantonly sought to damage Caterpillar's reputation and goodwill for its own financial gain, and succeeded in that effort, and exhibited reckless disregard for the truth of the Package.

67.     On information and belief, Miller UK Ltd. representatives have taken further steps to defame Caterpillar by placing unsolicited phone calls to Caterpillar dealers and making statements at trade shows for the purpose of repeating and embellishing the foregoing false, misleading, defamatory, and disparaging statements.

68.     Caterpillar has been damaged by said defamation in an amount to be determined at trial.  Caterpillar seeks compensatory and punitive damages.


## Counterclaim V – Tortious Interference

69.     Caterpillar incorporates by reference the allegations in Paragraphs 1-68 above.

70.     Miller UK Ltd. distributed the Package to Caterpillar dealers in Illinois and elsewhere, who are customers of Caterpillar and serve, pursuant to contract, as dealers of Caterpillar products.

71.     Due to Caterpillar's longstanding relationship with these customers, Caterpillar had a reasonable expectation that these customers would continue to purchase couplers, including the Cat® Center-Lock™ Pin Grabber Coupler, from Caterpillar.

72.     Miller UK Ltd. knew of Caterpillar's on-going relationship with Caterpillar dealers and Caterpillar's expectancy that Caterpillar would be able to sell couplers, including the Cat® Center-Lock™ Pin Grabber Coupler, to these customers.

73.     By sending Caterpillar's dealers a Package that, among other things, uses false and misleading statements to disparage the Cat® Center-Lock™ Pin Grabber Coupler and depicts it as unsafe, Miller UK Ltd. intentionally and unlawfully interfered with Caterpillar's relationships with these customers.

74.    As a result of its distribution of this Package, Miller UK Ltd. interfered with and harmed Caterpillar's contractual relationship with its dealers and Caterpillar's legitimate expectancy of purchases from these customers.  Miller UK Ltd. acted in a willful, malicious, and retaliatory manner.

75.    Caterpillar has been damaged by this above-described tortious interference with its contractual and prospective business relationships in an amount to be determined at trial. Caterpillar seeks compensatory and punitive damages.

## Counterclaim VI – False Advertising

76.    Caterpillar incorporates by reference the allegations in Paragraphs 1-75 above.

77.    Miller UK Ltd. distributed a Package containing false and misleading factual statements about the Cat® Center-Lock™ Pin Grabber Coupler to Caterpillar dealers (and perhaps others) in Illinois and elsewhere.  The Package also contains false and misleading statements about competing couplers offered by Miller UK Ltd.  The Package, which contained the false and misleading statements, was sent to Caterpillar dealers with the purpose of advertising and promoting couplers offered by Miller UK Ltd.  The Package constitutes false and misleading commercial advertising.

78.    The Package sent by Miller UK Ltd. contained a variety of false and misleading statements, including false and misleading statements about the purportedly dangerous nature of the Cat® Center-Lock™ Pin Grabber Coupler.  Such statements are material to a customer's decision to purchase a coupler.

79.    The false and misleading statements of Miller UK Ltd. about the Cat® Center-Lock™ Pin Grabber Coupler have deceived and are likely to deceive a substantial portion of the

customer audience receiving the Package, and have harmed those customers' willingness to purchase the Cat® Center-Lock™ Pin Grabber Coupler.

80. This deception perpetrated by Miller UK Ltd. has resulted and will continue to result in damage to Caterpillar's reputation and goodwill, and has resulted and will continue to result in decreased sales of the Cat® Center-Lock™ Pin Grabber Coupler.

81. The Cat® Center-Lock™ Pin Grabber Coupler is a good that is and was sold by Caterpillar in interstate commerce.

82. Miller UK Ltd. violated section §43(a) of the Lanham Act, 15 U.S.C. §1125, by disseminating false and misleading advertising about the Cat® Center-Lock™ Pin Grabber Coupler and about coupler products offered for sale by Miller UK Ltd.

83. Pursuant to 15 U.S.C. § 1116, Caterpillar seeks injunctive relief to preclude Miller UK Ltd. (or other Miller entities) from further dissemination of any part of the false and misleading Package, and for mitigation of the harm inflicted on Caterpillar.

84. Pursuant to 15 U.S.C. § 1117, Caterpillar also seeks to recover, in an amount to be determined at trial, enhanced damages, fees, and costs and/or the profits of Miller UK Ltd.

## **Counterclaim VII – Copyright Infringement**

85. Caterpillar incorporates by reference the allegations in Paragraphs 1-84 above.

86. Caterpillar is the author of the Competitive Bulletin.

87. As an original work of authorship, the Competitive Bulletin is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq.*

88.     On May 6, 2011, Caterpillar sought a Certificate of Registration from the U.S. Copyright Office for the Competitive Bulletin. The Copyright Application Identification number is 1-A0N0W7.

89.     To generate the Annotated Bulletin, Miller UK Ltd. copied the Competitive Bulletin and then added pictorial and textual material. The Annotated Bulletin is not the product of independent creation but is rather an unauthorized copy and/or derivative work.

