# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MILLER UK LTD. and MILLER INTERNATIONAL LTD., | ) ) ) | |
| Plaintiff, | ) ) | No. 10 C 3770 |
| v. | ) ) | Judge Shadur |
| CATERPILLAR, INC., | ) ) | Magistrate Judge Cole |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Miller and Caterpillar are in the earth-moving equipment industry. They enjoyed a long-term relationship during which Miller provided "quick coupler" technology to Caterpillar and shared trade secrets and proprietary information, which, it is alleged, Caterpillar has misappropriated. Now, as so often occurs when long-term business relationships sour, litigation follows, and Miller now accuses Caterpillar of seducing it into providing trade secrets, which Caterpillar allegedly misappropriated and used in the development of its own "coupler."

This case proves once again the wisdom of Judge Posner's observation that discovery is the bane of modern litigation. *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000). Indeed, it is by its very nature, intrusive and invasive. *Bond v. Utreras*, 585 F.3d 1061, 1067 (7th Cir. 2009); *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998). *See also Flentye v. Kathrein,* 2007 WL 2903128, 2 (N.D.Ill. 2007)(Discovery is, like life itself, "'nasty [and] brutish ....' Hobbes, Leviathan, Chapter XIII. Unfortunately, it is not generally short.").

Major litigation inevitably spawns major and seemingly intractable discovery disputes. Often, as here, the parties cannot agree on what is relevant or even what is sought by a discovery

request. Some of this is due to a failure to carefully read all the definitions pertaining to particular requests. More often, it is due to the parties' not having meaningfully participated in the required Local Rule 37.2 discovery conference. When parties come into court on a motion to compel and are confused as to what documents are even at issue, that's a clear sign that they haven't followed the Rule.

While Miller and Caterpillar insist they have complied with Local Rule 37.2, I have concluded that additional requirements to the Rule 37.2 procedure will lead to greater efficiency and hopefully to fewer discovery disputes. That, at least, has been my experience in other cases in which the following procedures have been employed. From this point forward, during the parties' Rule 37.2 conference, they will address and discuss each request separately. If the party raising an objection is confused about a definition that is the time to resolve the conflict. If the objector is skeptical about relevance, this is the time for the party seeking discovery to explain its theory. Then, before filing a motion to compel or for protective order, the parties shall prepare a combined report covering each request at issue. The report must include all the information required by Local Rule 37.2. For each request at issue, the report shall include the time spent on it at the meeting, as well as the arguments advanced by both sides. This should take the form of the movant's explanation of relevance, followed by the opponent's explanations of its objections.

The report need not be prolix, but it should be sufficiently detailed to allow the court to assess whether the parties have actually conferred in good faith effort. Only then will a discovery motion be entertained. Any failure on the movant's part will result in a denial of their motion. Any failure on the opponent's part will result in a waiver of their objections. *See, generally, Autotech Tech. Ltd. Partnership v. Automationdirect.Com, Inc.,* 05 C 5488, 2007 WL 2713352, at *4 (N.D.Ill.

2007); *Parvati Corp. v. City of Oak Forest*, 2010 WL 4792649, *4 (N.D.Ill. 2010); *Bowden v. Kirkland & Ellis LLP*, 254 F.R.D. 542, 544 (N.D.Ill. 2009).

Caterpillar's "overly burdensome" objections are another matter. They are based on Caterpillar's extravagant claims regarding the time it would take them to perform the searches necessary to retrieve the requested information. Its estimates range from months to years. But it strains credulity to accept Caterpillar's thesis that it cannot readily access the price of a machine or the cost of a machine or whether machines involved the components at issue here. This problem is addressed on a request-by-request basis below.

