**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MILLER UK LTD. and MILLER** | ) | |
| **INTERNATIONAL LTD.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 10 C 3770** |
| **v.** | ) | |
| | ) | **Judge Sara Ellis** |
| **CATERPILLAR, INC.,** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**INTRODUCTION**

Caterpillar and Miller had a decades-long, mutually beneficial business relationship, during which Miller shared confidential information and trade secrets with Caterpillar. In 2008, Caterpillar suddenly severed that relationship and began manufacturing a product that previously had utilized and allegedly depended on the confidential information supplied by Miller. Miller sued, claiming that Caterpillar misappropriated its trade secrets. Caterpillar has fiercely denied the charges, and the case has been bitterly contested at every turn. The overwhelming majority of the disputes have been over discovery, "the bane of modern litigation." *Rosetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000).

Protracted discovery is expensive and is a drain on the parties' resources. Where a defendant enjoys substantial economic superiority, it can, if it chooses, embark on a scorched earth policy and overwhelm its opponent. *See* Liesa L. Richter, *Making Horses Drink*, 81 Fordham L. Rev. 1669, 1695 (2013); Matthew Jarvey, *Boilerplate Discovery Objections: How They Are Used, Why They Are Wrong*, *And What We Can Do About Them*, 61 Drake L. Rev. 913, 915-916 (2013); William Griesbach, *The Joy Of Law*, 92 Marq. L. Rev. 889, 907 (Summer 2009). That is what Miller insists

has occurred here, (*Miller Memorandum* at 2) – a charge denied by Caterpillar. But even where a case is not conducted with an ulterior purpose, the costs inherent in major litigation can be crippling, and a plaintiff, lacking the resources to sustain a long fight, may be forced to abandon the case or settle on distinctly disadvantageous terms.

Creative businessmen, ever alert to new opportunities for profit, perceived in this economic inequality a chance to make money and devised what has come to be known as third party litigation funding, where money is advanced to a plaintiff, and the funder takes an agreed upon cut of the winnings. If the plaintiff loses the case, the funder may get nothing. Third party litigation funding is a relatively new phenomenon in the United States. The business model has generated a good deal of commentary about and controversy over its intrinsic value to society (or lack thereof depending on one's perspective) and the discoverability of the actual funding contract and information turned over to prospective funders by a party's lawyer during negotiations to secure financing.[1]

---

[1] *See e.g.*,Jasminka Kalajdzic, Peter Cashman, Alana Longmoore*, Justice for Profit: A Comparative Analysis of Australian, Canadian and U.S. Third Party Litigation Funding*, 61 Am.J.Comp.L. 93, 111-12 (Winter 2013); Jennifer Anglim Kreder, Benjamin A. Bauer, *Litigation Finance Ethics: Paying Interest*, 2013 Prof. Law. 1, 21 (2013); Grace M. Giesel, *Alternative Litigation Finance and the Work-Product Doctrine*, 47 Wake Forest L.Rev. 1083, 1085 (Winter 2012); Elizabeth Chamblee Burch, *Financiers as Monitors in Aggregate Litigation*, 87 N.Y.U.L.Rev 1273, 1326 (Nov. 2012); Maya Steinitz, *The Litigation Finance Contract*, 54 Wm.& Mary L.Rev. 455, 503 (Nov. 2012); Jonathan T. Molot, *Third Party Litigation Funding: Pros, Cons, and How It Works*, ALI-ABA 95 (Nov. 2012); Meriam N. Alrashid, Jane Wessel, John Laird, *Impact of Third Party Funding on Privilege in Litigation and International Arbitration*, 6 No. 2 Disp.Resol. Int'l 101 n.36 (Oct. 2012); Aren Goldsmith, *Third-Party Funding in International Dispute Resolution*, 25-AUT Int'l L. Practicum 147 (Autumn 2012); Jenna Wims Hashway, *Litigation Loansharks: A History of Litigation Lending and a Proposal to Bring Litigation Advances Within the Protection of Usury Laws*, 17 Roger Williams U.L.Rev. 750 n.64 (Summer 2012); Elisha E. Weiner, *Price and Privilege*, 35-APR.L.A. Law 20, 23 (April 2012);Robin Miller, *Enforcement and Validity of Litigation Funding Agreements,*72 A.L.R.6th 385 (2012); Stuart L. Pardau, *Alternative Litigation Financing: Perils and Opportunities*, 12 U.C. Davis Bus. L.J. 65 n.60 (Fall 2011); Christopher B. Little, *Third-Party Litigation Funding: Understanding the Risks*, 40-APR Colo.Law. 69 (April 2011); Kingston White, *A Call for Regulating Third-Party Divorce Litigation Funding*, 13 J.L.& Fam.Stud. 395 n.81 (2011); Nicholas Dietsch, *Litigation Financing in the U.S., The U.K., and Australia: How the Industry has Evolved in Three Countries*, 38 N.Ky.L.Rev. 687, 692 (2011); Jason Lyon, *Revolution in Progress: Third-Party Funding of American Litigation*, 58 UCLA L.Rev. 571, 576 (Dec. 2010); James M. Hosking, Andreas A. Frischknecht, *Third-Party*

(continued...)

In the instant case, apparently faced with financial difficulties, Miller sought financing from several third-party litigation funding sources. Miller was ultimately successful and entered into a contract with a third-party funder. Caterpillar has cried foul, invoking the hoary doctrines of maintenance and champerty and arguing that Miller's agreement with its funding source is illegal under the Illinois statute criminalizing "maintenance." *See infra* at 11. Caterpillar is seeking to discover the actual contract with Miller's funder and those documents provided by Miller to it and any other third party lender from which Miller sought funding for this case. The ostensible basis for this discovery is to enable Caterpillar to raise the supposed illegality of the funding contract as a defense to Miller's tort and breach of contract claims. Caterpillar also says those documents are relevant to the question of who is the real party in interest under Rule 17(a), Federal Rules of Civil Procedure.

Although it says it has produced any all documents that contain admissions or statements regarding the merits of the claims or defenses in the case (*Miller Memorandum* at 2), Miller has resisted any further production on the grounds that the actual funding contract (and related documents) are irrelevant, and that whatever information about the case it provided to any funder

---

[1](...continued)

*Funding Update: New York Court Narrowly Applies Champerty Law Whyile Florida Court Holds Investors Can Be Liable for Costs*, 15 No. 1 IBA Arb. News 190 n.14 (March 2010); Vince Morabito, *Class Actions Instituted Only for the Benefit of the Clients of the Class Representative's Solicitors*, 29 Sydney L.Rev. 5, 38 (March 2007); Mariel Rodak, *It's About Time: A Systems Thinking Analysis of the Litigation Finance Industry and Its Effect on Settlement*, 155 U.Pa.L.Rev. 503, 517 (Dec. 2006); Chris Messervy, *Recent Law Review Articles Concerning the Legal Profession*, 30 J. Legal Prof. 195 (2005-2006); *L.E.I. 2005 - 02 Legal Funding Plans*, 2005-Dec W.Va.Law. 33 n.1 Nov./Dec. 2005); Douglas R. Richmond, *Other People's Money: The Ethics of Litigation Funding*, 56 Mercer L.Rev. 649, 675-76 (Winter 2005); Douglas R. Richmond, *Litigation Funding: Investing, Lending, or Loan Sharking?*, 2005 Prof.Law. 17, 39 (2005);Douglas R. Richmond, *Other People's Money: The Ethics of Litigation Funding,* 56 Mercer L.Rev. 649 (2005); Kenneth L. Jorgensen, *Presettlement Funding Agreements: Benefit or Burden,* 61 Bench & B. Minn. 14 (2004); Andrew Hananel & David Staubitz, *The Ethics of Law Loans in the post-Rancman Era,* 17 Geo. J. Legal Ethics 795 (2004); Terry Carter, *Cash Up Front,* 90 A.B.A.J. 34 (2004). *See also* ABA Commission on Ethics 20/20, Informational Report To The House of Delegates, 1, notes 1- 4 (2012).

in connection with any funding request is privileged under the attorney-client and work-product privileges, and that those privileges were not waived by disclosure to the potential funders. Caterpillar has a divergent view, denying the documents are privileged and that any privileges that might have existed were waived by disclosure of the documents to prospective funders.[2]

## ANALYSIS

Caterpillar claims it learned from one of the third party funders that Miller had contacted it to obtain funding for the case, but that it had rejected the overture. Caterpillar has not disclosed who tattled or when. (*Defendant's Memorandum In Support Of Its Motion To Compel*, at 13)(Dkt. # 365)("*Defendant's Memorandum*"). Caterpillar served document requests seeking:

> 1. All documents created by Miller, Miller's counsel, or any third party entity for the purpose of considering, investigating, pursuing, arranging, or obtaining litigation funding.
>
> 2. All documents transmitted, shared, or discussed between Miller and Miller's counsel, between Miller's counsel and any third party entity, or between Miller and any third party entity for the purpose of considering, investigating, pursuing, arranging, or obtaining litigation funding.
>
> 3. All communications between Miller and Miller's counsel, between Miller's counsel and any third party entity, or between Miller and any third party entity relating to litigation funding.

Miller produced a number of documents responsive to Caterpillar's requests, including:

---

[2] Before turning to the merits, the manner in which the parties chose to brief the motion warrants mention. Both parties have violated Local Rule 7.1 by filing briefs that incorporate by reference their 32 page, Combined Rule 37.2 report, which contain extensive legal arguments. This requires the court to flip back and forth from document to document to attempt to assess arguments that are not fully developed in the parties' supporting memoranda, as they should have been. *Miller UK Ltd. v. Caterpillar, Inc.*, 2013 WL 4494683 (N.D.Ill. 2013) explained why it was improper to incorporate by reference other documents and arguments: it made the court's job harder not easier, and it resulted in a substantial violation of the limitation on the permissible length of briefs imposed by our local rules. The Opinion concluded that arguments that were not fully developed in the parties' memoranda would be deemed waived. Nonetheless I have considered the arguments. However, no further briefs will be accepted that incorporate by reference legal arguments from other documents.

