**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MILLER UK LTD. and MILLER INTERNATIONAL LTD., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10-cv-03770 |
| CATERPILLAR INC., | ) ) | Judge Andrea R. Wood |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Miller UK Ltd. and Miller International Ltd. (together, "Miller") assert claims against Defendant Caterpillar Inc. for breach of a contractual restriction on the use of Miller's confidential information, for trade secret misappropriation, and for fraudulent inducement. Caterpillar asserts counterclaims against Miller for breach of contract, defamation, disparagement, tortious interference, false advertising, and copyright infringement. Each party seeks summary judgment on the other party's claims; Miller also seeks a judgment in its favor on its own breach of contract claim. For the reasons detailed herein, Miller's motion for summary judgment (Dkt. No. 666) is granted as to Count I of Caterpillar's counterclaim (breach of contract) and Counts V (tortious interference) and VII (copyright infringement) of Caterpillar's supplemental counterclaim. Miller's motion is denied as to the remaining counts of Caterpillar's supplemental counterclaim and as to Miller's own breach of contract claim. Caterpillar's motion for summary judgment (Dkt. No. 688) is granted as to Miller's abandoned claims in Count I (breach of contract) and Count II (trade secret misappropriation) of the Second Amended Complaint, granted as to Count III (fraudulent inducement) and Count IV (unjust enrichment) of that complaint and otherwise denied.

**BACKGROUND**

Miller Welding Engineers Ltd. ("Miller Welding") made a coupler that allowed earthmover and excavator vehicles to attach shovels, buckets, and other attachments to their mechanical arms quickly without requiring the vehicle operator to leave its cab. In March 1999, Miller Welding entered into a "Supply Agreement" with Caterpillar to manufacture couplers that Caterpillar sold under its own name. In this action, the Miller successors to Miller Welding allege that Caterpillar used proprietary information about the coupler to make its own version and then terminated the Supply Agreement. Miller claims that this use violated the confidentiality provisions of the Supply Agreement and Illinois trade secret law. Miller also claims that Caterpillar represented that it would continue the Supply Agreement and expand the parties' business relationship while knowing that in actuality it intended to terminate the contract and sell its own product. In so doing, Miller claims, Caterpillar caused it to abandon an opportunity for a profitable sale of the Miller companies and committed the common law tort of fraudulent inducement.

After Caterpillar terminated the Supply Agreement and Miller brought this action, Caterpillar distributed to various equipment dealers a brochure that compared its new coupler favorably to other couplers. Miller amended its complaint to add a supplemental count alleging that the Caterpillar brochure falsely and deceptively compared the couplers in violation of the Lanham Act, 15 U.S.C. § 1125(a).[1]

Miller also made its own distribution to equipment dealers. Its communication package included a letter from Miller's chairman claiming that the Caterpillar coupler was potentially unsafe. (Miller Stmt. of Undisputed Facts Ex. 13, Dkt. No. 667-15.) The letter advised that the Caterpillar coupler lacked a mechanical backup and that the potential impact of the absence of

---

[1] Miller's Lanham Act claim was previously dismissed and is not at issue here.

this protection was that the coupler could lose its connection with its attachment and drop it to the ground. The letter referred recipients to an accompanying video that purported to demonstrate what could happen in the event of the described failure. According to Caterpillar's counterclaim, the video showed the failure of a coupler connection, the dropping of a bucket, and the decapitation of a hard-hat wearing life-sized dummy. (Supplemental Counterclaim ¶ 20, Dkt. No. 569.)[2] Miller's communication package also included a document that purported to be a third party safety test of the Caterpillar coupler. Lastly, the package also contained a copy of the Caterpillar coupler brochure that was the subject of Miller's (now dismissed) false advertising claim. The brochure was annotated with Miller commentary highlighting Miller's assessment of the competitive and safety deficiencies of the Caterpillar coupler. As a result of Miller's communication to Caterpillar's dealers, Caterpillar has counterclaimed for defamation, disparagement, false advertising, tortious interference, and copyright infringement.

Caterpillar also asserts its own breach of contract claim against Miller. It alleges that the parties signed a February 1998 agreement that governed the use and handling of Caterpillar's confidential information and further provided that Miller would not disclose to Caterpillar any confidential information without Caterpillar's prior written consent. (Caterpillar Answer and Affirmative Defenses ¶¶ 1, 2, Dkt. No. 569.) In its breach of contract counterclaim, Caterpillar alleges that if Miller's allegations that Caterpillar misappropriated Miller's confidential information are proven to be true, the fact that Miller disclosed such confidential information was a breach of the February 1998 Agreement. (*Id.* ¶¶ 61-63.)

---

[2] The supplemental counterclaim's detailed description of the video has not been included in the parties' summary judgment submissions and is not a basis for the Court's ruling on the motions at issue; it is offered here only as additional background detail regarding the allegations at issue.

