**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MILLER UK LTD. AND MILLER INTERNATIONAL LTD., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10-cv-03770 |
| CATERPILLAR, INC., | ) ) | Judge Andrea R. Wood |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Miller UK Ltd. and Miller International Ltd. (together, "Miller") have sued

Defendant Caterpillar, Inc. ("Caterpillar") for breach of contract and misappropriation of trade

secrets based on the alleged improper use of intellectual property that Miller provided Caterpillar

pursuant to a 1999 agreement to supply mechanical couplers for earthmoving equipment

("Supply Agreement"). Caterpillar has denied Miller's claims and asserted several counterclaims

under state and federal law. Before the Court are motions to exclude or limit trial testimony from

six proposed expert witnesses: Nicholas Patrikalakis and Keith Moody, who are offered as expert

witnesses by Miller, and Frank Fronczak, Alexander Glew, Daniel McGavock, and Edward

Smith, each of whom has been tendered by Caterpillar. The Court previously issued a minute

order ruling on the motions. (*See* Dkt. No. 869.) This Memorandum Opinion and Order details

the Court's reasons for its rulings.

## BACKGROUND

Caterpillar manufactures earthmoving equipment; Miller designs and manufactures

mechanical attachments for earthmoving equipment. In particular, Miller designs and

manufactures a type of attachment called a coupler, which is a device that attaches to the end of

an earthmoving machine's stick to enable the operator to attach and switch other work tools, such as buckets and hammers. Among the couplers manufactured by Miller are the Bug Coupler and the Pin Grabber Plus ("PGP") Coupler.

Miller and Caterpillar had a previously established business relationship when, on March 31, 1999, they entered into a written agreement for Miller to supply couplers to Caterpillar. Pursuant to that Supply Agreement, Miller also agreed to provide Caterpillar with certain intellectual property, including engineering models, designs, and drawings, subject to Caterpillar's agreement to maintain that information in confidence and to use it only for the purposes provided for in the parties' agreement.[1] The Supply Agreement entitled either party to terminate the agreement, with or without cause, on 60-day notice. In 2008, while the Supply Agreement was in effect, Caterpillar developed and introduced to the market its own coupler product, the Center-Pin Lock Grabber Coupler ("Center-Lock Coupler"). In September 2010, Caterpillar notified Miller that it was terminating the Supply Agreement. In January 2011, after Caterpillar's introduction of the Center-Lock Coupler (and the filing of this lawsuit), Miller distributed a package of materials to other companies in the industry, including Caterpillar dealers, in which Miller made what Caterpillar characterizes as false, misleading, and disparaging statements about the Center-Lock Coupler.

Miller alleges that Caterpillar designed the Center-Lock Coupler using Miller's trade secrets, which Caterpillar misappropriated and misused in contravention of the Supply Agreement. Based on those allegations, Miller asserts claims against Caterpillar for breach of contract under Illinois common law and misappropriation of trade secrets in violation of the

---

[1] The engineering models consist of "voluminous and highly technical and detailed engineering drawings" that "contain hundreds of incredibly detailed subassembly files, part files, design steps and references, textual and otherwise. Each model frequently amounts to many hundreds of pages of information . . . ." (11/6/2014 Mem. Op. and Order (Cole, M.J.), Dkt. No. 596 at 1-2 n.1.)

Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* Caterpillar, in turn, asserts five counterclaims based on Miller's conduct in distributing the January 2011 package: claims for commercial disparagement and defamation under Illinois common law; a claim for commercial disparagement under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2; a claim for consumer fraud under the Illinois Consumer Fraud Act, 815 ILCS 505/2; and a claim for false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125.[2]

## DISCUSSION

### Legal Standard for Admission of Expert Testimony

To prevail on either of its two surviving claims, Miller must convince a jury that Caterpillar used intellectual property that it obtained from Miller to develop its own coupler product. The jury tasked with determining this matter will hear weeks of testimony about such things as the role of computer-assisted design ("CAD") in the development of new mechanical products. Such evidence invites, if not requires, assistance from expert witnesses to make sense of it.

Although both lay persons and experts may offer opinion testimony at trial, testimony from non-expert witnesses is limited to those opinions that are "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Experts, however, may opine more broadly than lay witnesses, "subject to cross-examination on the work forming the basis of that opinion." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). The admissibility of expert testimony and opinions is governed by Federal Rule of Evidence 702 and the standard articulated by the Supreme Court in *Daubert v.*

---

[2] Miller previously asserted claims against Caterpillar for fraudulent inducement and unjust enrichment under Illinois common law and for false and deceptive advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). Caterpillar also had counterclaims for breach of contract and copyright infringement. None of these claims have survived past the summary judgment stage.

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[3] *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 and *Daubert* "require the district court to determine whether proposed expert testimony is both relevant and reliable." *Higgins v. Koch Dev. Corp.*, 794 F. 3d 697, 704 (7th Cir. 2015). The party offering an expert's testimony bears the burden of demonstrating that it satisfies those requirements by a preponderance of the evidence. *Lewis*, 561 F.3d at 705.

In *Daubert*, the Supreme Court held that Rule 702 does not limit a scientific expert's testimony to that based on a methodology "generally accepted" in the expert witness's field. 509 U.S. at 588.[4] The holding liberalized the admission of expert witness testimony, allowing courts in their "gatekeeping" function to find that methodologies not established as generally accepted may nonetheless be sufficiently reliable. *Id.* at 589. To evaluate whether a proffered scientific methodology is reliable enough to support the admission of evidence at trial, the *Daubert* Court offered the following factors for case-by-case consideration: whether the methodology can be tested, whether it has been subject to peer review, what the known or potential rate of error is and

---

[3] This Court exercised jurisdiction over Miller's complaint based on diversity of citizenship of the parties—the Miller entities are citizens of the United Kingdom and Gibraltar, and Caterpillar is a citizen of Illinois and Delaware. *See* 28 U.S.C. § 1332(a)(2) (providing for original federal court jurisdiction over civil actions between citizens of a State and citizens or subjects of a foreign state). Federal courts exercising diversity jurisdiction apply federal law to procedural issues. *See, e.g.*, *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The admissibility of expert testimony is a procedural issue. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993); *see also Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010) (applying *Stutzman*).

[4] Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

whether there are standards controlling the technique's operation, and whether there is general

acceptance of the technique in the relevant scientific community. *Id.* at 594. A district court may

also consider whether the expert has accounted for obvious alternative explanations to a

proffered theory. *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005), *vacated in*

*part on other grounds*, 448 F.3d 936 (7th Cir. 2000)). These factors do not necessarily exhaust a

court's evaluation of a scientific expert's methodology. Instead, "[t]he Rule 702 inquiry is

fact-dependent and flexible." *Lapsley*, 689 F.3d at 810.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court applied

its more liberal interpretation of Rule 702 to experts who are not scientists. The *Kumho Tire*

Court explained that what "establishes a standard of evidentiary reliability" is the idea of

knowledge itself, whether that knowledge is "scientific, technical, or other[wise] specialized." *Id.*

at 147. Because different disciplines may have different standards for reliability,

> *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all
> experts or in every case. Rather, the law grants a district court the same broad
> latitude when it decides *how* to determine reliability as it enjoys in respect to its
> ultimate reliability determination.

