**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,**<br><br>                **Plaintiffs,**<br><br>        **v.**<br><br>**CATERPILLAR INC.,**<br><br>                **Defendant.** | **Civil Action No. 10-cv-3770**<br><br>**Honorable Andrea R. Wood** |
| **CATERPILLAR INC.,**<br><br>                **Counterclaim–Plaintiff,**<br><br>        **v.**<br><br>**MILLER UK LTD. AND MILLER INTERNATIONAL LTD.,**<br><br>                **Counterclaim–Defendants.** | |

**MILLER UK LTD. AND MILLER INTERNATIONAL LTD.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A
MATTER OF LAW**

After twenty-five days of trial, it is indisputable that on the evidence presented, "no rational jury could [find] for" Caterpillar on any of its ten affirmative defenses and five remaining counterclaims. *Mathur v. Bd. of Trustees of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000). This Court should, accordingly, grant judgment as a matter of law for Miller.[1]

## I. CATERPILLAR'S AFFIRMATIVE DEFENSES

Caterpillar asserts (1) unclean hands; (2) license; (3) failure to mitigate damages; (4) statute of limitations; (5) laches; (6) statute of frauds; (7) estoppel; (8) waiver; (9) preemption; and (10) standing as affirmative defenses in this matter, each of which it has the burden to prove. *See Baylor v. Thiess*, 2 Ill. App. 3d 582, 584 (2d Dist. 1971). This Court has held that four of these defenses are for the Court, not the jury.[2] (*See* Dkt. 927 at 18-19 (holding that Caterpillar's affirmative defenses of unclean hands, standing, statute of frauds, and preemption are for the Court).) Not one of these affirmative defenses survives.

### A. Unclean Hands

As this Court recognized, the defense of unclean hands applies in Illinois only to equitable claims, not legal claims. (Dkt. 927 at 18–19.) *See also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, No. 07-CV-1394, 2009 WL 1329217, at *5 (N.D. Ill. May 13, 2009). Miller has no remaining equitable claims or requests for equitable relief in this matter. (*See* Dkt. 955 at 15 n.10.) Caterpillar's unclean hands defense should, thus, be rejected as a matter of law.

---

[1] Miller has chosen to file this motion before Caterpillar rests its case because the issues raised herein are likely to affect the jury instructions, which may be settled before Caterpillar rests, and because Caterpillar has represented that its only disclosed witness who has yet to testify, Daniel McGavock, will be last to testify. Pursuant to Federal Rule of Civil Procedure 50(a)(2), "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." FED. R. CIV. P. 50(a)(2).

[2] Additionally, Miller understands Caterpillar's failure to submit an instruction to the jury regarding the statutes of limitations or to include either the statutes of limitations or laches defenses on its proposed verdict form to concede that these affirmative defenses are either waived or not for the jury.

## B.    License/No Restriction on Use

Caterpillar claims that it was granted a license to or was allowed to use Miller's confidential information in a manner contrary to the express terms of the 1999 Supply Agreement in three ways:  (1) Caterpillar could use any "improvements, modifications, and derivatives of Caterpillar confidential information" per the terms of the February 1998 agreement between the parties (*see* Ex. 1, MTX0030); (2) Caterpillar could, after September 20, 2000, use any information supplied by Miller under the terms of the September 1998 agreement between the parties (*see* Ex. 2, MTX0031); and (3) Caterpillar could use any technical information supplied by Miller under the terms of Caterpillar's purchase orders.  (Dkt. 569 at 48.)  Not one of these theories is supported by the evidence in this case.

*First*, any putative license to use Miller's confidential information under the February 1998 Agreement was superseded by the 1999 Supply Agreement.  This Court already ruled that, per the 1999 Supply Agreement's integration clause, "all prior agreements between the parties on the subjects of the Supply Agreement were superseded by that agreement."  (Dkt. 871 at 12; *see also id.* at 8.)  This Court further ruled that the 1999 Supply Agreement limited Caterpillar's use of Miller's confidential information "to actions that served the purposes of the agreement" (*id.* at 7-8), which means that Caterpillar did not, as it claims, enjoy a license to "use, without restriction" Miller's confidential information.  (*See* Dkt. 569 at 48.)

Furthermore, Miller and Caterpillar witnesses have consistently testified that Miller's Bug coupler *was not* an improvement to, modification of, or derivative of Caterpillar's confidential information.  The evidence at trial is clear that Caterpillar did not perform any design work on the Bug coupler itself.  (*E.g.*, Tr. at 1428:9-15 (Keith Miller); Tr. at 1753:12–20, 1754:4–6 (Steve Ferguson); Tr. at 2636:2–4 (Gary Miller); Tr. at 2705:10-18 (Dr. Nick Patrikalakis).)  Every witness who has testified on this issue has confirmed that the only

2

information provided by Caterpillar was stick and bucket information for Caterpillar machines—information necessary to fit Miller's coupler to Caterpillar's excavators and buckets—and digging loads for purposes of stress testing. Steve Ferguson, for example, testified, the information given by Caterpillar was used to "ensure the coupler fitted correctly and there's no interference." (Tr. at 1750:13–15; *see also* Tr. at 1690:13–15.) Robert Evans, Caterpillar's only testifying witness who sent information to Miller, confirmed that he sent only dimensional information relating to Caterpillar machine sticks and linkages, buckets, and other work tools. (Tr. 4010:14-24, 4045:2-4046:16.) And Gary Miller similarly testified that the information was merely "connection information." (Tr. at 2393:8–21; Tr. at 2394:19–21.) Indeed, Gary Miller testified that Caterpillar's information was used to "check" that Miller's design satisfied Caterpillar's needs, but he expressly disavowed that Miller's Bug coupler in any way improved upon, modified, or "deriv[ed]" from that information. (Tr. at 2515:13-2516:1.) Caterpillar has not introduced any evidence such that a reasonable jury could find otherwise.

