**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MILLER UK LTD. and MILLER INTERNATIONAL LTD., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10-cv-03770 |
| CATERPILLAR INC., | ) ) | Judge Andrea R. Wood |
| Defendant. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

At the conclusion of a trial that extended for nearly eight weeks, a jury returned a verdict in favor of Plaintiff Miller UK Ltd. on its claims against Defendant Caterpillar Inc. for breach of contract and statutory trade secret misappropriation, and awarded Miller compensatory damages of $24.9 million and exemplary damages of $49.7 million on the statutory claim and $16 million on the contract claim. The jury also returned a verdict in favor of Caterpillar on its counterclaims against Miller for statutory commercial disparagement and common law defamation. Now before the Court are two post-trial motions: (1) Caterpillar's motion for judgment as a matter of law or, in the alternative, for a new trial or for remittitur of a substantial amount of the damages award (Dkt. No. 1032); and (2) Miller's motion for judgment on Caterpillar's counterclaims or for a reduction of the damage award (Dkt. No 1034). Miller's motion also seeks a clarification of the Court's judgment order to provide detail of the relationship between the jury's damages awards and the judgments in its favor. For the reasons detailed below, Caterpillar's motion is denied and Miller's motion is granted as to the requested clarification of the judgment award but otherwise denied.

# BACKGROUND

Miller's predecessor entity[1] made a coupler that allowed earthmover and excavator vehicles to attach shovels, buckets, and other attachments to their mechanical arms quickly without requiring the vehicle operator to leave its cab. That entity was party to a March 31, 1999 "Supply Agreement" with Caterpillar Inc. to manufacture a product based upon a Miller-developed coupler called "the Bug" that Caterpillar would sell under its own name. (Supply Agreement at Definitions, § (b); §§ 3(a), 3(c), Dkt. No. 667-6.) The Supply Agreement included a "Confidential Information" provision that stated in pertinent part:

> In order to accomplish the purposes of this Agreement, it is expected that each party will disclose Proprietary Information, including technical and business information, to the other; but the transfer of Proprietary Information shall not be considered a publication of such information. A party may use the Proprietary Information of the other party only for the purposes of this Agreement, and shall not disclose such Proprietary Information to any third party except pursuant to this Agreement or with the consent in writing of the other party. For the purposes of this Agreement, "Proprietary Information" shall include all confidential information and know-how, business, technical or otherwise, disclosed by a party to the other, but shall not include the information or know-how which is (i) available to the public or later becomes available to the public through no act or omission of the recipient party, or (ii) rightfully disclosed to the recipient by a person or entity not a party to this Agreement.

(*Id.* § 17(a).)

Miller brought the present action against Caterpillar, alleging that Caterpillar breached the Supply Agreement's confidentiality provisions by using proprietary information about the Bug to make its own coupler, the "Center-Lock," and then terminating the agreement. (Second Am. Compl. ¶¶ 45, 67-69, Dkt. No. 564.)[2]

---

[1] The parties do not dispute that Miller UK Ltd. was, at least initially, the successor to the rights and obligations created by agreements between its predecessor, Miller Welding Engineers, Ltd., and Caterpillar. "Miller" is used herein to refer to either entity except where a distinction between Miller entities is material.

[2] Claims and counterclaims resolved prior to trial are not detailed here.

Miller also alleged that Caterpillar's actions violated the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, which allows an aggrieved party to recover damages for "misappropriation." 765 ILCS 1065/4(a). In the provisions relevant to Miller's claims here, the statute defines misappropriation as disclosure or use of a trade secret of a person without express or implied consent by another person who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. 765 ILCS 1065/2(b). ITSA defines "trade secret" as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). ITSA permits damages including both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. 765 ILCS 1065/4(a). The statute also provides that if "willful and malicious appropriation exists," exemplary damages may be awarded in an amount not exceeding twice the compensatory damage award. 765 ILCS 1065/4(b).

In response to Miller's complaint, Caterpillar both denied liability and asserted counterclaims against Miller. In a supplemental counterclaim filed after its initial response to the original complaint, Caterpillar alleged that in January 2011, Miller sent to Caterpillar dealers a package of false, misleading, and defamatory statements about the performance and safety of the Center-Lock coupler. (Supplemental Countercl. ¶¶ 7-8, Dkt. No. 569.) Caterpillar asserted claims for damages and for injunctive relief for the allegedly false statements under the Lanham Act, 15 U.S.C. § 1125; for statutory commercial disparagement under the Illinois Deceptive Trade

Practices Act, 815 ILCS 510/3; under the Illinois Consumer Fraud Act, 815 ILCS 505/2; and under the common law of defamation and commercial disparagement.

The parties tried their claims to a jury. Over 23 days of evidence presentation, the parties together examined eleven fact witnesses and six expert witnesses, and introduced the deposition testimony of at least seven additional witnesses. The jury returned a verdict for Miller on its trade secret misappropriation and breach of contract claims. The jury had been instructed that it could award compensatory damages on the ITSA claim in an amount that reflected either the amount of profit Miller lost from the misappropriation or Caterpillar's unjust enrichment, and could award exemplary damages of not more than twice the compensatory amount. The jury had also been instructed that the measure of Miller's breach of contract damages were the profits it lost as a result of the breach. In accordance with the testimony of Miller's damages expert about the extent of the profit Caterpillar made from the misappropriation and the profit Miller lost from the breach of the Supply Agreement, the jury awarded Miller $24.9 million in compensatory damages and $49.7 million in exemplary damages on the ITSA claim and $16 million on the breach of contract claim. Because the ITSA and breach of contract claims were based upon the same conduct, the Court entered judgment only on the larger award. (Dkt. No. 1018.)

The jury returned a verdict for Caterpillar on the statutory commercial disparagement and common law defamation counterclaims; it found against Caterpillar on the Lanham Act, Illinois Consumer Fraud Act, and common law commercial disparagement claims. The jury awarded Caterpillar $1 million in damages on its defamation counterclaim.