90.     Miller UK Ltd. distributed the Annotated Bulletin in Illinois and elsewhere.

91.     With the above-described actions, Miller UK Ltd. has violated the exclusive rights of Caterpillar as the copyright owner as provided by sections 106 through 118 of the Copyright Act, 17 U.S.C. §§ 106-118, and is an infringer of Caterpillar's copyrights under section 501 of the Copyright Act, 17 U.S.C. § 501.

92.     Miller UK Ltd., through its infringement, has been and continues to be wrongfully enriched.

93.     Caterpillar has suffered damage and continues to suffer damage in the form of lost profits and injury to goodwill and reputation as a result of the infringement by Miller UK Ltd.

94.     Pursuant to 17 U.S.C. § 502, Caterpillar seeks injunctive relief to preclude Miller UK Ltd. (or other Miller entities) from further dissemination of the Annotated Bulletin, and for mitigation of the harm inflicted on Caterpillar.

95.     Pursuant to 17 U.S.C. § 504, Caterpillar seeks to recover, in an amount to be determined at trial, damages and costs caused by Miller UK Ltd.'s willful violation of the Copyright Act and/or the profits of Miller UK Ltd.

## **Prayer for Relief**

WHEREFORE, Counterclaim-Plaintiff Caterpillar respectfully requests that this Court enter a judgment for:

a)      recovery of compensatory and punitive damages caused by Miller UK Ltd.'s unlawful commercial disparagement;

b)      recovery of compensatory and punitive damages caused by Miller UK Ltd.'s unlawful consumer fraud;

c)      recovery of compensatory and punitive damages caused by Miller UK Ltd.'s unlawful defamation;

d)      recovery of compensatory and punitive damages caused by Miller UK Ltd.'s unlawful tortious interference;

e)      recovery of enhanced damages, fees, and costs caused by Miller UK Ltd.'s willful violation of the Lanham Act, and/or the profits of Miller UK Ltd.;

f)      recovery of damages and costs caused by Miller UK Ltd.'s willful violation of the Copyright Act and/or the profits of Miller UK Ltd.;

g)      an injunction to prevent Miller UK Ltd. and all of its officers, employees, directors, subsidiaries, affiliates, agents, and parents from disseminating and distributing the false, misleading, and disparaging statements described above, and to mitigate the harm inflicted on Caterpillar;

h)      an injunction to prevent Miller UK Ltd. and all of its officers, employees, directors, subsidiaries, affiliates, agents, and parents from copying, publishing, or disseminating the Annotated Bulletin, to impound and destroy the original and all copies of the Annotated Bulletin, and to mitigate the harm inflicted on Caterpillar;

- 81 -

i)      pre-judgment and post-judgment interest; and

j)      such other and further relief that the Court deems just and proper.

\* \* \*

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38(b), Caterpillar respectfully demands a trial by jury of all issues triable by a jury, regardless of whether the issues were raised as a claim or defense, and regardless of which party raised the issue.

\* \* \*

Dated: May 10, 2011                 Respectfully submitted,

/s/ Gregory L. Baker
Robert G. Abrams (admitted *pro hac vice*)
Gregory L. Baker (NDIL 288357)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C.  20036-5304
(202) 861-1500 phone
(202) 861-1783 facsimile
rabrams@bakerlaw.com
gbaker@bakerlaw.com


John M. Touhy (NDIL 3128400)
Edward H. Williams (NDIL 6217053)
BAKER & HOSTETLER LLP
191 North Wacker Drive, Suite 3100
Chicago, IL  60606-1901
(312) 416-6200 phone
(312) 416-6201 facsimile
jtouhy@bakerlaw.com
ehwilliams@bakerlaw.com

*Attorneys for Defendant and Counterclaim-Plaintiff Caterpillar Inc.*

## CERTIFICATE OF SERVICE

I, Joshua DeFord, hereby certify that on May 10, 2011, the foregoing **ANSWER TO AMENDED AND SUPPLEMENTAL COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND SUPPLEMENTAL COUNTERCLAIMS** was filed with the Clerk of the Court and served by operation of the electronic filing system of the United States District Court for the Northern District of Illinois upon the following counsel who have consented to receive notice of filings in the above-captioned matter pursuant to Fed. R. Civ. P. 5(b)(2)(D), the General Order on Electronic Case Filing, and Local Rule 5.9.

R. Mark Halligan
Jason S. Kray
Justin Douglas Swindells
Deanna R. Swits
Jodi Rosen Wine
NIXON PEABODY LLP
300 South Riverside Plaza, 16th Floor
Chicago, IL  60606
rhalligan@nixonpeabody.com
jkray@nixonpeabody.com
dswits@nixonpeabody.com
jwine@nixonpeabody.com

Robert A. Weikert
NIXON PEABODY LLP.
One Embarcadero Center, 18th Floor
San Francisco, CA  94111
rweikert@nixonpeabody.com

*/s/* Joshua DeFord
Joshua DeFord