**A. " Documents relating to the design and manufacture of any coupler that Caterpillar is currently developing"**

Underlying many of the disputes between the parties is what is relevant. And so we begin with the meaning of relevance under the Federal Rules of Civil Procedure. Consistent with the overall design of the Federal Rules of Evidence and the plain language of Rule 401, the federal courts are unanimous in holding that the definition of relevant is expansive and inclusive, *Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 387–388 (2008); *Daubert,* 509 U.S. at 587, and that the standard for admissibility is very low. *United States v. Needham,* 377 Fed.Appx. 84, 85–86 (2nd Cir.2010); *United States v. Jordan,* 485 F.3d 1214, 1218 (10th Cir.2007); *United States v. Murzyn,* 631 F.2d 525, 529 (7th Cir.1980)("minimal"); *United States v. Curtis,* 568 F.2d 643, 645 (9th Cir.1978). The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry. *Thompson v. City of Chicago,* 472 F.3d 444, 453 (7th Cir.2006). As Dean McCormick has aptly phrased it, to be relevant, evidence need only be a brick, not a wall. *See also Huddleston v. United States,* 485 U.S. 681, 691

(1988)("'[I]ndividual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'").

As expansive and inclusive as the definition of relevancy is under Rule 401 of the Federal Rules of Evidence, the standard for relevancy under the discovery provisions of the Federal Rules of Civil Procedure is even broader, *Hofer v. Mack Trucks,* 981 F.2d 377 (8th Cir.1992), for the information sought need not itself be admissible. It is enough if it appears reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b)(1).

The first request at issue, Request No. 18, concerns the technology going into the couplers that Caterpillar is currently developing. (*Plaintiff's Memorandum*, Ex. B, No. 18). In a case about trade secrets relating to coupler technology, this request is clearly relevant. Technology from Miller that Caterpillar originally implemented in one specific coupler could arguably be implemented as an improvement to any other kind of coupler. Miller claims it shared the information under the auspices of confidentiality provisions. *If* it has been misappropriated as Miller alleges – and that is the question the jury will be called upon to decide – Miller is certainly entitled to know how extensive that misappropriation is. The documents are, then, clearly relevant to Miller's claims under the broad definition of relevancy as defined by Rule 26.

Caterpillar also objects to the request as overly broad and invokes the shibboleth, "fishing expedition," as though its invocation were sufficient to defeat the request. It is not. "No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." *Hickman v. Taylor,* 329 U.S. 495, 507-508 ( 1947). All discovery is a fishing expedition, *Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir.

2004)(Posner, J.), and "'permits extensive intrusion into the affairs of both litigants and third parties.'" *Bond v. Utreras*, 585 F.3d 1061, 1067 (7th Cir. 2009)(quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 30 (1984).[1] As Judge Shadur already explained in this case:

> A party that asserts that it has been the victim of the kind of conduct that is involved here really has no way of knowing from the outside, not even looking in -- from the outside not looking whether that has extended beyond what has expressly been brought to their attention.
>
> \* \* \*
>
> if somebody has been the victim of anticompetitive conduct that they know about and they are dealing in the same market, I think that it is a legitimate inquiry to find out *whether* that has extended beyond the examples that they know about.

(Dkt # 46, at 6-7)(emphasis supplied). Judge Shadur stopped short of declaring "open season on everything Caterpillar may be preparing to do," of course. (Dkt. #46, at 10). But Caterpillar would at least have to reveal the nature of the products in development so a determination could be made as to whether arguably they potentially involve Miller's proprietary information. (Dkt. #46, at 9-10).

The difficulty with Miller's objection to Request #18 is that it inaccurately states what the request seeks. It claims it only seeks documents related to products *currently* under development. (*Plaintiff's Memorandum*, at 2-3; *Reply in Support*, at 1). Yet the request clearly covers "All Documents relating to the design and Manufacturing Process of the Center-Lock Coupler or any other Caterpillar Coupler currently under development *or that was under development at any time between 1989 and present*." (*Plaintiff's Memorandum*, Ex. B, No. 18). Given that Miller and Caterpillar didn't hook-up and share information until 1998 (Dkt #56, ¶¶16, 24, 57), that's an impermissibly broad request and Miller certainly should have known it.

---

[1] Of course, there are cases aplenty invoking the fishing expedition metaphor and denying discovery. But all, at bottom, really involve balancing the likelihood of discovery of relevant information against the value to the party seeking the information. Phrased differently, it is not an objection in and of itself that the existence of the information sought is uncertain.

Ultimately, Miller concedes in its reply brief that its request should be limited to couplers under current development. But it should never have to come to that, and this is something that will not be repeated under the procedures that must be followed in all future Rule 37.2 conferences. In any event, in response to Request No. 18, Caterpillar shall produce only documents related to those couplers currently in development.[2] The time for Miller to have figured out what it actually wanted and was legitimately entitled to was before it served the requests and certainly before it sent everyone down a path of briefing a discovery motion.