– a draft letter to third party funders summarizing the case, acknowledging that plaintiffs thought a cause of action might exist in 2003, and stating that plaintiffs made substantial investments to expand their operations even though it "felt compromised by the situation";

– an email exchange discussing between plaintiffs and a public relations firm strategy to sell their story by portraying a "David and Goliath scenario" in an attempt to "influence potential funders," a plan to lobby defendant's board of directors by sending materials to board members, assess the legal status of the case "[t]o see what can be done to stall matters whilst funding is being sought," and asking to see "ASAP" plaintiffs' lawyer's written evaluation of the case;

– email from plaintiffs to the public relations firm warning "you might not like what Jodi [Rosen Wine] said!"; email from public relations firm asking plaintiffs to get "constructive advice" from Nixon Peabody for inclusion in a letter distributed to third party funders;

– email exchange between plaintiffs and third party funders reflecting Nixon Peabody attorney's "thoughts on the claim" and concerns from the funder that the case is more complicated than originally believed and asking for correspondence between plaintiffs and their attorneys.

(*Defendant's Memorandum*, Exs. B, C, D).

Miller withheld documents showing the structure and terms of its financing deal on the grounds of relevance. Also withheld were agreements Miller has with Kirkland and Ellis, an English bank, and agreements with Dig Ventures LLC, the managing member of which is Arena Consulting.[3]

Miller redacted portions of its production on the basis of attorney-client privilege, attorney work

---

[3] Unfortunately, none of the "deal documents" were specifically identified, described, or discussed in any way in Miller's brief. Nor were they otherwise categorized or indexed in the five large binders that were provided for my *in camera* review. It was only after a request to Miller's counsel during a conference call with the parties that the deal documents were separately provided to the court. The documents that evidence or pertain to the actual financing agreement are found at:Binder1,Exhibitnumbers:LITFUNDING 0000168, LITFUNDING0000171,and LITFUNDING0000329; Binder3 at Exhibit numbers: PURCELP 0067225, PURCELP0067393, PURCELP0067597, PURCELP0067600; and Binder5at MILLERREV-006939, MILLERREV-006940, MILLERREV-006941,MILLERREV-006942, MILLERREV-006943, MILLERREV-006944, MILLERREV-006945, MILLERREV-006946,MILLERREV-006947, MILLERREV-006948, MILLERREV-006949, MILLERREV-006950,MILLERREV-006951, MILLERREV-006952, MILLERREV-006953, MILLERREV-006954, MILLERREV-006955,MILLERREV-006956, MILLERREV-006957, MILLERREV-006958, MILLERREV-006959.

product, and the "common interest" doctrine.  For example, on an application for funding form, Miller  redacted its response to a question that asked Miller to provide an estimate of the prospect of success of its lawsuit, and to give the amount of its attorneys fees. (*Defendant's Memorandum*, Ex. D). Miller also withheld a number of documents on these same bases that had been identified in its privilege log.

There  are  two broad categories of documents at issue. One is referred to as the "deal documents" and encompasses documents evidencing the structure and terms of the funding transaction. Caterpillar contends  that the funding agreement and related documents are discoverable as they obviously relate to the case, and in one sense that is true.  But the inquiry under Rule 26 is whether the funding contract (and related documents) relate to the claims or defenses, and that requires a more exacting analysis than Caterpillar has made.

The second category of documents is comprised of  those submitted to potential third party funders that Miller had contacted. Miller concedes that some of these documents are relevant, and has produced almost 300. But, it argues that, that the  balance of the documents are not discoverable, not because they are not relevant, but  because they are privileged, and the applicable privileges have not been waived.

## I.
## The Relevance of the "Deal Documents"

The terms of Miller's actual funding agreement would seem to have no apparent relevance to the claims or defenses in this case, as required by Rule 26 as a precondition to discovery. Caterpillar's argument that the "deal documents" are relevant is largely based on the oft-repeated,

and indisputable proposition, that discovery under Rule 26 is "broad." *See Tellabs Operations Inc. v. Fujitsu*, 283 F.R.D. 374, 390 (N.D. Ill. 2012). But, "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting).

While the discovery rules were designed to end what Wigmore and others called "the sporting theory of justice" that once prevailed throughout the Nation, *cf., In re Barnett* 124 F.2d 1005, 1010 -1011 (2d Cir.1941)(Frank, J.), they were never intended to be an excursion ticket to an unlimited exploration of every conceivable matter that captures an attorney's interest. "[D]iscovery... has ultimate and necessary boundaries" and limitations, "one of which comes into existence when inquiry touches upon the irrelevant...." *Hickman v. Taylor*, 329 U.S. 495 507- 08 (1947). Discovery of matter not "reasonably calculated to lead to the discovery of admissible evidence" is not within the scope of Rule 26(b)(1)." *Oppenheimer Fund, Inc. v. Sanders* 437 U.S. 340, 352 (1978).

The Supreme Court has cautioned that the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where necessary. *Herbert v. Lando*, 441 U.S. 153 (1979). *See also, Balderston v. Fairbank's Morse Engine Div. of Coltec Indus.*, 328 F3d 309, 320 (7th Cir 2003). Failure to exercise control results in enormous costs to the litigants and to the due administration of justice. *Cf. Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); *Swanson v. Citibank, N.A.,* 614 F.3d 400, 411- 412 (7th Cir. 2010); *Continental Insurance. Co. v. Chase Manhattan Mortgage Corp*., 59 Fed.Appx. 830, 840 (7th Cir.2003); Frank Easterbrook, *Discovery as Abuse,* 69 B.U.L.Rev. 635 (1989).

The cases Caterpillar cites to support its argument that funding documents are relevant require more analysis than its Memorandum has given them. It must not be forgotten that relevance for discovery purposes does not exist in the air. It is a function of the claims and defenses in the

case. Rule 26(b)(1).[4] "Relevance is not inherent in any item of evidence, but exists only as a relation between an item of evidence and the matter properly provable in the case." *See* January 2, 2014, 2 *Weinstein's Federal Evidence*, §401 App. 01 (Joseph M. McLaughlin ed., 2d ed. 2007). Thus, the fact that a particular case found a funding agreement relevant and discoverable is the beginning and not the end of analysis. Since what might make a species of documents relevant in one case does not necessarily make it relevant in all others, it is "inappropriate for courts to be guided by past judicial evaluations of the relevance of seemingly similar evidence." 1A Wigmore on Evidence, §37.3 at 1040 (Tillers Rev. 1983). *See also*, 1 C. Mueller and L. Kirkpatrick, Federal Evidence, 4:3 at 568 (3d ed. 2003)(decisions on relevancy are made on a case-by-case basis, and each is dependent on surrounding facts, circumstances, and issues in the case).

The Seventh Circuit has been critical of the approach to the reading of cases exemplified by Caterpillar's Memorandum – an approach that ignores the critical factual setting of the case. To look solely to the result in a case "can be misleading if [the holding is] carelessly lifted from the case-specific contexts in which they were originally uttered." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir.1999). *See also Penry v. Lynaugh*, 492 U.S. 302, 358 (1989)(Scalia, J., concurring and dissenting in part)("One must read cases, however, not in a vacuum, but in light of their facts"); *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1342, n.20 (7th Cir.1977).

It is Caterpillar's failure to recognize these basic principles that led it to rely on *Abu-Ghazaleh v. Chaul*, 36 So.3d 691 (Fla.App.3rd Dist. 2009). Contrary to Caterpillar's assertion that the court held the financing agreement was relevant to the issues in the case-in-chief, there was not so much as an insinuation that it was. 36 So.3d at 693. Nor did the opinion have anything to do

---

[4] For good cause, the court may order discovery "relevant to the subject matter involved in the action." Rule 26(b)(1). This provision has not been invoked by Caterpillar.

with pretrial discovery of a funding agreement; it involved an appeal of the trial court's denial of the plaintiff's *post-trial* motion for attorney's fees and costs against William A. Van Diepen and CSI Financial Investments Company, Inc., who funded and controlled the plaintiff's case. *Id.* at 693.

If the lender's agreement provided (as it did) that Van Diepen had to approve the filing of the lawsuit, controlled virtually every aspect of the case from the selection of the plaintiff's attorneys and approval of their bills to whether to settle, the lender was, the court held, a "party" under Florida law – and on the hook for attorney's fees for the baseless suit it authorized and ran. In that setting, the financing agreement was obviously relevant to the plaintiff's claim for attorney's fees. Unfortunately, the critical and outcome-determinate factual setting of the case is ignored by Caterpillar's brief. *Cf., Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir.1988)("This excerpt [in the brief] from a minority opinion neglects to mention that the *majority* had rejected the "second guideline."... [W]e take an extremely dim view of this futile attempt to mislead the court")(emphasis in original). "'A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'" *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008).

Then there is *Berger v. Seyfarth Shaw LLP,* 2008 WL 4681834, 2 (N.D. Cal. 2008), where the court held that Branton, a non-party to the action, was required to turn over to the defendant documents "pertinent to his financial assistance to the plaintiffs...." *Id.* at 1. The issue – which Berger and Seyfarth agreed was a legitimate one in the case – was whether, given the dispute between the parties about the percentage of any recovery in the case that had been assigned to Branton by Berger, the documents were "relevant to the above issue and discoverable." *Id.* at 3. The

court quite rightly held they were given the parties' agreement about what issues were in the case. Additionally, since Branton had a direct financial stake in the case's outcome, the court properly held that the documents were relevant to his "potential bias as a witness in that case." *Id.* at 1. Financial interest in a case is always relevant to the question of bias, either of a judge or a witness. *Tumey v. Ohio*, 273 U.S. 510 (1927); *Balsley v. LFP, Inc.*, 691 F.3d 747, 762 (6th Cir.2012). Miller's funder will not be a witness in the case, and the amount the funder will get if Miller wins is not an issue here as it was in *Berger*. In short, *Berger* is not susceptible to the expansive reading given it by Caterpillar.