**DISCUSSION**

Miller seeks summary judgment on its breach of contract claim and on each of Caterpillar's counterclaims. Caterpillar seeks summary judgment on each of Miller's claims. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). In deciding a summary judgment motion, the Court construes all inferences in favor of the nonmoving party. *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 631 (7th Cir. 2010).

Notwithstanding the requirement that the facts be construed in its favor, summary judgment is the "put up or shut up" moment for the nonmoving party, when it must show the evidence it has that would convince a trier of fact to accept its version of events. *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004). Courts of this District analyze summary judgment motions in accordance with Local Rule 56.1(b)(3), which requires parties opposing a summary judgment motion to file a concise response to each numbered paragraph in the moving party's Local Rule 56.1 statement. *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). The rule is designed, in part, to aid the district court, "which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information in determining whether a trial is necessary." *Id.* (Citation omitted.)  All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party. *Koszola,* 385 F.3d  at 1108.

## I.     Miller's Claims

### A.     Breach of Contract and Trade Secret Claims

As an initial matter, Caterpillar contends that its obligations under the Supply Agreement ended with the agreement, which Caterpillar terminated by sending a 60-day notice to Miller on September 2, 2010. But not all of the Supply Agreement's obligations ended with its term. Section 21 of the Supply Agreement states: "The provisions of this Agreement shall survive any termination of this Agreement to the extent required for their full observance and performance." (Miller Stmt. of Undisputed Facts, Ex. 4 at 10, Dkt. No. 667-6.) Under the Agreement's confidentiality provision, a party "may use the Proprietary Information of the other party only for the purposes of this Agreement, and shall not disclose such Proprietary Information to any third party expect pursuant to this Agreement or with the consent in writing of the other party." (*Id.* at 9.)

Under Illinois law, the interpretation of unambiguous contract terms is a question of law. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1104 (7th Cir. 1997). In *CustomGuide v. Career Builder, LLC*, No. 11-C-945, 2011 WL 5822417, at *2-3 (N.D. Ill. Nov. 15, 2011), the court, interpreting Illinois law, construed a promise not to use confidential information for purposes inconsistent with a licensing agreement "to include a promise not to use the materials after the Agreement terminates." The Court finds this construction persuasive here. The confidentiality provisions of the Supply Agreement plainly demonstrated an intent to grant Caterpillar use of Miller's confidential information only on a temporary basis, and the parties cite no provision of that agreement that demonstrates an intent to transfer rights permanently. If Caterpillar's rights with respect to Miller's confidential information are to be limited, those limitations can only be given full effect if they survive termination of the Supply Agreement. Granting Caterpillar carte

blanche to use Miller's confidential information as it pleased post-termination would be an anomalous result inconsistent with the Supply Agreement's stated intent to prevent such unlimited use. The Court accordingly concludes that full observance and performance of the Supply Agreement's confidentiality provisions dictate that they survive termination of that agreement.

Caterpillar next argues that Miller cannot establish the elements of a breach of contract claim. According to Caterpillar, Miller cannot show that any items were "Proprietary Information" defined under the Supply Agreement. Caterpillar contends that many of the items claimed by Miller to have been kept secret and confidential were actually publicly available, either through patent applications or due to the presence of Miller couplers on the marketplace, before any alleged improper use occurred.[3] In response, Miller has provided evidence that some of the significant characteristics of its coupler, such as the dimensions of various component elements and the nature of the interaction between those elements, could not have been readily determined by examination of the Miller patent applications or the couplers themselves. (Miller Stmt. of Additional Facts ¶¶ 74, 75 (not discernable from patents); ¶¶81-83 (not readily discernable from examination of the coupler itself), Dkt. No. 743-2.)

Miller also cites evidence indicating that Caterpillar used models and specifications of Miller's Pin Grabber Plus ("PGP") Coupler in the design and maintenance of the Caterpillar's

---

[3] Miller has abandoned claims regarding several elements it previously identified as confidential information improperly used by Caterpillar. Caterpillar's motion is granted as to those items. As described by the numbering system developed by Caterpillar and referenced by Miller (although Miller disparages it as "fictitious"), the items are: No. 14: test fatigue rig; No. 15: hydraulic mountings/components; No. 20: reduction of bucket height testing data; No. 21: bucket designs; No. 22: identity of Chinese foundry; No. 23: IP valuation; No. 26: proprietary and confidential manufacturing techniques; No. 27: confidential marketing information; No. 28: test protocols; No. 29: casting process in China; and No. 31: information re cast manufacturing process and cast mold. (Miller Summ. J. Resp. at 17, n.8, Dkt. No. 743.)

own Center-Lock Pin Grabber Coupler. Miller notes that Caterpillar engineers had referred to the Miller coupler as the basis for the new Caterpillar coupler and that they used the Miller coupler to determine the cause of a failure in the Caterpillar coupler. (Miller Stmt. of Undisputed Facts ¶¶ 19, 20, Dkt. No. 667-2.) Miller views these facts as concessions by Caterpillar that it breached the confidentiality provisions of the Supply Agreement. As a result, Miller invokes this evidence not only as a basis for denial of Caterpillar's summary judgment motion, but also as a basis for its own motion for summary judgment on its breach of contract claim.