*Id.* at 141-42 (emphasis in original); *see also Higgins*, 794 F.3d at 704. The Seventh Circuit has

applied the Supreme Court's liberal approach to the admission of expert opinions to find that

> [a]nyone with relevant expertise enabling him to offer responsible opinion
> testimony helpful to judge or jury may qualify as an expert witness. The principle
> of *Daubert* is merely that if an expert witness is to offer an opinion based on
> science, it must be real science, not junk science.

*Tuf Racing Prods. v. Amer. Suzuki Motor*, 223 F.3d 585, 591 (7th Cir. 2000). Moreover, if an

expert's methodology appears possibly subjective, courts have looked not only to the four

*Daubert* factors but also to whether the parties' or the courts' own analyses identify

"countervailing factors operating in favor of admissibility," such as an "indication . . . that other

experts in the industry use" the same sort of observations to draw conclusions. *Kuhmo Tire*, 526 U.S. at 156.

Methodologies based on experience are distinguishable from mere subjective assertions. Indeed, "an expert might draw [an admissible] conclusion from a set of observations based on extensive and specialized experience." *Id.* For example, where an expert's "testimony [i]s based not on his subjective belief or unsupported speculation but rather on his extensive experience," the Seventh Circuit has found that it is not an abuse of discretion for a trial court to "determin[e] the extent and type of experience that [the expert] had," and to admit his testimony while "limiting both the questioning and the . . . testimony to reflect only those areas in which the [expert] had extensive experience and training." *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000). But while a discipline's methods may include reliance on experience, "[t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

When assessing whether expert testimony meets the requirements of Rule 702 and *Daubert*, "it is not the trial court's role to decide whether an expert's opinion is correct, but it is instead limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Berman v. Stryker Corp.*, No. 11 C 1309, 2013 WL 5348324, at *3 (N.D. Ill. Sept. 24, 2013). "Determinations on admissibility should not . . . supplant the adversarial process . . . ." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). So, for example, that another expert might disagree with an expert's opinion "does not render the opinion inadmissible." *Brumley*, 217 F.3d at 912. Instead, a party who finds an expert's conclusion disagreeable is entitled to challenge the expert and his or her opinion through cross-examination and, of course, to put on his own expert to offer a counter opinion. The law

entrusts the powers of cross-examination to highlight lapses in logic and good sense. Put another way, "[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

**Caterpillar's Motion to Exclude**
**Expert Testimony of Nicholas Patrikalakis (Dkt. No. 783)**

Caterpillar designed and developed the Center-Lock Coupler with computer assistance, a complex process likely to be unfamiliar to the lay juror. Thus, Miller offers Nicholas Patrikalakis as an expert witness regarding CAD as well as "clean room" design techniques.[5] Patrikalakis's experience qualifies him to opine on most CAD issues. But, as explained below, the Court is unable to conclude that his experience qualifies him to opine on clean room design.

Patrikalakis is an engineering professor at the Massachusetts Institute of Technology, where his research focuses on "applications of computational geometry and software engineering in design, analysis and fabrication of complex systems." (Dkt. No. 822-1 at 19.) He also claims experience in software engineering. (*Id.*) His work experience includes projects for or supported by the U.S. Navy and its contractors. (*Id.*) Patrikalakis has served in an editorial capacity for several academic journals and has chaired various symposia, conferences, and workshops in his

---

[5] Patrikalakis defines "clean room" design as requiring "that a competing product's data remain physically and logically segregated" from engineers working on a new product. (Dkt. No. 822-1 at 197.) As he further explained:

> To be physically segregated, engineers must not be able to access, see or touch any physical artifacts of another competing product's engineering design. Logical segregation means that the engineers working on the new design should not be able to access another competing product's computer designs or testing on any computer system.

*Id.*

field. (*Id.* at 19.) He led a team in research that resulted in a patent and has co-authored several articles on topics relevant to his proposed testimony in this case. (*Id.* at 19-20.)

Miller provided Caterpillar with Patrikalakis's initial expert report on November 26, 2014, consistent with the expert discovery schedule in this case. In that report, Patrikalakis opines that "Caterpillar used Miller's engineering designs to design and develop its Center-Lock Pin Grabber coupler." (*Id.* at 17.) He further concludes that "Caterpillar took unconventional steps from an engineering standpoint in designing the Center-Lock coupler that had the effect of obscuring their use of Miller's engineering design in designing the Center-Lock coupler." (*Id.* at 218.) For example, according to Patrikalakis, Caterpillar stripped Miller's revision history from certain files, in violation of "conventional engineering practice."[6] (*Id.* at 220.)

On March 20, 2015, Patrikalakis provided his rebuttal expert report. In his rebuttal report, Patrikalakis concludes that "Caterpillar had access to and did access Miller's engineering designs while designing the Center-Lock coupler." (Dkt. No. 822-3 at 12.) Relatedly, he finds that "Caterpillar either consulted or copied Miller engineering design to create the Center-Lock coupler model" and that "Caterpillar's engineers consistently assembled parts of the Center-Lock coupler model" in computer files that contained Miller's information in violation of clean room design principles. (*Id.* at 13) Patrikalakis's rebuttal report also criticizes Glew's opinion as an expert for Caterpillar on reverse engineering.[7] (*Id.* at 28) Patrikalakis later supplemented his

---

[6] As used here, the term "revision history" refers to "the log maintained in each Pro-Engineer model that tracks when each save was performed, by whom, and on what computer." (Dkt. No. 822 at 8.)

[7] As defined by another of Caterpillar's witnesses, "reverse engineering" refers to
        an activity where you look at products . . . and by looking at physical
        artifacts, typically, or sometimes drawings, sometimes pictures,
        sometimes other information that you have about the product, developing
        an understanding of the functionality of the device, understanding how
        that functionality is achieved, that is, what features or what
        characteristics enable you to generate the functionality that is being

rebuttal report on April 3, 2015, asserting that he had "discovered additional evidence showing that Caterpillar took unconventional engineering steps that had the effect of obscuring their use of Miller's engineering designs." (Dkt No. 822-4 at 1.)