*Second*, Caterpillar's argument that it was granted a license under the September 1998 Agreement is not supported by the evidence or valid as a matter of law. The September 1998 agreement covered Miller's information "to the extent disclosed in [its] pending patent application" on its latching device. (Ex. 2, MTX0031.) The witnesses at trial testified consistently that Miller's Pro-E models contain dimensional information that was not disclosed in Miller's patents (*e.g.*, Tr. at 2410:9-22 (Gary Miller)), and no Pro-E models were disclosed in connection with this or any other of Miller's patents. (*E.g.*, Tr. at 1407:17-19 (Keith Miller); Tr. at 2410:6-8 (Gary Miller).) More importantly, any license to use Miller's confidential information granted by the September 1998 agreement was superseded by the 1999 Supply Agreement for the reasons already discussed. (*See* Dkt. 871 at 7-8, 12.) And, of course,

Caterpillar did not begin designing its own coupler for many years after the execution of the 1999 Supply Agreement. Even if the September 1998 agreement granted Caterpillar a right to use Miller's confidential information at issue here, the 1999 Supply Agreement curtailed that right to use for purposes of effectuating the Supply Agreement only. (*See id.*; Ex. 3, MTX0001 at ¶ 17.)

*Finally*, there is no evidence to support Caterpillar's assertion that its purchase orders granted it a license to use Miller's confidential information without restriction. The only purchase order in evidence is the one attached to the 1999 Supply Agreement. (Ex. 3, MTX0001 at 15.) That purchase order contains no language that either explicitly or implicitly confers upon Caterpillar a right to use Miller's technical information. Moreover, the Supply Agreement states explicitly that in the event of a conflict between a purchase order and the Supply Agreement, "the terms and conditions of this Agreement shall prevail." (*Id.* at ¶ 2(b).) Caterpillar's affirmative defense of license/no restriction on use thus fails as a matter of law.

### C.      Failure to Mitigate Damages

Caterpillar asserts as an affirmative defense that Miller's "claims are precluded and/or limited" by its putative failure to mitigate damages. (Dkt. 569 at 49.) But Caterpillar introduced no evidence by which a reasonable jury could find that Miller "failed to exercise reasonable diligence and ordinary care in attempting to minimize the damages after injury [was] inflicted." *See Ner Tamid Congregation of North Town v. Krivoruchko*, 638 F. Supp. 2d 913, 920. In fact, the evidence at trial establishes the opposite. Gary Miller, for example, testified that when Miller learned that Caterpillar was terminating their relationship, Miller developed "a plan to sell [Miller's] couplers in North America." (Tr. at 2457:3-5, 2457:8-18; *see also* Tr. at 2561:22-2562:4.) Keith Miller similarly testified that in the aftermath of Caterpillar terminating the parties' relationship and releasing the Center-Lock coupler, Miller assessed its "opportunity to

4

sell product in the North American market" and "move forward." (Tr. at 1014:23-1015:3.) Indeed, even questioning by Caterpillar's own counsel of Keith Miller confirmed that Miller made reasonable efforts to mitigate Caterpillar's misappropriation and the loss of Caterpillar's business. (Tr. at 1221:14-1222:8.) To that end, after losing its business with Caterpillar, Miller formed partnerships with both Miller/Baird and Paladin as distributors for its products in the United States. (Tr. at 1258:9-12; 2459:15-17; 3654:23-3655:14.) As Miller's damages expert, Louis Dudney, testified, a review of Miller's sales between 2009 and 2015 confirms that "even though Miller lost its relationship with Caterpillar, . . . Miller obviously then turned to an attempted to basically mitigate its damage . . . by selling to other customers in principally North America," which he factored into his assessment of Miller's damages. (Tr. at 3596:23-3598:7.)

Furthermore, although Miller was not required to incur "undue risk or burden" to mitigate its damages, *Krivoruchko*, 638 F. Supp. 2d at 920, it went to great lengths to do so. Chris Parkin and Jacqui Miller testified that Miller cut 75 percent of its work force, reduced the pay of its remaining staff by 20 percent, and assumed $15 million in debt to keep the business in existence and generate future sales. (Tr. at 3269:19-25, 3272:15-17 (Chris Parkin); Tr. at 3380:12-23 (Jacqui Miller).) There is no evidence that Miller did anything other than struggle mightily to mitigate the loss of Caterpillar's business during the almost concurrent global recession. (Tr. at 3267:7-19.) No reasonable jury could properly find that Miller failed to mitigate its damage or that Mr. Dudney's damages calculation did not account for Miller's successful mitigations efforts.[3]

---

[3] Although Caterpillar has argued at trial that Miller's management and performance contributed to a lack of success in combatting Caterpillar's misappropriation (*e.g.*, Tr. at 3307:25-3310:4), the law is clear that Caterpillar may not advance a theory of mitigation that "is contrary to the basic principles that a claim of failure to mitigate damages is not a basis for hypercritical examination of a plaintiff's conduct," *Krivoruchko*, 638 F. Supp. 2d at 922, and, regardless, a putative *lack of success* in mitigating damages is not evidence that Miller "failed to exercise reasonable diligence and ordinary care *in attempting to minimize* the damages after injury [was] inflicted," *see id.* at 920 (emphasis added).