Now before the Court are the parties' post-trial motions. Caterpillar seeks judgment on Miller's claims as a matter of law, a new trial, or remittitur of the majority of the damages award against it. Miller similarly requests a judgment in its favor on Caterpillar's counterclaims and a

reduction of the jury's damage award. Miller also asks that the judgment on its claims be modified to detail the jury's awards in its favor and their relationship to the final judgment.

## DISCUSSION

### I.      Caterpillar's Motion for Judgment as a Matter of Law

Caterpillar contends that it is entitled to judgment as a matter of law because Miller failed to present sufficient evidence to permit the jury to find that (1) the information on which Miller based its claims of breach of contract and misappropriation was confidential; (2) Caterpillar knowingly used Miller's information to design the Center-Lock coupler; and (3) Miller suffered compensable harm. For purposes of both motions for judgment as a matter of law, all reasonable inferences are drawn in favor of the non-moving party and the jury's verdict must stand unless no rational jury could have returned a verdict in its favor. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010).

#### A.      Confidentiality of the Miller Models

Caterpillar contends that any Miller information it used to design the Center-Lock coupler was not confidential and thus was not protected by the Supply Agreement or ITSA. As described above, status as "confidential information" under the agreement and as a "trade secret" under ITSA was a necessary component of Miller's claims. The information identified by Miller as its "confidential" and "trade secret" intellectual property were three-dimensional coupler models it created on computer design software known as "Pro-Engineer" or "Pro-E" and sent to Caterpillar. (Pl.'s Resp. at 1, Dkt. No. 1036.)

Caterpillar argues that the models it received were neither designated by Miller as confidential nor accompanied by any warning of any restrictions on their use. Although Miller, in response, argues that drawings it derived from the models contained confidentiality notices, it

does not identify any evidence that the models themselves contained or were accompanied by any such restriction. Caterpillar argues that this failure to identify the models as confidential precluded as a matter of law a jury finding that they were confidential information or trade secrets that could serve as the basis for Miller's contractual and statutory claims.

No provision of the Supply Agreement or ITSA imposes any requirement that protected information be marked or otherwise denoted in any specific manner, however. This Court, in ruling on the parties' summary judgment motions, commented that "[t]o the extent that Caterpillar received information that was not identified as confidential, such information does not appear to be covered by the agreement's restrictions." (Oct. 21, 2015 Op. at 8, Dkt. No. 871.) But this language merely anticipated the likely course of the parties' litigation of the issue; it did not determine any necessary method or standard of identification.

Miller asserts that all of the Pro-E models of the Bug/Pin Grabber Plus coupler that it sent to Caterpillar were confidential information and trade secrets. Miller further asserts that this confidentiality was established in the first instance by an August 1998 oral agreement between the companies. Two of Miller's three principals, Keith and Gary Miller, both testified at trial that the companies met on August 5 and 6, 1998, to confirm the parameters of Miller's provision of couplers for Caterpillar. They testified that the companies discussed sharing technical information and that Fred Grafton, a Caterpillar marketing manager, assured them that it would be okay to begin the information exchange, that everything shared would remain confidential, and that he was working on a final coupler supply agreement that would supersede any of the prior agreements between the companies. (Tr. 820-21, 2376.) Gary Miller testified that Miller shared its Bug/Pin Grabber Plus models with Caterpillar only after this oral agreement, and that

this agreement established the parties' understanding of what was confidential for purposes of the Supply Agreement and ITSA claims at issue here. (Tr. 2376-77.)

Caterpillar raises several arguments in opposition to Miller's assertion that the oral agreement established the confidentiality of the models. First, it contends that the companies were parties to a prior written agreement, signed in February 1998, in which Miller agreed that it would "not disclose to Caterpillar any confidential or proprietary information unless our two companies otherwise first agree in writing." (CTX0040.) Caterpillar construes this provision as a bar to any determination that Miller disclosures were afforded confidentiality treatment by an oral agreement. However, Illinois law allows the terms of a written contract to be modified by a subsequent oral agreement notwithstanding contractual language to the contrary. *U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 332 (7th Cir. 2009) (citing *Tadros v. Kuzmak,* 660 N.E.2d 162, 170 (Ill. App. Ct. 1995)).

Next, Caterpillar asserts that the February 1998 agreement is governed by a Uniform Commercial Code provision, 810 ILCS 5/2-209(2), that precludes oral amendment of contracts whose terms permit only written modification. But the cited provision is a subsection of UCC Article 2, whose application is limited to transactions in goods and may be extended only to contracts that are predominantly for the sale of goods. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 195 (Ill. 2002). The February 1998 agreement refers only to the exchange of confidential information and does not reference the sale of any items in any way; Caterpillar argues only that it "relates to" the purchase of couplers from Miller. (Def.'s Mem. at 6-7, Dkt. No. 1033.) It is thus not governed by the UCC Article 2 provision on which Caterpillar relies and was subject to oral modification under the Illinois common law principle noted above.

Caterpillar contends that a September 1998 "Proprietary Agreement" between the parties defeats Millers claims of confidentiality. That agreement defined "Proprietary Information" to include only items identified by Miller in writing, imposed restrictions on the treatment of such information for only a limited time, and provided that there were no restrictions on the handling of items not considered Proprietary Information. The Proprietary Agreement, by its own terms, applied only to a coupler component rather than a coupler itself, however. The agreement's preamble identifies its subject as "information about [Miller's] invention relating to a latching device for a quick coupler (Invention) to the extent disclosed in [Miller's] pending patent application on such Invention." (CTX0041.) "Proprietary Information" was limited to "written information about said Invention." This agreement cannot be construed to apply to information regarding the Miller coupler as a whole. Nor does the agreement determine the confidentiality to be afforded the coupler models or defeat Miller's claim that the August 1998 oral agreement reflected the parties' understanding about the models' confidentiality.