Beyond that, Caterpillar submits that it has an agreement with Miller that it would limit requests to "Caterpillar's standard operating procedures and processing parameters for Center-Lock Couplers and recessed pin buckets, including all revisions thereto." (*Opposition to Plaintiff's Motion to Compel*, at 11). But that was an agreement concerning scaling back a specific set of requests in Miller's First Request for Production of Documents. Those requests did not pertain to couplers Caterpillar is currently developing, but couplers already developed. (*Opposition to Plaintiff's Motion to Compel*, Nos. 1-8). Caterpillar must produce documents relating to the design and manufacture of any coupler that Caterpillar is currently developing.

**B. "Documents showing who at Caterpillar was using Miller's trade secrets, how they used those secrets, and why they acquired those secrets"**

This category covers two requests. The first, No. 16, asks for:

All Documents Relating to Models, Drawings, or Manufacturing Process information associated with the Miller Coupler and Miller Scoop Bucket (collectively "Miller's

---

[2] Given Judge Shadur's thinking on this issue, it may be prudent to limit the initial production of documents in this category to portions covering descriptions of the nature of the products, rather than "chapter and verse." This would, hopefully, allow Miller to make a preliminary determination of whether the product could involve Miller's proprietary information – in other words, whether it was relevant. If it did, full production relating to that product would follow. But this is not an argument Caterpillar makes.

6

>Information"), including, but not limited to, Communications regarding Caterpillar's intent to acquire, use, maintain, or modify Miller's Information.

(*Plaintiff's Memorandum*, Ex. B, No. 16).

Caterpillar complains that the request is too broad because the term "Miller Coupler" as used in the request is defined to include couplers purchased for back hoe loaders which Miller agreed were not part of its case. Thus, for Caterpillar, the request targets materials that are irrelevant. Caterpillar did not read the entire set of definitions pertaining to the fourth set of document requests. While "Miller Coupler" is defined as "each and every Coupler developed or sold by Miller" (*Motion to Compel*, Ex. B, ¶ 7) – truly a broad, all-encompassing definition – the universe is narrowed by Definition 20. There, the term "Coupler" is limited to couplers "that can be used with a hydraulic excavator." (*Motion to Compel*, Ex. B, ¶ 20). And so, again, the parties could have saved valuable time by Miller being more precise in defining the materials to be produced and by solving the issue at the Rule 37.2 conference. Caterpillar's objection to Request No.16 is overruled.

Caterpillar also argues that its "intent to inquire" Miller's proprietary information is not relevant to this case. It fails to elaborate in any meaningful way why this is so. The point is therefore waived under the familiar doctrine that perfunctory, skeletal, and unsupported arguments will not be considered. *See Puffer v. Allstate Insurance. Co.,* 675 F.3d 709, 718 (7th Cir. 2012); *Kyles v. J.K. Guardian Sec. Services,* 236 F.R.D. 400, 401 (N.D.Ill. 2006)(collecting cases).

Beyond waiver, it is difficult to imagine documents more relevant to this case than those evidencing Caterpillar's intent to acquire Miller's information. Suppose discovery discloses documents that reveal discussions between Caterpillar employees which make clear (or from which it may reasonably be inferred) that Caterpillar was planning all along to steal Miller's trade secrets

and utilize them for Caterpillar's benefit. Should such documents exist – and long experience in cases of all kinds from antitrust to employment discrimination has shown that such documents are routinely unearthed in discovery – their relevancy could scarcely be challenged. *See* Rule 404(b), Federal Rules of Evidence. *See* Jeffrey Cole, *Bad Acts Evidence in Civil Cases Under Rule 404(b): It's Not Just for Prosecutors Anymore,*" 37 LITIGATION 47 (Spring 2011). It is Miller's thesis that Caterpillar intended to gull it into continuing to provide its trade secrets knowing all along that it was going to misappropriate them. Discovery will show whether there is evidence to support that thesis. It is, of course, uncertain whether the documents Miller is seeking in fact exist. Perhaps the documentary record will rather conclusively disprove Miller's theory of the case. That remains to be seen. But what is certain is that Miller is entitled to see what documents that bear on the question of intent there are.