*Leader Technologies, Inc. v. Facebook, Inc.*, 719 F.Supp.2d 373, 376-77 (D.Del. 2010), on which Caterpillar also relies, does not even discuss the issue of the relevance of funding agreements. The only question presented was whether the documents sought in discovery were privileged. To say that the court "ruled that deal documents are relevant" (*Defendant's Memorandum*, at 6) is inaccurate. While it can be argued that the court must have assumed the agreement was relevant or it would never have reached the privilege issue, *(Caterpillar Reply* at 4), that would not advance Caterpillar's argument, for *sub-silentio* or assumptive resolution of an issue is not enough to establish a holding. *Brecht v. Abrahamson,* 507 U.S. 619, 631 (1993)(if a decision does not "squarely addres[s] [an] issue," the court remains "free to address [it] on the merits" at a later date."); *City of Kenosha v. Bruno,* 412 U.S. 507, 512–13 (1973); *United States v. Acox*, 595 F.3d 729, 731 (7th Cir.2010).

That leaves *Abrams v. First Tennessee Bank Nat. Ass'n*, 2007 WL 320966, 1 (E.D.Tenn. 2007), which did hold that financing documents were discoverable. But, like *Leader Technologies, Inc.*, it did so without explanation or analysis, and thus is not under Seventh Circuit precedent persuasive. *Szmaj v. AT&T,* 291 F.3d 955, 956 (7th Cir.2002)(Posner, J.)(a conclusory opinion

10

without analysis or discussion is "weak authority."). *See also Benson v. McMahon,* 127 U.S. 457, 468-469 (1888)("the views of counsel...are unsupported by any well-considered judicial decision"); *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 598 (7th Cir. 2012)("the *Franklin* opinion offers only a conclusion, not reasons"); *Bogan v. City of Chicago*, 644 F.3d 563, 570 (7th Cir. 2011)(rejecting four appellate decisions because the point was made "without discussion"); Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959)("*ipse dixits* are futile as instruments for the exercise of 'the judicial Power of the United States.'").

Caterpillar's claim of relevance for the "deal documents" ultimately rests on the theory that they relate to the unpled defense that Miller has violated the Illinois maintenance statute, and that Miller's funder is or may be the real party in interest under Rule 17(a). (*Defendant's Memorandum* at 7). Neither argument has any cogency.

## A.

## Champerty and Maintenance

Caterpillar's claim that the "deal documents" are relevant rests on its largely unexplained assertion that the Miller's funding agreement offends the Illinois statute prohibiting champerty and maintenance and its utterly unsupported and unexplained conclusion that that a violation of the statute by Miller is a defense to Miller's claims against it. (*Defendant's Memorandum* at 14). Indeed, we are told unequivocally that "litigation funding agreements are unlawful in Illinois and support a new Caterpillar defense." (*Id.* at 7, incorporating the discussion in the Rule 37.2 report).[5] Even

---

[5] If third party funding agreements were "illegal" in Illinois, one would expect there to be a defense to that effect raised by Caterpillar. Tellingly, there is none. *Cf. Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008) (Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening."); *Alexander v. City of South Bend*, 433 F.3d 550, 556 (7th Cir. 2006).

the most casual reading of *Puckett v. Empire Stove Co.* 183 Ill.App.3d 181 539 N.E.2d 420 (5th

Dist.1989), on which Caterpillar relies, reveals the unsupportability of this assertion. Here is what

the court said in a case involving an assignment of a claim to a third party:

> ITT argues that *the assignment of Ghibaudys' right of action* for contribution against
> ITT is void as against public policy because it encourages litigation *which otherwise
> would not be brought*. To allow the assignment in this case, ITT argues, would
> constitute approval of what was known at common law as champerty or
> maintenance.
>  *We disagree*.
> Black's Law Dictionary defines champerty as "[a] bargain by a stranger with a party
> to a suit, by which such *third person undertakes to carry on the litigation at his own
> cost and risk,* in consideration of receiving, if successful, a part of the proceeds or
> subject sought to be recovered."  Maintenance is defined as "maintaining,
> supporting, or promoting the litigation of another." Champerty and maintenance have
> been disapproved by the courts as against public policy because a litigious person
> could harass and annoy others if allowed *to purchase claims for pain and suffering
> and pursue the claims in court as an assignee*. However, plaintiff in the instant case
> is no stranger to the action between third-party plaintiffs Ghibaudys and third-party
> defendant ITT. *Nor is plaintiff promoting the litigation of another which otherwise
> might not be maintained*. Instead, plaintiff has a direct and immediate interest in
> Ghibaudys' right of action for contribution against ITT. Allowing Ghibaudys to
> assign that cause of action to plaintiff is not violative of any public policy of which
> we are aware.

> *Puckett*, 183 Ill.App.3d at 191-192 (emphasis supplied)(citations omitted).

The situation in *Puckett* is not remotely comparable to that in the instant case.

In Illinois, the common-law offense of maintenance was abolished long ago by statute, *Brush

v. City of Carbondale,* 229 Ill. 144, 151, 82 N.E. 252, 254 (1907), which has remained virtually

unchanged for over a century. 720 ILCS 5/32-12 provides that "if a person *officiously intermeddles*

in an action that in no way belongs to or concerns that person, by maintaining or assisting either

party, with money or otherwise, to prosecute or defend the action, with a view to promoting

litigation, he or she is guilty of maintenance and upon conviction shall be fined and punished as in

cases of common barratry." (Emphasis supplied). Being  a criminal statute, it  must be strictly

construed. *People v. Sedelsky,* _ Ill.App.3d _, 2013 WL 5370287, 3 (2nd Dist. 2013).

In construing penal statutes, the goal is to ascertain and give effect to the intent of the legislature. *People v. Davis,* 199 Ill.2d 130, 135, 766 N.E.2d 641 (2002). "The most reliable indicator of legislative intent is the language of the statute, which, if plain and unambiguous, must be read without exception, limitation, or other condition." *Id.* "Moreover, in construing criminal statutes, "nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute." *Id.*[6] Caterpillar's argument puts to one side the maintenance statute's limited purpose and its explicit requirement that there be "officious intermeddling." And it assumes – *without any explanation or analysis* – that a violation of the statute by Miller's funding agreement would provide Caterpillar with a viable defense to Miller's trade secret action. Being unamplified and unsupported, that argument could be deemed waived. *Cadenhead v. Astrue* 410 Fed.Appx. 982, 984, 2011 WL 549785, 2 (7th Cir.2011). But we prefer to consider it, since it implicates the public policy of this state.

Officiousness is synonymous with meddlesomeness and can be described as volunteering one's services where they are neither asked for nor needed. *Matter of Estate of Milborn,* 122 Ill.App.3d 688, 691, 461 N.E.2d 1075, 1078 (3rd Dist.1984). Here, there was no intermeddling by the funder in the sense contemplated by the statute. Quite the contrary. The funder was sought out by a cash-strapped litigant embroiled in bitterly contested litigation. There is no suggestion let alone proof that any of the funders with which Miller conferred "wickedly and willfully" tried to stir up

---

[6] Thus, there is no implied private cause of action for champerty, maintenance or barratry. *Galinski v. Kessler,* 134 Ill.App.3d 602, 606, 480 N.E.2d 1176, 1179(1st Dist.1985).

a suit between Caterpillar and Miller, *Wyman-Gordon Co. v. Lynch Area Fire Protection Dist.*, 51 Ill.App.3d 451, 454-455, 366 N.E.2d 1055 (4th Dist. 1977), or foment "useless" litigation for the sake of harassment, *In re Marriage of Malec*, 205 Ill.App.3d 273, 289, 562 N.E.2d 1010, 1021 (1st Dist. 1990), or promote or cause "meritless litigation." *Medallion Prods., Inc. v. H.C.T.V., Inc.,* 2007 WL 1022010, 4 (N.D.Ill.2007). *See also, Galinski*, 134 Ill.App.3d at 604, 480 N.E.2d at1176. The funders were sought out by Miller to enable it to continue with the litigation that Miller had initiated in 2010 without prompting from any funder.

Therefore, "[i]n this case there is no semblance of a violation of [the Illinois statute]. [Neither Miller nor its funder] has ... engaged in exciting or stirring up any suit or quarrel between the people of this state with a view to promote strife or contention." *Davis,* 199 Ill.2d at 135. *Cf., National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 440-441 (1963). Caterpillar cannot explain how, given Illinois's exacting and rigorous standards for champerty and maintenance, the statute has been violated. All we have is Caterpillar's *ipse dixit* that it has been. (*Defendant's Memorandum* at 15). But "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). Significantly, the same kind of exacting standards in champerty statutes in other states have been found to be a barrier to the proscription of litigation funding contracts. *See e.g.,Odell v. Legal Bucks, LLC,* 192 N.C.App. 298, 310, 665 S.E.2d 767, 775 (2008)((refusing to find the agreement champertous under North Carolina statute).

Finally, Caterpillar's claim that the deal documents are relevant because they will show whether it can raise the "new" defense of champerty and maintenance (*Defendant's Memorandum* at 7) overlooks the fact that neither would be a viable defense by Caterpillar to Miller's claims, which have nothing to do with the conduct forbidden by the Illinois maintenance statute. *Compare Oil, Inc. v. Martin*, 381 Ill. 11, 44 N.E.2d 596, 600 (1942)(claim that contract is champertous " may

14

only be invoked by the parties to the agreement [and] ... the defense of champerty can only be interposed in an action between the parties to the champertous contract, and does not furnish any reason for refusing relief in the proceeding to which the champertous agreement relates."); *Acorn Bankshares, Inc. v. Suburban Bancorp, Inc.*, 1985 WL 2671, 7 (N.D.Ill. 1985)(same). Even the broader rule that illegality of contract is a defense has application only to an action seeking enforcement of the illegal contract and only between the immediate parties to it. *Stolz-Wicks, Inc. v. Commercial Television Service Co.*, 271 F.2d 586, 589 (7th Cir. 1959); *Gamboa v. Alvarado*, 407 Ill.App.3d 70, 75, 941 N.E.2d 1012, 1017 (1st Dist. 2011); *Del Webb Communities v. Partington*, 652 F.3d 1145 (9th Cir.2011). [7]

Not surprisingly, the few state courts that have held funding agreements champertous under their state statutes have only done so in the context of a suit by the parties to the contract seeking its enforcement. See *Rancman v. Interim Settlement Funding Corp.*, 99 Ohio St.3d 121, 125, 789 N.E.2d 217 (2003); *Johnson v. Wright*, 682 N.W. 2d 671, 681 (Minn. App. 2004). That is obviously not the situation here.