It is thus apparent that the parties dispute which, if any, of the elements of the Miller coupler were proprietary and whether Caterpillar's actions constituted use of any proprietary elements other than those that were either unprotected or unprotectable. It is equally apparent that resolution of these disputes will require the drawing of inferences related to the competing evidence. As noted above, inferences cannot be drawn in favor of the moving party on summary judgment. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 574 (7th Cir. 2015). The parties' current submissions indicate that resolution of their dispute will require a fact-finder to assess the credibility of witnesses, make choices between competing inferences, and balance the relative weight of competing evidence, determinations that are improper at the summary judgment stage. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

In a further assault on Miller's claims that its coupler information was proprietary, Caterpillar contends that before the execution of the Supply Agreement, it received information from Miller's predecessors that was either disclosed without restriction or disclosed on terms that permitted its subsequent uses of the information. As noted above, the Supply Agreement limited a recipient's use of Proprietary Information to actions that served the purposes of the agreement. Proprietary Information was defined in the Supply Agreement to include "all confidential

information and know-how, business, technical, or otherwise, disclosed by a party to the other," with the exception of information that becomes publicly available through no act or omission of the recipient and information rightfully disclosed to the recipient by a third party. (Supply Agt. § 17(a), Dkt. No. 667-6.) To the extent that Caterpillar received information that was not identified as confidential, such information does not appear to be covered by the agreement's restrictions. But distinguishing the coupler elements that may have been given to Caterpillar without restriction from those that were Miller's confidential information is yet another task requiring judgments reserved for the fact-finder.

The Supply Agreement also included an integration clause, which provided that the agreement embodied the parties' entire understanding regarding its subject matter and that it superseded all of their other understandings and agreements. (*Id.* § 20.) Prior agreements between the parties relating to Caterpillar's purchase of couplers from Miller, along with their confidentiality provisions, are therefore abrogated by the Supply Agreement and can provide no basis for a judgment that they permitted the information uses at issue in this case.

In addition to its arguments that it did not violate the Supply Agreement, Caterpillar also asserts that Miller has failed to present evidence of damages, a necessary element of a breach of contract claim under Illinois law. *Bockman Printing & Servs., Inc. v. Baldwin-Gregg, Inc.*, 572 N.E.2d 1094, 1100 (Ill. App. Ct. 1991). But Miller's expert, Louis Dudney, testified that his opinion on damages from Caterpillar's trade secret misappropriation also applied to the damages Miller suffered as a result of the breach of the Supply Agreement. (Miller's Stmt. of Additional Facts ¶ 140, Dkt. No. 743-2 (*citing* Dudney Dep. at 270:21-271:11, P. Ex. 61).) Caterpillar is not entitled to judgment as a matter of law as a result of any failure by Miller to provide evidence of damages.

For these reasons, neither party has demonstrated its entitlement to summary judgment on Miller's breach of contract claim. The parties' cross-motions for summary judgment on that claim are both denied. Since Miller's statutory claim for trade secret misappropriation is based upon the same facts as its contract claim and Caterpillar's arguments on the statutory claim largely duplicate its contract claim contentions, Caterpillar's motion is also denied with respect to the trade secret claims in Count II of the Second Amended Complaint.

### B.    Fraudulent Inducement Claim

Miller further alleges that Caterpillar falsely communicated an intention to continue and expand the parties' supply relationship even though Caterpillar knew that it was planning to terminate the Supply Agreement and to make and sell its own couplers. As evidence of this deceit, among other things, Miller identifies a June 2006 conversation in which a Caterpillar representative told his Miller counterpart that Miller would continue to be Caterpillar's "exclusive supplier of couplers" and that it encouraged Miller's expansion. (Second Am. Compl. ¶ 36, Dkt. No. 564.)  Miller claims that as a result of Caterpillar's representations, it abandoned an opportunity to sell the company and thus seeks recovery of its claimed losses under the common law theory of fraudulent inducement.

In Illinois, the elements of a fraudulent inducement claim are: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) made with intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980).

As a general matter, under Illinois law, statements regarding future events or circumstances that do not come to fruition are not a basis for fraud. Such statements are regarded

as mere expressions of opinion, promises, or conjecture upon which the other party has no right to rely. *Madison Associates v. Bass*, 511 N.E.2d 690, 699 (Ill. App. Ct. 1987). However, promises of future conduct may be actionable where "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989). Miller may prevail on its fraudulent inducement claim if it can establish that Caterpillar made the representation to accomplish the goal of which Miller complains: to induce Miller to forgo any opportunities to sell the company. Yet Miller has presented no evidence of any such intent, and nothing in the record would permit a jury to find that Caterpillar had that intent. The record instead suggests that the potential buyer whose overtures Miller ultimately ignored was unknown to Caterpillar.