Caterpillar has moved to exclude certain of Patrikalakis's opinions on three grounds. The first two turn on whether he changed his theory of Caterpillar's misappropriation and, if he did, whether he did so too late under the discovery schedule. Specifically, Caterpillar complains that in his initial report, Patrikalakis focuses on a part-by-part analysis of certain Pro-E models of the couplers. Then, in his rebuttal report, he switches to a so-called "rich information" theory. But what Caterpillar calls a "new" theory of misappropriation actually just differs from its own expert's theory. The point of rebuttal evidence, in large part, is to challenge the conceptualization of an issue by an opponent. That is what Patrikalakis does. The nature of Miller's trade secrets is a potentially confusing subject for a fact-finder that is nonetheless central to the dispute between the parties. The Court declines to keep from the jury an expert's explanation of Miller's position. For the same reasons, despite Caterpillar's suggestion to the contrary, the Court will not limit Patrikalakis to testifying on either the rich information or individual parts conceptualization of the issue. If Caterpillar believes Patrikalakis to have taken inconsistent positions, it may cross-examine him on the purported contradiction. This portion of Caterpillar's motion is denied.

Caterpillar's second argument seeks to exclude the opinions expressed in Patrikalakis's supplemental rebuttal report as untimely under the court-ordered discovery schedule. Each litigant must disclose expert opinion reports "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D); *see also Higgins*, 794 F.3d at 704. These expert reports must contain "a complete statement of all opinions the witness will express and the basis and

---

achieved, looking at materials that are used, looking at manufacturing
processes that are employed . . . in the device.
(Dkt. No. 825-2 at 174:13-25.)

9

reasons for them." Fed. R. Civ. P. 26(a)(2)(B). As with other disclosure requirements, parties

have a duty to supplement their expert disclosures "in a timely manner if the party learns that in

some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P.

26(e)(1). Federal Rule of Civil Procedure 26(e)(2) specifically contemplates supplementation of

expert reports and information provided during an expert's deposition. Fed. R. Civ. P. 26(e)(2).

Caterpillar claims that Patrikalakis did not supplement his report based on new information on

April 3, 2015, but rather he developed a completely new opinion based on information that was

available to him at the time of his original opinions. Thus, Caterpillar asserts that Patrikalakis's

supplemental report is nothing more than a late expert disclosure that should be excluded.

Federal Rule of Civil Procedure 37 provides a mechanism for enforcing the disclosure

requirements of Rule 26 by providing that any party that fails to make or supplement the required

disclosures will not be allowed to use that information or witness at trial. Fed. R. Civ. P. 37(c).

To exclude evidence under Rule 37, the Court must "fin[d] the party's failure to comply with

Rule 26(a) was both unjustified and harmful to the opposing party." *Sherrod v. Lingle*, 223 F.3d

605, 612 (7th Cir. 2000). The party violating Rule 26(a) bears the burden of showing that its

violation was either justified or harmless. *Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 786

(7th Cir. 2000).

Whether Patrikalakis's supplemental opinion constitutes a late disclosure or merely a

permitted supplementation is of little consequence, however, because Patrikalakis's delay did not

prejudice or otherwise harm Caterpillar. Whatever change Patrikalakis made to his opinion is

harmless because Caterpillar had time to explore it, and did in fact explore it, during discovery

and well in advance of trial. Notably, Caterpillar did not depose Patikalakis until *after* the

purportedly late disclosure. Thus, Caterpillar had an opportunity to examine Patrikalakis

regarding all of his opinions, new and old. Moreover, Caterpillar's expert, Glew, was deposed only *after* Patrikalakis's supplemental report had been produced and *after* Patrikalakis had been deposed. As a result, Caterpillar's expert had a full and fair opportunity to respond to Patrikalakis's "new" opinions. In addition, the Court observes that Caterpillar could have moved to strike Patrikalakis's supposedly prejudicial opinion at the time of the late disclosure or sought a continuance to evaluate his allegedly new contentions. The docket reflects no such motion. Instead of raising its objections to the supplemental report during discovery, Caterpillar chose to wait until the eve of trial to do so. Finally, Patrikalakis's late submission was several months ago. Caterpillar has had more than enough time to adjust its litigation strategy—if that was truly necessary—in order to address Patrikalakis's supplemental material. This is not a situation in which a party disclosed an expert's opinions on the eve of trial; rather it is one where the opposing party waited until the eve of trial to object.[8]

      Patrikalakis supplementing his rebuttal expert opinions two weeks after he submitted the reports themselves and more than half a year before the beginning of trial did not prevent Caterpillar from preparing its defense adequately or surprise Caterpillar enough to affect the outcome of the case. "The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Sherrod*, 223 F.3d at 613. To impose the drastic sanction of exclusion would be unjustified here. *Id.*; *cf. Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005) (holding that exclusion of expert *was* appropriate sanction for failure to comply with Rule 26(a)(2)(C) where sanctioned party "failed to offer *any* explanation as to why he did not make the report available [and] failed to

---

[8] While the Court finds that Caterpillar cannot show prejudice that would warrant excluding Patrikalakis's supplemental opinions, it also bears noting that the Court is unconvinced that Patrikalakis's supplemental opinion went beyond that permitted (even required) by Rule 26(e).

offer *any* argument as to why his failure . . . should be considered harmless" (emphases added)). The Court denies Caterpillar's motion to exclude Patrikalakis's expert testimony disclosed in his supplemental report.

Caterpillar's final argument regarding Patrikalakis relates to his opinions about clean room design. Patrikalakis claims that clean room design is an aspect of engineering and design, about which he is an expert. But "[t]he question [to] ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation [to] answer a specific question." *Myers v. Ill. Cntr. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Caterpillar argues that this Court should preclude Patrikalakis from testifying about clean room design because Patrikalakis does not have expertise on that particular engineering issue and, even if he did have the requisite expertise, it would have been gained through work for the United States Navy about which Patrikalakis refused to testify at his deposition on national security grounds.

As his proponent, Miller has the burden of showing that Patrikalakis is qualified to opine about the specific topic of clean room design. *See Lewis*, 561 F.3d at 705. Yet Miller has offered little support for the conclusion that Patrikalakis is qualified to opine on that subject. In its response to Caterpillar's motion to exclude Patrikalakis's opinion on clean room design, Miller complains that Caterpillar asked Patrikalakis only five questions regarding his experience at his deposition and asserts that "Caterpillar's complaints ring hollow" because "Patrikalakis demurred in answering only one question . . . . If Caterpillar's counsel required additional information, he could have asked" for it. (*Id.* at 12-13.) But the relevant question for present purposes is not whether *Caterpillar* required additional information; rather, the question is whether the Court does. And it is Miller, not Caterpillar, that has the burden of providing the Court with sufficient information from which Patrikalakis's expertise can be determined. While

Miller states that Patrikalakis taught clean room design in undergraduate and graduate classes, it points to no support in the record. Miller also fails to cite any support for Patrikalakis's expertise in clean room design in his expert report or deposition testimony. Nor did Miller attempt to fill the gap in the record by submitting a declaration or affidavit from Patrikalakis in opposition to Caterpillar's motion.

The national security implications of requiring Patrikalakis to testify regarding his classified work for the Navy are not at issue here. Instead, the concern is that Miller must offer something—whether information about his work for the Navy or something else—to meet its burden. It bears noting that, to the extent Patrikalakis did answer questions about his work for the Navy, his answers did not tend to establish his expertise. Patrikalakis testified that he did not design or build, but merely visited, the clean room for the Navy project. His role was to work on the technical design itself (*i.e.*, what was designed *within* the clean room). Had Patrikalakis testified that he was actually involved in establishing a clean room arrangement for a secret Navy project that might have been enough. But Patrikalakis could not even say that he had been involved in designing the clean room.