### D.     Statute of Limitations

Caterpillar asserts as an affirmative defense that Miller's claims for breach of contract and trade secret misappropriation were barred by the applicable statutes of limitation.  (Dkt. 569 at 49.)  Miller first filed its claims for breach of contract and trade secret misappropriation on June 17, 2010 (Dkt. 1), and there is no evidence to support a finding that Miller did not file its claims within the limitations period for either claim.

The statute of limitations for Miller's claim for breach of contract is 10 years from the time the cause of action accrued.  *See, e.g., King v. Ashbrook*, 313 Ill. App. 3d 1040, 1043 (4th Dist. 2000) (citing 735 ILCS 5/13-206); *Indiana Ins. Co. v. Machon & Machon, Inc.*, 324 Ill. App. 3d 300, 303 (1st Dist. 2001) ("For contract actions . . . the cause of action ordinarily accrues at the time of the breach of contract . . . .").  The statute of limitations for Miller's claim for trade secret misappropriation under the Illinois Trade Secrets Act is "five years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  765 ILCS 1065/7.  Caterpillar did not begin designing the Center-Lock coupler until the fall of 2005, which is the earliest date at which Miller's confidential models, designs, and drawings for the Bug coupler were used by Caterpillar and, even if not kept secret, the earliest that such use could have been discovered.  (Tr. at 1880:9-18 (Oswald); Tr. at 2931:13-15 (Robl); JTX0002 at 2 (Stefek).)  Miller, thus, unquestionably filed its claims within the statutes of limitations by filing in June 2010.

Moreover, the evidence at trial also establishes that Caterpillar took steps to conceal the development of the Center-Lock coupler from Miller.  Caterpillar viewed its development of the Center-Lock coupler as part of its "confidential exit strategy" from its relationship with Miller. (Ex.4, MTX0161 at 6.)  As late as 2007, Caterpillar formed a risk mitigation team to prevent Miller from learning about its efforts.  (*E.g.*, Tr. at 1924:21-24; 1932:12-1933:12; *see also* Ex. 5,

6

MTX0013 at 4.)  There is no question that Miller's June 2010 filing of its claim for trade secret misappropriation fell within the 10-year statute of limitations for breach of contract and five years of the time that misappropriation, by the exercise of reasonable diligence, should have been discovered."  *See* 765 ILCS 1065/7.

### E. Laches

Caterpillar asserts that Miller's claims are barred by its affirmative defense of laches. (Dkt. 569 at 49-50.)  But where, as here, a claim seeks only monetary relief, the statute of limitations, not laches, controls.  *Cannon v. Univ. of Health Sciences/The Chicago Med. School*, 710 F.2d 351, 358–59 (7th Cir. 1983) (recognizing "the familiar rule that laches do not apply to an action seeking purely legal relief").[4]  As Miller no longer seeks injunctive relief as a remedy for any of its claims (*see* Dkt. 955 at 15 n.10), judgment should be entered against Caterpillar on this affirmative defense as a matter of law.

Caterpillar has failed to prove its burden even if laches could apply as an affirmative defense to Miller's damages claims.[5]  Caterpillar cannot prevail on its affirmative defense of laches unless it proves a lack of diligence by Miller in asserting its claims and prejudice to Caterpillar as a result.  *Tully v. States*, 574 N.E.2d 659, 662 (Ill. 1991.)  There is no evidence that would allow a reasonable jury to find for Caterpillar.  Miller did not learn that Caterpillar used its confidential and trade secret information until at least 2008, when Caterpillar notified Miller of its intention to terminate their relationship and revealed its plans to release the Center-Lock coupler.  (*See* Ex. 6, MTX0473.)  In the intervening time between Miller's notice of termination

---

[4]  Caterpillar recognizes that laches applies only to equitable claims, inserting in its proposed jury instructions an introductory statement that makes clear that this defense is presented only "should Miller make" a request for injunctive relief.  (Dkt. 898 at 92.)

[5]  Miller recognizes that there is conflicting authority from Illinois Courts on this point.  *Valdovinos v. Tomita*, 394 Ill. App. 3d 14, 18 (2009) ("There is still disagreement, however, as to whether *laches* is an appropriate defense to suits only seeking monetary damages. . . .").

and the commencement of its lawsuit in 2010, Miller repeatedly informed Caterpillar of the basis

of its allegations in the hopes of avoiding litigation without meaningful response from

Caterpillar.  (*See, e.g.*, Ex. 7, MTX0021; *see also infra* Section II.B.)  Given the short time

period in between Miller's discovery and its lawsuit, Miller's efforts to put Caterpillar on notice

during that time, and Caterpillar's own efforts to delay Miller's discovery of the Center-Lock

coupler, there can be no credible argument that Miller did not exercise diligence in bringing its

claims.  *See O'Brien v. Myers*, 281 Ill. App. 3d 832, 839 (Ill. App. 1996).  Nor is there any

evidence that Caterpillar suffered prejudice, as it claims, "by going ahead with its coupler . . .

and investing money and other resources in manufacturing such products."  (Dkt. 569 at 50.)

Caterpillar's decision to continue the Center-Lock coupler's production over Miller's warnings

between 2008 and 2010 preclude any argument that Caterpillar suffered prejudice.  *Rogers v.