Caterpillar also invokes the Supply Agreement as support for its claim that the models could not have been considered confidential information. As Caterpillar correctly emphasizes, the Supply Agreement contained an integration clause providing that it superseded all prior understandings and agreements. (Supply Agreement, § 20, MTX1.) Section 3(a) of the Supply Agreement obliged Miller to give Caterpillar "all dimensions, tolerances and technical assembly information necessary for the production of Caterpillar support material" in a form compatible with either Pro-E or a second computer-design file type, IGES. At trial, Gary Miller conceded that the information in Caterpillar's Pin Grabber Plus parts manuals and instruction books would be public, and Caterpillar construes that concession to be an admission that all of the information in the models would be public and thus could not have been considered confidential. But Section

3(a)'s explicit restriction to the model information required for Caterpillar's production of support materials is inconsistent with an interpretation that all coupler details sent in models would be subject to public disclosure and thus ineligible for confidential treatment.

Citing evidence that Miller disclosed coupler models before the March 31, 1999 effective date of the Supply Agreement, Caterpillar contends that no such information could be considered confidential for purposes of that agreement. But the confidential nature of information is not destroyed by its disclosure to potential licensees to the extent necessary to negotiate and facilitate permitted uses. *Tax Track Sys. Corp. v. New Inv'r World, Inc*., 478 F.3d 783, 787 (7th Cir. 2007); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) (citing *Jones v. Ulrich,* 95 N.E.2d 113, 117 (Ill. App. Ct. 1950)).

The Supply Agreement defines "Proprietary Information" to include all information disclosed by one party to the other but excludes from that definition information that is available to the public or disclosed to the recipient by a non-party. Immediately following its acknowledgement of the parties' expectation that they will disclose Proprietary Information, the agreement explicitly provides that "the transfer of Proprietary Information shall not be considered a publication of such information." It is thus apparent that Miller's disclosure of the models to Caterpillar did not preclude as a matter of law confidential treatment under the Supply Agreement. Similarly, Miller's disclosure of the models to Caterpillar in the absence of a valid confidentiality agreement did not as a matter of law preclude their protection as trade secrets under ITSA. *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 679–80 (N.D. Ill. 1997); *Hexacomb Corp. v. GTW Enters., Inc.,* 875 F. Supp. 457, 464 (N.D. Ill. 1993).

Caterpillar next contends that Miller's coupler models cannot be considered confidential because they contained information that originated with Caterpillar, was disclosed in Miller

patents, or was readily ascertainable by examination of the product itself. But even if the individual elements of a product are in the public domain, the combination of those elements still can be a trade secret under Illinois law. *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 542 F. Supp. 2d 849, 862 (N.D. Ill. 2008); *RRK Holding Co. v. Sears, Roebuck & Co.*, No. 04 C 3944, 2007 WL 495254, at *3 (N.D. Ill. Feb. 14, 2007); *Nilssen,* 963 F. Supp. at 677; *see also Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir. 1983). The Court accordingly rejects Caterpillar's contention that the presence of non-confidential elements in Miller's models rendered the models as a whole non-confidential and also rejects its argument that Miller was required to present the jury with evidence that identified confidential and non-confidential components of each model.

In its final argument with respect to the models' confidentiality, Caterpillar contends that Miller failed to take reasonable steps to keep them confidential. Under Illinois law, confidentiality agreements will be enforced only if the plaintiff made such reasonable efforts to protect the confidential information. *Tax Track Sys. Corp,*, 478 F.3d at 787. ITSA incorporates the reasonable protection effort requirement into its definition of "trade secret." 765 ILCS § 1065/2(d).

At trial, Miller presented evidence of the general security measures surrounding its premises and computer systems. This evidence included testimony that Miller did not share its confidential information without entering into confidentiality agreements with recipients. (Testimony of G. Miller, Tr. 2433–35; Testimony of K. Miller, Tr. 838.) As discussed above, Miller also presented evidence that it did not reveal its Bug/Pin Grabber Plus models to Caterpillar before the parties orally agreed that the information it shared would be treated as confidential. Such understandings may themselves constitute reasonable security measures

sufficient to trigger confidential treatment. *Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *3–5 (N.D. Ill. Jan. 3, 2013) (citing *Gillis Associated Indus. v. Cari–All, Inc.,* 564 N.E.2d 881, 885–86 (Ill. App. Ct. 1990)). Miller also presented evidence of the existence of a mutual confidentiality understanding between the parties. Robert Evans, who was a drafter in the engineering department of Caterpillar's work tools division at the time of the start of the parties' work on the Bug/Pin Grabber Plus, worked with Miller on the project and received from Miller designs that he used to make Caterpillar's drawings for the product. (Tr. 4007 – 10.) His expectation was that when Miller shared information with him, he would keep it confidential. (Tr. 4044.)

In sum, Caterpillar has failed to demonstrate that, as a matter of law, Miller's models were not confidential, and it has also failed to show that the jury lacked sufficient evidence to find that they were confidential. The issue of the models' confidentiality affords no basis to disturb the jury's verdict in Miller's favor.

**B.    Caterpillar's Use of the Miller Models**

Caterpillar argues that, even if the Miller models were considered confidential, the jury was not presented with evidence sufficient to support a finding that Caterpillar knew or had reason to know of any restriction on their use or that the Center-Lock coupler was substantially derived from the Miller models. Since the Supply Agreement construed confidential information to be "Proprietary Information" and permitted use of Proprietary Information only for purposes of the agreement, a jury finding that the Miller models were confidential would reasonably permit a finding that Caterpillar knew or should have known that use of the models to make its own coupler was prohibited.

Caterpillar also asserts that the jury was not presented with sufficient evidence to allow it to find that it used the Miller models to a culpable degree. But Troy Robl, a Caterpillar engineer who was one of the two principal designers of the Center-Lock coupler, testified that he used Miller's Pro-E models in his design work on the Center-Lock. He also confirmed the accuracy of internal email messages documenting the company's desire to make the Center-Lock coupler "identical" to the Miller coupler. (Tr. 2931-33, 2944, 2970, 3013.) The jury also heard testimony from a Miller expert who examined the Pro-E program's audit trail of modifications to the models and confirmed that the Caterpillar models were derived from the Miller models. (Test. of Patrikalakis, Tr. 2734.) The foregoing evidence was sufficient to allow the jury to find a culpable Caterpillar use of the Miller models.