> Request No. 17 asks for:
>
> All Documents Relating to internal Caterpillar Communications or Communications with third-parties in which Miller's Information was enclosed, attached, or discussed.

(*Motion to Compel*, Ex. B, No. 17). Caterpillar objects to this request as too broad because "Miller's Information" covers far too many documents. "Miller's Information" is not defined in the request. But Miller assures that it means "models, drawings, and manufacturing information regarding the Miller Coupler – limited to couplers "that can be used with a hydraulic excavator" – and the Miller Scoop Bucket – which is detailed in paragraphs 47-63 of Miller's complaint. " (*Motion to Compel*, Ex. B, ¶ 8). So, contrary to Caterpillar's interpretation, it doesn't mean every single document relating to Miller, just those relating to the technology at issue here. But, again, this is something that could and should have been resolved at a proper Rule 37.2 conference.

As a fall-back position, Caterpillar states that Miller refused an offer of production of "communications with third-parties disclosing models, drawings, or manufacturing process information regarding the Miller Scoop bucket or quick couplers for hydraulic for hydraulic excavators that Caterpillar purchased from Miller." (*Opposition to Plaintiff's Motion*, at 14). But Caterpillar's offer would not have covered internal communications or information regarding products that Caterpillar did not purchase, but that it may nonetheless have had access to during the parties' relationship. That information could just as easily have been misappropriated.

**C. "Sales and Financial Information Relating to the Machines and Attachments That Caterpillar Sold as a Package with its Couplers . . . ."**

Miller submits that Requests Nos. 56-57, 63-66, 68, 70 address Miller's calculation of its damages. It says it needs information regarding sales and costs of excavators and attachments in order to determine profits, and information regarding the impact of its couplers on sales of those products. Principally, the parties are at loggerheads over whether a search of Caterpillar's database for responsive information would be nearly impossible. For example, Request No. 64 seeks:

> Documents sufficient to show detailed sales transactions, listing for each sales transaction in which a Miller Coupler, Center-Lock Coupler, Recessed Pin Bucket, or Finished Product was distributed in the transaction, electronically in the form of a transaction history, from 1995 to present including:
>
> (a) Invoice number/purchase order number; (b) Customer name; (c) Date of transaction; (d) Product numbers (of all individual units included on the subject invoice); (e) Product number and description; (f) Number of units distributed, by product number; (g) Unit sales price for each individual product number included within a particular invoice (with discount detail provided, if any); and (h) Invoice totals for number of units and amounts invoiced.

(*Motion to Compel*, Ex. B, No. 64).

9

Caterpillar argues that it is virtually impossible for it to determine hydraulic excavator sales prices and whether any such sale included a Miller Coupler, Center-Lock Coupler, or a Recessed Pin Bucket. (*Opposition to Plaintiff's Motion*, at 15). Although it would seem that it would be a simple task for a sophisticated company to figure out what kind of excavators it sold over a certain period – and hence, whether they employed Miller technology – Caterpillar estimates that it would take 21,0612 hours or 10.5 man years to accomplish such a task. That's a difficult estimate to accept. But, assuming it to be true, if Caterpillar – a $60-billion company with 150,000 employees – had assigned 20 people to the task when it received the Fourth Request in March 2012, the task would have been completed by October 2012. That would have been before Caterpillar had even filed its brief in this dispute.

Moreover, the affidavit Caterpillar provides from its engineering technical coordinator, Mr. Klein, does little or nothing to convince the court that it would take even that long. Caterpillar says it has sold 400,000 machines since 1995. Mr. Klein says the starting point to determine which of those machines were hydraulic excavators would be to conduct 4,550 searches – one for each day. He does not explain why. He says that the invoices for each day would have to be searched manually to determine which were hydraulic excavators. (*Opposition to Plaintiff's Motion*, Ex. 19, ¶ 11). It is stunning that Caterpillar does not have a database that can separate its sales by product type. Surely, as a successful publicly traded company, it has to know, with relative ease, which products are selling well or poorly, and when. And just as surely, it should be able to discover in fairly short order which machines implemented Miller's technology which – Caterpillar does not dispute – was a key selling point of the hydraulic excavators that incorporated it.