Ultimately, Caterpillar's argument, although not phrased as such, is a kind of unclean hands argument. Beyond begging the question of the applicability of the Illinois maintenance statute to this case, such an argument would be misapplied here, as Judge Posner's panel opinion in *Schlueter v. Latek,* 683 F.3d 350, 355-356 (7th Cir. 2012) shows:

> When as in such cases the plaintiff is asking for equitable relief, the *in pari delicto* defense is referred to as the unclean-hands defense. But the label doesn't matter, and the defenses were equated in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 360–61 (1995). .... The second ground is the one on which the defense was rejected in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 312–14 (1985), and *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134,

---

[7] None of these cases have been cited by the parties.

137–39 (1968) (plurality), the latter a case in which the plaintiff challenged, as a violation of antitrust law, restrictions on its competitive freedom, to which it had agreed in contracts with the defendant. The defendant pleaded *in pari delicto* as a defense to the plaintiff's suit for damages. The Court rejected the defense, holding that antitrust law, which would be disserved by enforcing the contracts, trumps contract law. The law could easily do without an unclean-hands doctrine and an in *pari delicto* doctrine*, since they reduce to the principle that a court will not entertain a claim or defense that would create a greater legal wrong than vindicating the claim or defense would avert.* (Emphasis supplied).

To sustain a maintenance/champerty defense in this case would create a greater legal wrong than vindicating the defense would avert. It would effectively endorse the alleged misappropriation of trade secrets (if, in fact, that occurred) and would encourage future commercial dishonesty – a wrong of manifestly greater significance than whatever wrong could be averted by recognizing the defense at the insistence of the alleged tortfeasor, who is a stranger to the contract claimed to be champertous. "The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. 'The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world.'" *Kewanee Oil v. Bicron Corp*., 416 U.S. 470, 481-82 (1974). *See also Waner v. Ford Motor Co.,* 331 F.3d 851, 859 (Fed. Cir.2003)("An industrial society can remain healthy only with rigorous enforcement of business ethics; and indeed this is the foundation of the common law of commerce.").

By contrast, over the centuries, maintenance and champerty have been narrowed to a filament. Indeed, they "ha[ve] been so pruned away and exceptions so grafted upon [them], that there is nothing of substance left of [them] in this State, and [they] ha[ve] been wholly abandoned in others." *Dunne v. Herrick*, 37 Ill.App. 180, 182 (1ˢᵗ Dist. 1890). "The consistent trend across the country is toward limiting, not expanding, champerty's reach." *Del Webb Communities, Inc.,* 652 F.3d at 1156. Illinois has been in the vanguard of that trend, and the Illinois criminal maintenance statute should not be given a new life by judges in a setting like the one in this case to which the

16

Illinois Legislature never intended it be applied.

The ABA Commission on Ethics 20/20's white paper of February, 2012 concluded that "shifts away from older legal doctrines such as champerty, and society's embracing of credit as a financial tool have paved the way for a litigation financing industry that appears poised to continue to grow...." Jennifer Anglim Kreder, Benjamin A. Bauer, *Litigation Finance Ethics: Paying Interest*, 2013 Prof. Law. 1, 21 (2013). The Massachusetts and South Carolina Supreme Courts have recognized that the champerty doctrine is no longer needed to protect against the evils once feared, such as speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position because there are now other devices that more effectively accomplish these ends. *See , Saladini v. Righellis,* 426 Mass. 231, 687 N.E.2d 1224, 1226-27 (1997);*Osprey, Inc. v. Cabana Ltd. P'ship,* 340 S.C. 367, 532 S.E.2d 269, 277 (2000). *See also*, *Toste Farm Corp. v. Hadbury, Inc*., 798 A.2d 901, 905 (R.I.2002)(collecting cases).

In sum,  for the same reason that it is proper to deny discovery that is relevant only to claims or defenses that have been stricken, *Oppenheimer Fund, Inc*., 437 U.S. at 352, it is proper to deny discovery regarding a matter that is not and cannot be a defense. Since the funding  agreement in this case cannot support a defense of champerty or maintenance, the "deal documents" are irrelevant under Rule 26(b)(1) insofar as Caterpillar's claim of relevance is bottomed on the unpled, "new" defense of champerty and maintenance. (*Defendant's Memorandum* at 7). And since there has been no crime, Caterpillar's claim that the crime-fraud exception to the attorney-client privilege applies is stillborn.

The cases Caterpillar relies on  do not begin to support its argument.  In *Todd v. Franklin Collection Service, Inc*., 694 F.3d 849, 851 (7th Cir. 2012), the court determined that an assignment of an action was void because the assignee was using it to engage in the unauthorized practice of

law. And in *Birner v. General Motors Corp.*, 2007 WL 269847, 3 (C.D.Ill. 2007), a third party who purchased a cause of action and then sued defendant was found to have no standing to pursue that claim."Enough said." *Foufas v. Dru*, 319 F.3d 284, 287 (7th Cir.2003).

## B.
## The "Real Party in Interest" Contention

Attempting to liken third party litigation funding to subrogation in an insurance context, Caterpillar argues that the funding agreement (and related transactional documents) are therefore relevant to the issue of who the real party in interest is – Miller or the funder. What Judge Posner said in *Adams v. Raintree Vacation Exchange, LLC,* 702 F.3d 436 (7th Cir.2012) applies perfectly to Caterpillar's unsupported analogy: "But the analogy is imprecise (as argument by analogy so often is), as well as labored.." *Id.* at 441 (Parenthesis in original). We begin with the basics.

Rule 17(a)(1) provides that "an action must be prosecuted in the name of the real party in interest." Rule 17(a) "is a procedural rule requiring that the complaint be brought in the name of the party to whom that claim 'belongs or the party who, according to the governing substantive law, is entitled to enforce the right." *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 756 (7th Cir. 2008). The purpose of the Rule is to protect the defendant against a subsequent action by the party actually entitled to recover. *RK Co. v. See,* 622 F.3d 846, 850 (7th Cir. 2010). An action may not be dismissed for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. Rule 17(a)(3).

While Rule 17 does not define "real party in interest," the generally accepted definition of the term is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *Farrell Constr. Co. v. Jefferson Parish, La.,*

18

896 F.2d 136, 140 (5th Cir. 1990). The Federal Rules do not set out a specific procedure for raising a Rule 17(a) objection, but it is generally agreed that it should be made in a timely manner, such as in an answer or responsive pleading. *See, e.g., In re Signal Int'l, LLC,* 579 F.3d 478, 487 (5th Cir. 2009); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1554 (2d ed.1990). This requirement ensures that the correct party may, if necessary, assume the role of the plaintiff. *Forza Technologies, LLC v. Premier Research Labs, LP,* 2013 WL 6355383, 2 (N.D.Ill. 2013). Although this case is now several years old, no "real party in interest" defense has been raised, and no motion to dismiss filed by Caterpillar – not even on information and belief.

Subrogation is the "'substitution of one person in the place of another with reference to a lawful claim...so that he who is substituted succeeds to the rights of the other in relation to the ...claim, and its rights, remedies, or securities.'" *Employers Insurance. of Wausau v. James McHugh Constr. Co.,* 144 F.3d 1097, 1105 (7th Cir.1998)(ellipsis in original). Under Illinois law, the party claiming a right of subrogation must establish that he paid a claim or debt for which a third party is primarily liable, that he did so not as a volunteer, but instead was under legal compulsion to satisfy the debt, and that he seeks to enforce a right against that third party possessed by the subrogor. *Gearing v. Check Brokerage Corp.,* 233 F.3d 469, 471- 472 (7th Cir. 2000); *American Nat. Bank and Trust Co. of Chicago,* 692 F.2d 455, 460 (7th Cir. 1982).

Applicable state law determines who has the substantive right for purposes of subrogation. *Id. at* 460, n.10; 3A Moore's Federal Practice, ¶ 17.07 (2nd Ed. 1996). For the reasons discussed in *American Nat. Bank and Trust Co. of Chicago,* that should be the law of Illinois.[8] Under Illinois law,

---

[8] As in *American Nat. Bank and Trust Co. of Chicago,* neither party has addressed the question of the applicable state law. Thus, as in situations where the parties do not raise the issue of which law should apply, Illinois law will be selected. *Faulkenberg v. CB Tax Franchise Systems*, LP 637 F.3d 801, 809

(continued...)

an action by a subrogee/insurance company is one of indemnification, and thus the insurance company as subrogee is limited to reimbursement for what it paid its insured and no more. *American Nat. Fire Insurance. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Systems, Inc.*, 325 F.3d 924, 936-937 (7th Cir.2003).

I have reviewed *in camera* the agreement between Miller and its funder, and there is nothing in those agreements that remotely supports Caterpillar's attempt to equate Miller's funding agreement to the relationship between an insured and its insurer. Unlike an insurer, the funder in this case has not paid nor will ever pay Miller for any losses caused by Caterpillar's claimed misappropriation of trade secrets and breach of contract; it will never be a plaintiff seeking indemnification from Caterpillar. *American Nat. Fire Insurance. Co. ex rel. Tabacalera Contreras Cigar Co., supra*. Nor is it an assignee of Miller.[9]  Rather, it is contractually obligated to provide Miller with an agreed amount of funds to assist Miller in defraying expenses incurred in suing Catepillar to recover for its claimed losses. If Miller loses, that is the end of the matter.