Illinois law also demands that a valid fraudulent inducement claim be based on the plaintiff's reasonable reliance on the alleged falsehood. *Regensburger v. China Adoption Consultants, Ltd.,* 138 F.3d 1201, 1207 (7th Cir.1998). As a matter of law, it is unreasonable to rely on an oral representation that is inconsistent with a written provision in a contract that precludes modifications not made in writing. *AAR Int'l, Inc. v. Vacances Heliades S.A.*, 302 F. Supp. 2d 869, 872-73 (N.D. Ill. 2004).

The Supply Agreement provided that no modification to any of its terms would be binding unless contained in a writing signed by both parties. (Supply Agt. § 20, Dkt. No. 667-6.) It also provided that Caterpillar "makes no representations or guarantees as to the quantities of Products and Parts it will purchase from Miller." (*Id.* § 1(a).) Moreover, after the initial two year term of the agreement, it could be canceled by either party on 60 days written notice. (*Id.* § 12.) The Supply Agreement is explicit in its admonitions that Miller could not rely on Caterpillar to purchase any specific quantity of couplers, nor could Miller rely on the relationship to last for

any lengthy period beyond its initial two-year term. Miller's claimed reliance on oral representations by Caterpillar representatives to the contrary, despite contract language indicating that no such representations would be binding, was unreasonable as a matter of law.

Because Miller has presented no evidence of Caterpillar's intent that would expose it to liability for false statements regarding its future conduct, and because Miller's reliance on any such statements would have been unreasonable as a matter of law, the Court concludes that Caterpillar is entitled to judgment in its favor on Miller's fraudulent inducement claim. Caterpillar's motion for summary judgment is accordingly granted as to Count III of the Second Amended Complaint and Miller's corresponding claim for punitive damages.

### C.      Exemplary Damages

Miller seeks exemplary damages for Caterpillar's alleged misappropriation of its trade secrets. Under the Illinois Trade Secrets Act, a court may award exemplary damages in an amount not exceeding twice the plaintiff's damages in the event of a willful and malicious misappropriation. 765 ILCS § 1065/4(b). Caterpillar seeks summary judgment on this claim, contending that even if a misappropriation were found, there is no evidence of conduct sufficiently egregious to justify any such award.

In the absence of Illinois authority construing the term, the Seventh Circuit has held that willful and malicious misappropriation includes "an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 730 (7th Cir. 2003). In this case, it is undisputed that, by virtue of their prior partnership, Caterpillar was well aware of the Miller coupler and its features. As noted above, a jury certainly could find that Caterpillar made use of some of those features for its own purposes. The degree of culpability associated with that use is

yet to be determined, and it would be premature to hold that Caterpillar's use was less than a willful disregard of Miller's rights with the record containing ample evidence suggesting the contrary. Caterpillar's motion is denied as to Miller's claim for exemplary damages for misappropriation of its trade secrets.

## II.      Caterpillar's Counterclaims

### A.      Breach of Contract Claim

In a February 1998 agreement with Caterpillar, Miller represented that it would not disclose to Caterpillar any confidential or proprietary information unless the two companies first agreed in writing. (Caterpillar Resp. to Miller's Mot. for Summ. J. Ex. 239, Dkt. 731-49.) Count I of Caterpillar's counterclaim alleges that if Miller's allegations that it misappropriated Miller's proprietary information are true, then Miller's delivery of confidential information to Caterpillar without prior permission breached the February 1998 agreement. (Caterpillar Answer and Affirmative Defenses ¶¶ 61-63, Dkt. No. 569.) This claim is defeated by the integration clause of the Supply Agreement. As noted above, the impact of that clause is that all prior agreements between the parties on the subjects of the Supply Agreement were superseded by that agreement.

Undaunted, Caterpillar contends that the February 1998 agreement is not superseded by the Supply Agreement because the two contracts cover different subjects. Its counterclaim contradicts that contention, however. Caterpillar's breach of contract claim is explicitly based upon the same allegedly proprietary information as Miller's complaint. Caterpillar alleges that if Miller recovers damages for Caterpillar's use of Miller proprietary information, Miller's prior disclosure of that same information to Caterpillar was a breach of the February 1998 agreement. Thus, both parties invoke the two agreements as governing the rights and obligations resulting from the transfer and use of the same proprietary information. Those rights and obligations are

within the purview of the Supply Agreement and that agreement supersedes prior agreements on its subject matter. As Caterpillar cannot recover on the basis of the superseded agreement, Miller's motion for summary judgment on Count I of the counterclaim is granted.

**B.     Tortious Interference Claim**

Caterpillar claims that Miller's communication to equipment dealers tortiously interfered with its dealer contracts. Under Illinois law, a plaintiff claiming tortious interference with a contract must establish: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other caused by the defendant's wrongful conduct; and (5) damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989).