Thus, Caterpillar's motion to exclude Patrikalakis's opinions on clean room design is granted. But the Court construes this exclusion narrowly. The Court's ruling is not intended to prevent Patrikalakis from opining that Caterpillar accessed and used Miller's models to design its own coupler; however, he will not be permitted to opine either that by doing so Caterpillar violated principles of clean room design or that clean room design was necessary or appropriate under the circumstances.

**Caterpillar's Motion to Exclude**
**Expert Testimony of Keith Moody (Dkt. No. 785)**

Miller offers Keith Moody as an expert in the fields of engineering, reverse engineering, designing, and developing products such as couplers. The record demonstrates that he is qualified to testify regarding those subjects. Since 2012, Moody has held the position of Product Development Manager with Miller UK. As Product Development Manager, he is responsible for new product introduction. (Dkt. No. 818-1 at 1.) Moody's career in engineering spans 27 years, of which he has spent 20 working in design. (Dkt. No. 818-2 at 212:17-20.) Before his promotion to Product Development Manager, Moody served Miller and other companies in a variety of engineering roles, including several related to coupler products. (Dkt. No. 818-1 at 1-2.) While working for firms other than Miller, he "reverse engineered some parts" for a couple of machines. (Dkt. No. 846-1 at 81:12-14, 81:17, 82:18-22.) In this case, Miller offers Moody to opine regarding "the difficulty to reverse engineer the frame and hook of the Miller Bug coupler." (Dkt. No. 818-1 at 2.) Moody's opinion supports Miller's position that Caterpillar misappropriated Miller's intellectual property, rather than reverse engineered it.

Caterpillar seeks to exclude Moody's opinion on a variety of primarily procedural grounds. First, Caterpillar takes the position that whether the alleged trade secrets would be difficult to reverse engineer is an element of Miller's affirmative case, and thus Miller should have listed any experts on the issue in its initial expert disclosure rather than its rebuttal disclosure. Springing Moody as a rebuttal witness, Caterpillar argues, is unfair and warrants exclusion. But Caterpillar is wrong to assume that Miller must show as part of its affirmative case that its alleged trade secrets were difficult to reverse engineer. *See, e.g.*, *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714 (7th Cir. 2003) (stating that the difficulty with

which others could duplicate intellectual property information is a factor tending to instruct, but not an element necessary to show, that the information is a trade secret).

Caterpillar alternatively contends that, since Miller disclosed Moody as a rebuttal expert during discovery, Moody should only be permitted to testify during Miller's rebuttal case at trial. But Caterpillar fails to recognize the difference between discovery and trial. As noted above, the discovery rules are intended to facilitate the exchange of information, to enable both sides to prepare their cases adequately and efficiently, and to prevent the tactic of surprise from affecting the outcome of the case. *Sherrod*, 223 F.3d at 613. For whatever reason, Miller did not consider it necessary to disclose Moody along with its initial expert disclosures. Perhaps Miller did not see the need to present an expert on the difficulty of reverse engineering until it understood that Caterpillar might emphasize that issue in its defense. In any case, for discovery purposes, Moody was a proper rebuttal witness. Having properly disclosed Moody as an expert during discovery, Miller will be permitted to present him in its case-in-chief so long as his testimony falls within the scope of his expert disclosures.

Caterpillar also seeks to exclude the entirety of Moody's testimony on the ground that he is not an expert on reverse engineering. Caterpillar offers three rationales for this conclusion: first, Moody's lack of educational credentials; second, Moody's lack of experience with reverse engineering of complex parts such as couplers; and third, Moody's lack of membership in professional engineering societies. The first and third points are easily dismissed. That Moody may lack the credentials typical for a professional engineer in the United States does not preclude him from serving as an expert in that field. "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," rather than academic or practical expertise. *United States v. Parra*, 403 F.3d 752, 758 (7th Cir. 2005). That

experience may render an expert as knowledgeable as a credentialed, but not particularly experienced, engineer seems especially true when the proposed expert was educated and works in a country with a different credentialing and licensing system from where he seeks to testify. (*See, e.g.*, Dkt. No. 846-3 at 199-201 (discussing difference between Moody's education and education of engineers in the United States); *id.* at 206-09 (discussing, *inter alia*, whether Moody's postsecondary education could be considered "vocational training" and whether Moody could qualify as an engineer in the United States).)

Moody's lack of experience in the specific area of reverse engineering of complex parts merits greater concern but ultimately does not warrant excluding his testimony. Moody has extensive professional experience as a design engineer, including experience with the type of products at issue. That professional familiarity has resulted in an expertise that will assist the jury in considering the facts regarding Caterpillar's ability to reverse engineer, and history of reverse engineering, Miller's products. *See* Fed. R. Evid. 702(a). In addition, Moody's reverse engineering experience, although limited, will allow him to help the jury understand the practice of reverse engineering in an industrial context. Caterpillar implies in its briefing that Moody believes it would be too difficult to reverse engineer Miller's coupler only because he is a mediocre engineer. But that argument, such as it is, goes to the weight of Moody's testimony, not its admissibility.

Finally, Caterpillar seeks to preclude Moody from opining about matters beyond the scope of his expert disclosure. Caterpillar does not identify any particular topic about which it believes Moody may seek to testify that has not been disclosed. Thus, Caterpillar's request is not sufficiently specific to permit a ruling in its favor. Of course, the Court will enforce the Federal Rules of Civil Procedure and the Federal Rules of Evidence with respect to all expert witnesses.

Either party may object at trial if the other tries to elicit expert testimony beyond the scope of its experts' disclosures.

In sum, Caterpillar has provided no basis for this Court to exclude Moody's testimony. Its motion is therefore denied.

**Miller's Motion to Exclude**
**Expert Testimony of Frank Fronczak (Dkt. No. 801)**

Caterpillar offers Frank Fronczak as an expert in engineering, reverse engineering, designing, and developing products such as couplers. Fronczak is an emeritus professor of engineering at the University of Wisconsin-Madison and the Principal Mechanical Engineering Design Advisor at Marvel Medtech, LLC. (Dkt. No. 825-1 at 1.) Fronczak holds a D.E. in Engineering Design from the University of Kansas, among other degrees. He served as a lecturer or professor at the University of Wisconsin-Madison from 1982 to 2012, and worked as an engineer for a few different organizations, including NASA's Langley Research Center, in the 1970s. He has been a member of various engineering professional societies, has published dozens of research papers, and holds eight patents. (*Id.* at 3, 6-10.)