Barton*, 386 Ill. 244, 254 (1944) ("[I]t is only when by delay or neglect to assert a right the

adverse party is lulled into doing that which he would not have done or into omitting to do that

which he would have done . . . had the right been properly asserted that the defense of *laches* will

be considered.").  The court should dismiss this affirmative defense as a matter of law.

### F.      Statute of Frauds

Caterpillar raises the statute of frauds as an affirmative defense.  (*See* Dkt. 569 at 50.)

The statute of frauds is inapplicable to this case as a matter of law because Miller does not allege

any claims seeking to enforce an oral agreement, and this Court has ruled that no oral agreement

in this case is subject to the statute of frauds.  (*See* Dkt. 927 at 19.)

Miller offered evidence at trial that Miller and Caterpillar orally agreed to protect as

confidential information shared by both parties after August of 1998.  This agreement evidences

that Miller took reasonable precautions to protect its trade secrets despite the fact that the Supply

Agreement between the parties was not formally executed until March of 1999.  Miller has not

asserted that Caterpillar breached the oral agreement between them, nor has it otherwise sought to enforce rights granted to it under the oral agreement. Caterpillar's misuse did not begin until 2003 or later—long after the Supply Agreement was signed. (*See* Ex. 8, MTX0014.) The statute of frauds, which governs whether certain oral agreements are *enforceable*, is, therefore, inapplicable. *See* 810 ILCS 5/2-201(1); 740 ILCS 80/1.

This affirmative defense should also be rejected because it does not apply to the oral agreement on confidentiality. The statute of frauds applies only to contracts for the sale of goods for a price over $500, 810 ILCS 5/2-201(1), or agreements that are not to be performed within a year from their making, *see* 740 ILCS 80/1. The August 1998 oral agreement did not relate to the sale of couplers or any other product. And it certainly was performed within the year. The parties agreed to guarantee the confidentiality of each other's information exchanged after August of 1998 and until the 1999 Supply Agreement was formally executed in March 1999. (Tr. at 792:2-19, 794:13–15, 819:25–821:9 (Keith Miller); Tr. at 2376:3–2376:21 (Gary Miller).)

### G.    Estoppel

Caterpillar asserts as an affirmative defense that Miller is estopped from claiming that information disclosed to Caterpillar was confidential or a trade secret. (Dkt. 569 at 50.) Caterpillar, however, has not introduced any evidence that would allow the jury to conclude that it has met its burden of proof on its estoppel theory.[6] Caterpillar's claim that it "justifiably relied" on "contractual promises" made in the February 1998 and September 1998 agreements fails as a matter of law. (*See* Dkt. 569 at 50.) This Court has ruled that both of these earlier

---

[6]    Caterpillar must prove by clear and convincing evidence that (1) Miller misrepresented or concealed material facts, (2) Miller knew at the time its representations were made that the representations were untrue, (3) Caterpillar did not know the representations were false when they were made and when Caterpillar acted upon them, (4) Miller intended or reasonably expected the representations to be acted upon by the Caterpillar, (5) Caterpillar reasonably relied upon the representations in good faith to its detriment; and (6) Caterpillar has been prejudiced by its reliance on Miller's representations. *In re Scarlett Z. -D.*, 28 N.E.3d 776, 784–85 (Ill. 2015).

agreements were superseded by the 1999 Supply Agreement.  (Dkt. 871 at 12–13.)  *See supra* Section I.B.  This Court also held that the Supply Agreement granted protection to Miller's confidential information and limited Caterpillar's use of it to purposes effectuating the Supply Agreement.  *See supra* Part I.B.  Caterpillar, therefore, may not argue that it justifiably relied on prior contractual promises regarding the treatment of Miller's confidential information.

To the extent that Caterpillar invokes the 1998 agreements to argue that it justifiably relied on Miller's supposed representations that information shared with Caterpillar was not confidential, assuming *arguendo* that Miller ever made any such representations, there is no evidence in the record that supports the second and fourth elements of Caterpillar's estoppel defense—that Miller (2) knew it was misrepresenting or concealing any material fact from Caterpillar related to the confidentiality of Miller's information or (4) intended or reasonably expected that Caterpillar would rely on any misrepresentation or concealment of any material fact related to the trade secrets.

## H.      Waiver

Caterpillar's theory underlying its affirmative defense of waiver has shifted.  In its Answer, Caterpillar asserted that Miller waived any claim that its information was confidential or a trade secret (1) to the extent it disclosed to Caterpillar any confidential or proprietary information relating to the scoop bucket; or (2) to the extent it asserts rights to improvements, modifications, or derivatives of Caterpillar confidential information.  (Dkt. 569 at 51.)  In its proposed jury instructions, Caterpillar claims that Miller waived any claim that its information was confidential or proprietary or a trade secret "by virtue of" the 1998 agreements and Caterpillar's purchase orders.  Waiver under either formulation should be rejected.  As this Court has recognized, no claims relating to Miller's scoop buckets remain in this case (Dkt. 927 at 4), and Miller has *never* claimed that its designs, models, or drawings for the Bug coupler were

10

improvements, modifications, or derivatives of Caterpillar's confidential information.  (*See, e.g.*, Dkt. 564 at 19-21.)  To the contrary, that claim is one of *Caterpillar's* invention (*see, e.g.*, Dkt. 938 at 21; Dkt. 955 at 9-11), and, for the reasons set forth above, is defeated by the express terms of the Supply Agreement and the evidence.  *See supra* Section I.B.  The Court should not permit Caterpillar to recast *its* attack on Miller's ownership of its trade secrets as an affirmative defense that Miller waived its claims.  Furthermore, for the reasons that Caterpillar's affirmative defense of license fails, Caterpillar's reformulated waiver defense fails, as well.  *See supra* Section I.B.