### C. Compensable Harm

Caterpillar argues that Miller failed to establish that it suffered lost profits because a different Miller entity, Miller International Ltd., was selling the Pin Grabber Plus to Caterpillar when the Center-Lock coupler was introduced.

This argument was not presented in Caterpillar's motion for judgment as a matter of law at the close of Miller's case. In that motion, Caterpillar argued that Miller UK was the party to the Supply Agreement and the owner of the intellectual property contained in the Bug/Pin Grabber Plus models. (Def.'s Directed Verdict Memo. at 23, Dkt. No. 938.) Caterpillar asserted that there was no evidence of a transfer of either Supply Agreement rights or intellectual property rights from Miller UK to Miller International and that the latter entity, then a plaintiff in this action, accordingly lacked standing to participate further. (*Id.* at 23–24.) Caterpillar's motion did not contend that there was insufficient evidence of harm to Miller UK to support an award of damages in its favor. The Court granted Caterpillar's motion for a judgment as a matter of law

against Miller International. (Tr. 5587.) In so doing, the Court noted its understanding that Caterpillar conceded that the judgment against Miller International would not impact the ultimate damage award and that the Miller entities were free to decide amongst themselves how any such award would be apportioned between them. (Tr. 5588.) Caterpillar did not object to this understanding.

A party seeking a pre-verdict judgment as a matter of law under Federal Rule of Civil Procedure 50(a) must articulate the basis on which that judgment might be rendered. *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010). Because a post-trial motion for a judgment as a matter of law under Rule 50(b) is only a renewal of the pre-verdict motion, it can be granted only on grounds advanced in the prior motion. *Id.; see also Thompson v. Mem'l Hosp. of Carbondale,* 625 F.3d 394, 407 (7th Cir. 2010). Caterpillar's failure to present in its pre-verdict motion any argument regarding the sufficiency of the evidence of damage to Miller UK prohibits consideration of that issue here.

Caterpillar's remaining argument regarding Miller's compensable harm focuses on the application of ITSA. It asserts that the statute is inapplicable to the present case, and cites *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852–54 (Ill. 2005), for the proposition that ITSA applies only if the events at issue occurred substantially and primarily in Illinois. Caterpillar notes that Miller is a nonresident entity and cites evidence that, despite the location of its own headquarters in this state, much of the work involving its relationship with Miller was centered in offices in Kansas. It asserts that on these facts, *Avery* bars ITSA's application here.

*Avery* invoked the general rule of statutory construction under Illinois law that denies extraterritorial effect to a statute unless its language appears to provide for such application. 835 N.E.2d at 852. *Avery* interpreted the Illinois Consumer Fraud Act, 815 ILCS 505, and its

construction of the intended scope of that statute found significance in a provision that defined its coverage to include "any trade or commerce directly or indirectly affecting the people of this State." 835 N.E.2d at 850 (citing 815 ILCS 505/1(f)). ITSA contains no similar language and Caterpillar cites no precedent construing it to have any geographic limitation. In contrast to the consumer fraud statute at issue in *Avery*, ITSA's "Legislative intent" provision states that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty." 765 ILCS 1065/8(b)(1). It is thus apparent that ITSA not only lacks a geographic limitation, it authorizes broad geographic application for purposes of trade secret protection that would be invalid in other contexts. Caterpillar's duty to avoid misappropriation of Miller's trade secrets cannot be considered unenforceable merely because some of its employees and Miller were located beyond the borders of Illinois.

ITSA's application here is further supported by the fact that the Supply Agreement between the parties provides that it will be governed by Illinois law—a factor that, while not dispositive, weighs in favor of application to the independent statutory claims of non-resident plaintiffs. *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 537 (7th Cir. 2011). The Court concludes that ITSA is properly applied to Miller's claims in the present matter.

## II. Caterpillar's Motion for Vacation of the Exemplary Damage Award

Caterpillar also asserts that the jury was not presented with sufficient evidence to permit it to award exemplary damages after finding for Miller on its ITSA claims.

The statute permits exemplary damages of up to twice the amount of compensatory damages in the event of a willful and malicious misappropriation. 765 ILCS 1065/4(b). A "willful and malicious misappropriation" includes an intentional misappropriation as well as a

misappropriation resulting from the conscious disregard of the rights of another. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 730 (7th Cir. 2003). Caterpillar's assertion that there was insufficient evidence to permit such damages here is based primarily upon its claim that Miller's failure to identify specific models as confidential prevented Caterpillar from knowing that it had a duty to refrain from using any of Miller's models to design its own coupler. As discussed above, however, the evidence presented at trial was sufficient to allow the jury to find that Caterpillar's employees knew that Miller's models were confidential and knowingly used those models to design the Center-Lock coupler despite their contractual obligation to use Miller's information only for development, sale, and support of the Bug/Pin Grabber Plus product.

## III.    Caterpillar's Motion for a New Trial

Caterpillar argues that certain evidentiary rulings and jury instructions were both erroneous and prejudicial, warranting a new trial.

### A.    Miller Evidence Admitted

Caterpillar asserts that multiple evidentiary rulings at trial erroneously subjected it to undue prejudice and warrant retrial. Its initial contention in this regard focuses on the admission of testimony about the August 1998 oral agreement presented by Miller as evidence of the parties' understanding that all information exchanged between them from that point forward would be treated as confidential.

Caterpillar's opening salvo challenging the admission of such testimony consists of the previously-rejected arguments that the oral agreement was precluded by the subsequent February 1998 and September 1998 written agreements between the parties. The Court adheres to its view that neither agreement precludes the relevance of the August 1998 oral agreement as a reflection

15

of the parties' understanding of their overall confidentiality obligations. Caterpillar also contends that the oral agreement was invalid because, according to Miller, the parties committed to reducing its terms to writing. Caterpillar asserts that this commitment made the agreement non-binding. Illinois law is to the contrary, however. While a preliminary agreement "subject to" a subsequent written agreement may be insufficiently definitive to be binding, an agreement that the parties contemplate memorializing in writing may be binding if the parties so intend. *Interway, Inc. v. Alagna*, 407 N.E.2d 615, 618 (Ill. App. Ct. 1980). Whether such intent was present for the August 1998 oral agreement in the present case was a question for the jury to resolve, and testimony as to that agreement was properly admitted.