10

It is difficult to accept the notion that Caterpillar's record-keeping is too inexact and its undoubtedly sophisticated computers too rudimentary to accomplish such tasks and to be able to do so in a reasonable amount of time. In addition, if it really is so tremendously taxing for Caterpillar to search its records, it is difficult to sympathize because the situation is one of Caterpillar's own creation, and it must bear the consequences of a system it has chosen. *See In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 362 (N.D.Ill. 2005); *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73, 76 (D.Mass.1976). *Compare United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir. 2006)("It is in that sense that he is the author of the delay of which he complains.").

The court has no way of knowing whether what Caterpillar claims is true – that would take some sort of discovery mini-trial. However, it certainly seems improbable. But, if Caterpillar wishes to maintain its 21,000 hour position, short of a mini-trial, then it will have to foot the bill for an independent computer expert to take a look at its record-keeping system and advise the court as to what is really going on. *Cf. In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 665 (7th Cir. 2002).[3]

Caterpillar continues in a similar vein for all the financial/sales requests at issue. Request No. 65 asks for:

> Documents sufficient to show a detailed breakout of the costs of each Finished Product sold or given away in connection with any transaction that occurred between 1996 to present, in which the transaction included a Miller Coupler, Center-Lock Coupler, or Recessed Pin Bucket, including, but not limited to, a breakout of gross margin, operating margin and net margin on the individual product numbers included within invoices.

---

[3] Caterpillar can, of course, seek to have Miller share in these costs by application to the court at an appropriate time.

11

(*Motion to Compel*, Ex. B, No. 65).

For this request, Caterpillar submits the search will take 536,000 hours – 25 times as long as the estimate for Request No. 64. In addition to the search for the Request No. 64 information described above, Caterpillar says it would have to wade through 13,432,929 part numbers. It is unclear why this would be necessary in order to determine the cost of the machines sold that incorporated Miller's couplers, center-lock buckets, or recessed pin buckets. If Caterpillar is saying that, in order to determine the manufacturing cost of any product it sells it must determine the product number of every single nut and bolt that went into that machine,[4] and then add up their costs, I find that assertion unpersuasive. Caterpillar goes on from there. But, again, it will take an independent expert to determine whether Caterpillar's assertions are true, since I am not prepared to accept them at face value.

As to Request No. 70, Caterpillar asserts, and Miller does not dispute, that they have agreed to narrow the scope of the request as per Miller's Exhibit D at 6-7. (*Motion to Compel*, Ex.B, ¶ 18). Miller cannot renege on its agreement now. *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 185 (N.D.Ill. 2006); *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 351, 361 (N.D.Ill. 2005)(discussing significance of attorney's promise to entertain certain discovery requests); *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 341 (N.D.Ill.2005)(representation that there would be prompt compliance with discovery if motion to dismiss were denied was an enforceable promise).

---

[4] The definitions explain that "Finished Products" refer to products that can incorporate a Miller Coupler or Recessed Pin Bucket. While it would include hydraulic excavators and attachments such as buckets, it would not, common-sensically, encompass every single part in a machine with a Miller Coupler or Recessed Pin Bucket.

Next on Caterpillar's list of disputes are requests 56, 57, and 63:

**Request No. 56:** Documents sufficient to show monthly, quarterly, and annual sales or distribution, by units, by revenue generated by each customer, and by geography from the distribution of the Center-Lock Coupler, Recessed Pin Bucket, and Finished Products.

**Request No. 57:** All monthly and quarterly balance sheets, income statements, or cash flow statements Relating to the distribution of any (a) Couplers developed by or for Caterpillar, (b) any Recessed Pin Bucket developed by or for Caterpillar, and (c) Finished Products.

**Request No. 63:** All monthly and quarterly balance sheets, income statements, or cash flow statements Relating to any buckets not having an integrated or recessed pin design developed by or for Caterpillar.