Abraham Lincoln once was asked how many legs a donkey has if you call its tail a leg. His answer was four: calling a tail a leg does not make it one. *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Insurance. Co.,* 671 F.3d 635  (7th Cir. 2011). Just so here. Calling Miller's funder a subrogee does not make it one.

## II.
### Discoverability Of The Non-Deal Documents Claimed To Be
### Privileged Under The Attorney-Client And Work Product Privileges

---

[8](...continued)
(7th Cir.2011).

[9] Miller was careful to divorce the funders from any legal interest in this case.  It repeatedly argues that the case was and continues to be its own, and that it has no more than a funding relationship with the funder. (Dkt. #402, at 5-6; Dkt. #362, at 21-23). A review of the funding agreement confirms these representations.

The second category of documents Miller has refused to turn over are documents that were provided to the actual and any potential funders by Miller and its counsel. For purposes of a relevancy analysis, there is nothing unique about documents submitted to an entity from which litigation funding is sought. Clearly, they may well include information relating to Miller's claims against Caterpillar, and thus could themselves be admissible or otherwise could reasonably lead to the discovery of admissible evidence. The relevance of these documents is not really contested. Miller's essential objection is that they are privileged under the attorney-client and/or work-product privileges.

Caterpillar argues that there is no attorney-client privilege in documents that are prepared "primarily for a business transaction, rather than for securing legal advice." (*Defendant's Memorandum* at 8). Although documents prepared "for business purposes or for the purpose of obtaining advice on 'political, strategic, or policy issues' " do not receive protection, "legal advice relating to business matters clearly does." *Sullivan v. Alcatel-Lucent USA, Inc*., 2013 WL 2637936, 2 (N.D.Ill.2013). *See also Sandra T.E. v. South Berwyn School Dist. 100* 600 F.3d 612, 620 (7th Cir.2010); *Radiant Burners, Inc. v. American Gas Ass'n,* 320 F.2d 314, 324 (7th Cir. 1963). Documents prepared for use in connection with funding that were intended to be given and/or were given to funders also would be governed by cases like *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir. 1983) and *United States v. Schussel*, 291 Fed.Appx. 336, 347 (1st Cir. 2008), which hold that when information is transmitted to an attorney with the intent that the information will be transmitted to a third party, who is not itself a protected party, such information is not confidential

and the attorney-client privilege does not obtain.[10]

Caterpillar's contention about the proposed uses of the funding documents is borne out by Miller, itself. For example, Miller repeatedly argues that the case is its own, and there was nothing beyond a funding relationship. (Dkt. #402, at 5-6; Dkt. #362, at 21-23). In fact, Miller's written Mutual Non-Disclosure Agreement with Juris Capital explicitly states that the parties contemplated "business discussions" involving "business matters," with a view to entering into "business transactions." The parties recognized that confidential information would be shared to allow "business decisions" to be made. (*Defendant's Memorandum*, Ex. H).[11] Miller's Memorandum in Opposition to Caterpillar's Motion to Compel further confirms the business nature of the relationship between a litigant and a funder. The Memorandum says that Miller and the litigation funders it consulted shared a common interest "regarding investing in the case." (*Id*. at 10). And a number of the "deal documents" use the term "financier" to refer to Miller's counterpart in the overall funding arrangement. Thus, by Miller's own classification, the contemplated funding transaction was merely commercial or financial, and it documents conveyed to funders was not

---

[10] Caterpillar's Memorandum points to the following items in "Miller's Privilege Log for Funding Documents," which is attached as Exhibit G to its Memorandum – as being documents "created either for Plaintiffs to finalize their claimed business transaction with third party funders or for the full or partial purpose of third party review": Entry Nos. 4, 6-7, 9, 11, 16, 18, 21, 24, 26-51, 53-62, 64-81, 84-87, 88-91, 93, 96-97, 101-104, 107, 109-112, 121-154, 158, 160-167, 170, 172-174. (*Caterpillar Memorandum* at 9). Caterpillar contends that "the same is true for Privilege Log Entry Nos. 8, 10, 12-15, 17, 19, 21, 23, 25, 52, 54, 63, 73-76, 78, 83, 88, 94-95, 98-99, 105, 106, 108, 114 and 118, which are spreadsheets and summaries apparently prepared for third party funder review." (*Caterpillar Memorandum* at 9).

At my request, Miller produced in one binder copies of the materials which it has refused to produce on the ground of attorney/client or work-product privilege, or both. The numbers in the revised privilege log no longer correspond to those in the original log. I have reviewed *in camera* the 160 items in the revised Privilege Log.

[11] While the parties' characterization in the agreement is not conclusive, *cf.*, *TKO Equipment Co. v. C & G Coal Co.,* 863 F.2d 541, 543 (7th Cir. 1988), it is not without value in assessing the nature of the relationship.

protected by the attorney-client privilege.

Although Caterpillar has the better of the argument, we shall assume, *arguendo*, that Miller has sustained its burden of showing that the materials it provided to its lawyers for further submission to prospective funders were protected by the attorney-client privilege and proceed to the question of waiver.

### A.

"Evidentiary privileges in litigation are not favored." *Herbert,* 441 U.S. at 175. "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth." *United States v. Nixon,* 418 U.S. 683, 710 (1974). *See also Pierce County, Wash. v. Guillen,* 537 U.S. 129, 144-145 (2003); *University of Pennsylvania v. EEOC,* 493 U.S. 182,189 (1990). This, of course, applies to claims of work product. *See Ross v. City of Memphis,* 423 F.3d 596, 600 (6th Cir.2005); *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 138 (3d Cir.2001); *Hawkins v. Stables,* 148 F.3d 379, 383 (4th Cir.1998). And just as constitutional privileges may be waived, so too may the attorney-client and work product privileges. *United States v. Nobles* 422 U.S. 225, 239 (1975);*United States v. Brock*, 724 F.3d 817, 821 (7th Cir.2013).

Since the purpose behind the attorney-client privilege is to encourage full disclosure to one's lawyer by assuring confidentiality, disclosure to a third party that eliminates that confidentiality constitutes a waiver of the privilege. *United States v. Hamilton,* 19 F.3d 350, 353 (7th Cir. 1994); *Powers v. Chicago Transit Authority*, 890 F.2d 1355, 1359 (7th Cir. 1989); *Pampered Chef v. Alexanian,* 737 F.Supp.2d 958 (N.D.Ill.2010). To avoid waiver and shield from discovery information it provided prospective funders, Miller seeks to invoke the "common interest" doctrine, claiming claimed to be privileged that it shared with the funding sources a "common interest in the

successful outcome of the litigation." The "common interest" doctrine is not a separate privilege, in and of itself. It is a rule of non-waiver. That is, it is an exception to the general principle that disclosure to a non-privileged party of communications protected by the attorney-client privilege waives the privilege. It allows communications that are already privileged to be shared between parties having a "common legal interest" without a resultant waiver.[12] Unless the party asserting the "common interest" establishes that the withheld documents were otherwise privileged, the "common interest" doctrine does not come into play. *See In re Pacific Pictures Corp.*, 679 F.3d at 1128-1131*; Pampered Chef,* 737 F.Supp.2d at 968; *Dexia Credit Local v. Rogan,* 231 F.R.D. 268, 273-274 (N.D.Ill.2004); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 470 (S.D.N.Y. 2003); *Metro Waste Water Reclamation District v. Cont'l Cas. Co.*, 142 F.R.D. 471, 478 (D.Colo. 1992).

In this, as in most Circuits, the "common interest" doctrine will only apply "where the parties undertake a joint effort with respect to a common *legal* interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *BDO Seidman*, 492 F.3d at 815-16 (emphasis supplied). *See also Leader Technologies, Inc*., 719 F.Supp.2d at 376; *Berger v. Seyfarth Shaw LLP,* 2008 WL 4681834, 2 (N.D. Cal. 2008).[13] A shared rooting interest in the "successful outcome of a case" – and that is what Miller explicitly alleges here – is not a common *legal* interest.

---

[12] The "common interest" exception is closely related to the exception for jointly represented co-parties, with the difference being that parties may have a "common interest" even if they are not represented by the same lawyer. *See In re Pacific Pictures Corp*., 679 F.3d at 1129 -1130 for an extended discussion and explanation of the matter. The "common interest" doctrine is not limited to defendants, to formal parties to litigation, or to litigated matters. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).

[13] Miller seems to have tacitly acknowledged the necessity that the interest be legal. In his Declaration of February 12, 2013, Miller's Chairman of the Board, Keith Miller, states that Miller and one of the funders it consulted with, "had a common legal interest in obtaining and/or providing financial assistance that would allow Miller to pursue its legal claims against Caterpillar." (Motion, Ex. I, ¶3).

24

*See In re Pacific Pictures Corp.,* 679 F.3d at 1129-1130;[14] *Continental Oil Co. v. United States,* 330 F.2d 347, 350 (9th Cir.1964); *Islands Leasing, Inc,* 215 F.R.D. at 473; *Baby Neal v. Casey,* 1990 WL 163194, 2 (E.D.Pa. 1990). *See also, Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 327 (N.D.Ill. 2008)(funding agreement giving third party percentage of proceeds from award if plaintiff prevails does not create a common legal interest).

The rationale underlying the "common interest" doctrine accounts for the Seventh Circuit's insistence that the parties claiming protection must share a common *legal* interest. The "common interest" doctrine is designed to encourage "parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly." *BDO Seidman,* 492 F.3d at 815; *Pampered Chef,* 737 F.Supp.2d at 964. That planning serves the public interest by advancing compliance with the law, "facilitating the administration of justice" and averting litigation. *BDO Seidman*, 492 F.3d at 816.