Caterpillar has offered no evidence that any dealer breached its contract with Caterpillar. In response to Miller's motion, it has identified a form dealer contract and argues that it could show that a hypothetical dealer's decision to stop selling Caterpillar's couplers would violate the form contract. (Caterpillar Resp. at 40, Dkt. No. 717.) But as noted above, an element of a tortious interference with contract claim under Illinois law is an actual breach caused by the defendant's conduct, not the mere possibility of a breach. Caterpillar identifies one dealer, Finning, that stopped offering the Caterpillar coupler to its customers, allegedly after receiving a communication from Miller, but Caterpillar argues only that this dealer stopped its purchases of the coupler, not that this action breached any agreement. (*Id*. at 40, Dkt. No. 717; Caterpillar Resp. to Miller Stmt. of Facts ¶ 34, Dkt. No. 717-1.)

Although Caterpillar seems to concede that its tortious interference claim is based on contract rights, Miller correctly observes that another legal theory might plausibly offer

Caterpillar relief based on the facts alleged. Caterpillar's counterclaim is labeled as one for Tortious Interference without further specification. (Supplemental Countercl. at 72, Dkt. No. 569.) It includes allegations that Caterpillar had longstanding relationships with its customers, that Caterpillar had a reasonable expectation that these customers would continue to purchase its couplers, and that Miller intentionally interfered with those relationships by sending its communication to dealers. (*Id.* ¶¶ 71-73.)

Illinois common law also recognizes a cause of action tortious interference with prospective economic advantage pursuant to which Caterpillar might seek to proceed. To succeed on such a claim, a plaintiff must prove: (1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages. *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (*citing Fellhauer v. City of Geneva,* 568 N.E.2d 870, 877-78 (Ill. 1991)).

Caterpillar's reference to the business relationship it lost as a result of the Miller communication is limited to the above-noted relationship with the dealer Finning. According to Caterpillar, Finning decided to cease distribution of Caterpillar's coupler in May 2010. (Caterpillar Stmt. of Additional Facts ¶ 37, Dkt. No. 717-1.) This allegation does not aid Caterpillar's cause, however, because Caterpillar's supplemental counterclaim seeks relief only for damages from the allegedly false statements in the Miller communication package sent to dealers in 2011. (Supplemental Countercl. ¶¶ 7, 9, Dkt. No. 569.) No allegations in the counterclaim address any culpable communications by Miller to Finning in the time period leading up to Finning's decision.

Caterpillar does contend in its summary judgment papers that Finning's decision was caused by a March 2010 meeting between representatives of Finning and Miller in which Finning was shown the video and test report that would be sent to other dealers the following year. (Caterpillar Resp. at 30, Dkt. No. 717; Caterpillar Resp. to Miller Stmt. of Facts ¶ 34, Dkt. No. 717-1.) Since allegations regarding this communication were not included in Caterpillar's counterclaim, they may be disregarded for purposes of Miller's summary judgment motion. *Samuels v. Wilder*, 871 F.2d 1346, 1351 (7th Cir. 1989).

Moreover, Caterpillar has not presented evidence sufficient to raise an issue of fact as to the Miller's actions preventing the continuation of the Finning relationship. It points to no evidence that Finning ceased distributing the Caterpillar coupler immediately after the Miller meeting in March 2010. Instead, the record indicates that Finning wrote Caterpillar in May 2010, mentioned its concerns about the safety of the coupler, and asked for "an official letter from Caterpillar to confirm that the couplers are 100% safe," that they conformed to a specific U.K. safety standard, and that they "do not have any outstanding mechanical issue." (Dkt. No. 667-24.) Finning stated in its correspondence that it was important to both companies to consider how to re-position the Caterpillar coupler "as the coupler of choice," and further stated that it would "work with [Caterpillar's] engineers to understand & assist with any queries [Caterpillar] may have." (*Id.*) No reasonable juror could conclude from this evidence that the disruption in the Finning-Caterpillar relationship in May 2010 was caused by a communication from Miller two months earlier.

Caterpillar has thus failed to offer evidence that would permit a jury to find in its favor on its tortious interference claim. Miller's motion for summary judgment is granted as to that claim.

### C.    Copyright Claim

Caterpillar distributed to some of its dealers a brochure labeled "Competitive Bulletin" and dated August 2010. (Caterpillar Resp. Ex. 66, Dkt. No. 725.) The bulletin purported to compare Caterpillar's new Center-Lock Pin Grabber Coupler to a Miller-produced coupler and one manufactured by another competitor, the Geith Claw. (*Id.*) Miller countered that communication with its own distribution to dealers of materials promoting its coupler and alleging safety concerns with the Caterpillar coupler. Included in that distribution was a copy of Caterpillar's bulletin annotated with commentary from Miller disputing the Caterpillar product claims and highlighting the advantages of the Miller coupler. (Miller Stmt. of Undisputed Facts Ex. 13. Dkt. No. 667-15.) Caterpillar claims that its Competitive Bulletin was protected by copyright and that Miller's annotated version constituted a violation of its rights.