Caterpillar offers Fronczak as an expert witness to opine that (1) Caterpillar did not misappropriate Miller's trade secrets to design and to develop the Center-Lock Coupler because it "performed the full range of engineering activities that would be expected to design, develop, and introduce new coupler products" on its own; (2) Miller based its PGP Coupler on a modification and improvement of a third party's coupler; (3) "Caterpillar did not use certain of the alleged trade secrets and/or they are readily reverse-engineered because they are readily ascertainable," and (4) the information and principles that Miller claims as trade secrets are not

actually secret. (Dkt. No. 804-2 at 2.).[9] Fronczak also concludes that certain of Miller's patent

applications disclose intellectual property that Miller nonetheless claims as secret. (*See* Dkt. No.

804-2 at 79-81.) These opinions support Caterpillar's arguments that it did not misappropriate

Miller's intellectual property and that, to the extent it did rely on Miller's intellectual property,

that information did not include trade secrets.

Fronczak further opines about the time it would take to reverse engineer certain of

Miller's intellectual property and to review certain patents. As part of his work, Fronczak

discussed with McGavock, Caterpillar's damages expert, how Fronczak had "arrived at those

times based on [his] experience in managing projects as well as [his] experience in designing,

being [a] membe[r] of a design team that's been acquired over the course of my career, which

is . . . 44 years . . . ." (*Id.* at 24:19-24.)

Miller argues that Fronczak's opinions regarding the time estimates, which also support

McGavock's testimony, are inadmissible under *Daubert* because they lack a methodology. In

particular, Miller contends that experience is not a reliable methodology because it is not

testable. The law is not so simple, however.

Fronczak describes his methodology "as exercising engineering judgment based upon

[his] experience in both managing the design and being members of the design team of devices

of comparable complexity [to the coupler] as well as designs of considerable more complexity."

(Dkt. No. 825-2 at 34:11-15.) That experience includes work as a practicing engineer, a professor

working with fellow academics to design devices, a consultant, and, for the past ten years, a

---

[9] The five reasons offered for why the information and principles were not secret are that they (1) "result from a straightforward application through the design process of well-known, established, fundamental engineering principles utilizing common engineering knowledge/skill," (2) are well known in prior art, (3) "are reflected in readily accessible information on products in market," (4) "are disclosed in non-protected form," or (5) were independently known and sometimes utilized by Caterpillar for years. (Dkt. No. 804-2 at 2.)

senior mechanical design advisor a company not party to this case. (*Id.* at 34:16-35:1.) Fronczak also articulates the methodology he used to analyze the time it would take to reverse engineer certain products at issue as replicating design elements, acquiring prototypes, analyzing competitive couplers, reviewing patents, and testing. (*See, e.g.*, Dkt. 804-10 at Ex. 12.) For example, to conclude that it would not take long to reverse engineer certain Miller couplers, Fronczak does not detail how many couplers at which a reverse engineer would need to look. (Dkt. No. 825-2 at 37:11-12.) Instead, he states that he applied his experience in the design process with other products, "some of which . . . are less complex, some of which are more complex, [and] some of which are of comparable complexity," taking into account that "the first time through doing something is gonna [*sic*] take you longer than the second time through . . . ." (*Id.* at 38:4-6, 39:15-19.)

Miller is correct that the sort of experience upon which Fronczak relies is not testable. It is also true that, under *Daubert*, testability is considered characteristic of reliable science. *See Daubert*, 509 U.S. at 593.[10] For its part, Caterpillar has not introduced much evidence to support the claim that experts in Fronczak's field really do often base their time estimates on nothing more than experience. Were the Court limited to the four factors articulated in *Daubert*, this might pose a problem for Caterpillar. But *Daubert* also emphasizes that none of its factors should be considered dispositive of reliability. The *Daubert* factors are nonexhaustive, even on admission of scientific expert testimony. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). And not all experts are scientists. *See Kumho Tire*, 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 589-90; Fed. R. Evid. 702).

---

[10] Two other *Daubert* factors—peer-review and rate of error—also do not support admission of Fronczak's opinions, while Caterpillar has argued that the fourth *Daubert* factor—general acceptance—does suggest validity.

In addition to the *Daubert* factors, courts may consider (1) "whether the testimony relates to matters growing naturally and directly out of research [the expert has] conducted independent of the litigation, or whether [the expert has] developed their opinions expressly for purposes of testifying," (2) "[w]hether the expert has adequately accounted for obvious alternative explanations," and (3) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (internal quotations omitted).

The first of these considerations cuts both ways here. On the one hand, Fronczak's opinions clearly relate to his research. On the other hand, he would not have reached conclusions about Caterpillar's design process but for his employment in connection with this litigation. With respect to the second consideration, Fronczak details his disagreement with Patrikalakis's conclusion, an explanation alternative to his own. As to the third, the Court can infer a high level of professional care from Fronczak's many professional accomplishments, the detail and thoroughness of his report, and his testimony about many, lengthy conversations with other of Caterpillar's witnesses. This last factor alone goes a long way toward establishing Fronczak's expertise, as "[t]he goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire*, 526 U.S. at 152).

In sum, testability is not a necessary characteristic of an experienced expert's methodology. Experts in design, such as Fronczak, spend their lives estimating the amount of time required for engineering projects. Miller may find Fronczak's opinions incredible, but the question of credibility is one for the fact-finder.

Miller also seeks to exclude specific portions of Fronczak's testimony for other reasons. It seeks to exclude Fronczak's opinions regarding Caterpillar's design and development of the Center-Lock Coupler as unscientific and his opinions regarding the basis for the PGP Coupler as irrelevant and prejudicial. The methodology point is the same one raised above and thus the Court reaches the same conclusion: *Daubert* and its progeny allow for experience as a relevant methodology and here Fronczak's experience with design engineering constitutes a methodology resulting in a valid opinion.

Miller complains that "Fronczak employed literally no methodology to determine what advantage Caterpillar gained through the use of Miller's designs." (Dkt. No. 804 at 11-12.) But this argument assumes Miller's conclusion. As the Seventh Circuit has observed, "an expert does not assist the trier of fact . . . if he starts his analysis based upon the assumption [of an answer to] the very question that he was called upon to resolve." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (internal quotation omitted). Fronczak's expertise will assist the jury in determining whether Caterpillar used Miller's designs and, if so, whether it gained any advantage from doing so. Fronczak's failure to adopt Miller's preferred methodology does not mean that he exhibited no methodology. For similar reasons, Miller is wrong to claim that Fronczak "fail[s] to provide any benchmark by which to measure Caterpillar's design and development process." (Dkt. No. 804 at 12.) Fronczak compared Caterpillar's process with the process that, in his experience and according to his research, is the standard for developing coupler-like products. That is a benchmark.

Miller's suggestion that a lay witness "can speak to the design process just as well as Fronczak" is belied by the record. (Dkt. No. 804 at 13.) Fronczak is an academic and accomplished professional in the field of design engineering. Fronczak's knowledge certainly

will assist the jury's determination of the difficult factual issues in this case. Of course, Miller may argue to the jury that Fronczak's methodology was inferior to the one that Patrikalakis employed. But inferiority of method is not the same as absence of method, and it would be unfair for the Court to deprive the jury of an alternative expert opinion because that alternative is "unscientific."