### I.        Preemption

Caterpillar challenged Miller's claims for fraudulent inducement and unjust enrichment as preempted by the Illinois Trade Secret Act.  (*See* Dkt. 569 at 51.)  Neither of these claims remains in this case.  (Dkt. 927 at 19.)  The Court should reject this affirmative defense as moot.

### J.        Standing

Caterpillar raises as an affirmative defense Miller International's standing to sue.  (*See* Dkt. 569 at 51.)  For the reasons set forth in Miller's Response to Caterpillar's Motion for Judgment as a Matter of Law, both Miller International and Miller UK have standing to sue Caterpillar for breach of contract and trade secret misappropriation, and Caterpillar's affirmative defense of standing must be rejected by this Court.  (*See* Dkt. 955 at 23-26.)

## II.        CATERPILLAR'S COUNTERCLAIMS

Caterpillar has failed to satisfy its burden to prove the elements of its counterclaims for commercial disparagement; commercial disparagement under statute; consumer fraud; defamation; and false advertising under the Lanham Act.

### A. Caterpillar Failed to Establish that Miller's Statements in Its January 2011 Package were False.

Each of Caterpillar's remaining counterclaims demands that Caterpillar establish by a preponderance of the evidence that Miller's statements in its January 2011 package were false.[7] (*See* Ex. 9, CTX0151.)  But Caterpillar can point to no statement in Miller's package for which it has satisfied that element of its burden.  Indeed, every witness to testify at trial, as well as Caterpillar's own documents, establish that Miller's statements in its January 2011 package were true, and no reasonable juror could find to the contrary.

Miller's package alerted Caterpillar dealers that the Center-Lock coupler created a safety risk of dropped attachments because it did not have an independent mechanical back-up system to prevent that risk in the event of a hydraulic malfunction or a loss of engagement forces.  (Ex. 9, CTX0151.)  Miller was correct.  Troy Robl, one of the two designers of the Center-Lock coupler, admitted that the hydraulics used with the Bug coupler would not work on the Center-Lock coupler, and if someone had the Bug hydraulics on a Center-Lock coupler, the coupler could drop attachments.  (Tr. at 3038:17-24.)  Robl also agreed that having the incorrect hydraulics on the coupler was a "significant safety issue" and that this error could kill someone if

---

[7]     Caterpillar's claim for commercial disparagement  requires it to show "that [Miller] made false and demeaning statements regarding the quality of [its] goods and services."  *See Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 396 (1st Dist. 1995).  Its claim for commercial disparagement under statute requires Caterpillar to prove that Miller "disparage[d] [its] goods, services, or business . . . by false or misleading representation of fact" or "engage[d] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  *See* 815 ILCS § 510/2(a)(8), (12).  Its claim for consumer fraud under statute requires Caterpillar to prove "a deceptive act or practice by [Miller]," *see De Bouse v. Bayer*, 235 Ill. 2d 544, 550 (Ill. 2009); 815 ILCS § 505/2, which Caterpillar pleads as "false, misleading, and disparaging" statements (*see* Dkt. 569, Supplemental Counterclaims ¶¶ 51-59).  Its claim for defamation requires that Caterpillar establish that "[Miller] made a false statement concerning [it]."  *See Krasinski v. United Parcel Serv., Inc.*, 124 Ill. 2d. 483, 490 (1988).  And its claim for false advertising pursuant to the false or deceptive advertising prong of Section 43(a) of the Lanham Act demands that Caterpillar demonstrate "(1) a false statement of fact by [Miller] in a commercial advertisement about its own or [Caterpillar's] product."  *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); 15 U.S.C. § 1125(a).

the Center-Lock coupler opened at the wrong time or place.[8]  (Tr. at 3038:25-3039:9.)  In fact,

Robl admitted that he was personally concerned that this was a real risk.  (Tr. at 3072:8-12.)

Caterpillar has asserted that it released a putative fix for the Center-Lock coupler's

hydraulic control kit.  (*E.g.*, Tr. 1232:20-23; Ex. 10, CTX0427 at 2.)  Troy Robl admitted that

even with this "fix," the Center-Lock coupler could still release attachments in certain positions.

(Tr. at 3065:19-3066:15 ("Yeah.  If you took another step and then you reach out to the cylinder,

so now the coupler rotates back around this way, then you can drop the bucket.").)  Moreover,

Caterpillar's own documents establish that, even after this "fix" was released, *Caterpillar* was

concerned that certain Center-Lock couplers were still receiving the incorrect hydraulic kit,

which Caterpillar personnel identified as a "HUGE PROBLEM" and "**a serious issue that**

**prohibits the coupler from operating correctly**."  (Ex. 11, MTX0022 at 3, 8 (emphasis in

original); *see also* Ex. 12, MTX0182 at 1.)  One of Caterpillar's own dealers even suggested that

Miller should be thanked for calling this issue to Caterpillar's attention.  (Ex. 13, MTX0132 at

2.)

Caterpillar dealers also reported multiple incidents of the Center-Lock coupler dropping

work tools well into 2011, after Miller sent its letter to Caterpillar's dealers.  (*See, e.g.*, Ex. 13,

MTX0132 at 132 (February 2010 notice that for two Center-Lock couplers sold, "the cause of

the Center-Lock Coupler not having the fail-safe that prevents the release of the bucket *even*

*when the bucket is in unlock mode* is that the incorrect QC hydraulic kit was installed."