Caterpillar next contends that testimony about Miller's agreements with two companies, JB Sales and RCID, was improperly admitted. The testimony presented to the jury on these subjects addressed Miller's relationships with third parties involved in development of Miller couplers, JB Sales for the Mag 7 coupler, a predecessor of the Bug; and RCID for the Bug. Miller presented evidence regarding its relationship with each company and written agreements that confirmed Miller's ownership of the intellectual property involved, despite the fact that the agreements themselves were not produced. Caterpillar argues that testimony regarding the agreements should not have been admitted because Miller failed to show sufficient details of either contract to establish the existence of a valid agreement.

Rule 1004 of the Federal Rules of Evidence does not require demonstration of that level of detail before evidence of the existence of a contract may be admitted. Rather, Rule 1004(a) requires only a showing that the original is lost or destroyed by some reason other than its proponent's bad faith. Rule 1008 provides that, upon such showing, whether the purported writing ever existed and whether the offered evidence of its content is accurate are questions for

the jury to decide. *Urban v. United States*, No. 03 C 6630, 2005 WL 1819954, at *3 (N.D. Ill. June 9, 2005). Here, Keith Miller testified to his unsuccessful efforts to locate each of the contracts in question. (Tr. 747, 952-53.) His testimony about the contracts' provisions was thus admissible; whether his testimony was accurate or believable was a question for the jury.

### B.    Caterpillar Evidence Excluded

In addition to its arguments regarding the evidence that Miller was permitted to introduce, Caterpillar asserts that it is entitled to a new trial because certain of its proffered evidence was improperly excluded.

First, Caterpillar claims that it was prejudiced by rulings barring evidence regarding problems with Miller's coupler, its value, and its product support. But a substantial amount of evidence of these issues was in fact admitted. Robert Meng, general manager of Caterpillar's work tools division for the Americas and Asia Pacific regions when the Center-Lock coupler was under development, testified that Caterpillar spent more time working with Miller on its issues than it did with all of its other suppliers combined, and elaborated on issues with bulging cylinders, castings not meeting specifications, customers not getting products on time, excessive costs, and accident risks caused by Miller's couplers. (Tr. 3799-3800, 3812-14, 3821, 3827-28.) Jacqui Miller, the third of Miller's three owners, testified at length during her cross examination about her own complaints within the company that competitors' products were better than their coupler, that they had a bad service reputation, that Caterpillar was dealing with litigation about the Bug/Pin Grabber Plus coupler, and that Miller had problems that might make Caterpillar want to replace them as a supplier. (Tr. 3416-18, 3425, 3427-28, 3457-58, 3496-97.)

Caterpillar sought to introduce additional similar evidence, including exhibits showing the two companies' communications on Caterpillar's complaints about Miller. (Dkt. No. 935.)

To the extent that the additional evidence was offered to show (1) a legitimate business purpose for its development of the Center-Lock (rather than a malicious motive); or (2) a counterpoint to any inference that the Miller coupler was a superior design and an attractive misappropriation target, this evidence was cumulative and properly excluded. Caterpillar also argues that additional detail regarding problems with the Miller coupler would have permitted it to demonstrate the extent to which it collaborated with Miller in the development and refinement of the Pin Grabber Plus coupler. But the apparent foundation for this argument is the premise that Caterpillar needed to show the reasons for its collaboration efforts to show their nature and impact. The Court finds no basis for this premise—Caterpillar was free to demonstrate its contributions to the various iterations of the Pin Grabber Plus coupler even in the absence of a detailed showing of problems that prompted those contributions.

The Court also adheres to its ruling that an exhibit offered by Caterpillar to show its internal response to Miller's accusation of misuse of its models was properly excluded as hearsay. The document was a slide presentation authored by Caterpillar engineering manager Richard Oswald in response to Miller accusations that the Center-Lock coupler improperly used Miller's confidential information. It expressed Oswald's view that various couplers were basically similar, that Miller's coupler was not novel, and that the differences between the couplers were embodied in locking mechanisms for which Miller could not claim Caterpillar infringement. (CTX1401.) Caterpillar argues that the exhibit fell outside the definition of hearsay pursuant to Rule 801(d)(1)(B) of the Federal Rules of Evidence. But under Rule 801(d)(1)(B), an out-of-court statement is excluded from the hearsay rule if (1) that statement is consistent with the declarant's trial testimony; (2) the party offering that statement did so to rebut an express or implied charge of recent fabrication or improper motive against the declarant; (3) that statement

was made before the declarant had a motive for fabrication; and (4) the declarant testifies at trial and is subject to cross-examination. *United States v. Foster*, 652 F.3d 776, 787 (7th Cir. 2011). Oswald's presentation was created in response to Miller's anti-Center-Lock commentary, not before the existence of a motive for fabrication. The Rule 801(d)(1)(B) exception was thus inapplicable and the Oswald exhibit was hearsay.

Similarly, the Court finds no error in the exclusion of Caterpillar's proffered video demonstration of a coordinate measurement machine to show the possibility of reverse engineering a coupler by automated tracing of its dimensions. The video was not an actual demonstration of steps that Caterpillar took to discover the dimensions of the Miller coupler at the time it designed the Center-Lock; it was instead created in preparation for litigation as a response to Miller's expert testimony but was not disclosed as an expert opinion. (Tr. 492-94, 500-01.) The video was properly excluded as an opinion that had not been timely disclosed.