(*Motion to Compel*, Ex. B, Nos. 56-57, 63). The sticking point with these requests appears to be "Finished Products." As noted earlier, "Finished Products" covers "all Caterpillar products that are sold with, incorporate, or can be used with a Coupler or Recessed Pin Bucket." (*Motion to Compel*, Ex. B, ¶ 18). Caterpillar takes this to mean an array of product and tool *numbers* – some 20,469 – including hammers, augers, rippers, forks, cold planers, shears, grapples, pulverizers, compactors, etc. In other words, it appears to be focusing on nuts and bolts. Never mind focusing on trees rather than the forest, Caterpillar seems obsessed with pine needles. In any event, it claims to have produced all documents covering Center-Lock Couplers and recessed pin buckets. It refuses to produce documents that relate to other "Finished Products," whatever those might be.

Miller explains that "Finished Products" does not mean every component part, but "actual finished products used with the coupler, not thousands of individual [Caterpillar] product and part numbers." (*Reply in Support*, at 9). Miller allows that this would potentially touch on 23 *classes* of work tool products. Its unclear how burdensome this would or would not be; perhaps 23 classes

13

of products encompasses thousands of finished machines and attachments. The only thing clear is that the parties are talking about two different things. They are in fact, on completely different pages every step of the way in this lawsuit – which suggests with some force that there could have been more earnest participation in the mandatory discovery conferences.[5] In any event, Caterpillar's unduly burdensome objection cannot be assessed as things stand.

Caterpillar's objection on relevance grounds is not well articulated or fleshed out. Sales of just the products that incorporated the trade secret during the parties' relationship are not sufficient. Miller says that it is seeking "unjust enrichment damages based on increased sales of the Finished Products that Caterpillar experienced *after* it began using Miller's trade secrets in its Center-Lock Coupler." (*Reply in Support*, at 9 (emphasis in original)). So, sales of Caterpillar machines of the type that use couplers prior to Caterpillar's relationship are necessary for a comparison to sales during the relationship and thereafter. Otherwise, how could any impact of use of the trade secret be assessed?

Caterpillar also objects to Request No. 68, which asks for price lists for any Couplers, Recessed Pin Buckets, or Finished Products. This is claimed to be yet another overly burdensome request based on Caterpillar's stance that such information touches on over 20,000 separate products

---

[5] Caterpillar shows 37 different classes of machines it produces on its website. One has no way of knowing which can or do incorporate the components at issue in this lawsuit and which cannot. In addition, Caterpillar states that it has offered to produce financial documents "that most directly relate to quick couplers/buckets (having an integrated recessed pin design) for hydraulic excavators developed by or for Caterpillar and which are in the same size range as the quick couplers for hydraulic excavators purchased from Miller/Miller Scoop buckets tested by Caterpillar." (*Opposition to Plaintiff's Motion*, at 19). But Caterpillar does not elaborate on the relevance of this offer for the court's edification. The case is about the misappropriation of a trade secret. Presumably, the technology could be employed in various sized and classed equipment, not just a few specific models Caterpillar may have had direct access to. It is simply not enough to say, without more "[t]hat is all Plaintiffs should reasonably need." (*Opposition to Plaintniff's Motion*, at 19).

14

– apparently, again, a reference to component parts – and that Caterpillar has not stored information relating to prices of hydraulic excavators over the years in a reasonably searchable manner. Indeed, in order to retrieve prices of hydraulic excavators it sold over the years, Caterpillar claims it would have to contact hundreds of its employees individually and search each of their records. As before, it is simply not believable, without greater proof, that Caterpillar's records are stored in the database equivalent of the Augean stables. And, as before, if it chooses to maintain this stance it must pay for an independent expert to investigate and report back to the court. The selection of such an expert will be made by the court.

**"D. Documents Relating to a Competitive Bulletin distributed by Caterpillar. . . ."**

Request No. 2 concerns what the parties call a "competitive bulletin" that Caterpillar issued. Miller contends the document contains blatantly false statements about its products and defames it. Caterpillar argues that it, and documents related to it, are irrelevant because Judge Shadur dismissed Miller's supplemental claims against Caterpillar that were related to the competitive bulletin. But Caterpillar all but ignores Miller's argument that the documents are relevant to its unclean hands defense to Caterpillar's counterclaim that Miller disparaged it in a package Miller sent to Caterpillar dealers. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999). That defense is in play, and the question of whether Caterpillar acted in bad faith in creating the document makes the documents pertaining to its creation relevant to that defense. *Compare Geldon v. South Milwaukee School District,* 414 F.3d 817 (7th Cir.2005)(even if summary judgment were granted on a particular count, the evidence would nonetheless be admissible on those counts that were still in play if

otherwise relevant). Caterpillar must produce the documents.[6]