Here, there was no legal planning with third party funders to insure compliance with the law,[15] litigation was not to be averted, as it was well underway, and. Miller was looking for money from prospective funders, not legal advice or litigation strategies. The funders, for their part, were interested in profit. Legal strategies and subtleties were exclusively for Kirkland & Ellis and for its predecessor in the case, Nixon Peabody. In short, the funders and Miller did not share a common legal interest, and materials shared with any actual or prospective funders lost whatever attorney-

---

[14] The Court of Appeals cited *BDO Seidman* in support of this proposition.

[15] There is no claim by Miller that it undertook a joint litigation strategy with any funding source. *See United States v. Evans,* 113 F.3d 1457, 1467 (7th Cir.1997)(The common interest doctrine "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."). And a review of the documents provided for my *in camera* review shows conclusively that no such action was undertaken or contemplated.

25

client privilege they might otherwise have enjoyed.

Miller relies exclusively on *Devon IT, Inc. v.IBM Corp.*, 2012 WL 4748160 (E.D. Pa. 2012), which determined, in a footnote to its single-sentence order, that the "common interest" doctrine applied because the plaintiff and the outside consultant assessing its case for funding purposes had a common interest in the successful outcome of the litigation. However, the court did not discuss whether it thought that interest was legal or commercial or whether under Third Circuit precedent the distinction mattered. And contrary to Miller's contention that that the court's holding was made with full awareness and after consideration of "the host of case law that provides" that the shared interest must be legal (*Miller Memorandum* at 10), the court cited and discussed only one case, *Thompson, Jr. v. Glenmede Trust Co.*, 1995 WL 752443, 4 (E.D.Pa. 1995).

*Thompson* involved an obvious, shared, legal interest among family members to whom privileged information was circulated to determine if they wanted to join the plaintiffs in their lawsuit. And Third Circuit precedent seems to support the requirement that the shared interest be legal not commercial. *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 363-366 (3d Cir.2007).[16] Moreover, like the decision in *Abrams*, *supra*, the abbreviated discussion in *Devon IT*,

---

[16] The Court of Appeals in *In re Teleglobe Communications Corp*. cited *Duplan Corp. v. Deering Milliken, Inc*., 397 F.Supp. 1146, 1172 (D.S.C.1974):

> "'A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, *and be legal, not solely commercial*. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.'" (Emphasis supplied).

After noting that the Restatement (Third) of the Law Governing Lawyers, takes a more flexible

(continued...)

if it was intended to hold that any interest in the successful outcome of a case shared by two people suffices under the "common interest" doctrine, would be viewed by the Seventh Circuit as "weak authority." *Szmaj*, 291 F.3d at 956. *See also Sottoriva v. Claps*, 617 F.3d 971, 976 (7th Cir.2010)(district judges must give "an explanation—that is, a rendering of reasons in support of a judgment—rather than a mere conclusory statement."). And, since it appears the issue of the necessity that there be a shared *legal* interest as opposed to a shared commercial or other interest before the "common interest" doctrine comes into play was not raised by the parties, the case does not establish a holding. *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 118-199 (1993); *United States. v. Acox*, 595 F.3d 729, 731 (7th Cir. 2010).

And finally, and most importantly, whatever *Devon IT* was intended to hold, it cannot trump the Seventh Circuit's decision in *BDO Seidman*, *see United States v. Watson*, 87 F.3d 927, 930 n.2 (7th Cir. 1996), or the admitted "host of case law that provides" that the shared interest must be *legal*. (*Miller Memorandum* at 10).

In conclusion, any documents otherwise protected by the attorney-client privilege that Miller shared with any prospective funder lost their protection under the attorney-client privilege when shared with third party funders.

### B.

---

[16](...continued)

approach than *Duplan*, the Third Circuit said: "For our purposes, it is sufficient to recognize that members of the community of interest [i.e., those not represented by the same lawyer] must share at least a substantially similar *legal* interest." *In re Teleglobe Communications Corp.*, 493 F.3d at 365. (Emphasis supplied).

That leaves the attorney work product privilege. For purposes of a privilege analysis, there is nothing unique about cases involving third party litigation funding. The principles that govern other cases apply equally where privilege claims are asserted.

The attorney work product privilege establishes a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary. It protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case. *Sandra T.E,* 600 F.3d at 618; *Hobley v. Burge,* 433 F.3d 946, 949 (7th Cir. 2006). The core of attorney work product consists of "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed.R.Civ.P. 26(b)(3)(B). Material containing this information "are out of bounds...." *Mattenson v. Baxter Healthcare Corp.* 438 F.3d 763, 768 (7th Cir.2006).

Underlying the privilege is the deeply felt notion that the opposing party "shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy, or...invite the [trier of fact] to treat candid internal assessments of a party's legal vulnerabilities as admissions of guilt." *Menasha Corp. v. U.S. Dept. of Justice,* 707 F.3d 846, 847 (7th Cir.2013). Justice Jackson has perhaps said it best: opposing counsel should not be permitted "to perform [their] functions...on wits borrowed from their adversary." *Hickman v. Taylor,* 329 U.S. 495, 516, (1947)(Jackson, J., concurring).

Miller argues that documents turned over to potential funders containing counsel's mental impressions and theories were created "because of" this litigation and thus are protected as core work product. (*Miller Memorandum* at 9). Some cases contain language that the burden is on the party claiming protection to show that anticipated litigation was the "driving force behind the preparation of each requested document." *In re Professionals Direct Insurance. Co.,* 578 F.3d 432, 439 (6th Cir.

2009). The majority in *United States v. Adlman,* 134 F.3d 1194 (2d Cir.1998), on which Miller relies, rejected the "primarily to assist in litigation test, " in favor of the "because of" test, explaining that "[i]n addition to the plain language of the Rule, the policies underlying the work-product doctrine suggest strongly that work-product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision."

The majority held that framing the inquiry as whether the primary or exclusive purpose of the document was to assist in litigation "threatens to deny protection to documents that implicate key concerns underlying the work-product doctrine." *Id*. at 1199. The majority looked to the test in the Wright & Miller treatise: whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained "because of" the prospect of litigation. Any other test, the majority held, could unreasonably deny the protection to "dual purpose" documents generated in making the decision whether to enter into a transaction based upon tax litigation concerns, even though such documents could reveal an attorney's litigating strategies and assessment of legal vulnerabilities—"precisely the type of discovery that the Supreme Court refused to permit in *Hickman*." *Id*. at 1199.

The majority concluded: "as most other courts have held, this court finds that the 'because of' test [in Wright & Miller] is the proper way to determine whether a document was prepared 'in anticipation of litigation' and thus is eligible for protection under [Rule] 26(b)(3)." This is the formulation employed by the Seventh Circuit in *Binks Mfg. Co. v. National Presto Industries, Inc*. 709 F.2d 1109, 1119 (7th Cir.1983), which held that "'the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to

have been prepared or obtained *because of* the prospect of litigation.'" (emphasis in original).[17] *See also Logan v. Commercial Union Insurance. Co.,* 96 F.3d 971, 977 (7th Cir.1996).

Any documents containing Miller's lawyers' mental impressions, theories and strategies about Caterpillar's claimed misappropriation of trade secrets that were given to prospective funders were only prepared "because of" the litigation. *Adlman, supra.* And a review of the documents reveals quite clearly that a number of them were prepared to aid Miller's counsel in the preparation of the case. Materials that contain counsel's theories and mental impressions created to analyze Miller's case do not necessarily cease to be protected because they may also have been prepared or used to help Miller obtain financing. *See Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 649 F.3d 5, 31 (1st Cir. 2011); *United States v. Deloitte LLP,* 610 F.3d 129, 138, 391 (D.C. Cir. 2010); *In re Professionals Direct Insurance Co.,* 578 F.3d 432, 439 (6th Cir.2009); *Evergreen Trading, LLC ex rel. Nussdorf,* 80 Fed.Cl. 122, 133, n.16 (Fed.Cl. 2007)(collecting cases).

Even the dissent in *Adlman* does not support a different result. Judge Kearse disagreed with what he called the majority's "expansion of the work-product privilege to afford protection to documents not prepared in anticipation of litigation but instead prepared in order to permit the client to determine whether to undertake a business transaction, where there will be no anticipation of litigation unless the transaction is undertaken." *Id.* at 1205. That concern does not apply here since litigation antedated the business transaction – i.e. the funding. The question then is whether the work product privilege was waived by the turnover of protected documents to funders.

While disclosure of a document to a third party waives attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance, the

---

[17]The Seventh Circuit cited *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977), which in turn relied on the "because of" test in the Wright & Miller treatise cited by the *Adlman* majority.

same is not necessarily true of documents protected by the work product doctrine. This disparity in treatment flows from the very different goals the privileges are designed to effectuate. The attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. *Upjohn Co. v. United States* 449 U.S. 383 (1981). In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1022 (7th Cir. 2012); *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1428 (3rd Cir.1991); *E.E.O.C. v. FAPS, Inc*., 2012 WL 1656738, 28 (D.N.J. 2012).

Because the work-product doctrine serves to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not automatically waive work-product protection. *Westinghouse Elec. Corp.,* 951 F.2d at 1428. *See also Adkins Energy, LLC v. Farmland Mut. Insurance. Co.*, 2009 WL 1259344, 2 (N.D.Ill. 2009); *Jumper v. Yellow Corp. et al.,* 176 F.R.D. 282, 287 n. 5 (N.D.Ill.1997). A waiver occurs "when the protected communications are disclosed in a manner that "'substantially increase[s] the opportunity for potential adversaries to obtain the information.'" *Appleton Papers, Inc.*, 702 F.3d at 1025.

To avoid the risk of disclosure, Miller took precautions through confidentiality agreements with at least some prospective funders. Its October 27, 2011 agreement with Juris Capital was written. (*Defendant's Memorandum*, Ex. H).[18] Other protective agreements were oral according to the Declaration of Miller's Chairman of the Board, Keith Miller. Mr. Miller says that in 2011 he spoke with two named individuals at CLFL, a potential funder, and that "the parties agreed that any

---

[18] Miller's Reply Brief has represented that no confidential materials were disclosed to Juris before October 27.

information shared between them would be kept strictly confidential." Mr. Miller goes on to say that Miller had "a similar [oral] understanding of confidentiality" with Harbor Litigation. (*Motion,* Ex. I, ¶¶3-4).