Miller, in turn, contends that its annotation was a fair use of the Competitive Bulletin. Under the Copyright Act, the owner of a copyright has the exclusive right to reproduce the protected work, to prepare derivative works, or to distribute copies. 17 U.S.C. § 106. However, a fair use of protected material does not infringe the author's rights. 17 U.S.C. § 107. The Copyright Act provides that in determining whether the use made of a work in any particular case is a fair use, the factors to be considered include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. The statute's list of factors is not intended to be exhaustive or to be rigidly applied. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 522 (7th Cir.

2002). The effect of the use on the value of the protected work is generally considered the most important factor. *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014).

Fair use is an affirmative defense. *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003). It presents a mixed question of law and fact that may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion. *Ty, Inc.,* 292 F.3d at 516. Miller asserts that its distribution of the annotated version of the Competitive Bulletin had no impact on any value of that work and therefore it has established the affirmative defense as a matter of law.

Indeed, Caterpillar has not claimed any impact to the value of the brochure—*i.e.,* the copyrighted work—as a result of Miller's action. Instead, Caterpillar's claim of harm resulting from Miller's annotations relates to the impact on the value of the product described in the bulletin—*i.e.*, the Caterpillar couplers—not of the bulletin itself. But as noted above, the Copyright Act directs the focus of the fair use analysis to the impact on the value of the work, not the subjects discussed in the work. Furthermore, a reproduction is permitted to impact the value of a protected work by convincing the audience for the original work that it is "no good." *Ty, Inc.,* 292 F.3d at 518. "Ownership of a copyright does not confer a legal right to control public evaluation of the copyrighted work." *Id.* at 521. So to the extent Caterpillar might claim that Miller's annotation constituted a critique of the original brochure, it would suggest fair use.

The Court finds that the first of the statutory fair use factors weighs in favor of fair use. Although the nature of Miller's use of the Caterpillar brochure was, at least to some degree, commercial, the commercial value to Miller and any resulting decline in the commercial value of the original work resulted not from the value of the original, but from the Miller additions. Such uses are not considered substitutes for the original work and are encouraged by the fair use

doctrine. *Id.* The Court assesses the second factor, the nature of the copyrighted work, similarly. Caterpillar has not suggested that the brochure has its own intrinsic value. It appears to have value only as an advertisement for the product it depicts – the coupler. Miller copied the entire brochure, and the third statutory factor accordingly weighs in Caterpillar's favor.

Because Miller's annotations did not impair any intrinsic value of the Caterpillar brochure and their impact on Caterpillar was in the nature of the sort of commentary that the fair use doctrine protects, the Court concludes that the statutory factors weigh in favor of applying the doctrine here. Miller's motion for summary judgment is therefore granted as to Count VII of the supplemental counterclaim.

### D.      Disparagement, Defamation, Consumer Fraud, and False Advertising Claims

Along with its annotated version of Caterpillar's "Competitive Bulletin" brochure, Miller sent equipment dealers other media messages asserting that Caterpillar's coupler posed safety risks for users: a letter from one of Miller's principals, a video that purported to show how the Caterpillar coupler could drop its attachments, and a document that purported to show the results of third-party tests conducted of the Caterpillar and Miller couplers. (Caterpillar Resp. to Miller Stmt. of Undisputed Facts ¶ 26, Dkt. No. 717-1.)

Caterpillar claims that Miller's communications, as a group, were false and misleading descriptions of its coupler. Count I of its supplemental counterclaim alleges that the materials were disparagement under Illinois common law.  Count II alleges commercial disparagement under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/2(a)(8) and 510/2(a)(12). Count III claims an unfair and deceptive practice under the Illinois Consumer Fraud Act, 815 ILCS §505/2. Count IV asserts a common law defamation claim. Count VI alleges false advertising in violation of the Lanham Act, 15 U.S.C. § 1125. In support of its

motion for summary judgment on these counterclaims, Miller makes several arguments common to the group.

### 1.    Proof of Damages

Miller contends that Caterpillar's claims relating to Miller's communications should not be submitted to the jury because proof of damages is a necessary element of each claim and Caterpillar offers no evidence of any such damages. But Caterpillar has presented evidence that the Miller communications prompted it to take steps to mitigate the impact on its customers, resulting in expenses it is entitled to recover as damages. (Caterpillar Stmt. of Additional Facts ¶ 38, Dkt. No. 717-1; *id.* Ex. 221, Dkt. No. 731-31; *id.* Ex. 224, Dkt. No. 731-34.)

Miller argues that such costs cannot be considered damages sufficient to permit Caterpillar to pursue its claims and that, instead, such claims must be predicated on lost sales or profits. (Miller Reply at 14, Dkt. No. 742.) This argument was rejected by the Sixth Circuit in *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683 (6th Cir. 2000). There, the plaintiff stipulated that it had suffered no lost sales or change in its financial condition as a result of the defendant's false advertising. *Id.* at 693. It nonetheless sought to recover the costs of its mitigation efforts as damages under the Lanham Act. The Sixth Circuit held that such recovery was appropriate, noting that "no court has excluded damage control costs from its definition of damages that are considered 'actual'." *Id.* at 692. The court further elaborated:

> [A] rule that predicated recovery of damage control expenses on a showing of marketplace damages would penalize successful efforts at mitigating damages. That is, under such a rule, a plaintiff who is successful in preventing marketplace damages would not be able to recover under the Lanham Act, but a plaintiff who is unsuccessful would be permitted to recover. That would be an anomaly.