Miller also asks this Court to exclude Fronczak's testimony about the basis for the PGP Coupler. An important factual question in this case is the extent to which the intellectual property that allows for the design and manufacture of the PGP Coupler is a trade secret. Fronczak's expert opinion will assist the jury in answering that question. Fronczak's opinions, far from confusing the jury, will assist its determination of the extent to which the PGP Coupler differs from prior art. Such testimony would tend to support Caterpillar's arguments concerning the purportedly non-secret nature of Miller's intellectual property. The Court denies Miller's motion to exclude Fronczak's testimony on the PGP Coupler.

In addition, Miller challenges Fronczak's testimony on trade secrets as irrelevant. But the nature of Miller's intellectual property is a core factual issue in this case. The fact-finder may benefit from opinions of an engineering expert like Fronczak when resolving that issue. Fronczak applied his expertise through the methodology of his experience. His opinions are reliable as well as relevant. The Court denies Miller's argument to preclude Fronczak's testimony on trade secrets.

Finally, Miller moves to exclude Fronczak's testimony about information revealed in Miller's patents.[11] Insofar as the Court allows Caterpillar to introduce evidence of information

---

[11] The Court has granted Miller's motion in limine to exclude argument that the fact that Miller did not patent the PGP frame means the frame designs do not embody any protectable trade secrets. (*See* Dkt. No. 807 § VIII.) But whether the patents themselves made public information about Miller's designs that

Miller revealed in its patents, Fronczak may opine on such information about which he is expert. The Court denies Miller's motion to exclude Fronczak's testimony on Miller's revelation of information in its patents.

**Miller's Motion to Exclude**
**Expert Testimony of Alexander D. Glew (Dkt. No. 797)**

Caterpillar offers Alexander Glew as an expert on CAD modeling. Since 1997, Glew has been the President of Glew Engineering Consulting, Inc. (Dkt. No. 826-2 at 1.) There, his "[c]onsulting work includes thin film characterization, process development, project turn-around/rescue, gas flow and vacuummetrology, design of experiments, corrosive gas applications, finite element analysis and related market analysis." (*Id.* at 2.) He has a Ph.D. from Stanford University's Department of Materials Science & Engineering. Between 1987 and 1997, prior to his work at Glew Engineering Consulting, Glew worked in various positions at Applied Materials, Inc. (*Id.* at 2-3.) His background reveals both management and engineering experience, including work as "a supplier quality engineering manager," in which position he "ha[d] . . . tens of thousands of parts inspected in [his] shops." (Dkt. No. 826-1 at 75:8, 75:11-14.) He has authored a patent, published and presented various research papers, and is a member of a variety of professional associations. (Dkt. No. 826-2 at 3, 17-18.)

In this case, Glew opines that: (1) Miller failed to satisfy its obligations as a supplier, (2) Caterpillar performed extensive, independent testing and analysis of its new couplers, (3) Miller's PGP Coupler resulted from a collaboration between Miller, Caterpillar, and a third firm, (4) citations to references in Caterpillar's coupler to information concerning the PGP Coupler can be explained in no less than eight ways, none of which depends upon misappropriation of Caterpillar's trade secrets, (5) Caterpillar's new Pin Grabber Coupler "is a wholly original design

___

would otherwise have been confidential, and therefore may disqualify such information from protection as trade secrets, is a matter for the jury's consideration.

with no overlap with either the [Caterpillar] Center-Lock Coupler or the Miller Pin Grabber Plus Coupler," and (6) Patrikalakis was wrong to conclude that Caterpillar had attempted to obscure its design efforts and that Caterpillar was obligated to establish clean room design procedures for its coupler development. (Dkt. No. 799-3 at 5-6.)

It appears that Caterpillar intends to offer Glew's testimony primarily to rebut that of Patrikalakis. For example, Glew criticizes the methodologies that Patrikalakis used in reaching his conclusions. (*See, e.g.*, Dkt. No. 799-3 ¶ 150 ("[A] troubling aspect of Dr. Patrikalakis' [*sic*] methodologies is his repeated claim that similar 'geometric construction' shows that Caterpillar Center-Lock Coupler parts are based upon Miller PGP parts. . . . A claim of similar 'geometric construction' does not imply copying. Many unrelated objects have similar 'geometric constructions[':] For example, a pancake and a penny . . . .").) Glew's opinions tend to show both that the intellectual property at issue did not include trade secrets and that it was not misappropriated by Caterpillar.

Glew, like Fronczak, has also estimated the amount of time it would take to reverse engineer certain of Miller's products. These estimates support McGavock's damages opinions. Miller seeks to exclude Glew's opinions regarding the time estimates for the same reason that it moved to exclude Fronczak's testimony on that topic. But although Glew has not reverse engineered a coupler, he has extensive experience with the design and development of couplers and similar products, and CAD in particular. (Dkt. No. 826-1 at 75:4.) In essence, Miller's quarrel with Glew is that he employed his own methodology rather than using Miller's preferred approach. The presentation of multiple methodologies in this instance would serve to illuminate the relevant factual question: Did Caterpillar misappropriate Miller's intellectual property to

design and develop the Center-Lock Coupler? The Court finds that the jury will benefit from Glew's testimony and thus denies Caterpillar's motion to exclude it.

Miller also objects to Glew's reverse-engineering opinion as irrelevant and unverifiable. Glew's testimony is clearly relevant to the question of whether the information that Miller seeks to protect does, in fact, include protectable trade secrets. Miller argues that Glew's opinion, even if relevant, is unreliable because his methodology and conclusions are unverifiable. In response, Caterpillar makes a colorable argument that Miller could verify Glew's process. But, in any case, verifiability is not the *sine qua non* of admissible expert opinion testimony. Purported lack of verifiability goes to the weight, not the admissibility, of Glew's testimony. Glew's testimony on reverse engineering is relevant, grounded in his expertise, and will assist the jury in resolving a factual issue in this case. It is therefore admissible.

Miller also challenges Glew's opinion that Caterpillar used information that it obtained from Miller prior to 1999 to design its coupler, arguing that Glew fails to prove that Caterpillar used the pre-1999 information. But the standard for admissibility is not so high as to permit only expert opinions that absolutely prove the fact for which they are offered. The question, instead, is whether the testimony will help the fact-finder in its task. Glew's testimony that the parties exchanged some of the intellectual property at issue before signing the Supply Agreement speaks to the secret nature of that intellectual property and would tend to help the jury.

Finally, Miller challenges certain of Glew's opinions as based on lay interpretations of the evidence rather than true expertise. These include Glew's opinions regarding Caterpillar's justification in terminating its contract Miller, Miller's disclosure of intellectual property, and Caterpillar's testing of its couplers.