(emphasis in original)); Ex. 14, MTX0199 at 2 (April 2011 notice of another "detachment

incident"); Ex. 15, MTX0133 at 4 (April 2011 notice of a "5th reported incident of a similar

failure" in which a "hammer ha[d] fallen off the machine with no operator error," which was

---

[8]    Trent Stefek, the other engineer who designed the Center-Lock coupler, also agreed that a Center-Lock coupler
       inadvertently dropping a work tool would be a serious safety issue.  (Tr. at 4168:22-4169:1.)

forwarded to the attention of Rick Oswald by David Koch "Urgent Safety Issue" in the email subject-line); Ex. 16, MTX0153 at 1 (May 2011 incident report detailing the "uncontrolled release of the bucket" that "allowed it to fall off and onto the ground").) Indeed, at least one Caterpillar dealer flagged the very same concerns that Miller raised—that a bucket could unlock with the Center-Lock coupler because it did not have the Bug coupler's "blocking bar to prevent movement until the bucket is curled under" in the event of a hydraulic failure. (Ex. 17, MTX0131 at 3-4 (April 2010 email from Ransome Cat).)

Rick Oswald admitted receiving reports that the Center-Lock coupler "could uncouple the bucket" (Tr. at 2323:19-2324:5), as well as several reports that such uncoupling had occurred (Tr. at 2324:17-23; *see also, e.g.*, Ex. 18, MTX0152 at 2, Ex. 19, MTX0154 at 1). He also admitted that when a solenoid valve fails on the Center-Lock coupler, it could cause the coupler to either drop or swing a bucket, and thereby admitted that Miller *was right*. (Tr. 2328:6-15; *see* Ex. 18, MTX0152 at 2 (September 2010 report of "another [solenoid valve] screen failure," which "in turn created a Coupler failure (releasing a bucket).").) In short, Miller's January 2011 statements that the Center-Lock coupler could experience dropped attachments were true, and no reasonable jury could find otherwise. Miller is, therefore, entitled to judgment as a matter of law on Caterpillar's counterclaims.

### B. Caterpillar Failed to Establish that Miller Abused Its Qualified Privilege to Make the Statements at Issue.

Even if Miller's statements in its January 2011 package were not true, this Court determined that Miller's statements in its January 2011 package were protected by a qualified privilege (Dkt. 871 at 21-23), which Caterpillar has failed to prove that Miller abused. *See Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24 (1993); *Turner v. Fletcher*, 302 Ill. App. 3d 1051, 1056 (4th Dist. 1999). To defeat Miller's qualified privilege,

Caterpillar was required prove that Miller had "a direct intention to injure" it or acted with "a reckless disregard of [Caterpillar's] rights and of the consequences that may result to [it]" by making the statements in its January 2011 package. *See Kuwik*, 156 Ill. 2d at 30. No reasonable jury could find that Caterpillar has satisfied this burden.

Miller, like Caterpillar's own personnel, was concerned that the Center-Lock coupler lacked a mechanical back-up system to prevent it from dropping attachments. (*E.g.*, Tr. at 2461:16-21 (Gary Miller); Tr. at 3386:10-16 (Jacqui Miller); Ex. 9, CTX0151; *see also* Tr. 3036:21-3037:3 (Robl); Ex. 20, MTX0127 at 8 ("Having a type of mechanical locking (blocking) device integral to the fully automatic unlocking/locking process, remains a CCR and is high on the VOC list.").) Gary and Jacqui Miller testified that Miller believed that the Center-Lock coupler would still drop a bucket in certain positions even with the adjustments Caterpillar made.[9] (Tr. at 2463:6-2464:15; 2644:6-2645:1 (Gary Miller); 3397:4-9 (Jacqui Miller).) In addition to conducting its own tests to assess the Center-Lock coupler's safety risks (*e.g.*, Tr. at 991:24-992:4 (Keith Miller); Tr. at 2457:25-2458:2 (Gary Miller)), Miller hired Laidler Certification to independently test the Center-Lock coupler (*e.g.*, Tr. at 978:20-979:3 (Keith Miller), Tr. at 2460:18-23 (Gary Miller); Ex. 21, JTX009 at 3-4). Laidler is appointed by the UK Government and recognized in Europe as a Notified Body for Machinery and EMC Directives, which means that it has no ties to any equipment manufacturer or supplier and is independent in its examinations. (Ex. 22, CTX0450 at 3; Ex. 21. JTX009 at 61.) Laidler issued its report in November 2009, in which it found that Caterpillar's Center-Lock coupler was "not fit for purposes in that it does not comply with the safety requirements of the machinery directive" and "d[id] not meet the basic safety requirements of the applicable EN Standard EN474-1." (Tr at

---

[9]     Troy Robl admitted that Gary Miller's understanding was, in fact, correct. (Tr. at 3065:19-3066:15.)

984:3-7, 990:24-991:6; Ex. 23, MTX0025 at 12.)  Laidler's independent testing thus confirmed Miller's concerns about the Center-Lock coupler.  Mr. William Raine, the Laidler employee who oversaw the test, testified forcefully and unequivocally that the Miller report accurately reflected his firm's independent conclusions.[10]  (*E.g.*, Ex. 21, JTX009 at 65-67.)