### C.     Jury Instructions

Caterpillar argues that the giving and the refusal of certain instructions was error that requires a new trial. A court considering a challenge to jury instructions reviews the instructions as a whole to determine if they adequately informed the jury of the applicable law. *Phoenix Bond & Indem. Co. v. Bridge*, 911 F. Supp. 2d 661, 677 (N.D. Ill. 2012). The court examines whether the instructions, taken as a whole, misstated or failed to fully state the law; if so, the court must then determine whether the instructions confused or misled the jury, thereby causing prejudice. *Id.* (citing *Aldridge v. Forest River, Inc.,* 635 F.3d 870, 876 (7th Cir. 2011); *Van Bumble v. Wal–Mart Stores, Inc.,* 407 F.3d 823, 825–26 (7th Cir. 2005)).

Caterpillar's first argument in this vein is that the jury received an improper instruction on the standard for an award of exemplary damages. The jury was instructed in accordance with Illinois law as stated in *Learning Curve Toys,* 342 F.3d at 730:

> You may award Miller exemplary damages only if Miller demonstrates that Caterpillar's acts giving rise to liability for misappropriation of trade secrets were willful and malicious. Caterpillar's acts were willful and malicious if Caterpillar either intentionally misappropriated Miller's trade secrets or if Caterpillar's misappropriation resulted from Caterpillar's conscious disregard of Miller's rights.

Caterpillar's reliance on *Micro Data Base Systems v. Dharma Systems,* 148 F.3d 649, 654 (7th Cir. 1998), as support for a different instruction is unpersuasive because that precedent interprets the laws of Indiana and New Hampshire, not Illinois. Caterpillar also argues that ITSA violations, by definition, are intentional acts and that the instruction given authorizes exemplary damages for merely intentional acts, thereby improperly failing to distinguish the aggravated conduct warranting such damages from any other ITSA violation. But ITSA's provisions permit a finding of misappropriation even in the absence of knowledge or intent: its terms include prohibition of "disclosure or use" of a trade secret without consent by a person who knew "or had reason to know" of a duty to maintain its secrecy or limit its use. 765 ILCS 1065/2. The given instruction followed authoritative Seventh Circuit interpretation of Illinois law and did not eliminate the distinction between threshold ITSA violations and those sufficiently aggravated to trigger exemplary damages.

Caterpillar next contends that the failure to give its proposed instructions on the definition of trade secrets was error requiring a new trial. It concedes that the instruction given accurately tracked ITSA's statutory definition of the term "trade secret." 765 ILCS 1065/2(d). There is thus no basis to suggest that the charge given was inaccurate. But Caterpillar also offered and the Court refused detailed instructions describing items that were not properly

considered trade secrets: readily ascertainable information; information disclosed in patents; published material; information obtained by reverse engineering; and self-evident variations of known procedures. (Def.'s Proposed Instr. at 55-59, Dkt. No. 898.) The Court rejects the assertion that the failure to give these additional instructions misled the jury. Each of the concepts in Caterpillar's proffered "not a trade secret" instructions is logically inferred from the statutory definition of what is a trade secret: information that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. The Court concludes that the given instruction neither misled the jury nor deprived it of the proper direction for its analysis of the evidence. That Caterpillar's offered instructions may have been correct statements of the law did not mandate that they be given, since "a judge need not deliver instructions describing all valid legal principles." *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 923 (7th Cir. 2016) (quoting *Gehring v. Case Corp.,* 43 F.3d 340, 343 (7th Cir. 1994)).

In its final instruction-related argument, Caterpillar seeks a new trial based on the rejection of its proposed instruction listing multiple items the jury could consider in determining whether Miller had made reasonable efforts to maintain the confidentiality of its information. The proposed instruction listed eight "may-consider" factors: (1) the value of the information; (2) whether the information was marked as confidential; (3) whether Miller required its employees to sign written confidentiality agreements; (4) whether Miller had established policies and procedures for safeguarding its confidential information; (5) how widely Miller distributed the information to other companies or individuals; (6) whether Miller had written confidentiality agreements with each of the companies that received its information; (7) whether Miller had

written confidentiality agreements with companies and individuals that had access to the information; and (8) whether the information was kept under lock and key or stored on a computer with limited access. (Def.'s Supp. Instr. at 5, Dkt. No. 954.)

In the criminal law context, the Seventh Circuit has held that the rejection of instructions that attempt to define simple and commonly used terms such as "reasonable" is not error. *United States v. Lawson*, 507 F.2d 433, 442 (7th Cir. 1974) *overruled on other grounds by United States v. Hollinger*, 553 F.2d 535 (7th Cir. 1977). That principle is readily applicable here. Caterpillar cites no authority suggesting that a jury must receive instructions providing a framework for its analysis of the term;[3] its offered instruction was properly rejected.

## IV.     Caterpillar's Motion for Remittitur or Damages Retrial

ITSA permits recovery of damages for misappropriation in the amount of "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4(a). If willful and malicious misappropriation exists, ITSA permits an award of exemplary damages in an amount not exceeding twice the compensatory award. As detailed above, the jury awarded Miller $24.9 million in compensatory damages and $49.7 million in exemplary damages.

The factors to be considered in reviewing a damages award include whether the award was "monstrously excessive;" whether it had no rational connection between the award and the evidence; and whether it was roughly comparable to awards made in similar cases. *AutoZone, Inc.*, 707 F.3d at 833. Caterpillar's assault on the compensatory award here consists primarily of

---

[3] In proposing its instruction, Caterpillar cited *nClosures Inc. v. Block & Co.*, 770 F.3d 598, 602–03 (7th Cir. 2014), and *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 884–85 (N.D. Ill. 2009), as authority for its list of factors. Neither addressed whether a "reasonable efforts" instruction should have been given to a jury.

disagreement with Miller's damages expert about the extent to which its profits from the Center-Lock were attributable to its use of the Miller models and argument that the measure of its unjust enrichment should have been the amount of development costs it saved by using the Miller models rather than the amount of profit it made from Center-Lock sales. Caterpillar does not suggest that Miller's estimate of its Center-Lock sales was improperly calculated, nor does it offer examples of other verdicts from any jurisdiction that show the present award to be an outlier. Its arguments provide no basis for disturbing the jury's compensatory award.