**"E. Documents Sufficient to Show the Number of Center-lock Couplers That Caterpillar Manufactured . . . ."**

The parties' dispute over Request No. 3 is yet another that demonstrates they ignored the local rule requiring a (meaningful) discovery conference. Miller explains that the number of couplers Caterpillar manufactured but was unable to sell will be relevant to any damages it claims to have suffered from Miller disparaging its products. In other word, did Miller's disparagement have any effect on Caterpillar's bottom line in terms of machines it projected it would have been able to sell before Miller allegedly derided the quality of those machines?

Caterpillar complains that it is not for Miller to specify what Caterpillar's damage theory might be. But Caterpillar neither denies that this is at least one measure of its alleged damages nor shares what its theory will be in order to rule Miller's theory out. (*Opposition to Plaintiff's Motion*, at 22). Instead, it sets up a straw man argument for Miller that the information is relevant to Miller's damages and knocks that down by asserting that if Caterpillar manufactures a coupler it fails to sell, it gains no financial benefit, let alone any benefit traceable to Miller's trade secrets. But, as is fairly clear from Miller's opening brief, that is not the issue. Caterpillar must produce these documents.

**"F. Documents Relating to Caterpillar's Procedures for Protecting its Trade Secrets . . . ."**

Request No. 12 seeks documents showing what Caterpillar did to protect its trade secrets and other parties' trade secrets in its possession. " (*Motion to Compel*, Ex. B, No. 12). Caterpillar

---

[6] Caterpillar also seems to be making an argument that its bulletin concerned MillerBaird rather than Miller and, therefore, is irrelevant to an unclean hands defense from Miller. But Caterpillar alleges the annotated version of the document – annotated by Miller – is a basis for its counterclaim (Dkt. # 73, ¶ III.9) and the allegation in Miller's fourteenth affirmative defense is that the document defamed *Miller* and its products. (Dkt. #88, at 35).

16

complains that the request is overly broad and that the evidence sought is irrelevant. But Caterpillar's objection is overly broad. The efforts Caterpillar took to secure Miller's trade secrets, when compared to the efforts it took with its own trade secrets and those of others, are relevant because Miller is claiming that Caterpillar failed to take sufficient efforts in that regard. In other words, if Caterpillar was lackadaisical with Miller's information and strict with its own and others, that's certainly relevant to Miller's case. Caterpillar must produce these documents.

Caterpillar's efforts to protect trade secrets might also be relevant to show that the efforts Miller took to protect its trade secrets were reasonable. While it may be true that, from a general perspective, that what is "reasonable . . . in the context of one enterprise may be plainly insufficient or vast overkill in the context of another," 4 R. Milgrim and E. Bensen, *Milgrim on Trade Secrets*, §18.03, how else can what is reasonable be determined if not by comparison? Perhaps a battle of experts will ensue eventually, but this is merely a discovery dispute. Besides, the efforts of what other companies do to protect trade secrets is repeatedly found relevant in cases like these. *See, e.g.,Motorola, Inc. v. Lemko Corp.*, 2012 WL 74319, 18 -19 (N.D.Ill. 2012)(Kenneally, J.)(looking to various industries for comparators on trade secret protection); *Von Holdt v. A-1 Tool Corp.*, 2013 WL 53986, 3 (N.D.Ill. 2013)(Chang, J.)(rejecting argument that industry custom is not a proper basis on which to rely to show reasonable efforts to protect trade secrets); *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F.Supp.2d 881, 885 (N.D.Ill. 2009)(Shadur, J,)(looking to steps taken by other companies in various industries to assess steps taken to protect trade secrets). And here, the comparison would be between companies in the same industry with the same type of trade secrets. Caterpillar must produce this information.