It perhaps could be argued that the assertions that Miller and one or more prospective funders "agreed"and had an "understanding" regarding confidentiality are merely legal conclusions, and that therefore the Declaration should not be considered.[19] But this is not an argument that Caterpillar makes and thus it is waived. *United States v. ADT Sec. Services, Inc.,* 522 Fed.Appx. 480, 488 (11th Cir. 2013); *Catlin v. City of Wheaton,* 574 F.3d 361, 364 (7th Cir.2009).[20]

Caterpillar merely says that when pressed for details about the precise terms of the claimed oral agreements, Miller offered only "vague statements." (*Defendant's Memorandum* at 14 ). Perhaps. But the question is whether the Miller Declaration suffices for the present discovery motion. Whatever force the vagueness objection might have as to the claim of "similar understandings," it has far less, if any, as regards the agreement with CLFL of "strict confidentiality." In the context of the present motion, and given the skeletal and perfunctory contention of Caterpillar, the Declaration is sufficient – although perhaps just barely so as to the claim of "similar understandings."[21]

---

[19] *See Nester v. Diamond Match Co.,* 143 F.72 (7th Cir. 1906); *Ocasio-Hernandez v. Fortuno-Burset,* 640 F.3d 1, 8 (1st Cir. 2011); *Smith v. McAlister-Smith Funeral Home, Inc.,* 2012 WL 4378185, 3 (D.S.C.2012; *Maldonis v. City of Shell Lake,* 2008 WL 4735143, 2 (W.D.Wis.2008); *Shields Enterprises, Inc. v. First Chicago Corp.,* 1988 WL 142200, 4 (N.D.Ill.1988)(Moran, J.).

[20] Caterpillar's Memorandum (at 4) merely notes, without discussion or analysis, that a letter from Miller's counsel states in "conclusory fashion" that Mr. Miller and Mr. John Burley, a public relations expert in England who was advising Miller on funding issues and who was a recipient of most of the materials listed on the Privilege Log, had an oral confidentiality agreement. But that is a very different matter than advancing a supported argument regarding the question of whether Mr. Miller's Declaration is insufficient because it states a legal conclusion.

[21] Skeletal and perfunctory arguments are essentially mere assertions and are deemed waived. *Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.,* 493 F.3d 782, 789 (7th Cir. 2007); *United States*
(continued...)

*Ecologix, Inc. v. Fansteel, Inc.*, 676 F.Supp. 1374 (N.D.Ill.1988), cited by Caterpillar, does not require a different result. In fact, it provides some support for Miller's position. The court recognized that an oral proposal "to maintain the confidentiality of whatever information was exchanged" could constitute a viable offer, and that acceptance could be oral as well. *Id.* at 1379. The problem in *Ecologix* was that the evidence failed to show an acceptance and did show that the parties acted in a manner inconsistent with the claimed existence and terms of the oral contract. The evidence was undisputed that Ecologix's custom and practice was to routinely require all third parties to whom it would divulge confidential information to sign a non-disclosure agreement. Ecologix memorialized this policy and incorporated it as a standard pre-printed term and condition of its written proposals. *Id.* The claimed oral agreement was thus quite at variance with the customary way Ecologix did business, and significantly undercut the claim that there was an oral agreement of confidentiality.

Here, Mr. Miller's statement that there was an oral agreement, in effect, asserts that there was an offer and an acceptance. Moreover, there is no inconsistency of behavior alleged by Caterpillar. Quite the contrary. Caterpillar's claim that a funder blew the whistle on Miller's unsuccessful attempt to secure funding is not a violation of the oral confidentiality agreements referred to in Mr. Miller's Declaration. The agreements merely required that *shared information* be kept confidential. There was no agreement that the fact that Miller had approached the funder for money would be also be kept confidential. Thus, the claimed disclosure by the unnamed funder is not inconsistent with the arrangement alleged by Mr. Miller. In fact, the absence of any claim by Caterpillar that it was provided with confidential information is, at least facially, consistent with Mr. Miller's description

---

[21](...continued)
*v. Cusimano*, 148 F.3d 824, 828 n.2 (7th Cir. 1998).

of his confidentiality agreements with funders.

In contrast to the attorney-client privilege, the party asserting work product immunity is not required to prove non-waiver. The party asserting waiver has the burden to show that a waiver occurred. *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 379 (5th Cir.2010). Caterpillar has not done so. All we have is Caterpillar's unamplified statement in its briefs as to how it learned about Miller's funding efforts. Unsupported statements in briefs don't count. *United States v. Stevens,* 500 F.3d 625, 628-29 (7th Cir. 2007); *Gonzalez v. Houlihan's Restaurants, Inc.*, 2010 WL 1664931, 2 (N.D.Ill.2010)(collecting cases). So, we cannot on this record determine where or how Caterpillar actually got its limited information. And if it did not come from a prospective funder, it is inconsequential for purposes of determining whether Miller's disclosures occurred in a manner that substantially increased the opportunity for Caterpillar to obtain the disclosed information.[22]

In *Mondis Technology, Ltd. v. LG Electronics, Inc.*, 2011 WL 1714304 (E.D.Tex. 2011), the case Miller exclusively relies on, disclosure to prospective investors of documents reflecting the plaintiff's litigation strategy and licensing plan did not substantially increase the likelihood that the adversary would come into possession of the materials because disclosure was pursuant to an oral confidentiality agreement. *See also*, *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725-26 (7th Cir. 2003)(oral arguments sufficient); *U.S. Information Systems, Inc. v. International Broth. of Elec. Workers Local Union Number 3,* 2002 WL 31296430, 6 (S.D.N.Y.2002)(divulging work product to the prospective consultant under a confidentiality agreement does not substantially

---

[22] Contrary to Caterpillar's argument, it does not follow that Caterpillar must have learned of Miller's attempts to obtain funding from a third-party funder. (*Defendant's Memorandum* at 13). The information could have come from a faithless present or former employee of Miller or could have been an educated guess by Caterpillar about Miller's financial condition following the severance of its relationship with Miller and its possible need for money.

34

increase the risk of disclosure to the adversary as the person to whom disclosure is made has a strong incentive to comply with the agreement since breaching it would surely result in the inability to attract clients in the future).

Miller has made an adequate showing for purposes of the present motion that it had oral confidentiality agreements with the prospective funders named in Mr. Miller's Declaration as well as a written agreement with Juris Capital. Therefore, Caterpillar has failed to carry its burden to show that Miller made disclosures *to these entities* under circumstances that *substantially* increased the likelihood that Caterpillar would learn of them.

It is a relevant inquiry in cases like this whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential. *United States v. Deloitte LLP,* 610 F.3d 129, 141 (D.C. Cir.2010). While a confidentiality agreement may provide that basis, its absence may not be fatal to a finding of non-waiver. Phrased differently, a confidentiality agreement may be a sufficient but not a necessary element of a finding of non- waiver in cases like this. With or without a confidentiality agreement, it could be argued that a prospective funder would hardly advance his business interests by gratuitously informing an applicant's adversary in litigation about funding inquiries from that company.[23] To do so would announce to future litigants looking for funding this was a company not to be trusted. *Cf., International Broth. of Elec. Workers Local Union Number 3*, *supra.* Depending on all the surrounding circumstances, that perhaps could give rise to a reasonable expectation of confidentiality on which Miller could have relied. But this is not an argument that Miller makes, and we need not pursue it further,

---

[23] This rationale would apply to John Burley, who was counseling Miller on funding issues. One of the withheld documents says he had a confidentiality agreement (Privilege Log No. 78), but even if he did not, it is obvious a turnover to him did not substantially increase the chances of Caterpillar learning of the information.

However, even if Caterpillar had shown waiver of the work product privilege, not all of the materials Miller has withheld need be produced for the reasons explained in Part III, *infra*.

## III.
### The *In Camera* Review

### A.

Caterpillar requested that I conduct an *in camera* review of the documents Miller has refused to produce. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Industries* 328 F.3d 309, 320 (7th Cir.2003); *RBS Citizens, N.A. v. Husain,* 291 F.R.D. 209, 219 (N.D.Ill.2013); *Sullivan v. Alcatel-Lucent USA, Inc.*, 2013 WL 2637936, 10 (N.D.Ill.2013). Miller agreed and sent to chambers five, large, three-ring binders, measuring some 13 inches in height, and containing 5,108 pages. The binders are labeled "Litigation Funding Materials For In Camera Review."[24] Given their volume, it is perhaps surprising that few of the documents "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Federal Rules of Evidence. Nor are they reasonably likely to lead to the discovery of admissible evidence.

There are innumerable unenlightening emails that discuss amounts sought from funders and the progress of funding efforts, thoughts about meals, budgets, observations about particular people and entities, comments about all manners of things, blank form agreements and questionnaires from potential funders, completed applications for funding with information that is obviously known to Caterpillar and which was public information, documents apparently relating to prior dealings or

---

[24] To be certain that all of the materials on Miller's privilege log were included in the Litigation Funding Materials, I requested that they be submitted separately. I have reviewed the 160 items in that submission that Miller claims are covered by the work-product privilege, the attorney/client privilege, or both, as well as the five volumes of Litigation Funding Documents.

relationships Miller had with one or more banks, communications between Miller and its present and former lawyers, the transactional documents for the funding Miller did obtain, and various other documents, none of which contains any information that could be utilized by either party in proving or disproving Miller's claims or Caterpillar's counterclaim or defenses and none of which would allow Caterpillar's lawyers "to perform [their] functions...on wits borrowed from their adversary," *Hickman v. Taylor,* 329 U.S. 495, 516, (1947)(Jackson, J., concurring).