*Id.* at 692.

The Court concludes that Caterpillar has provided evidence of the damages it allegedly suffered as a result of Miller's conduct. Although *Balance Dynamics* analyzed a Lanham Act claim, its rationale is readily applicable to Caterpillar's state law counterclaims as well, since a single legal analysis is properly applied to Lanham Act claims and Illinois statutory unfair competition claims when the claims are based on the same factual allegations. *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013). Illinois law allows defamation plaintiffs to recover "special damage, that is, of directly linking specific economic loss to the defamatory material by competent evidence." *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1138 (7th Cir. 1987) (citation omitted). The mitigation expenses claimed by Caterpillar are such damages, and the Court finds that they are also sufficient to support its common law defamation claim.

Miller is not entitled to a judgment on the supplemental counterclaims as the result of any failure to offer such evidence. Because Caterpillar has offered evidence of its damages from Miller's communications, the Court need not examine at this time Miller's assertions that the statements, if defamatory at all, are not actionable here because they are not defamatory *per se* and instead require proof of damages.

### 2. Truth of Miller's Claims

Miller next contends that the truth of its commentary on the Caterpillar coupler is a defense to each of the supplemental counterclaims. Under Illinois law, whether a statement is substantially true is normally a jury question. *Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1219 (Ill. 1996); *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004). In the present case, the parties directly dispute the accuracy of statements in the Miller communications about safety issues with the Caterpillar coupler. For example, Miller's

statements indicated that problems with the coupler resulted in attachments falling from excavators, while Caterpillar argues that the statements falsely suggested systemic problems with the coupler rather than isolated and unrelated incidents. (Caterpillar Resp. to Miller Stmt. of Undisputed Facts ¶¶ 32-37.) On the record presented, a reasonable jury need not accept Miller's assessment of the coupler. Judgment in its favor on the basis that its communications were true is not warranted at this stage of the proceedings.

### 3.    Qualified Privilege

Miller asserts that Caterpillar's Illinois law counterclaims are barred by the application of the state's common law qualified privilege for certain communications. Under certain circumstances, the privilege "serves to enhance a defamation plaintiff's burden of proof." *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993). If the privilege is established, the plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness. *Id.* Otherwise, the plaintiff need only show negligence. *Id.* Whether the privilege exists is a question of law for the court but, if it is found to exist, whether the defendant has acted with the requisite level of intent to be held liable nonetheless is a question for the jury. *Id.*

To determine whether the privilege applies, Illinois jurisprudence dictates a comparison of the general interest served by the allegedly defamatory communication and the degree of harm expected to result from communications of that kind. *Id.* at 134. The interest that provides the protection need not be the interest of the communicator and may be that of the recipient, third parties, or the public in general. *Id.* at 135.  The privilege is designed to protect valuable speech, even at the possible risk of defamation, when the public interest in encouraging that speech outweighs the interest of the subject in avoiding the impact of a falsehood. *Id.*

Illinois courts have not delineated a framework for the analysis that should be employed to weigh the competing interests to determine whether the privilege applies, but have construed *Kuwik's* principles liberally in favor of its application. The protection of the privilege has not been limited to communications involving the public's interest. In *Cianci v. Pettibone Corp.*, 698 N.E.2d 674, 683 (1998), for example, the communication at issue was an employee's unauthorized use of a company overnight delivery account to send personal packages; communication on the subject was protected because of the employer's interest in the action and because of the supervisor's interest "in confronting the employee." In *Barakat v. Matz*, 648 N.E.2d 1033, 1040 (1995), an allegedly defamatory accusation that the plaintiff doctor billed for unnecessary medical treatment was granted protection because of the interest of the recipient of the statement, the workers' compensation insurer, in determining whether presented claims were valid.

Caterpillar cites no precedent for the rejection of a claim of privilege here. The Court concludes that Miller's interest in the accurate assessment of its coupler in comparison to that of Caterpillar plus the interest the Caterpillar dealers (and the public in general) may have had in learning about competitive or safety deficiencies in the Caterpillar coupler combine to create an interest sufficient to trigger the protection of the privilege.

But the fact that the qualified protection applies to Miller's commentary does not, in itself, entitle Miller to summary judgment on Caterpillar's defamation claim. The privilege is not a complete defense. When the privilege applies, the plaintiff may still recover for a falsehood caused by a direct intention to injure or a reckless disregard of the defendant's rights and the consequences of the false communication. *Kuwik,* 619 N.E.2d at 135. Judgment for Miller would be appropriate at this stage only if the record contained no evidence that would permit a

reasonable jury to find the heightened culpability that overcomes the qualified privilege. That is not the case here. Caterpillar has adduced evidence that would support a jury finding that Miller was motivated by desire to harm the reputation of the Caterpillar coupler to such a degree that it recklessly disregarded the truth of its statements about its safety. (*See* Keith Miller letter of May 1, 2010, Caterpillar Resp. to Miller's Stmt. of Facts Ex. 218, Dkt. No. 731-28.) Although the qualified privilege applies, Miller's motion for summary judgment on that basis is denied.