Whether Miller's performance under the Supply Agreement somehow justified Caterpillar's termination of the contract is not at issue in this case. To the contrary, it is undisputed that the contract gave either party the right to terminate the contract without cause on 60-day notice. Thus, whether or not Caterpillar was justified in terminating the Supply Agreement is irrelevant to this lawsuit and not a proper subject of expert opinion testimony. The Court grants Miller's motion to exclude Glew's opinions regarding Caterpillar's justification in terminating Miller. On the second issue, Caterpillar points to no particular evidence showing that Glew has more than a lay knowledge of industry standards for trade secret protection. So, although such testimony is arguably relevant, the Court grants Miller's motion to exclude Glew's opinion regarding Miller's disclosure of trade secrets to third parties as well.

In seeking to exclude the third opinion, however, Miller has reached too far. Glew has "opined on the extent of the testing performed on Caterpillar's couplers." (Dkt. No. 826 at 13.) Glew's experience and education renders him considerably more knowledgeable about such testing processes than the typical lay person. Glew's opinion will assist the fact-finder in understanding the evidence. Thus, the Court denies Miller's motion to exclude Glew's opinion regarding Caterpillar's testing.

**Miller's Motion to Exclude**
**Expert Testimony of Daniel M. McGavock (Dkt. No. 793)**

To support its damages argument, Caterpillar offers Daniel McGavock as an expert on valuing intellectual property. The record indicates that he is qualified to opine in that area. McGavock is an accountant, as well as a vice president of an accounting firm and the leader of its intellectual property practice. (Dkt. No. 795-1 at 1.) He has a B.S. degree in Accounting from Indiana University. (Dkt. No. 795-1 at Ex. 1.) For nearly three decades, he has consulted on the valuation of intellectual property assets for a variety of purposes. (Dkt. No. 795-1 at 1.) He

co-founded and subsequently served as President and Director of a firm that his current firm acquired in 2004. McGavock teaches an intellectual property valuation course at Northwestern Law School, is a member of several professional societies, and has published several papers. (Dkt. No. 795-1 at Ex. 1.)

In preparing his expert report, McGavock met with and reviewed the expert reports of two other Caterpillar experts, Fronczak and Glew, in order to (1) confirm his understanding of Miller's intellectual property, (2) "[a]ssess the advantages or economic benefits Caterpillar could have achieved had it used" that intellectual property, (3) "[a]ssess whether or not Caterpillar could have independently obtained or replicated" that intellectual property through proper means, and (4) "[e]stimate the effort and associated costs of replicating . . . separately" that intellectual property. (*Id.* at 31.) Ultimately, McGavock opines that were Miller to establish Caterpillar's liability, the following amounts of relief (among others) would be appropriate: (1) $110,000–$150,000 for Caterpillar's unjust enrichment and a reasonable royalty, and (2) $0 for Miller's lost profits. (Dkt. No. 795-1 at 3-4). In addition, McGavock opines that Miller's damages expert failed to account for offsets and erred in calculating damages due to unjust enrichment, lost profits, and fraudulent inducement. Finally, McGavock opines on the damages that would be due to Caterpillar if Miller were found liable on Caterpillar's counterclaims.

McGavock discusses three generally accepted approaches for valuing intellectual property: the Cost Approach, which bases value "on the cost to replace the subject asset and develop an alternative asset of acceptable utility;" the Market Approach, which bases value "on comparable arm's-length transactions between involving [*sic*] similar parties and assets;" and the Income Approach, which bases value "on the income that can be attributed to the subject" asset. (*Id.* at 28.) To calculate a reasonable royalty, an expert first must select an approach. McGavock

opines that, "[b]ased on [his] review of Miller's own descriptions, [his] discussions with Caterpillar personnel and Caterpillar's technical experts, and [his] review of Caterpillar's technical experts' reports," he has concluded "that the Cost Approach should be the basis for determining the price that would be agreed upon by a willing buyer and a willing seller for the use made of Miller's Alleged Trade Secrets to [*sic*] Be Valued." (Dkt. No. 795-1 at 35, 38.) That is because "prudent parties would recognize that the only benefit to Caterpillar of 'licensing' the alleged trade secrets is the avoided costs that would have been incurred to achieve the same result without access to" those trade secrets. (*Id.* at 39.) McGavock further concludes that "a reasonable royalty should be structured as a one-time lump sum payment that would be no more than Caterpillar's costs to replicate the alleged trade secrets, which [McGavock] determined to be between $110,000 and $150,000." (*Id.*)

McGavock also considered the Market and Income Approaches in reaching his opinions. Those approaches involve the use of running royalty rates. McGavock relied on a few valuations of Miller's intellectual property. Among them was the firm's agreement in 2005 to pay Miller royalties based on certain rates, including "4% of the transaction price with respect to the Bug patents" and, also in 2005, a valuation of all of Miller's intellectual property based "upon a royalty rate of 5%." (*Id.* at 12-13.) Based on these valuations, McGavock opines, in relevant part, that subtracting a 4% royalty for Miller's patents from the 5% royalty for all of its intellectual property "leaves an effective royalty rate for all other intellectual property, including trade markets and trade secrets, etc. of 1%." (*Id.* at 39.) "This results in a total royalty of $862,200." (*Id.* at 39-40.) McGavock further opines that "[t]he royalty base may require further adjustment to account for . . . . drawings and/or engineering models for hydraulic couplers" that "Miller

supplied to Caterpillar in violation of the February 1998 Agreement." (*Id.* at 40.) The adjustment results in a royalty of $212,000. (*Id.*)

Miller's objections to McGavock's opinions fall into three categories.

First, Miller objects to various aspects of McGavock's proposed testimony as based on impermissible assumptions. Miller argues that McGavock's opinion that it lost no profits depends on a factual conclusion that Caterpillar was permitted to terminate the Supply Agreement at any time. McGavock bases this opinion on his reading of the record. But whether Caterpillar had a right to terminate the Supply Agreement is a question of law and, in any case, McGavock is not an expert on contracts. Moreover, Caterpillar's reasons for terminating the Supply Agreement are irrelevant to the claims and counterclaims at issue in this case. Thus, the Court grants Miller's motion to exclude McGavock's opinion to the extent he opines on the validity of Caterpillar's decision to terminate the agreement.

Second, Miller complains that McGavock assumes Caterpillar easily could have replicated Miller's alleged trade secrets. (*See* Dkt. No. 795 at 4.) The dispute on this point is really about whether McGavock may rely on the opinions of Caterpillar's engineering experts, Fronczak and Glew. As discussed above, the opinions of Fronczak and Glew are admissible. And an expert may rely on the opinion of another expert. *See, e.g.*, *Dura Automotive Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002) (discussing *In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992)). Thus, there was nothing inappropriate about McGavock's reliance on the time estimates provided by Caterpillar's other experts. The Court will not exclude his opinions on that ground.

Third, turning to McGavock's methodology, Miller contends that McGavock's unjust enrichment estimate is speculative because it depends on Fronczak's and Glew's opinions. The

Court already has addressed this issue—it is permissible for McGavock to rely on Glew's and Fronczak's work for his own opinions.