Any conclusion of malice or reckless disregard is also defeated by Miller's repeated and rejected efforts to get Caterpillar's attention before it went public with its concerns.  Keith Miller testified that that he raised the Center-Lock coupler's potential safety issues with Caterpillar's Jim Tevebaugh during a breakfast meeting in 2009, telling him that the Center-Lock coupler was "dangerous" and "should not be sold in the marketplace."  (Tr. at 964:5-9, 22-24.)  He sent Tevebaugh a letter in October 2009, in which he reiterated that the Center-Lock coupler was "fundamentally dangerous" and "unsafe" because it did not have an independent backup system to prevent the risk that the Center-Lock coupler would drop attachments and likely did not comply with EN474.  (Tr. at 965:9-15, 966:21-969:8; Ex. 24, MTX0558.)  In response, Keith Miller received a letter from Caterpillar's attorneys on November 11, 2009, in which they dismissed "[his] opinions and those of [his] advisors regarding the Center-Lock coupler a[s] simply unfounded" and informed him that Caterpillar viewed the matter to be resolved.[11]  (Tr. at 969:19-970:3; Ex. 7, MTX0021 at 1.)  On December 1, 2009, Keith Miller elevated his concerns to Caterpillar's CEO, Jim Owens, writing to express his worry that the Center-Lock coupler was a dangerous product and forwarding to Owens the independent testing report performed by Laidler, as well.  (Tr. at 973:11-14, 974:8-24, 975:5-12; Ex. 25, MTX0177 at 5; *see also* Tr.

---

[10]   Notably, Miller's January 2011 package disclosed reliance on both internal and independent tests.  (Ex. 9, CTX0151 at 2.)

[11]   The evidence establishes that those two lawyers made these representations to Miller without even speaking to the designers of the coupler—Robl and Stefek—or to their boss, Oswald.  (Tr. at 3027:13–15 (Robl); Tr. at 1984:7–9) (Oswald).)

2470:17-2471:10 (Gary Miller); Tr. at 3389:20-3390:7 (Jacqui Miller).) On December 17, 2009, Owens directed Keith Miller to "send all future correspondence" to the two lawyers who had dismissed his concerns in the November 11, 2009 letter. (Tr. at 975:23:976:8; Ex. 25, MTX0177 at 7.) Keith Miller followed up yet again in January 2010, directing his correspondence to Owens, Tevebaugh, and the two Caterpillar attorneys. (Tr. at 976:19-977:2; Ex. 25, MTX0177 at 3.) The result was "silent treatment."[12] (Tr. 2470:17-2471:10 (Gary Miller); Tr. at 3389:20-3390:7 (Jacqui Miller).)

Caterpillar has not offered any evidence that contradicts Miller's description of its actions, other than attempts to impugn the independence and validity of Laidler report and suggestions that Miller's January 2011 package was motivated by competition. The law is clear that a desire to compete, without more, does not defeat a qualified privilege and is, in fact, protected as privileged itself. *See Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 392 (1995) ("Under Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses . . . ."). As such, no reasonable jury could conclude that Miller had a direct intention to injure Caterpillar or acted with a reckless disregard of Caterpillar's rights by making the statements in its January 2011 package. *See Kuwik*, 156 Ill. 2d at 30. Miller is entitled to judgment as a matter of law on Caterpillar's counterclaims for commercial disparagement, commercial disparagement under statute, and defamation.

---

[12] Keith Miller testified that he also contacted regulators at OSHA and the HSE to share these concerns. (Tr. 993:16-994:3.) And Gary and Jacqui Miller testified that Miller urged the HSE to conduct its own test of the Center-Lock coupler and not to rely on Miller's assessment. (Tr. at 2474:11-17 (Gary Miller); Tr. at 3393:9-17 (Jacqui Miller).)

### C.    Caterpillar Failed to Establish Any Evidence of Damages.

1.    Caterpillar Introduced No Evidence of Actual Damages Necessary to Recover on Its Counterclaims for Commercial Disparagement, Consumer Fraud, and False Advertising.

Caterpillar's counterclaims for commercial disparagement, consumer fraud, and false advertising require that Caterpillar plead and prove actual damages in order to recover monetarily.[13]  Its commercial disparagement counterclaim requires that Caterpillar prove it suffered pecuniary losses and damage to its reputation as a result of Miller's communication. *See Unique Concepts, Inc. v. Manuel*, 669 F. Supp. 185, 190 (N.D. Ill. 1987) (holding that special damages are required to sustain a claim for commercial disparagement unless the statements at issue "accuse a businessman of outright dishonesty or reprehensible business methods in connection with his goods"); *Tunca v. Painter*,  2012 IL App (1st) 093384, ¶ 60 (defining "special damages"); *Suhadolnik v. City of Springfield*, 184 Ill. App. 3d 155, 185 (1st Dist. 1989) (dismissing a claim for commercial disparagement because the plaintiff did not plead a causal connection between the alleged statements and damages).[14]  Caterpillar's counterclaim for consumer fraud, 815 ILCS § 505/2, requires that it prove both that it suffered damages that are "calculable and measured by [its] loss," *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 913 (N.D. Ill. 2012) (citation omitted), and that Miller's putatively deceptive act "proximately caused any damages" it suffered, *De Bouse v. Bayer*, 235 Ill. 2d 544, 550 (Ill.

---

[13]    This Court ruled on summary judgment that Miller's statements in its January 2011 package, if defamatory, would constitute defamation *per se*, absolving Caterpillar of its burden to prove actual damages to establish liability.  (Dkt. 871 at 25.)  Miller respectfully suggests the evidence at trial has proven otherwise.  Given Caterpillar's concerns and those of its own dealers both before and after Miller sent its package that the Center-Lock coupler could drop attachments, Miller's statements, even if false, were not "so obviously and materially harmful to[Caterpillar] that injury to [its] reputation  may be presumed."  *See Kraff*, 273 Ill. App. 3d at 390.