Caterpillar contends that the jury's award of the largest statutorily permissible amount was the product of passion and prejudice rather than the evidence. But a statutory cap on damages suggests that an award of damages at the capped maximum is not outlandish and that the mere fact of an award in that amount does not establish its impropriety. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1024 (7th Cir. 2016).

## V.     Miller's Motion for Judgment as a Matter of Law

The jury returned a verdict in favor of Caterpillar on its statutory commercial disparagement and common law defamation counterclaims and awarded it damages of $1 million. Miller contends that there was insufficient evidence to support these verdicts.

### A.     Sufficiency of Evidence of Falsehood

The subject of Caterpillar's counterclaims was a January 2011 communication package sent by Miller to Caterpillar's United States dealers. (CTX151.) The package included a cover letter from Keith Miller that described its manufacture of Caterpillar's Pin Grabber Plus coupler, the end of the Miller-Caterpillar coupler production arrangement, and Caterpillar's introduction of the Center-Lock coupler. The letter referred to an "urgent safety issue," stated that the "major issue" with the Caterpillar coupler was "its potential lack of safety," and warned that "in the case

of a hydraulic malfunction or 'loss of engagement forces' the CAT designed coupler has the very real potential of dropping a bucket or attachment." The letter stated that Miller had "a strong desire not to see couplers perceived as dangerous products simply because some models have a poor design." It advised that an enclosed DVD "shows exactly what can happen," but also suggested "please don't just take our word for it, carry out the test for yourself which is described in the DVD or in the following attachment."

Keith Miller's cover letter was followed by a "Coupler Test" sheet that described recommended test procedures. Beneath a "What to look out for" heading, the sheet contained a drawing of a scoop bucket attachment falling from an excavator arm and the descriptive words "Bucket/Attachment is released from the coupler. Does not comply with EN474-1/-4/-5;2006+A1;2009 and the Machinery Directive 2006/42/EC." The aforementioned DVD included in the communication package showed video of tests of the Miller and Caterpillar couplers. A bucket was shown falling from the Caterpillar coupler and decapitating a life-sized dummy. (CTX452.) A report of a third-party entity accompanied the video and detailed its conclusions that two Miller couplers met applicable regulatory standards while Caterpillar's coupler was "deemed to be unsafe and should not be placed on the market."

Caterpillar's supplemental counterclaim alleged that Miller's January 2011 communication package was false and misleading. The jury found in Caterpillar's favor on its claim under the disparagement provisions of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2(8), which prohibits the disparagement of the goods, services, or business of another by a false or misleading representation of fact. The statute creates a cause of action for injunctive relief, not damages. *Fedders Corp. v. Elite Classics*, 268 F. Supp. 2d 1051, 1063–64 (S.D. Ill. 2003) (citing *Greenberg v. United Airlines,* 563 N.E.2d 1031, 1036–37 (Ill. App. Ct. 1990)). The

jury also found in Caterpillar's favor on its common law defamation claim, which required proof of a false statement. *Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988). The jury awarded Caterpillar damages of $1 million on this claim. Miller argues that the jury was not presented with evidence sufficient to support a finding that any of the statements in its January 2011 package to Caterpillar's dealers was false.

Miller's package stated that Caterpillar's Center-Lock coupler failed to meet a United Kingdom safety standard referred to as "EN474;" Caterpillar asserts that this statement was false. They cite as support for this assertion a June 20, 2011 letter from an inspector with the office of the United Kingdom's Health and Safety Executive ("HSE") which reported that it had tested Caterpillar's coupler for compliance with EN474 and that the result of that test was that it met the required standard. (CTX628.) In response, Miller argues that the jury heard no evidence that its accusation of non-compliance with the regulation was false when it was made in January 2011, before the HSE letter was issued.

The jury was presented with evidence that, in 2010, Miller showed HSE the results of its own tests and the supposed failures of Caterpillar's Center-Lock coupler. (CTX426.) Bill Raine, an employee of the company that conducted the demonstrations shown in the video included in Miller's January 2011 package, reported that sharing its tests with HSE resulted in "an impasse." (*Id.*) He acknowledged that the failures their tests produced relied upon the operator action of switching off the hydraulics that activated the Caterpillar coupler's locking mechanism and that they needed to come up with a test that showed that competitor couplers were unsafe without operator action on the switch. Raine also advised that Miller's new tests of competitor couplers must be one that HSE would use in its own testing program. At trial, Keith Miller conceded that despite Miller's knowledge that HSE did not consider the Miller tests to be proof of the Center-

Lock coupler's regulatory non-compliance, the company sent the January 2011 package to Caterpillar's U.S. dealers. (Tr. 1233-36.) The video included in that package depicted the test that HSE had rejected as proof of the Center-Lock coupler's failure to meet safety standards; also included was the reference to EN474 and the "Does not comply" accusation. This evidence was sufficient to permit a jury to find that when Miller sent its package to Caterpillar dealers in January 2011, it knew that HSE had not found the Center-Lock coupler to be non-compliant with its standards and also knew that the tests it was sharing with recipients of the package did not persuade HSE to make any such finding. This evidence and HSE's subsequent confirmation that the Center-Lock did comply with EN474 were sufficient to permit the jury to find that Miller's claim of non-compliance was knowingly false when it was made and to support a verdict for Caterpillar on the deceptive trade practice and defamation claims.

### B.      Sufficiency of Evidence of Intent to Injure

Under Illinois law, a defendant who makes a false statement may nonetheless be shielded from liability for defamation by a qualified privilege. *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 134–35 (Ill. 1993). After weighing the value of the interests served by the speech at issue against the defendant's right to be protected from falsehoods, the court may determine that an interest in the subject of the speech warrants a heightened burden of proof before defamation liability may be imposed. *Id.* Under the heightened burden for statements protected by the privilege, a defendant will incur liability for defamation only if he had a direct intention to injure another or a reckless disregard of the defamed party's rights and of the consequences that may result to him. *Id.* at 135. Before trial, this Court held that Miller's statements were protected by the privilege. (Oct. 21, 2015 Op. at 22, Dkt. No. 871.) The jury was therefore instructed that it could find in Caterpillar's favor on its defamation claim if it found (l)

Miller's statements referred to Caterpillar; (2) Miller's statements represent that Caterpillar lacks ability in its business; (3) Miller's statements were false; and (4) Miller knew that its statements were false, or recklessly disregarded whether its statements were false, or intended to injure Caterpillar, or recklessly disregarded Caterpillar's rights and the consequences that may result to it. (Jury Instr. at 58, Dkt. No. 1020.)