**"G. Documents Relating to Attachments That Were Designed to Work with Caterpillar's**

**Center-lock Coupler . . . ."**

Request No. 51 demands "[a]ll Documents Relating to the design and testing of any attachments, tools, or buckets in order to ensure that such products would work with the Center-Lock Coupler." (*Motion to Compel*, Ex. B, No. 51). Caterpillar argues that information related to the design of products other than the Center-Lock coupler is irrelevant and that Miller should be content with Caterpillar's offer of "documents related to testing of any attachments, tools, or buckets in order to ensure that such products would work with the Center-Lock coupler." (*Opposition to Plaintiff's Motion*, at 24).

In its opening brief, Miller explains that if the design documents are indeed relevant, because if Caterpillar designed any attachments using the Center-Lock coupler, that would mean it was designing attachments using Miller's trade secrets. That's because the Center-Lock coupler is allegedly based on those trade secrets. (*Plaintiff's Memorandum*, at 14). In other words, Caterpillar benefitted from its purported theft of trade secrets not just by coming up with its own version of Miller's coupler, but by coming up with its own, new compatible products as well. Caterpillar does not provide any inkling into why this would not be the case. Accordingly, the documents are relevant and must be produced.

**"H. Documents Relating to Caterpillar's Efforts to Sell the Miller-Supplied Coupler in Europe . . . ."**

Request No. 49 asks for documents concerning Caterpillar's efforts to sell Miller's couplers in Europe. But what it really concerns is the termination of the parties' Supply Agreement. Under that agreement, Miller granted Caterpillar exclusive rights to market Miller's Bug Coupler in Europe. In turn, Miller agreed to refer all inquiries it received about the coupler to Caterpillar. Caterpillar

agreed to pursue all these inquiries. Miller believed, and continues to believe, that Caterpillar didn't do this, and that was a valid reason for Miller to terminate the Supply Agreement. It threatened to terminate the agreement in 2003 (*Plaintiff's Motion to Compel*, Ex. O), but didn't. The parties continued on for another six years.

Miller does not indicate what claim or defense in this trade secrets case this 2003 dispute is relevant to. Instead, it points out that Caterpillar has requested documents relating to "Keith Miller's stated view that the Supply Agreement was not valid." (*Plaintiff's Motion to Compel*, Ex. P, No. 54). Because of Caterpillar's request for these documents – which Miller produced – Miller contends the documents it requests must be deemed relevant as well, and Caterpillar cannot object to production. It is not clear whether Miller is raising a kind of estoppel argument or something akin to a "curative admissibility" contention. It matters not; the argument, which not surprisingly, is unsupported, is wrong.

Miller's decision to produce documents of a certain kind in response to a request from Caterpillar has nothing to do with whether Miller's request to Caterpillar for similar (or even identical) kinds of documents satisfies Rule 26(b)(1)'s requirement that evidence be relevant. The question is not whether Miller produced documents without protest, but whether its current request complies with the Federal Rules of Civil Procedure's requirement that only relevant documents may be sought. Relevance has its limits, and judges are required to honor them. Indeed, recognizing and honoring those limits is ultimately the means for preventing much of the discovery abuse that characterizes modern day discovery. *Cf. Herbert v. Lando,* 441 U.S. 153, 177 (1979); *Swanson v. Citibank, N.A.* 614 F.3d 400, 411412 (7th Cir. 2010); *Robinson v. Stanley,* 2010 WL 1005736, 5 (N.D.Ill. 2010).

In sum, neither Caterpillar nor Miller is the ultimate authority on what is relevant. If that were true, Miller's motion to compel would have to be denied completely. So Miller cannot rely on a previous request from its opponent to which it did not object to sustain its objection to the relevancy of the request. It was required to explain why the quibble it had in 2003 regarding sales in Europe is relevant and what claim or defense it is relevant to. It has not done so, and, accordingly, Caterpillar need not produce these documents.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion to compel [#267] is GRANTED in part and DENIED in part. If Caterpillar insists on pursuing its objection of undue burden, it must, within seven days, either agree with Miller on an independent expert to investigate Caterpillar's record-keeping system or submit a list of three experts for the court's selection. As to all other documents not covered by an undue burden objection, Caterpillar must begin immediately to produce the documents and it must do so on a rolling basis. The court, of course, understands that production may take some time.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE:2/7/13