A perfect example is an email from Chris Parkin to John Burley, a public relations consultant in England who was assisting Miller's funding efforts. (*See Defendants' Memorandum*, Ex. F). It is mystifying why this document was redacted. It notes what was public information, namely that a jury trial has been demanded, that the case has not yet been set for trial, that discovery is ongoing, and that Caterpillar is mounting a vigorous defense. The document goes on to sat that, "no one can estimate with certainty how a U.S. jury will decide the case." But that simply expresses the reality known to first year law students, that juries are inherently unpredictable, *In re Southeastern Milk Antitrust Litigation,* 2013 WL 2155379, 4 (E.D.Tenn.2013), and there is no such thing as a sure winner either in pretrial proceedings or at trial. *See Evans v. City of Chicago*, 513 F.3d 735, 746 (7th Cir. 2008); *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 781 (9th Cir. 1990)(Kozinski, J., dissenting). The email goes on to say that it is unlikely that any jury would find for Caterpillar.

The actual transactional documents between Miller and its funder – the "deal documents"- reflect the terms of the funding agreement, the amount funded, and the details about how any recovery is to be divided between Miller and the funder if Miller wins the case and what happens if it does not. This and related information – some of which is generally adverted to in emails – have nothing to do with the claims or defenses in the case – contrary to Caterpillar's arguments to the contrary.

The only arguable relevance of the information about the terms of the Miller funding agreement goes to the question of whether the funder is the or a real party in interest. The provisions of a funding agreement that would bear on that question would appear to involve whether the funder has been accorded some measure of control over the case or its settlement – it hasn't – and whether Miller has effectively assigned or transferred some part of its claims against Caterpillar to the funder – it hasn't. A review of the funding contract and related documents shows quite clearly that Miller is the real party in interest, and that the funder is not an assignee or subrogee.

My review of the documents compels the conclusion that the following items in the revised privilege log are not relevant and need not be turned over: Nos. 1-3, 5, 8-12, 14, 16, 18-74, 76-84, 86-95, 97-160. Many of these documents are simply copies of each other and deal with funding, budgets, scheduling, etc. While a number of them make reference to an attorney's opinion regarding chances of success, I did not see such a document.

**B.**

There is, however, a category of documents that apparently have not been turned over by Miller that are relevant, namely damage estimates, summaries, or worksheets created by Miller and/or its lawyers that were shared with third party funders. By disclosing these documents, Miller waived whatever protection they might have enjoyed under the attorney-client privilege. The question is whether they lost whatever protection they may have enjoyed under attorney work-product.

In those instances where Miller had an oral or written confidentiality agreement, they remain protected and are not discoverable. But what about those funders with which Miller had no agreement? All Miller has said is that the turnovers to funders did not increase the chances that Caterpillar would get the information. (*Miller Memorandum* at 7). But that is nothing more than an

unsupported contention and thus does not preserve the point. *United States. v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). *See also Roger Whitmore's Automotive Svcs., Inc. v. Lake County*, 424 F.3d 659, 674 (7th Cir. 2005); *Hickey v. O'Bannon,* 287 F.3d 656, 657 (7th Cir.2002) and cases cited at 33, n. 21, *supra*. Had Miller advanced the argument discussed at page 35 *supra*, perhaps a different result would obtain. But it didn't, and thus it is waived.

Thus, on the present record, it appears that Miller took protective measure with some but perhaps not all prospective funders. On the present record and given the absence of any developed legal argument from Miller, Caterpillar has sufficiently shown that as to the latter group of funders a turnover of information substantially increased the risk of disclosure to Caterpillar and resulted in a waiver of the work product privilege. Miller must produce all damage summaries, damage estimates and spread sheets. These include, but are not necessarily limited to item Nos. 4, 6, 7, 13, and 15 on the revised privilege log.[25]

Additionally, Miller must also produce all documents that it concedes are relevant, but which it claimed were privileged under either the attorney/client or work-product privilege and which it shared with any actual or prospective funder, except those with which it had a confidentiality agreement as discussed in Mr. Miller's declaration, including the written agreement it had with Juris.

Miller need not turn over any document that in whole or in part deals with budgets for the case, expected funding requirements, legal fees, expected or actual, or any other document that discusses funding efforts or actual or prospective funders. Certain of the documents I reviewed (i.e. No. 75) has been turned over in redacted form. The redactions on No. 75 deal with funding issues,

---

[25] The original privilege log seems to have more entries for this category of documents. *See* 22, *supra* n.10.

expected costs and legal fees, discussion of abstract legal questions, etc. These redactions are proper.

### C.

There is a final aspect of the materials I reviewed *in camera* that warrants separate mention. Miller has redacted on a funding application a percentage estimate of the chances of success in the case. The percentage estimate, which it bears repeating is quite high, is unexplained. It is simply a number. The identical, unexplained, percentage estimate appears in a number of other documents – many are duplicates -- that Miller has listed on its revised Privilege Log. *See, e.g.*, Nos. 5, 12, 16, 43, 44, 47, 50, 61, 66, 67, 68, 71, 72, 85, 99, 101. The question is whether documents containing this unexplained, percentage assessment should be turned over to Caterpillar. I think not.


A numerical estimate of the chances of success, even if unexplained, would appear to fall within that portion of Rule 26(b)(3)(B) that covers materials containing "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Cf., United States v. Frederick*, 182 F.3d 496, 501 (7th Cir.1999); *Adlman,* 134 F.3d at 1199.[26] Such an estimate necessarily was made while discovery was in its early stages, and thus would have been unavoidably imprecise and uninformed.

Miller, quite obviously, could not use its own estimate at trial since it would be irrelevant and run afoul of the hearsay rule. And given the rosy estimate, Caterpillar would never try to use it as an admission. But even if it did, it would never be admitted: the lawyers certainly could not testify about the basis for the estimate. In fact, that would be error essentially for the reasons explained in

---

[26] *Frederick* holds that numerical information can fall within the attorney-client or work-product privilege, and *Adlman* held that an evaluation of the likelihood of success in contemplated litigation would be protected even though its primary purpose was to inform a business decision of whether to initiate contemplated litigation.

*Mattenson*:  "What [Mattenson] should not be allowed to do [on remand]  is cross-examine lawyer Bradley about the company's 'legal vulnerabilities.' That cross-examination, irrelevant and highly prejudicial, should not have been permitted quite apart from the work-product doctrine. Fed.R.Evid. 403." 438 F.3d 769. Any attempted explanation by Miller's witnesses about the educated guess it made early on would deflect attention from the real issues in the case, namely whether there has been a misappropriation of trade secrets and a breach of contract, and pose an unacceptable risk of misleading and confusing the jury, and unfairly prejudicing Miller to a degree that would substantially outweigh any conceivable probative significance the evidence might have.

In sum, even if Caterpillar were foolhardy enough to seek admission of Miller's high estimate of its chances of success on the theory that the estimate was an admission, it would inevitably be excluded under Rule 403. *See Mattenson, supra;  Mister v. Northeast Illinois Commuter R.R. Corp.*, 571 F.3d 696 (7th Cir. 2009)(party admission can be excluded under Rule 403). Hence, any unexplained, percentage estimate of the chances of success made by Miller to a prospective funder need not be produced.

## CONCLUSION

My *in camera* review of the withheld documents has revealed that, quite apart from any questions of privilege and waiver, few of the documents for which Miller has claimed privilege are relevant: most do not contain analysis or discussion of the facts underlying or implicating the claims or defenses or counterclaims. They contain no admissions or statements that undercut any claim or support or undercut any defense or counterclaim in the case. They could not reasonably lead to the discovery of admissible evidence. Moreover, for the reasons discussed earlier, Caterpillar is not entitled to discover the amount of money sought or received by Miller, the details of the agreement it has with its funder, or how much the funder will receive if Miller wins the case. In the setting of

this case, that information is simply irrelevant. It bears repeating that one of the necessary and ultimate limitations on discovery that comes into play is when "inquiry touches upon the irrelevant...." *Hickman,* 329 U.S. at 507- 08. Discovery not "reasonably calculated to lead to the discovery of admissible evidence" is not within the scope of Rule 26(b)(1)." *Oppenheimer,* 437 U.S. at 352. "

The Seventh Circuit has recognized that district courts are in the best position to decide the proper scope and pace of discovery. *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 785 (7th Cir.2013). There has already been "enough discovery here to choke a horse." *Walker v. Sheahan,* 526 F.3d 973, 978 (7th Cir.2008). Not only is discovery ongoing, but Caterpillar is seeking a six month extension of the present schedule. Under the circumstances of this case, to require Miller to produce the documents Caterpillar is seeking in the motion to compel would be a disservice to the parties and to the due administration of justice. It would, to a not insignificant degree, make the touchstone for decision whether the production of the information would "harm[]" Miller, (*Defendant's Memorandum* at 7), not whether the information is relevant. That is the wrong focus.

A final thought. The literature on litigation funding contains divergent views of its merit. *See e.g.,* Kenneth L. Jorgensen, *Presettlement Funding Agreements: Benefit or Burden,* 61 Bench & B. Minn. 14 (2004); Andrew Hananel & David Staubitz, *The Ethics of Law Loans in the post-Rancman Era,* 17 Geo. J. Legal Ethics 795 (2004); Terry Carter, *Cash Up Front,* 90 A.B.A.J. 34 (2004); Douglas R. Richmond, *Other People's Money: The Ethics of Litigation Funding,* 56 Mercer L.Rev. 649 (2005). But questions of societal value are generally for the Legislature, and a judge ought not "succumb to the temptation to substitute his own 'incandescent conscience' for the will of the legislature." H. Shanks, The Art and Craft of Judging: The Decisions of Judge Learned Hand 13 (1968). *See also,* Cardozo, The Nature of the Judicial Process 141 (1921).

Caterpillar's Motion to Compel Litigation Funding Documents [Dkt. # 364] is GRANTED

IN PART AND DENIED IN PART.

**ENTERED:**_____
               **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 1/6/14