### 4. Standing Under The Illinois Consumer Fraud and Deceptive Business Practices Act

Caterpillar claims that Miller's communications violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, which prohibits unfair methods of competition and unfair or deceptive practices. Although the Illinois Supreme Court has not spoken on the subject, the Seventh Circuit and the Illinois Appellate Court have both interpreted the statute to permit an action by a plaintiff business that is not a consumer of the defendant's products only if the conduct about which the plaintiff complains is directed to the market generally or otherwise implicates consumer protection concerns. *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996); *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217, 220 (Ill. App. Ct. 2003); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989). Miller contends that Caterpillar lacks standing to bring a claim under the statute because it was not a consumer and because it has presented no evidence that the communications at issue were directed to the general market or that they were otherwise relevant to consumer protection concerns.[4]

---

[4] Miller's challenge to Caterpillar's claim here—that Caterpillar is not included in the class of persons entitled to recover under the Consumer Fraud and Deceptive Business Practices Act—presents a question of statutory standing, a merits-based issue properly addressed in the summary judgment context, rather than one of Article III standing. *See Jordan v. Jewel Food Stores, Inc.*, No. 10 C 340, 2015 WL 3561493,

Miller's argument is belied by the record evidence showing its broad distribution of the material. Caterpillar has produced evidence that Miller distributed its communications to more than 50 dealers in North America (Caterpillar Resp. Ex. 68 at 35-36 of 36, Dkt. No. 725-2), to a director at the U.S. Occupational Safety and Health Administration (*id.* Ex. 70, Dkt. No. 725-4); and health and safety officials in the United Kingdom (*id.* Ex. 71, Dkt. No. 726). Caterpillar has also offered evidence that the Miller video was posted on its website (Miller Stmt. of Undisputed Facts Ex. 13, Dkt. No. 667-15 at 2 of 32) and that Miller's principals actively discussed more widespread media distribution (Caterpillar Resp. Ex. 205 at 5-7 of 7, Dkt. No. 731-15). This evidence is at least sufficient to create a contested issue of material fact as to the general market distribution of Miller's communication and is thus also sufficient to defeat its claim that it is entitled to judgment as a matter of law on Caterpillar's statutory consumer fraud counterclaim.

## 5.      Defamatory Nature of Miller's Communication

Miller also seeks summary judgment on Caterpillar's common law defamation counterclaim.  Illinois law recognizes five types of statements as defamatory *per se:* (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication. *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). Although certain forms of defamation do not apply to corporate entities, Illinois defamation law in general protects corporations as well as individuals. *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 269 (7th Cir. 1983).

___

at *2 (N.D. Ill. June 5, 2015) (*citing Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1387 (2014)).

Citing *Allcare, Inc. v. Bork*, 531 N.E.2d 1033 (Ill. App. Ct. 1988), Miller asserts that its communication about the Caterpillar coupler can only be considered product disparagement, not defamation, since the communication referred only to Caterpillar's products, not its integrity. But as *Allcare* itself acknowledges, Illinois law recognizes the possibility that a single statement "could simultaneously constitute defamation and commercial disparagement." 531 N.E.2d at 1037. In such cases, "both causes of action may lie." *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 720 (Ill. App. Ct. 1978); *see also Montgomery Ward & Co. v. Fretter, Inc.*, No. 91 C 8011, 1992 WL 212513, at *2 (N.D. Ill. Aug. 28, 1992).

The Court concludes that the statements at issue here are such statements. Given their most benign construction, Miller's communications suggest that Caterpillar produces and distributes an unsafe product. This suggestion defies innocent construction and plainly implies that Caterpillar lacks ability in its business, a *per se* category of defamation. Whether the communications were in fact understood to be defamatory is a question for the jury. *Tuite v. Corbitt*, 866 N.E.2d 114, 126 (2006). Miller is not entitled to summary judgment on the defamation counterclaim.

## CONCLUSION

For reasons discussed above, Miller's motion for summary judgment is granted as to Count I of Caterpillar's counterclaim (breach of contract) and Counts V (tortious interference) and VII (copyright infringement) of Caterpillar's supplemental counterclaim. Miller's motion is denied as to Caterpillar's remaining counterclaims and as to Miller's own breach of contract claim. Caterpillar's motion for summary judgment is granted in part as to Miller's abandoned claims in Count I (breach of contract) and Count II (trade secret misappropriation) of the Second

Amended Complaint, granted as to Counts III (fraudulent inducement) and IV (unjust enrichment) and is otherwise denied.

ENTERED:

Dated: October 21, 2015

_____
Andrea R. Wood
United States District Judge