Next, Miller argues that McGavock's methodology for quantifying Miller's damages is unprincipled (and thus inadmissible) because it does not consider all of Miller's purported trade secrets. This boils down to a complaint that Caterpillar misconstrues Miller's trade secrets to exclude Miller's complex Pro-E models and engineering designs. Whether those models and designs constituted protectable trade secrets is a fact question for the jury, however. The Court will not exclude testimony simply because it depends on how the jury answers that question.

Miller also argues that McGavock's approach to determining a reasonable royalty is not scientific. But here, the issue is not whether McGavock's calculation is perfect but rather is it based on a methodology sufficient to ensure a reliable result. Clearly it is. McGavock has spent his career evaluating intellectual property, and his opinion applies that knowledge to the intellectual property at issue in this case. The concerns raised by Miller go to the weight, not the admissibility, of McGavock's testimony.

Finally, McGavock's opinions regarding Miller's fraudulent inducement claim and Caterpillar's breach of contract counterclaim are now irrelevant in light of the Court's ruling granting the parties' cross-motions for summary judgment on those claims. Miller's motion to exclude those opinions is therefore denied as moot.

### Miller's Motion to Exclude
### Expert Testimony of Edward Smith (Dkt. No. 788)

Caterpillar offers Edward Smith as an expert on the value of brands. Smith holds the position of Division Manager of Caterpillar's Global Brand Management. (Dkt. No. 791, Ex. B at 1.) In that role, he helps to formulate Caterpillar's corporate brand strategy. (*Id.* at 1-2.) Smith has worked for Caterpillar for 40 years. (*Id.* at 2.)

For purposes of this case, Smith has opined that a strong brand (1) "indicates success at delivering on a company's promise to its customers," (2) "enhances value to the customer," (3) "builds customer loyalty to a company's brand," and (4) "enhances value to Caterpillar." (Dkt. No. 791 at 1.) In addition, according to Smith, "[i]t is important for Caterpillar to know the strength of its brands," and "[t]he strength of Caterpillar's brand portfolio is a competitive advantage." (*Id.*) Finally, Smith has opined that "[u]p to ten percent of Caterpillar sales can be attributed to its brand reputation." (*Id.*) Caterpillar presumably intends for Smith's testimony to demonstrate the value of its brand, a necessary element of its counterclaims.

Miller's objection to Smith's testimony proceeds along two lines. First, Miller argues that Smith's opinions about Caterpillar's brand are not relevant because he does not identify or quantify any damage, and damage is the issue to which his testimony is directed. This argument is misguided, however, as "[t]he expert need not have an opinion on the ultimate question to be resolved by the trier of fact" for his testimony to be relevant. *Ford*, 215 F.3d at 718. The Court agrees with Caterpillar that Smith's testimony will assist the jury in understanding the importance and value of Caterpillar's brand and how it impacts sales of Caterpillar products. This is sufficient to establish relevance.

Second, Miller urges the Court to find that Smith's opinion is not reliable because his methodology does not satisfy the *Daubert* factors. As discussed above, however, the factors enumerated in *Daubert* should not be considered exhaustive even when a court is evaluating scientific experts. And the law allows courts additional leeway when evaluating the expertise of non-scientists such as Smith. The first six of Smith's opinions are based, at least in part, on his experience. The Court finds that Smith's experience provides a valid methodology for those

opinions and, furthermore, that his testimony will assist the jury in understanding the value of Caterpillar's brand. Thus, the Court declines to exclude those opinions.

Miller also seeks to exclude Smith's opinion that "[u]p to ten percent of Caterpillar sales can be attributed to its brand reputation." Smith initially reached this conclusion by taking a valuation of Caterpillar's brand from a third-party, Interbrand, and dividing it by Caterpillar's sales. (*See* Dkt. No. 828 at 9.) But Caterpillar has provided no basis from which the Court can conclude that Interbrand's information is reliable or the sort of information upon which experts in brand valuation would typically rely. Smith testified only that "the methodology that Interbrand uses is a proprietary methodology." (Dkt. No. 828-1 at 158:19-20.) Moreover, Caterpillar does not propose to call anyone from Interbrand as a witness and Smith declines to confirm that Interbrand's valuations are industry standard.

Furthermore, although Smith admits that there are methodologies that allow precise calculations of the impact of specific brands on sales, he does not claim ever to have used such a methodology himself. (Dkt. No. 791, Ex. A, Smith Dep. at 178:3-5.) Instead, according to his deposition testimony, Smith's methodology "was more of a thought process that [he] went through of how can [he and his colleagues] educate [their] employees on the importance of [Caterpillar's] brand." (Dkt. No. 828-1 at 158:16-18; *see also id.* at 160:18-24 ("The thought process is the methodology. . . . [A]s a Six Sigma Black Belt, you methodically think how you can solve a problem. The problem was education. . . . That was the thought process, the methodology.").) Smith testified that he utilized this methodology in the context of conveying to Caterpillar employees the importance of brand management. As he explained it, he set out to answer the question "[w]hat does [the calculation of Caterpillar's brand] really mean to me if I'm

a, you know, shop worker or a young engineer that's just looking for a new invention?" (*Id.* at 159:4-6.)

Smith himself all but acknowledges the lack of any real method behind his calculation, explaining that his "calculation of 10 percent was just a basic calculation that says how do I help communicate . . . to new employees" that Caterpillar's brand impacts its sales. (Dkt. No. 791, Ex. A at 177:12-15.) He further testified that, after initially concluding that Caterpillar's brand reputation was responsible for about ten percent of Caterpillar's sales, his calculation became "just one of those things that [he] look[s] at from time to time to see if [they're] still in the ballpark of 10 percent, just so [he] can be relatively accurate with that. For [Smith's] purposes, precise accuracy was not critical." (*Id.* at 171:12-15.)

In short, Caterpillar has not demonstrated that Smith's methodology can be considered reliable. Indeed, Smith nearly concedes as much. Accordingly, the Court grants Caterpillar's motion to preclude Smith's opinion that "[u]p to ten percent of Caterpillar sales can be attributed to its brand reputation."

## CONCLUSION

In conclusion, the Court grants Caterpillar's motion to exclude Patrikalakis's opinions on clean room design but denies the remainders of Caterpillar's motions to exclude testimony from Miller's expert witnesses. The Court also grants Miller's motions to exclude Glew's opinions on Caterpillar's termination of the Supply Agreement and Miller's disclosure of trade secrets to third parties, to exclude McGavock's opinion on the legitimacy of Caterpillar's decision to terminate the Supply Agreement, and to exclude Smith's opinion that "[u]p to ten percent of Caterpillar sales can be attributed to its brand reputation." The remainders of Miller's motions to exclude testimony from Caterpillar's expert witnesses are denied.

ENTERED:

Dated:  November 1, 2015

_____
Andrea R. Wood
United States District Judge