[14]    Caterpillar must, at a minimum, prove that its "business . . . was adversely impacted" in order to sustain its counterclaim.  *See Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 381-82 (7th Cir. 2010) (recognizing that a product disparagement claim "seeks to protect economic interests" and concluding that no disparagement occurs absent an indication that a plaintiff's business was adversely impacted).

2009). And Caterpillar's counterclaim for false advertising, 15 U.S.C. § 1125(a), demands that Caterpillar demonstrate that it "has been or is likely to be injured as a result of [Miller's allegedly] false statement, either by direct diversion of sales from itself to [Miller] or by a loss of goodwill associated with its products." *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014) (noting that a plaintiff "must show economic or reputational injury flowing directly from the deception wrought" to prevail on a false advertising under the Lanham Act). Caterpillar has not introduced any evidence of pecuniary losses or of a loss of goodwill as a result of Miller's statements necessary to recover on these counterclaims,[15] and, thus, no reasonable jury could conclude that Caterpillar satisfied its burden.

<blockquote>2.    Caterpillar Failed to Introduce Evidence of a Likelihood of Injury Required to Obtain Injunctive Relief.</blockquote>

The only remedy available for Caterpillar's counterclaim for commercial disparagement under statute is injunctive relief. *See* 815 ILCS § 510/3. Because Caterpillar's counterclaim for

---

[15] Caterpillar's damages expert, Daniel McGavock, offered no opinion on Caterpillar's damages as a result of Miller's January 2011 package. And the only evidence at trial that attempted to quantify Caterpillar's brand value established that after Miller circulated its January 2011 package, Caterpillar's brand value *increased.* Tr. at 4771:7-4772:1.) Thus, the only arguable evidence of damages Caterpillar offered is Troy Robl and Trent Stefek's testimony that they spent 23 hours and 19 hours respectively investigating Miller's January 2011 statements. (Tr. at 3223:10-13 (Robl); Tr. at 4136:12-23 (Stefek).) While this Court, citing the Sixth Circuit's ruling in *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683 (6th Cir. 2000), recognized that costs incurred to mitigate the effect of false statements constitute evidence of damages for Lanham Act claims and extrapolated that analysis to the balance of Caterpillar's counterclaims (Dkt. 871 at 19-20), that analysis does not save Caterpillar's counterclaims. First, it is not clear that the value of Robl and Stefek's time is a cost incurred by Caterpillar. *See* Seventh Circuit Pattern Instruction 13.6.3 (identifying the "[c]ost of corrective advertising" as a recoverable damage, defining that cost as an "amount *spent*" by the plaintiff, and not including in that definition or otherwise identifying as recoverable the value of a salaried employee's time (emphasis added)). Even if it were, the false advertising analysis does not apply to Caterpillar's commercial disparagement counterclaim because only claims "for unfair competition and deceptive business practices brought under Illinois *statutes* are to be resolved according to the principles set forth under the Lanham Act." *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013) (emphasis added). Furthermore, where a plaintiff has established only mitigation costs, those damages are insufficient to entitle a plaintiff to recover anything other than those costs. *See Balance Dynamics Corp.* 204 F.3d at 690-92, 95 (recognizing that while evidence of actual consumer confusion was not necessary to recover "damage control costs," such evidence is "a prerequisite" to recover an award for lost sales, lost profits, loss of goodwill, as well as finding the plaintiff's showing insufficient to award disgorgement of the defendant's profits).

commercial disparagement under statute stems from the same facts that give rise to its claim for false advertising under the Lanham Act, the former claim "must rise or fall based on [its] Lanham Act claim." *Desmond v. Chicago Boxed Beef Distrib., Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013). Therefore, Caterpillar, to obtain injunctive relief, was required to establish that harm to its commercial interest in sales or business reputation is "impending." *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578, 581 (7th Cir. 2001). At a minimum, Caterpillar was required to offer "[p]roof of likely [customer] confusion," which is "essential" to establishing both actual and potential injury. *See First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 806 (7th Cir. 2001). Caterpillar has offered no evidence of any likely threat of harm mandatory for an injunction. No reasonable juror could conclude that Caterpillar has satisfied its burden, and the Court should, accordingly, reject this claim as a matter of law.

## III.     CONCLUSION

For the foregoing reasons, Miller's Motion for Judgment as a Matter of Law should be granted.

Submitted:  December 11, 2015

*/s/* Reed S. Oslan

Reed S. Oslan (IL 6203342)
roslan@kirkland.com
Michael P. Foradas (IL 6180229)
mforadas@kirkland.com
Justin A. Barker (IL 6274518)
jbarker@kirkland.com
Inbal Hasbani (IL 6303480)
inbal.hasbani@kirkland.com
Stacy Pepper (IL 6306726)
stacy.pepper@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: 312-862-2000
Fax: 312-862-2200

*Attorneys for Plaintiffs Miller UK Ltd. and
Miller International Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that, on December 11, 2015, a true and correct copy of **MILLER UK LTD. AND MILLER INTERNATIONAL LTD.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW** was served on all parties having made appearances in this matter via the Court's ECF Notification System.

/s/ Reed S. Oslan
*An attorney for Plaintiffs Miller UK Ltd. and*
*Miller International Ltd.*