Miller argues that there was no evidence of the intent to injure necessary for imposition of liability for its statements (even if those statements were false). It asserts that its communications about the Center-Lock were merely efforts to share safety concerns and that no evidence permitted the jury to find otherwise. This assertion is readily contradicted by the record. In an April 28, 2009 email chain between Keith, Gary, and Jacqui Miller identified by the subject line, "Cat tests . . . their coupler," Gary Miller stated that because they "were not going to cat dealers" he saw "little point in spending a lot on testing." (CTX 408.) He continued, "it is still worth seeing one work and video it dropping a bucket if switched off. This could be done by us at very little expense. A full blown benchmarking test could backfire as it would give cat engineers what they are up against . . ." In response, Keith Miller agreed, and further elaborated, "It will still be good to know the details and facts on all our competitors." He continued, "We do not need to share this with Cat or anyone else if we don't want, knowledge is power." A December 29, 2009 email message from Keith Miller to Gary and Jacqui Miller referred to "the Cat attack" and Miller's need for an American marketing campaign. (CTX 420.) The message further stated, "We need a bucket to be dropped on American soil." Another message from Keith Miller to his siblings, dated May 1, 2010, said, "If we can get the HSE to test the Cat centre lock coupler and it fails this would be the best ever out come for us and our position with Cat. Can we influence this?" (CTX 195.)

This evidence was sufficient to allow the jury to discredit Miller's claims that its communication was prompted by safety concerns and to support a finding that it was instead motivated by a desire to harm the reputation of the Center-Lock coupler—either as a means of prompting Caterpillar to resume purchases of Miller couplers or to diminish its attractiveness as a competitive product.

### C. Sufficiency of Evidence of Imminent Injury

Caterpillar's statutory disparagement claim provides for injunctive relief, rather than a damages remedy, and Miller argues that Caterpillar offered no proof of imminent harm that would warrant equitable relief. In response, Caterpillar identifies evidence that, even after the filing of the present action, Miller continued to distribute the third-party report that concluded that Miller couplers met applicable regulatory standards while the Caterpillar coupler was "unsafe and should not be placed on the market." (CTX150.) Miller's reply does not dispute this assertion. Thus, the Court concludes that Caterpillar offered sufficient evidence to justify injunctive relief.

### D. Effect of Verdict on Caterpillar's Lanham Act Claim

The jury found for Miller on Caterpillar's Lanham Act claim. Miller contends that this finding dictates a finding in its favor on Caterpillar's counterclaim for commercial disparagement under the Illinois Deceptive Trade Practices Act. In support of this argument, Miller cites precedent holding that such statutory claims are to be resolved in accordance with Lanham Act claims. *See Manley v. Boat/U.S., Inc.*, 75 F. Supp. 3d 848, 853 (N.D. Ill. 2014); *Desmond v. Chicago Boxed Beef Distrib., Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013). But the cited authorities only equated the Lanham Act and Illinois claims for purposes of the legal inquiry to be conducted at the pleading dismissal stage when the same factual allegations served

as the basis for each cause of action. Neither court suggested that link between the two causes of action would permit a jury verdict on one claim to be invalidated because of a decision on the other. This Court's own research has revealed no support for this premise, and the Court further observes that the elements of the two claims differ to such a degree (Jury Instr. at 46, 52, Dkt. No. 1020) that no such support can be readily imagined. The Court therefore rejects Miller's argument that the Lanham Act verdict mandates vacation of the commercial disparagement claim.

### E. Damages Award

Miller argues that the evidence at trial showed that its January 2011 communication, even if defamatory, could not be considered *per se* defamation that relieved Caterpillar of the burden to prove actual damage. As the Court has previously ruled, Miller's statements about the unsafe nature of the Center-Lock coupler imply Caterpillar's lack of ability in its business, a category recognized by Illinois law as defamatory *per se. Green v. Rogers,* 917 N.E.2d 450, 459 (Ill. 2009). Caterpillar was not required to present evidence of actual damages.

Miller next contends that the jury's $1 million award is excessive and must be reduced. The Seventh Circuit, interpreting Illinois law, has held that jury awards for *per se* defamation claims—though inherently speculative because of the absence of any requirement of proof of damages—are entitled to some deference but cannot rise to a level that would be considered substantial. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 734 (7th Cir. 2004). In *Republic Tobacco*, the court held that an award of $1 million was appropriate for defamatory statements made by the defendant in two letters to customers. *Id.* at 721. This award was entered despite the lack of evidence of actual loss and despite the fact that the defamatory statements were made to a "relatively limited audience": the defendant's customers and potential customers.

*Id.* at 734. Following the lead of the Seventh Circuit's approach in *Republic Tobacco*, the Court will not disturb the jury's $1 million award here.

### F. Modification of Judgment Order

Miller asks that the Court's final judgment order include a more detailed explanation of the jury's verdicts than the preliminary order. (Dkt. No. 1018.) Caterpillar does not object, but proposes a different form of final order. (Def.'s Resp. at 14, n.3, Dkt. No. 1037.) Miller's motion is granted to the extent that it requests modification; the language of the Court's final judgment order shall be modified to take into account the submissions of both parties.

### CONCLUSION

For the reasons detailed above, Caterpillar's motion (Dkt. No. 1032) is denied. Miller's motion (Dkt. No. 1034) is granted to the extent that it seeks clarification of the Court's final judgment order and is otherwise denied.

ENTERED:

Dated: March 31, 2017

_____
Andrea R. Wood
United States District Judge